Dale C. Campbell, State Bar No. 99173
Charles L. Post, State Bar No. 160443
James Kachmar, State Bar No. 216781
**weintraub** genshlea chediak
a law corporation
400 Capitol Mall, 11th Floor
Sacramento, CA 95814
(916) 558-6000 – Main
(916) 446-1611 – Facsimile

Attorneys for Plaintiffs
MV Transportation, Inc. and
MV Public Transportation, Inc.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| MV TRANSPORTATION, INC., a California corporation; MV PUBLIC TRANSPORTATION, INC., a California corporation, | Case No. |
| Plaintiffs, | COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF |
| vs. | DEMAND FOR JURY TRIAL |
| JANET DAVIS; and DOES 1 through 20, inclusive, | |
| Defendants. | |

Plaintiffs MV Transportation, Inc. and MV Public Transportation, Inc. hereby allege the following:

### FACTUAL ALLEGATIONS

1.    Plaintiff MV Transportation, Inc., a California corporation, is a business headquartered in Fairfield, California, that operates a variety of transportation systems for cities, counties, transit districts, and private companies.   MV Transportation, Inc. currently operates transit systems throughout the United States.

/ / /

2.    Plaintiff MV Public Transportation, Inc. is a corporation incorporated under the laws of the State of California and is a wholly-owned subsidiary of MV Transportation, Inc. MV Public Transportation, Inc. is generally responsible for MV's operations in the western region of the United States. MV Transportation, Inc. and MV Public Transportation, Inc. are hereinafter collectively referred to as "MV."

3.    Defendant Janet S. Davis ("Davis") is an individual who currently resides in the state of Arizona. From December 2003 through October 19, 2007, Davis was an employee of MV or one of its subsidiaries. Davis was an executive vice president of MV at the time she announced her departure in October 2007. Davis had regular, frequent and substantial contacts within the State of California during her employment with MV.

4.    MV is unaware of the true names, capacities, or basis for liability of defendants sued herein as Does 1 through 100, inclusive, and therefore sue said defendants by their fictitious names. MV will amend the complaint to allege the true names, capacities, or basis for liability when the same has been ascertained.

5.    MV is informed and believes and based on such information and belief, thereon alleges that defendants sued herein as Does 1 through 100, inclusive, and each of them, are in some manner responsible for the occurrence and happenings alleged herein and that MV's damages as alleged herein were, and are, the direct, proximate and/or legal result of all of the actions of said defendants and each of them.

6.    MV is informed and believes that, at all times herein mentioned, defendants were the agents, servants, employees, and representatives of each of the remaining defendants and were acting within the scope of their ability as such agents, servants, employees and representatives, with the knowledge, consent, permission, approval and ratification of the remaining defendants.

7.    Jurisdiction is based upon diversity of citizenship, 28 U.S.C. 1332, in that both plaintiffs are citizens and residents of California, and Davis is a citizen and resident of Arizona. The amount in controversy exceeds $75,000 because, although the complaint seeks only injunctive relief, the value of the relief sought exceeds $75,000 in both the cost to MV if

Davis's conduct is permitted to continue and also Davis's potential wrongful gain by her conduct.

8.     Venue is proper in this district pursuant to 28 U.S.C. 1391(a)(2), as a substantial part of the events giving rise to the claims occurred in the Northern District.  Venue is also proper in this district pursuant to section 8.8 of the Share Purchase Agreement executed between the parties on or about December 5, 2003, which expressly provides for venue in this district.  A true and correct copy of the Share Purchase Agreement, without lengthy exhibits, is attached hereto and incorporated herein as **Exhibit 1**.

9.     MV is a transportation management company.    MV has more than 10,000 employees that work in more than 120 locations throughout 25 states, to provide a wide array of transportation solutions to public and private entities across the country.

10.     A portion of MV's business includes providing and developing paratransit services, consulting services, medical transportation, paratransit brokerage, and paratransit software application service to users throughout the United States.  In 2003, MV decided to expand its services in those areas.  In furtherance of that goal, MV sought to acquire the business and goodwill of Local Motion ITS, Inc., a Virginia corporation, ("Local Motion"), which was also involved in providing the same line of services in the paratransit and medial transportation fields to users throughout the United States.

11.     On or about December 5, 2003, MV, Local Motion, and Local Motion's four (4) shareholders entered into a Share Purchase Agreement whereby MV purchased the control and goodwill of Local Motion by acquiring eighty percent (80%) of the issued and outstanding shares of Local Motion.   The four shareholders of Local Motion were Davis, Ryan Larsen, Marsha Moore (aka Marsha Madrid), and Kevin John Dresser.  The consideration paid by MV to acquire Local Motion included, among other things:

(a)     the sum of $50,000 paid to the four shareholders;

(b)     Davis and the three other individual sellers each agreed to enter into, and did execute, a Non-Competition Agreement as required by section 4.1(i) of the Share Purchase Agreement to protect the goodwill to MV being sold to MV.  MV paid an additional

**weintraub** genshlea chediak
LAW CORPORATION

aggregate sum of $100,000 as additional consideration under the Share Purchase Agreement in recognition of the sellers' execution of their Non-Competition Agreement and transfer of Local Motion's goodwill to MV.

        (c)     an additional sum based upon the later-appraised value of real estate located in Elk Horn, Iowa; and

        (d)     hiring Davis, Moore, and Larsen as employees of Local Motion upon completion of the merger pursuant to written employment agreements.

    12.    The Share Purchase Agreement specifically referenced the importance of Local Motion's goodwill as a component of the sale. Davis, and the other sellers, covenanted in section 5.1(a) of the Share Purchase Agreement that:

    (a)    the business and affairs of [Local Motion] shall be carried on in the ordinary and normal course of the business, consistent with past practice, and in compliance with the representations, warranties, covenants and agreements contained in this Agreement and the Sellers and [Local Motion] and the Sellers shall use their best efforts to preserve the goodwill of all Persons having business relations with [Local Motion].

    (b)    [Sellers] shall not make, nor permit to be made, any material change in the way the Business or the affairs of [Local Motion] are being operated and will not take any action which would interfere with customer or supplier relationships and the future prospects which exist on the date hereof.

    13.    Davis and the other sellers each executed a Non-Competition Agreement as required under section 4.1(j) of the Share Purchase Agreement. A true and correct copy of the Non-Competition Agreement signed by Davis is attached hereto and incorporated herein as **Exhibit 2.**

    14.    Pursuant to the terms of the Non-Competition Agreement, Davis agreed:

        (a)     that MV is engaged in the business of paratransit services, consulting services, medical transportation, paratransit brokerage, and was a paratransit software application service provider;

        (b)     that the term of the Non-Competition Agreement shall be in force for a period of sixty (60) calendar months from the Closing Date;

/ / /

weintraub genshlea chediak
LAW CORPORATION

(c)    that the area covered by the Non-Competition Agreement includes all cities, counties, and states within the United States in which MV, Local Motion, or any of their subsidiaries, successor, affiliates do or market business (Share Purchase Agreement, § 1.02);

(d)    that Davis shall not in any manner directly or indirectly:

(i)    engage in, or become interested in (whether as an owner, stockholder, lender or other investor, director, officer, employee, consultant, broker, agent, trustee, landlord or otherwise) any business which offers to supply services or products substantially similar to or in competition with MV including its subsidiaries, successors or affiliates within the covenant area;

(ii)    solicit, service, divert or appropriate to any competing business customer or client or other business opportunities of MV including its subsidiaries, successors or affiliates; or

(iii)    attempt to induce any employee of MV to leave such employment.

(e)    that MV would suffer irreparable injury if Davis breached the Non-Competition Agreement and that MV would be entitled to obtain an injunction to prevent Davis's continuing breach.  Specifically, Article II of the Non-Competition Agreement states:

> In the event of breach of this Covenant set forth in this instrument, shareholders hereby acknowledge and stipulate that Purchaser [MV] and Company [Local Motion] will suffer irreparable damage for any such breach, that any remedy at law for any such breach of this Covenant would be inadequate in that the Purchaser or the Company will be entitled to both (a) a preliminary or permanent injunction to prevent the continuation of such breach, and (b) monetary damages insofar as they can be determined.  Nothing contained herein shall be construed to prohibit either the Purchaser or the Company from also pursing any other remedy, the parties having agreed that all remedies shall be cumulative.

15.    Davis agreed, by executing the Share Purchase Agreement and the Non-Competition Agreement, that she would not become involved, either directly or indirectly, in any business that offers to provide services or products substantially similar to, or in competition with, Local Motion or with MV, "including [MV's] subsidiaries, successor, or affiliates," during the tem of the covenant.  Non-Competition Agreement, § 1.02.1.  At the time of the acquisition and since, MV and its subsidiaries and affiliates have continually provided public transit services _broader_ than just paratransit services, consulting services,

1   medical transportation, paratransit brokerage, and paratransit software application service
2   provider business engaged in by Local Motion.

3       16.    At the time of the acquisition, MV and Local Motion contemplated developing
4   computer software for the scheduling, routing, reservation, or dispatching of passenger
5   transportation, transit, or paratransit vehicles, referred to as the "Transit Software Business."
6   Davis understood and agreed that entering into the software development business was part of
7   the future business expansion for MV and Local Motion, as reflected in the Share Purchase
8   Agreement. Accordingly, Davis agreed by signing her Non-Competition Agreement that, in the
9   event MV or Local Motion subsequently begins the development or completes an acquisition of
10  a company in the Transit Software Business, Davis agreed that the Non-Competition
11  Agreement would then extend to the Transit Software Business for the remaining term of the
12  Non-Competition Agreement. MV negotiated for this valuable protection since it was MV's
13  plan and intent to enter into the Transit Software Business either directly or through its
14  subsidiary Local Motion. MV knew that Davis, Moore, and Larsen had experience in the
15  Transit Software Business, and MV was acquiring the goodwill of Local Motion in order to
16  advance its desire and to enter into the Transit Software Business.

17      17.    Davis executed an Employment Agreement dated December 1, 2003 with Local
18  Motion in accordance with the terms of the Share Purchase Agreement. The Employment
19  Agreement provides that Davis was employed as a senior vice president of Local Motion for an
20  initial term of two years with automatic annual renewals unless either party provided notice on
21  or before August 1, stating that party's election not to renew the Employment Agreement.
22  Attached hereto and incorporated herein as **Exhibit 3** is a true and correct copy of Davis's
23  Employment Agreement dated December 1, 2003.

24      18.    Two other seller shareholders, Marsha Moore and Ryan Larsen, executed similar
25  employment agreements with Local Motion. One of the first employees hired by Local Motion
26  after the sale to MV was Christopher Bryan, who had previously worked with Marsha Moore
27  and Davis since at least 1993.

28  / / /

**weintraub** genshlea chediak
LAW CORPORATION

19.    Davis continued in her role as senior vice president of Local Motion until approximately January 2005 when Davis's Employment Agreement was amended. From December 2003 to January 2005, Local Motion had attempted grow its volume of business in the public and paratransit contracting services, consulting, transportation brokerage, and application service provider business. Local Motion did not succeed in those efforts as a subsidiary of MV. MV altered its business strategy and elected to attempt to grow the medical and paratransit transportation business within MV. Davis's Employment Agreement was amended on January 13, 2005 to expand her responsibilities to also include duties as the regional vice president for MV Contract Transportation, Inc. and to perform duties assigned to her by the president of MV Contract Transportation, Inc. Attached hereto and incorporated herein as **Exhibit 4** is a true and correct copy of the January 13, 2005 Amendment to Employment Agreement.

20.    Davis continued in this dual capacity as senior vice president of Local Motion and as regional vice president for MV Contract Transportation, Inc. until approximately January 1, 2006, when Davis's Employment Agreement was further amended. The January 1, 2006 Amendment to Employment Agreement effectuated an assignment by Local Motion of the entire Employment Agreement, as previously amended, to MV Public Transportation, Inc., another wholly-owned subsidiary of MV. Davis accepted the new assignment and agreed that MV Public Transportation, Inc. was her employer. Effective January 1, 2006, Davis was assigned the position of executive vice president information technology for MV Public Transportation, Inc. Attached hereto and incorporated herein as **Exhibit 5** is a true and correct copy of the Amendment to Employment Agreement dated January 1, 2006.

21.    Davis continued as executive vice president information technology for MV until she resigned in October 2007.

22.    During the course of Davis's employment by MV and its subsidiaries, Davis became knowledgeable about MV's operations across the country. Davis, in her capacity as regional vice president for MV Contract Transportation, Inc. was responsible for overseeing MV operations in the eastern region of the United States, including New York, New Jersey,

**weintraub** genshlea chediak
LAW CORPORATION

Maryland, Rhode Island, and Pennsylvania. Similarly, as executive vice president information technology, Davis was responsible for overseeing MV's information technology operations for all of the United States.

23. Since January 2006, after Davis became MV's executive vice president information technology, she was exposed to and became responsible for overseeing and managing the information technology and information systems for all of MV and its subsidiaries. Since January 1, 2006, Davis would also be assigned to certain operations to improve performance at those locals. As such, Davis became intimately knowledgeable about MV's information technology infrastructure, including both hardware and software applications.

24. Shortly after acquiring Local Motion, MV started to develop its own proprietary software application and reports for improving and facilitating the management of public and private transportation systems. Davis, both in her capacity as regional vice president of MV Contract Transportation, Inc., as well as in her role as executive vice president information technology for all of MV, became familiar with, and participated with numerous other MV officers and employees in, the development of the custom design, functionality, and user interfaces of MV's proprietary public transportation management software, applications, and reports.

25. MV has been very successful in developing a full suite of custom and proprietary software programs, applications, and automated reports. The proprietary software that MV has developed includes both standalone transportation management programs and customized applications that interface with the Trapeze scheduling software. MV's proprietary software includes a series of tools allowing MV and its clients to identify potential trouble spots in "real time" in order to implement prompt fixes; allowing employees to perform at higher levels by providing simplified real time scheduling and routing information; providing automated information systems accessible to passengers to allow for a better passenger experience; and providing improved real time performance reports to MV's executives for quicker managerial response.

///

**weintraub** genshlea chediak
LAW CORPORATION

26.    Davis's Employment Agreement includes a provision under which Davis expressly agreed that all proprietary information learned by Davis in the course of her employment with MV was confidential and belonged to MV and that Davis would keep and hold all such proprietary information in confidence and trust as a fiduciary.    Specifically, section 6.1 of Davis's Employment Agreement provides, in pertinent part:

> Employee agrees that all trade secrets, confidential or proprietary information with respect to the activities and businesses of the Company, including, without limitation, personnel information, secret processes, know-how, customer lists, employee lists, data bases, ideas, techniques, processes, inventions (whether patentable or not), and other technical plans, business plans, marketing plans, product plans, forecasts, contacts, strategies and information (collectively "Proprietary Information") which were learned by Employee in the course of her employment by the Company, and any other Proprietary Information received, developed or learned by Employee hereafter in the course of her future employment by or in association with the Company, are confidential and will be kept and held in confidence and trust as a fiduciary by Employee.

27.    Davis, in section 6.2 of her Employment Agreement, further agreed that her breach of section 6.1 "will result in irreparable harm and damage to [MV] which cannot be compensated adequately by a monetary award." and that, in addition to any other remedies at law, and notwithstanding the arbitration provision contained in section 9 of her Employment Agreement:

> MV will be entitled to the immediate remedy of a temporary restraining order, preliminary injunction, or such other form of injunctive or equitable relief as may be used by any court of competent jurisdiction to restrain or enjoin any of the parties to this [Employment] Agreement from breaching any such covenant or restriction, or otherwise specifically to enforce the provision contained in section 6.1 and Article 7 of this [Employment] Agreement.

28.    On or about Wednesday, October 10, 2007, Davis announced her resignation from MV.    Davis has advised several MV officers that she was leaving MV to join Veolia Transportation ("Veolia"), a major competitor of MV.    MV is informed and believes that Davis started employment with Veolia on or about October 22, 2007.

29.    Veolia claims to be North America's largest private transportation provider and is a direct competitor of MV.    MV is informed and believes that Veolia provides the same range of transportation solutions that MV provides, including private paratransit services, bus rapid

/ / /

**weintraub** genshlea chediak
LAW CORPORATION

1  transit, and shared ride transportation.  Veolia markets itself as having a solution for all
2  transportation needs.

3      30.    Sean Kimble, MV's executive vice president for human relations, conducted
4  Davis's exit interview from MV.  During the course of the interview, Davis told Mr. Kimble that
5  her new position at Veolia would be exactly the same position and role that she held with MV.

6      31.    Davis also told Sean Kimble that she was taking another employee, Christopher
7  Bryan, "with her" to Veolia.  Christopher Bryan was MV's director of information technology.
8  Davis further advised Sean Kimble that she and Christopher Bryan had received an offer of
9  employment from Google, but Christopher Bryan did not want to go to Google.  Davis
10  decided to accept the position with Veolia since she and Christopher Bryan were a package
11  deal.  Davis has admitted to MV's chief information officer that Davis and Christopher Bryan
12  were a "package deal" that Davis negotiated with Veolia.  On October 11, 2007, the day
13  after Davis announced her resignation, Christopher Bryan tendered his resignation from MV.
14  Mr. Bryan's last day of employment at MV was October 26, 2007.

15      32.    MV currently provides transportation services to Access Services, as a paratransit
16  project provided by the Southwest Ohio Regional Transportation Authority, a public entity
17  located in Cincinnati, Ohio.  MV's transportation services contract with Access Services expires
18  in February 2008, and Access Services has started the bidding process for the successor
19  contract.  On October 12, 2007, Access Services held an informational meeting for interested
20  bidders.  Veolia and MV both had employees present during the informational meeting.
21  During the meeting, the representative from Access Services advised the bidders that the
22  computer screens and user interfaces visible on the scheduling monitors were proprietary to MV
23  and, if the new contract was awarded to a provider other than MV, the new provider would be
24  required to supply its own software in order to satisfy the contract requirements.  In response,
25  one of the Veolia representatives stated, "Don't worry, we have that covered."

26      33.    After the meeting, the director of Access Services approached Bodie Lyon and
27  Chad Hockman, MV's regional vice president for the central region and MV's general
28  manager of operations in Cincinnati, and told them that the Veolia representative had just

weintraub genshlea chediak
LAW CORPORATION

informed Access Services that Davis and Christopher Bryan were leaving MV and joining Veolia. This was the first time either Mr. Lyon or Mr. Hockman heard that Davis was leaving MV. MV considered this to be a very serious situation coming at a very critical time since Christopher Bryan was MV's primary technology contact with Access Services and installed and serviced MV's proprietary software applications for Access Services. Lyon immediately called Jon Monson, MV's president and CEO, and confirmed Davis and Bryan were leaving MV.

34.    Based upon the statements by Davis and Veolia alleged above, MV is informed and believes that Davis and Christopher Bryan are working for Veolia in direct competition with MV and their responsibilities will be to improve and upgrade Veolia's computerized scheduling programs and methodology.

35.    As Davis agreed in executing the Non-Competition Agreement, MV will suffer irreparable damage from Davis's breach of the Non-Competition Agreement and that any remedy at law for Davis's breach would be inadequate. Davis expressly agreed that, in light of such irreparable damage, MV would be entitled to both (a) a preliminary and permanent injunction to prevent the continuation of such breach; and (b) monetary damages insofar as they can be determined.

36.    The Share Purchase Agreement, section 8.3, provides that disputes respecting any matter contemplated by the Stock Purchase Agreement, which would include the Non-Competition Agreement and Davis's Employment Agreement, were subject to arbitration with the express exception that MV is entitled to seek injunctive relief in Court. Both the Non-Competition Agreement at Article II and the Employment Agreement at section 6.2 expressly provide that MV may bring a court action to obtain a temporary restraining order, preliminary injunction or other injunctive or equitable relief if necessary to avoid irreparable damage or to preserve the status quo.

37.    On or about November 6, 2007, MV notified Davis of the existence of an arbitrable dispute under the Share Purchase Agreement, her Non-Competition Agreement, and her Employment Agreement as amended. MV also advised Davis of its intent to seek injunctive relief from this Court.

weintraub genshlea chediak
LAW CORPORATION

# FIRST CAUSE OF ACTION

## (Preliminary and Permanent Injunctive Relief)

### (Against Davis and Does 1 through 20)

38.   MV realleges and incorporates herein by reference paragraphs 1 through 37 above as if set forth in full.

39.   Davis breached the Non-Competition Agreement and Share Purchase Agreement by soliciting Christopher Bryan to work for a competitor of MV while Davis was still employed as an officer of MV.  Davis has further breached the Non-Competition Agreement by accepting employment with Veolia, an MV competitor.  Davis's wrongful conduct interferes with MV's business and restricts MV from fully enjoying the goodwill of the business it purchased under the Share Purchase Agreement.  Unless enjoined by this Court, MV will suffer great and irreparable injury to its business, its business reputation, and its goodwill with customers and vendors.

40.   MV is informed and believes, and thereon alleges, that Davis possesses proprietary information belonging to MV with respect to MV's secret processes, know-how, data bases, idea, techniques, and other proprietary information within the meaning of Article 6 or Article 7 of Davis's Employment Agreement.   Davis's current employer, Veolia, has publically stated that, after the date Veolia had hired Davis and Christopher Bryan from MV, Veolia had covered the ability to match MV's proprietary software applications.

41.   MV is informed and believes that, unless enjoined by this Court, Davis will continue to violate the Non-Competition Agreement, continue to disrupt MV's business, harm MV's business reputation and good will, and solicit MV's vendors and current and prospective customers, solicit MV's current and prospective employees and MV will be required to maintain a multiplicity of judicial proceedings to protect its interests.  MV is also informed and believes that issuance of a temporary restraining order and preliminary and permanent injunctions is necessary to restrain Davis from breaching section 6.1 of her Employment Agreement obligating her to maintain the confidentiality of MV's proprietary information.

/ / /

**weintraub** genshlea chediak
LAW CORPORATION

Complaint for Preliminary and
Permanent Injunctive Relief

42.    Accordingly, MV requests that the Court issue preliminary and permanent injunctive relief enjoining Davis and Does 1 through 100, and each of them:

(1)    from breaching the Share Purchase Agreement and specifically the Non-Competition Agreement found therein, including, but not limited to, any breach or continued break of section 1.01.1 (non-competition) and section 1.02.3 (non-solicitation of employee);

(2)    from providing confidential, trade secret, and/or proprietary information to Veolia, a direct competitor of MV, or to any other third party;

(3)    from soliciting any of MV's current or prospective customers using MV's trade secret, proprietary and/or confidential information;

(4)    from soliciting any of MV's current or prospective employees;

(5)    and requiring Davis and Does 1 through 100, and each of them, to turn over to MV any and all confidential information, proprietary information, trade secrets, and/or any other property of MV in their possession, custody, or control.

## PRAYER

WHEREFORE, MV prays for judgment against defendants, jointly and severally, as follows:

1.    for a temporary restraining order, providing that defendants and each of them, and their officers, agents, employees, representatives and all persons acting in concert or participating with them, are restrained and enjoined from engaging in or performing directly or indirectly all of the following acts:

2.    for an order requiring defendants and each of them to show cause, if any, they have why they should not be preliminarily and permanently enjoined as hereinafter set forth during the pendency of this action;

(a)    violating the employee non-solicitation provisions of the Non-Competition Agreement;

(b)    using or disclosing MV's confidential, trade secret, and/or proprietary information to Veolia, a direct competitor of MV, or to any other third party;

(c)    soliciting any of MV's current or prospective employees;

**weintraub** genshlea chediak
LAW CORPORATION

(d)    soliciting any of MV's current or prospective customers, using NV's trade secret, proprietary and/or confidential information;

(e)    destroying, concealing from MV or disclosing of MV's confidential, proprietary, and/or trade secret information;

(f)    copying, disseminating, duplicating, conveying, communicating or destroying any and all confidential customer information, confidential employee information, proprietary software functionality, business methods, and/or other proprietary information of MV in the custody or control of Davis or her agents, servants, employees and representatives, and all persons acting in concert or participating with her;

(g)    concealing, modifying, or destroying any confidential customer information, trade secrets, proprietary information, and/or any other MV property; and

(h)    using any of MV's confidential customer information, confidential employee information, and/or any other property of MV in the possession, custody, or control of Davis, and other than for the purpose of its immediate turnover to MV;

3.    for a preliminary and permanent injunction, providing that defendants and each of them, and their officers, agents, employees, representative and all persons acting in concert or participating with them, are restrained and enjoined from engaging in or performing directly or indirectly all of the following acts:

(a)    any violation or continuing violation of the Share Purchase Agreement and specifically sections 1.02.1 and 1.02.3 of the Non-Competition Agreement;

(b)    using or disclosing MV's confidential, trade secret, and/or proprietary information to Veolia, a direct competitor of MV, or to any other third party;

(c)    soliciting any of MV's current or prospective employees;

(d)    soliciting any of MV's current or prospective customers, using NV's trade secret, proprietary and/or confidential information;

(e)    destroying, concealing from MV or disclosing of MV's confidential, proprietary, and/or trade secret information;

/ / /

**weintraub** genshlea chediak
LAW CORPORATION

1    (f)    copying, disseminating, duplicating, conveying, communicating or

2    destroying any and all confidential customer information, confidential employee information,

3    proprietary software functionality, business methods, and/or other proprietary information of

4    MV in the custody or control of Davis or her agents, servants, employees and representatives,

5    and all persons acting in concert or participating with her;

6    (g)    concealing, modifying, or destroying any confidential customer

7    information, trade secrets, proprietary information, and/or any other MV property; and

8    (h)    using any of MV's confidential customer information, confidential

9    employee information, and/or any other property of MV in the possession, custody, or control

10    of Davis, and other than for the purpose of its immediate turnover to MV;

11    4.    orders, as appropriate, to compel or otherwise effectuate the arbitration

12    provisions of section 8.3 of the Share Purchase Agreement;

13    5.    MV's costs of suit and reasonable attorneys' fees; and

14    6.    all other remedies the Court deems just and proper.

15

16    Dated:  November 8, 2007                    Respectfully submitted,

17                                                WEINTRAUB GENSHLEA CHEDIAK
                                                  Law Corporation
18

19

20    By:_____/S/ Dale C. Campbell_____
                                                  Dale C. Campbell
                                                  State Bar No. 99173
21
                                                  Attorneys for Plaintiffs
22                                                MV Transportation, Inc. and
                                                  MV Public Transportation, Inc.
23

24    ///

25    ///

26    ///

27    ///

28    ///

**weintraub** genshlea chediak
LAW CORPORATION

DEMAND FOR JURY TRIAL

Plaintiffs MV Transportation, Inc. and MV Public Transportation, Inc. hereby demand a trial by jury.


Dated:  November 8, 2007                    Respectfully submitted,

                                            WEINTRAUB GENSHLEA CHEDIAK
                                            Law Corporation


                                            By:_____/S/  Dale C. Campbell_____
                                                    Dale C. Campbell
                                                    State Bar No. 99173

                                                    Attorneys for Plaintiffs
                                                    MV Transportation, Inc. and
                                                    MV Public Transportation, Inc.

**EXHIBIT 1**

## SHARE PURCHASE AGREEMENT

**THIS AGREEMENT** is made as of the 5th day of December, 2003.

**B E T W E E N:**

**Ryan James Larsen, Marsha Louise Madrid, Janet Sue Davis and Kevin John Dresser**

(collectively, the "Sellers")

- and -

**MV TRANSPORTATION, INC.**, a corporation incorporated under the laws of the State of California,

(the "Purchaser")

- and -

**LOCAL MOTION ITS, INC.**, a corporation duly incorporated under the laws of Virginia,

(the "Company").

**WHEREAS** the Sellers collectively are the registered and beneficial owners of and control all of the issued and outstanding shares in the capital stock of the Company (the "Shares");

**AND WHEREAS** the Sellers desire to sell and the Purchaser desires to purchase 80% of the issued and outstanding Shares on the terms and conditions of this Agreement;

**NOW THEREFOR THIS AGREEMENT WITNESSES THAT** in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration (the receipt and sufficiency of which is hereby acknowledged by each of the parties hereto),  the parties hereto agree as follows:

\

## SHARE PURCHASE AGREEMENT

**THIS AGREEMENT** is made as of the 5th day of December, 2003.

**B E T W E E N:**

> **Ryan James Larsen, Marsha Louise Madrid, Janet Sue Davis and Kevin John Dresser**
>
> (collectively, the "Sellers")
>
> - and -
>
> **MV TRANSPORTATION, INC.**, a corporation incorporated under the laws of the State of California,
>
> (the "Purchaser")
>
> - and -
>
> **LOCAL MOTION ITS, INC.**, a corporation duly incorporated under the laws of Virginia,
>
> (the "Company").

    **WHEREAS** the Sellers collectively are the registered and beneficial owners of and control all of the issued and outstanding shares in the capital stock of the Company (the "Shares");

    **AND WHEREAS** the Sellers desire to sell and the Purchaser desires to purchase 80% of the issued and outstanding Shares on the terms and conditions of this Agreement;

    **NOW THEREFOR THIS AGREEMENT WITNESSES THAT** in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration (the receipt and sufficiency of which is hereby acknowledged by each of the parties hereto), the parties hereto agree as follows:

12/5/03

2

## SHARE PURCHASE AGREEMENT

**THIS AGREEMENT** is made as of the 5th day of December, 2003.

**B E T W E E N:**

**Ryan James Larsen, Marsha Louise Madrid, Janet Sue Davis and Kevin John Dresser**

(collectively, the "Sellers")

- and -

**MV TRANSPORTATION, INC.,** a corporation incorporated under the laws of the State of California,

(the "Purchaser")

- and -

**LOCAL MOTION ITS, INC.,** a corporation duly incorporated under the laws of Virginia,

(the "Company").

**WHEREAS** the Sellers collectively are the registered and beneficial owners of and control all of the issued and outstanding shares in the capital stock of the Company (the "Shares");

**AND WHEREAS** the Sellers desire to sell and the Purchaser desires to purchase 80% of the issued and outstanding Shares on the terms and conditions of this Agreement;

**NOW THEREFOR THIS AGREEMENT WITNESSES THAT** in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration (the receipt and sufficiency of which is hereby acknowledged by each of the parties hereto), the parties hereto agree as follows:

12/5/03

3

12/05/2003  10:58    712-764-2773    MARNE-EH TELE    PAGE 02

## SHARE PURCHASE AGREEMENT

**THIS AGREEMENT** is made as of the 5th day of December, 2003.

**B E T W E E N:**

> **Ryan James Larsen, Marsha Louise Madrid, Janet Sue Davis and Kevin John Dresser**
>
> (collectively, the "Sellers")
>
> - and -
>
> **MV TRANSPORTATION, INC.,** a corporation incorporated under the laws of the State of California,
>
> (the "Purchaser")
>
> - and -
>
> **LOCAL MOTION ITS, INC.,** a corporation duly incorporated under the laws of Virginia,
>
> (the "Company").

**WHEREAS** the Sellers collectively are the registered and beneficial owners of and control all of the issued and outstanding shares in the capital stock of the Company (the "Shares");

**AND WHEREAS** the Sellers desire to sell and the Purchaser desires to purchase 80% of the issued and outstanding Shares on the terms and conditions of this Agreement;

**NOW THEREFOR THIS AGREEMENT WITNESSES THAT** in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration (the receipt and sufficiency of which is hereby acknowledged by each of the parties hereto), the parties hereto agree as follows:



4

**ARTICLE I**
**INTERPRETATION**

**1.1    Definitions**. Whenever used in this Agreement, unless there is something in the subject matter or context inconsistent therewith, the following words and terms shall have the respective meanings ascribed to them:

(a)    "**Agreement**" means this Share Purchase Agreement, including the Schedules listed in Section 1.3, and all amendments hereto and restatements hereof;

(b)    "**Authority**" means any governmental or regulatory authority, body, agency or department, whether federal, state, county or local, having jurisdiction over the any of the Sellers, the Company or the Business or any aspect thereof;

(c)    "**Business**" means all of the business of paratransit services, consulting services, medical transportation, paratransit brokerage and paratransit software Application Service Provider (ASP) services provided in the United States of America.

(d)    "**Business Day**" means a day other than a Saturday, Sunday or any day on which the principal commercial banks located at San Francisco, California are not open for business during normal banking hours;

(e)    "**Closing**" means the completion of the sale to and purchase by the Purchaser of the Shares hereunder by the Sellers, by the transfer and delivery of documents of title to the Shares and the payment of the Purchase Price in accordance with the terms of this Agreement;

(f)    Not applicable.

(g)    "**Closing Date**" means December 1, 2003 or such other date as the Parties may agree upon;

(h)    "**Closing Time**" means 10:00 A.M. on the Closing Date, or such other time as the Parties may agree upon;

(i)    "**Code**" means the Internal Revenue Code of 1986, as amended;

(j)    "**Consents**" means all consents or approvals from any party to an indenture, mortgage, lease, quota, permit, instrument, license, contract, agreement, arrangement or understanding to which the Company or any of the Sellers is a party or by which any of them or the assets of the Company is bound, required for the execution of this Agreement, the Closing or the performance of any terms hereof and the completion of the transactions contemplated by this Agreement;

(k)    Not applicable.

(l)   **"Encumbrance"** shall include any mortgage, deed of trust, lien, pledge, charge, security interest, restriction, claim, encumbrance, right to use or acquire, ownership interest, action or demand of any nature whatsoever;

(m)   **"Environmental Laws"** shall include all applicable federal, state, regional, municipal or local laws, statutes, regulations, ordinances, rules, policies, guidelines, decrees, orders, authorizations, approvals, notices, licenses, permits, directives or other requirements of any Authority, court, tribunal or other similar body, relating to environmental or occupational health and safety matters;

(n)   **"Environmental Orders"** means applicable orders, decisions, directions, notices and the like rendered by any Authority under or pursuant to any Environmental Laws;

(o)   **"Environmental Permits"** means all permits, certificates, approvals, certificates of approval, registrations and licenses issued by any Authority and relating to or required for the operation of the Business and the Property in compliance with all Environmental Laws and Environmental Orders;

(p)   **"ERISA"** means the Employee Retirement Income Security Act, as amended;

(q)   Not Applicable.

(r)   **"GAAP"** means generally accepted accounting principles applied in the United States in a manner consistent with prior periods;

(s)   **"Hazardous Substances"** means poly-chlorinated biphenyl wastes, asbestos, urea formaldehyde foam insulation, petroleum, petroleum by-products and any other substance or material that is prohibited, controlled or regulated under any Environmental Laws;

(t)   **"Hazardous Waste"** means any contaminants, pollutants and dangerous substances, including asbestos, liquid waste, special waste, toxic substances, hazardous or toxic chemicals, Hazardous Substances and "hazardous substances" "hazardous wastes" or "hazardous materials" as defined in or pursuant to any Environmental Laws;

(u)   Not applicable.

(v)   **"Financial Statements"** means the financial statements of the Company, consisting of a  balance sheet as of November 30, 2003 and a  statement of income (loss), and a statement of cash flows for the eight months November 30, 2003 , all of which are set out in Schedule 3.1(l);

(w)   Not applicable.

6

(x)     "**Parties**" means the Sellers, the Company and the Purchaser, collectively; and "**Party**" means any one of them;

(y)     "**Pension Authorities**" means the applicable federal and state pension Authorities, including the Internal Revenue Service;

(z)     "**Pension Contracts**" means texts and amendments to all Plans and all collective bargaining agreements, employment contracts, trust and funding agreements and applicable insurance contracts of the Company;

(aa)     "**Pension Legislation**" means ERISA and all other applicable state or federal pension benefits legislation including, where applicable, the Code;

(ab)     "**Person**" includes any individual, corporation, limited liability company, partnership, trustee or trust, unincorporated association, organization, syndicate, executor, administrator or other legal or personal representative or other legal entity and pronouns have a similarly extended meaning;

(ac)     "**Personal Property Leases**" means all of the leases, subleases, licenses, agreements and other arrangements and instruments relating to equipment, office equipment, furniture, machinery, vehicles, fixtures, computer hardware and software and other personal property and fixtures to which the Company is a party or by which the Company is bound, including those set out in Schedule 3.1(x).

(ad)     "**Plan Terms**" means the terms and conditions of all Plan texts and amendments thereto;

(ae)     "**Plans**" means all pension and employee benefit plans established or maintained for, or to which the Company has contributed to in respect of, any officers, employees and former officers and employees of the Company or predecessor companies and their beneficiaries, including, where applicable: (i) the assets and funds maintained to provide benefits under or related to Plans; and (ii) Plan Terms;

(af)     "**Predecessors**" means any owner, occupier or Person who previously had charge, management or control of the Real Property or any other real property which has been at any time under the control of the Company or where the Company carries on or has carried on the Business, or any part thereof;

(ag)     "**Purchase Price**" means the price to be paid by the Purchaser to the Sellers for the purchase of the Shares, as set out in Article II of this Agreement;

(ah)     "**Purchaser's Adjustment Amount**" means the amount which the final shareholder's deficit of the Company is less than $199,600.00.

(ai)     "**Real Property**" means all of the real property owned by the Company, including the real property described in Schedule 3.1(s);

7

(aj)  **"Real Property Leases"** means all of the leases, subleases, licenses, agreements and other arrangements and instruments relating to real property to which the Company is a party or by which the Company is bound, copies of which are included in Schedule 3.1(s1);

(ak)  "**Regulatory Approvals**" means all approvals, permits, sanctions, rulings, orders, declarations or consents from any Authority or self-regulatory organization within or outside of the United States required for the execution of this Agreement, the Closing or the performance of any terms hereof and the completion of the transactions contemplated by this Agreement;

(al)  **"Related Persons"** or "persons related to each other" means (i) individuals connected by blood relationship, marriage or adoption, (ii) a corporation and: (A) the person who controls the corporation, if any; (B) any member of a related group that controls the corporation, if any; and (C) any person related to a person described in (A) or (B) above, (iii) any two corporations if: (A) they are controlled by the same person or group of persons; (B) they are each controlled by one person and the two control persons are related to each other; (C) one corporation is controlled by one person who is related to any member of a related group that controls the other corporation; (D) one corporation is controlled by one person who is related to each member of an unrelated group that controls the other corporation; (E) one corporation is controlled by a related group, any member of which is related to each member of an unrelated group that controls the other corporation; or (F) both corporations are controlled by unrelated groups and each member of one unrelated group is related to at least one member of the other unrelated group, (iv) a trust and its settlor, its beneficiaries and any Person the trust controls; and (vii) a partnership and any partner that controls it.

(am)  "**Release**" means a releasing, spilling, emitting, depositing, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, disposing or dumping which is in breach of any Environmental Law, Environmental Regulation or Environmental Order;

(an)  **"Shareholders Deficit"** means the amount by which the liabilities of the Company exceed the assets of the Company in accordance with United States Generally Accepted Accounting Principals.

(ao)  **"Shareholders Equity"** means the amount that by which the assets of the Company exceed the liabilities of the Company in accordance with United States Generally Accepted Accounting Principals.

(ap)  "**Shares**" means all of the issued and outstanding shares in the capital stock of the Company;

(aq)  "**Tax**" means all federal, state and local governmental taxes, levies, duties,

assessments, reassessments and other charges of any nature whatsoever, whether direct or indirect, including income tax, franchise tax, profits tax, gross receipts tax, Company tax, commodity tax, sales and use tax, wage tax, payroll tax, worker's compensation levy, capital tax, stamp duty, real and personal property tax, land transfer tax, customs or excise duty, fuel tax, excise tax, turnover or value added tax on goods sold or services rendered, withholding tax, pension plan, social security and unemployment insurance charges or retirement contributions, and any interest, fines, additions to tax and penalties thereon;

(ar)    Not Applicable.

(as)    **"Sellers' knowledge"** (and similar phrases such as "to the knowledge of the Sellers") means facts or matters which are or were actually known to each of the Sellers having reviewed all relevant records and made all due enquiries of all appropriate officers and employees of the Corporation and all other Persons to whom enquiries ought reasonably be made in the circumstances, or which should have been known to any of the Sellers if they had reviewed all relevant records and made all such due enquiries; and

(at)    Not Applicable.

Terms defined in the preamble to this Agreement shall have the same meanings in this Agreement as ascribed to them in the preamble.

**1.2    Construction.**  In this Agreement:

(a)    words denoting the singular include the plural and vice versa, and words denoting any gender include all genders;

(b)    the word "includes" or "including" shall mean "includes without limitation" or "including without limitation", respectively;

(a)    Related Persons shall be deemed not to deal at arm's length with each other and Persons who are not Related Persons shall be deemed not to deal at arm's length with each other where a common mind directs the bargaining for both such Persons as parties to any transaction and where both such Persons act in concert without separate interests;

(b)    any reference to a statute shall mean the statute in force, as amended from time to time, and any regulation in force thereunder, unless otherwise expressly provided;

(c)    the use of headings is for convenience of reference only and shall not affect the construction of this Agreement;

(d)    references herein to Articles, Sections, subsections, clauses, and Schedules are references to Articles, Sections, subsections and clauses of and Schedules to this

Agreement unless the context otherwise requires;

(e)    when calculating the period of time within which or following which any act is to be done or step taken, the date which is the reference day in calculating such period shall be excluded. If the last day of such period is not a Business Day, the period shall end on the next Business Day;

(f)    all dollar amounts are expressed in U.S. funds;

(g)    any tender of documents or money under this Agreement may be made upon the parties or their respective counsel and money may be tendered by bank draft (in U.S. funds), by negotiable check payable in U.S. funds and certified at the payee's request by a U.S. bank or by wire transfer of immediately available funds payable at par in the United States; and

(h)    all accounting terms shall have the meanings ascribed to them in accordance with generally accepted accounting principles, and all references to "generally accepted accounting principles" shall be deemed to be, unless otherwise specified, reference to accounting principles which are generally accepted in the United States.

{The remainder of this page is deliberately blank}

**1.3    Schedules.**  The following schedules are incorporated into this Agreement as if they were set out in full herein, and shall be deemed to be an integral part of this Agreement:

| | | |
|---|---|---|
| Schedule 2.2 | - | Purchase Price Distribution |
| Schedule 2.8(a) | | Form of Company Stock Option Plan |
| Schedule 2.8(b) | | Form of Stock Option Agreements |
| Schedule 3.1(b) | - | Corporate Matters |
| Schedule 3.1(e) | - | Regulatory Approvals and Consents |
| Schedule 3.1(g) | - | Shares/Capitalization |
| Schedule 3.1(k) | - | Permits, Licenses, Registrations and Authorizations |
| Schedule 3.1(l) | - | Financial Statements |
| Schedule 3.1(m) | - | Liabilities, performance bonds, letters of credit |
| Schedule 3.1(r) | - | Encumbrances |
| Schedule 3.1(s) | - | Real Property |
| Schedule 3.1(s1) | | Real Estate Leases |
| Schedule 3.1(t) | - | Environmental Matters |
| Schedule 3.1(u) | - | Fixed Assets |
| Schedule 3.1(w) | - | Vehicles |
| Schedule 3.1(x) | - | Personal Property Leases |
| Schedule 3.1(y) | - | Accounts Receivable |
| Schedule 3.1(aa) | - | Revenue Contracts |
| Schedule 3.1(ab) | - | Insurance Policies |
| Schedule 3.1(ac) | - | Intellectual Property |
| Schedule 3.1(ad) | - | Material Contracts |
| Schedule 3.1(ae) | | Purchasing Contracts |
| Schedule 3.1(ai) | - | Employment Matters |
| Schedule 3.1(ak) | - | Pension and Benefit Matters |
| Schedule 3.1(an) | - | Bank Accounts |
| Schedule 3.1(ao) | - | Contracts with Non-Arms Length Persons |
| Schedule 3.1(ap) | - | Non-Compete   Agreements   with   other   Parties |
| Schedule 3.1(ar) | | Schedule of Outstanding Proposals |
| Schedule 3.8 | | Form of Shareholder Agreement |
| Schedule 4.1(g) | - | Form of Sellers' Closing Opinion |
| Schedule 4.1(h) | - | Form of Release |
| Schedule 4.1(j) | - | Form of Non-Competition Agreement |
| Schedule 4.1(k) | - | Form of Employment Agreements |
| Schedule 4.1(l) | - | Encumbrances to be Discharged |

## ARTICLE II
## PURCHASE AND SALE

**2.1     Purchase and Sale.** Subject to the terms and conditions of this Agreement, the Sellers shall sell, transfer and deliver to the Purchaser and the Purchaser shall purchase 800 Shares (the "Purchased Shares"), representing 80% of the issued and outstanding Shares of the Company, for a total purchase price of FIFTY THOUSAND DOLLARS ($50,000). The Purchase Price shall be adjusted in accordance with the provisions of Section 2.7.

**2.2     Payment.**     Subject to the terms and conditions of this Agreement, at Closing the Purchaser shall pay the sum of $50,000.00 (subject to subsequent adjustment as provided in Section 2.7) to the Sellers in accordance with Schedule 2.2 (the "Closing Cash Payment").

**2.3     Non-Competition Payments.** In consideration of each of the Sellers, Ryan James Larsen, Marsha Louise Madrid, Janet Sue Davis and Kevin John Dresser (hereinafter collectively, the "Covenantors") entering into the Non-Competition Agreements, as required by Section 4.1(j), the Purchaser shall pay to the Covenantors the aggregate sum of ONE HUNDRED THOUSAND DOLLARS ($100,000.00) (the "NC Funds") in one instalment of $100,000.00 payable on the Closing.

**2.4     Closing.** The Closing shall take place on or about December 1, 2003.  At Closing the Sellers shall transfer and deliver to the Purchaser the stock certificates representing the Purchased Shares duly endorsed in blank for transfer or accompanied by irrevocable stock transfer powers of attorney duly executed in blank, in either case by the holders of record thereof. The Sellers shall take such steps as shall be necessary to cause the Company to enter the Purchaser or its nominee upon the books of the Company as the holder of the Purchased Shares and to issue one or more share certificates to the Purchaser representing the Purchased Shares.

**2.5     Tender.** Any tender of documents hereunder may be made upon the Parties or, in the case of any Sellers not present at Closing, upon agent, and money shall be tendered by certified check bank draft or wire transfer of federal funds in accordance with the respective instructions provided by the Sellers, at the sole discretion of the Purchaser.

**2.6     Sellers' Liabilities.**     Notwithstanding that the Purchaser is purchasing the Purchased Shares, and notwithstanding anything in this Agreement, it is agreed by the Parties that the Sellers shall retain: (a) all matters, claims, actions, suits, administrative and judicial proceedings, debts, liabilities, obligations, costs and expenses whatsoever and howsoever arising, direct or indirect, known or unknown, contingent or absolute, express or implied, asserted or unasserted, statutory or otherwise resulting from, arising out of or relating to the period prior to the Closing Date and (b) any and all Taxes imposed upon or with respect to the Company or its assets, operations or activities relating to the period up to and including the Closing Date (collectively, the "Sellers' Liabilities."). Sellers' liabilities shall not include normal trade payables and accrued payroll expense which shall

remain a liability of the Company after closing.

**2.7    Purchase Price Adjustment.**  The Purchase Price in Section 2.1 and the Payment in Section 2.2 shall be increased by the appraised value of the real property listed in Schedule 3.1(s) herein.   The Purchaser and Sellers shall each retain a real estate appraiser experienced in the appraisal of commercial real estate to conduct an independent appraisal of the value of the land and building of the real property in Schedule 3.1(s).   When the appraisals from the Purchaser's appraiser and Sellers' appraiser are received, if the amount of difference between the two appraisals is fifteen percent (15%) or less, the two appraisals will be averaged and said average value shall be added to the cash purchase price paid by Purchaser to Sellers at Closing.  Purchaser shall bear the cost of the appraisals.  In the event the difference between the appraisal of the Purchaser's appraiser and the Sellers' appraiser is greater than fifteen percent (15%), then Purchaser and Sellers shall attempt to negotiate an amount acceptable to the parties. In the event the parties are unable to agree, then the Purchaser's appraiser and the Sellers' appraiser shall agree to the appointment of a third appraiser, not affiliated to Purchaser, Sellers, the Purchaser's appraiser or the Sellers' appraiser.   The third appraiser's appraisal shall be final and determine the amount of the Purchase Price adjustment for the real property listed in Schedule 3.1(s).  Purchaser and Sellers shall instruct all appraisers to consider the impact of the restrictions contained in Schedule 3.1(s) herein when establishing the appraised value of the real property.  In the event a third appraisal is necessary, the Purchaser and Sellers agree to divide the cost of this appraisal equally.

In the event the independent appraisal of the real estate is not completed by the date of closing, the Purchaser shall place in escrow, with the law firm Gaw, Van Male, Smith, Myers & Miroglio (the "Escrow Agent") the sum of TWO HUNDRED THOUSAND DOLLARS ($200,000.00).  Upon receipt of the independent appraisal, the Escrow Agent shall disburse to Sellers within three business days a sum equal to the amount of the appraisal and shall return any amount not disbursed to Sellers to Purchaser within three business days.  The cost of fees of the Escrow Agent shall be borne by Purchaser.  The distribution of proceeds to Sellers shall be in accordance with the instructions in Schedule 2.2 herein.

The Purchaser shall also pay to Sellers the Purchaser's Adjustment Amount at Closing based on the Projected Financial Statement of Sellers and Company as of November 30, 2003 as detailed in Schedule 3.3(l).  Sellers and Company shall prepare, no later than December 31, 2003, a Final Financial Statement as of November 30, 2003.  In the event the shareholder's deficit in the Final Financial Statement is different than the Projected Financial Statement, then an adjustment to the Purchaser's Adjustment Amount shall be made after the receipt and approval of the Final Financial Statement by Purchaser.  An additional payment, calculated on the change in the amount of the shareholders deficit between the Projected Financial Statement and the Final Financial Statement will be made by Purchaser to Sellers in the event the shareholders deficit in the Final Financial Statement is less than the shareholders deficit in the Projected Financial Statement. Likewise, if the shareholders deficit in the Financial Statement is greater than the

shareholders deficit in the Projected Financial Statement, then Sellers shall pay to Purchaser and amount equal to the difference between the shareholder deficit in the Projected Financial Statement and the shareholder deficit in the Final Financial Statement.

**2.8    Stock Option Plan –** Immediately following the Closing, the Company shall adopt an incentive stock option plan as set forth in Schedule 2.8(a) herein. The Company shall also enter into stock option agreements with Ryan James Larsen, Janet Sue Davis, Marsha Louise Madrid and Kevin John Dresser as set forth in Schedule 2.8(b) herein.

**2.9    Dividend –** In the event the pre-tax income of the Company from the date of Closing to December 31, 2006 exceeds One Million Dollars ($1,000,000), then the Company shall declare a cash dividend equal to twenty-five percent (25%) of the amount of pre-tax income in excess of $1,000,000 during the period from Closing to December 31, 2006. Said dividend amount shall be divided by the number of outstanding common shares of the Company as of February 1, 2007 and the per-share dividend shall be paid to all shareholders of record as of February 1, 2007. For purposed of this Section 2.9 only Pre-Tax income will exclude any revenue earned and expenses incurred from consulting services performed for MVT or any of its affiliates or subsidiaries.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

**3.1    Representations and Warranties of the Sellers and the Company.** Each of the Sellers and the Company jointly and severally represent and warrant to the Purchaser (and acknowledge that the Purchaser is relying on such representations and warranties in completing the transactions contemplated hereby) that:

(a)    **Sellers' Corporate Matters** - Each of the Sellers has all necessary authority and capacity to enter into this Agreement and to perform its obligations hereunder.

(b)    **Corporate Matters of the Company** - The Company is a Corporation duly incorporated and organized and is validly existing and in good standing under the laws of the State of Virginia. The Company has all necessary corporate power, authority and capacity to own or lease its property and assets and to carry on the Business as currently conducted. Neither the nature of the Business nor the location or character of the property and assets owned or leased by the Company requires the Company to be registered, licensed or otherwise qualified in any jurisdiction other than the jurisdictions set out in Schedule 3.1(b).

(c)    **Authorization of Agreement** - This Agreement has been duly authorized, executed and delivered by each of the Sellers and the Company and constitutes a legal, valid and binding obligation of each of them, enforceable against each of them in accordance with its terms.

(d)    **Validity of Transactions –** Subject only to the receipt of the Consents set out in Schedule 3.1(e), the Sellers have the exclusive right to dispose of the Purchased

Shares as provided for in this Agreement. The execution and delivery of this Agreement by each of the Sellers and the Company, the consummation of the transactions contemplated hereby and the fulfillment by each of the Sellers and the Company of the terms, conditions and provisions hereof has not and will not:

(i)    contravene or violate or (with or without the giving of notice or lapse of time, or both) result in the breach or acceleration of or constitute a default under any obligations of any of the Sellers or the Company under: (a) the laws applicable to any of the Sellers or the Company, (b) any judgment, order, writ, injunction or decree of any Authority, court, tribunal, instrumentality or arbitrator applicable to any of the Sellers or the Company, (c) the articles, by-laws or any resolutions of any of the Sellers or the Company, or any amendments thereto or restatements thereof, or (d) the provisions of any indenture, mortgage, lease, quota, license, permit, instrument, contract, agreement, employment agreement, arrangement or understanding to which any of the Sellers or the Company is a party or by which any of them or the property or assets of any of them are bound;

(ii)    relieve any other party to, or grantor of, an indenture, mortgage, lease, sublease, instrument, contract, quota, license, permit, agreement, arrangement or understanding with, or of, the Company, of its material obligations thereunder or enable it to terminate its material obligations thereunder; or

(iii)    result in the creation or imposition of any Encumbrance on the assets of the Company or on the Shares.

(e)    **Regulatory Approvals** - No Regulatory Approval, or filing or registration with any Authority is required to be made or obtained by any of the Sellers or the prior to the consummation of the transactions contemplated hereby, except as set out in Schedule 3.1(e).

(f)    **Consents** - Except as set out in Schedule 3.1(e), no Consent is required to be obtained by any of the Sellers or the Company prior to the consummation of the transactions contemplated hereby.

(g)    **Capitalization** - The authorized and issued and outstanding share capital of the Company is set out in Schedule 3.1(g). The Shares have been duly and validly issued and are issued and outstanding as fully paid and non-assessable shares in the capital of the Company. There are no outstanding securities convertible into or exchangeable or exercisable for any shares of the capital stock of the Company. The Company has no outstanding rights to subscribe for or to purchase, any options for the purchase of, or any agreements providing for the issuance of, any shares of its capital stock or any securities convertible into or exchangeable or exercisable for any shares of its capital stock. The Purchased Shares constitute, and on the Closing Date shall constitute, eighty percent (80%) of the issued and

outstanding Shares in the capital of the Company. There are no stock transfer restrictions imposed by the Company or known by the Sellers that could affect the transfer of the Purchased Shares to the Purchaser which have not been waived or complied with.

(h)   **Ownership of Shares of the Company** - Each Seller is the sole legal and beneficial owner of and has good and marketable title to the Shares set out beside the name of such vendor in Schedule 3.1(g), free and clear from all Encumbrances (other than the rights of the Purchaser hereunder). There is no agreement, contract, option, commitment, right of privilege or other right of another binding upon, or which at any time in the future may become binding upon, any of the Sellers to sell, transfer, assign, pledge, subject to lien, charge, grant a security interest in, mortgage or in any other way dispose of or encumber any of the Shares other than pursuant to this Agreement.

(i)   **Subsidiaries** - The Company does not own, either directly or indirectly, and has not agreed to acquire any of the outstanding shares or securities convertible into shares of any other corporation, including any subsidiary, and has no participating interest in any partnership, joint venture or other business enterprise. The Company does not have and has never had any subsidiary.

(j)   **Compliance with Law** - The Sellers have caused the Company to conduct, and the Company has conducted, the Business in compliance with all laws, statutes, regulations, ordinances, rules, policies, guidelines, decrees, orders, authorizations, approvals, notices, quotas, licenses, permits, directives, judgments or other requirements applicable to the Business. The Company is in compliance with and will have filed all reports or returns required under all laws, statutes, regulations, ordinances, rules, policies, guidelines, decrees, orders, authorizations, approvals, notices, quotas, licenses, permits, directives, judgments or other requirements applicable to them and the Business.

(k)   **Permits, Licenses, Registrations and Authorizations** - The Company is the sole legal and beneficial holder of all permits, licenses, registrations and authorizations necessary for the lawful operation of the Business as currently conducted pursuant to all applicable laws, statutes, regulations, ordinances, rules, policies, guidelines, decrees, orders, notices, directives and other requirements of all Authorities and copies of all such permits, licenses and authorizations have been delivered to the Purchaser. Schedule 3.1(k) sets forth a true and complete list of all such permits, licenses, registrations and authorizations. All such permits, licenses, registrations and authorizations are valid and subsisting and in good standing. No violations have been recorded in respect of any such licenses, permits, registrations and authorizations, and no proceeding is pending or threatened to revoke, limit or adversely affect the use of any thereof.

(l)   Not Applicable.

(m) **Absence of Undisclosed Liabilities** – Schedule 3.1(m) contains a description of all financial performance bonds, letters of credit and other instruments, agreements and understandings under which the Company may have a contingent liability. Except to the extent set out in Schedule 3.1(m) and except as reflected or reserved against in the Interim Balance Sheet, the Company does not have any outstanding indebtedness, liabilities or obligations (whether accrued, absolute, contingent or otherwise) or any outstanding commitments or obligations of any kind (whether or not such obligations or commitments are currently considered liabilities of the Company under generally accepted accounting principles).

(n) **Absence of Guarantees** - The Company has not given nor agreed to give, and is not a party to nor bound by, any guarantee of indebtedness, indemnity, bond or suretyship or other obligation of any Person, or any other commitment by which the Company is, or is contingently, responsible for such indebtedness, indemnity, bond, suretyship or other obligation except as specifically provided for or referred to in this Agreement or in any Schedule.

(o) **Promissory Notes** - The Company has requested pay-out statements from each of the Noteholders of the Company, namely:

   (i)   Kevin John Dresser in respect of the promissory note having a principal amount of $110,600;

   (ii)  Ryan James Larsen in respect of the promissory note having a principal amount of $26,900;

   (iii) Marsha Louise Madrid in respect of the promissory note having a principal amount of $24,000.00;

   (iv)  Janet Sue Davis in respect of the promissory note having a principal amount of $5,000

   requesting that each of such Persons advise the Company of the amounts that such Persons would require to be paid out in full and discharge the notes payable or credit facilities between such Persons and the Company (including any prepayment penalties or costs) and the Company will provide the responses received from such Noteholders to the Purchaser forthwith upon receipt thereof and, in any event, prior to Closing. The Sellers agree that the Buyer shall deduct from the Purchase Price, the Non-Competition Payments and the Purchase Price Adjustment at closing funds to pay-off the Noteholders and the Noteholders shall, at closing, certify that said Notes have been paid in full and that no additional principal or interest amounts are due to Noteholders.

(p) **Absence of Changes** – Since September 25, 2003 there has not been:

   (i)   any adverse change in the condition, operations, affairs, personnel or future

prospects of the Business as currently conducted, or the assets or financial condition of the Company other than changes in the ordinary and normal course of business, none of which has been, either alone or together with all other such changes, materially adverse to any of them; or

(ii)    any damage, destruction or loss, labor trouble or other event, development or condition of any character (whether or not covered by insurance) in the aggregate adversely affecting the Business, or the assets or financial condition of the Company,

and the Business has been conducted in the ordinary and normal course of business, consistent with past practice.

(q)    **Absence of Unusual Transactions.** Since September 25, 2003, the Company has neither agreed to nor authorized or otherwise become committed to:

(i)    acquire or initiate a new business or undertaking or assume a commitment or obligation (by written agreement or otherwise) or enter into any commitment or transaction not in the ordinary and normal course of business consistent with past practice or disclosed to Purchaser in writing;

(ii)    transfer, assign, sell or otherwise dispose of any of the assets disclosed in the Reviewed Balance Sheet or cancel any debts or claims except in the ordinary and normal course of business consistent with past practice;

(iii)    incur or assume any obligation or liability (fixed or contingent) except unsecured current obligations and liabilities incurred in the ordinary and normal course of business consistent with past practice;

(iv)    discharge or satisfy any lien or encumbrance, or pay any obligation or liability (fixed or contingent) other than liabilities disclosed in the Reviewed Balance Sheet and liabilities incurred since the date thereof in the ordinary and normal course of business consistent with past practice;

(v)    mortgage, pledge, subject to lien, charge, grant a security interest in or otherwise encumber any of its property or assets (whether tangible or intangible);

(vi)    issue or sell any shares, warrants, bonds, debentures or other corporate securities of the Company, or issue, grant or deliver any right, option or other commitment for the issuance of any such securities, except the transfer of all shares owned by Stacey Larsen to Ryan James Larsen;

(vii)    declare or make any payment of a dividend or other distribution in respect of any shares in its capital, or purchase or redeem any such shares, or effect any subdivision, consolidation or reclassification of any such shares, or

repay in full or in part any shareholder loans;

(viii)  suffer an operating loss or any extraordinary loss or waive any rights of material or substantial value;

(ix)  amend or change or take any action to amend or change its incorporating documents or by-laws;

(x)  amend, revise, renew or terminate any indenture, mortgage, lease, instrument, license, contract, agreement, arrangement or understanding to which the Company was or is a party or which may affect the Business or any trade name, business name, trademark, proposed trademark, certificate mark, distinguishing guise, industrial design, copyright or patent, whether domestic or foreign and whether registered or unregistered, relating to the Business, except in the ordinary and normal course of business consistent with past practice;

(xi)  terminate the employment of any director, officer or employee of the Company except in the ordinary and normal course of business, consistent with past practice;

(xii)  enter into any employment, labor, consulting or service contract except in the ordinary and normal course of business consistent with past practice;

(xiii)  make any general wage or salary increase, or pay any bonus or extraordinary payment to the personnel which it employs or to any other Person other than those increases, bonuses or payments in respect of which the written approval of the Purchaser has been obtained;

(xiv)  pay or become liable for any management fee or any other fee or charge whatsoever to the Sellers or any Person who is an associate or affiliate or Related Person of any of the Sellers;

(xv)  enter into any transaction, indenture, mortgage, lease, instrument, license, contract, agreement, arrangement or understanding with any Person with whom the Company does not act at arm's length;

(xvi)  lend money to any of the Sellers or any other Person;

(xvii)  make or commit to make any single capital expenditure or series of capital expenditures in excess of $10,000 or any lease commitment where the item(s) leased has a fair market value in excess of $10,000 at the inception of the lease, other than those capital expenditures and lease commitments in respect of which the written consent of the Purchaser has been obtained; or

(xviii)  initiate or settle any litigation to which the Company was or may become a party.

(r)  **Title to Assets** - The Company is the sole legal and beneficial owner of and has good and marketable title to all of its assets (whether tangible or intangible), including those assets reflected on the Reviewed Balance Sheet or acquired since the date of the Reviewed Balance Sheet (except as since transferred, sold or otherwise disposed of in the ordinary and normal course of business), free and clear from all Encumbrances other than those identified in Schedule 3.1(r). There is no agreement, contract, option, commitment, right of privilege or other right of another binding upon, or which at any time in the future may become binding upon, the Company to sell, transfer, assign, pledge, charge, subject to lien, grant a security interest in, mortgage or in any other way dispose of or encumber any of their assets other than in the ordinary and normal course of business. There is not now any basis upon which the assets of the Company might become subject to any further Encumbrance.

(s)  **Real Property** -

(i)  The Company is the legal or beneficial owner of the unencumbered real property listed in Schedule 3.1(s).

(ii)  The Company is a party to the lease of real property. A complete, true and accurate copy of each lease is enclosed as Schedule 3.1(s1).

(iii)  The buildings and operations of the Company do not encroach on the property of others. All such buildings are suitable for the purposes for which they are used, and all buildings and the operations of the Company thereon conform to all applicable zoning, use and other laws, ordinances and regulations. Until the Time of Closing, the Company shall maintain all of the Real Property, including the buildings and improvements thereon, in at least its current condition. The Company has received no order or directive of any applicable department of building, safety, health or any other city, county, state or federal authority that any work, repairs, maintenance or improvement be performed on the Real Property, nor has any such order or directive been threatened. There is no pending or threatened condemnation or other similar proceeding or assessment affecting the Real Property or any part thereof, nor, to the Sellers' knowledge, is any such proceeding or assessment being contemplated by any Authority. Other than the restrictions contained in Schedule 3.1(s), there are no other restrictions on the sale, transfer or use of said Real Property.

(iv)  The Sellers, individually and collectively, warrant to Purchaser that the real property is, as of the date of closing, free and clear of all liens and encumbrances and that the Company has free and clear title to the real property listed in Schedule 3.1(s). Sellers, when purchasing said real property, did not purchase a policy of title insurance. Sellers, individually

and collectively, indemnify Purchaser and Company from any defect in title to said real property to the extent that Purchaser and Company would have been protected if Sellers or Company purchased a policy of title insurance commercially available in the State of Iowa upon close of escrow of the purchase of the real property by the Company.

(v)    The Sellers warrant that a policy of all risk property insurance is in full force and effect to protect the real property listed in Schedule 3.1(s) as of the date of Closing.

(t)    **Environmental Matters -**

(i)    The Business has been and is being carried on, and the Real Property and any other property which has been at any time under the control of the Company has been and is, in compliance with all, and does not violate and has never violated any, Environmental Laws, Environmental Orders or common law respecting environmental or public or workers health and safety matters.

(ii)    None of the Real Property or any other real property which has been at any time under the control of the Company has been used by any Person: (A) to generate, manufacture, receive, refine, treat, transport, use, handle, store, dispose of, transfer, produce or process Hazardous Waste; or (B) as a landfill or waste disposal site.

(iii)    The Company has maintained all environmental operating documents, manifests and other records in the manner and for the time periods required by Environmental Laws.

(iv)    The Company has not conducted any environmental audits except as disclosed in Schedule 3.1(t) (for the purposes hereof "environmental audits" means any evaluations, assessments, studies or tests performed relating to environmental matters, including any results of soil, ground water, air or water quality samples and any associated reports, whether prepared by the Company, its agents or employees or any other Person whomsoever); to the extent they are in the possession or control of the Company or its agents or consultants, correct and complete copies of said environmental audits have been or shall be delivered to the Purchaser prior to Closing.

(v)    The Company is in compliance with all Environmental Orders and Environmental Permits issued to them and holds all Environmental Permits it is required to hold pursuant to Environmental Laws; correct and complete copies of all said Environmental Orders and Environmental Permits have been or shall be delivered to the Purchaser prior to Closing;

(vi)    The Company has not received any written notice, nor to the Sellers' knowledge, is there any claim or allegation, that the Company is a

"potentially responsible party" for a waste disposal site pursuant to the Comprehensive Environmental Response, Compensation and Liability Act or any other Environmental Laws.

(vii)   No Hazardous Substances are stored on or in any of the Real Property or which has not at any time been under the control of the Company.

(viii)  The Company has not failed to report to the proper governmental authority the occurrence of each event which is required to be so reported by any Environmental Laws and the Sellers have provided or shall prior to Closing provide the Purchaser with correct and complete copies of all such reports and all correspondence relating thereto.

(ix)    The Company has not received any notification that any work, repairs, construction or capital expenditures are required to be made in respect of any of the assets owned or used by them or any of them as a condition of continued compliance with any Environmental Laws, Environmental Orders or Environmental Permits.

(x)     All underground storage tanks and vessels, associated piping and appurtenances under the Real Property or any of the facilities of the Company situated on the Real Property, either currently or at any time in the past, have been maintained and operated in compliance with all Environmental Laws, Environmental Orders and Environmental Permits and have not leaked.

(xi)    The Company has not received any written or oral notice of any alleged non-compliance with or has been charged with or convicted of an offence for non-compliance with any Environmental Laws or Environmental Orders or any other damage to the environment or human health, or has been fined or otherwise sentenced or settled any prosecution short of conviction and there is no fact which could give rise to a notice of non-compliance with any Environmental Laws or Environmental Orders.

(xii)   The Company has neither caused nor permitted nor has any knowledge of any Predecessor having caused or permitted the Release of any Hazardous Waste on or off-site from the Real Property or any other real property which has been at any time under the control of the Company or where the Company carries on or has carried on the Business, and all wastes and substances disposed of, treated or stored by the Company or any Predecessor in any location, whether hazardous or non-hazardous, have been and are disposed of, treated and stored in compliance with all Environmental Laws, Environmental Orders and Environmental Permits.

(u)    **Fixed Assets** - Schedule 3.1(u) sets forth a true and complete list of all machinery, equipment, furniture, office equipment, computer hardware and software and other personal property and fixtures, wherever situate, legally and beneficially owned by the Company with a net book value in excess of $500. There is no basis upon which any such assets may become subject to any Encumbrances. The Company possesses all such assets.

(v)    **Condition of Assets** - All machinery, equipment, furniture, office equipment, computer hardware and software and other personal property and fixtures, including those set out in Schedule 3.1(u), used in or in connection with the Business are in good condition, repair and (where applicable) proper working order.

(w)    **Vehicles** - Schedule 3.1(w) sets out a list of all vehicles owned, leased or operated by the Company. All such vehicles are in good condition, repair and working order, have been maintained in accordance with the Company's current written vehicle maintenance policy, a copy of which has been provided to the Purchaser, and comply with all applicable laws, regulations and guidelines respecting its operation and bears a current Safety Standards Certificate (if required by applicable laws, regulations or guidelines). The Company possesses all such vehicles.

(x)    **Leases of Personal Property** - Schedule 3.1(x) sets forth a true and complete list of all equipment, office equipment, furniture, machinery, vehicles, fixtures, computer hardware and software and other personal property and fixtures in the possession or custody of the Company which is leased, subleased, held under license or similar arrangement or instrument, or subject to an agreement to lease, sublease, license or similarly held, together with the Personal Property Leases relating thereto. Each Personal Property Lease is in good standing and in full force and effect without amendment, and the Company is entitled to all benefits, rights and privileges thereunder. Each Personal Property Lease constitutes a valid and binding obligation of the parties thereto, enforceable in accordance with its terms. None of the parties to any Personal Property Lease is in breach of its obligations thereunder, and no act or event has occurred which, with notice or lapse of time, or both, would constitute a breach thereof. All of the Personal Property Leases were entered into in the ordinary course of business. Neither the Company nor its respective counsel has received notice that any party has breached, intends to breach or intends to discontinue any such Personal Property Lease.

(y)    **Accounts Receivable** - Schedule 3.1(y) sets forth a true and complete aged listing of the trade accounts receivable, notes and other receivables of the Company as at November 30, 2003.

(z)    **Collectability of Accounts Receivable** - The accounts receivable of the Company at October 31, 2003 are, and all other accounts receivable at the Time of Closing shall be, good and collectible at their aggregate recorded amounts less all reserves for doubtful accounts recorded in respect thereof (subject to no defense, counterclaim or set-off) and are or will be *bona fide* accounts receivable created in

the ordinary and normal course of business.

(aa)   **Revenue Contracts** - Schedule 3.1(aa) sets out all contracts pursuant to which the Company is to conduct business.

(ab)   **Insurance** - The Company has insured the Business and the assets of the Company as set forth in Schedule 3.1(ab). Such insurance coverage shall be continued in full force and effect (with all premiums paid) up to and including the Closing Date. The Company is not in default, whether as to the payment of premiums or otherwise, under the provisions contained in any insurance policy identified in Schedule 3.1(ab) and has not failed to give any notice or present any claim under any such insurance policy in due and timely fashion. Nothing has been done or omitted to be done by the Company that could make any policy of insurance void or voidable. The Company has no liability for any retrospective insurance premiums or costs. The Company has no material outstanding liabilities nor is it the subject of any material outstanding claims which liabilities or claims are normally covered by insurance policies but which are not covered by the Company's insurance. The Company does not self-insure any risk related to the Business.

(ac)   **Intellectual Property** - Schedule 3.1(ac) sets out all domestic and foreign trade names, business names, trademarks, proposed trademarks, certification marks, distinguishing guises, industrial designs, copyright licenses and exploitation agreements, inventions, patents, other intellectual property, whether or not registered, and all applications in respect thereof relating to the Business, including particulars of any registration in respect thereof and, where unregistered, the date of first use thereof. The Company has all other proprietary rights, trade processes and secrets necessary for the conduct of, or that are used in the Business (such rights, processes and secrets together with the intellectual property referred to in Schedule 3.1(ad) being referred to herein as the "Intellectual Property"). The Company is the sole legal and beneficial owner of and has the sole right to use the Intellectual Property and the Intellectual Property is free and clear from all Encumbrances other than those identified in Schedule 3.1(ad). The Company has neither used nor enforced, nor failed to use or enforce, any of the Intellectual Property in any manner which could limit its validity or result in its invalidity. The Company has not granted and is not obligated to grant any license or sublicense to any third party permitting the use of the Intellectual Property. There has been no infringement or violation of the Company's rights in and to the Intellectual Property, nor any claim of adverse ownership, invalidity or other opposition to conflict with any of the Intellectual Property and the Company is not and has not been engaged in any activity that violates or infringes any intellectual property rights of a third party (including the use of computer software).

(ad)   **Material Contracts** - Except for the Personal Property Leases referred to in Schedule 3.1(x), the revenue contracts referred to in Schedule 3.1(aa) and the written employment contracts referred to in Schedule 3.1(ai), the Company is not a

party to or bound by any indenture, mortgage, loan, banking agreement, credit facility, lease, sublease, instrument, license, contract, agreement, arrangement or understanding, whether oral or written, with an aggregate value in excess of $1,000, other than the contracts and agreements referred to in Schedule 3.1(ad). Each indenture, mortgage, loan credit facility, banking agreement, lease, sublease, instrument, license, contract, agreement, arrangement and understanding to which the Company is bound, including those set out in Schedule 3.1(ad), is in good standing and in full force and effect without amendment, and the Company is entitled to all benefits, rights and privileges thereunder. Each such contract or agreement (other than those contracts and agreements which are not in writing) is in good standing and in full force and effect and constitutes a valid and binding obligation of the parties thereto, enforceable in accordance with its terms. None of the parties to any such contract or agreement is in breach or default of its obligations thereunder, and no act or event has occurred which, with notice or lapse of time, or both, would constitute a breach thereof. All such contracts or agreements were entered into in the ordinary course of business. Neither the Company nor its respective counsel has received notice that any party has breached, intends to breach or intends to discontinue any such contract or agreement.

(ae)    **Contracts to Purchase** - Except as set out in Schedule 3.1(ae), the Company is not a party to any contract to purchase goods or services with a value in excess of $1,000 per year.

(af)    **Sufficiency of Assets** - The assets legally and beneficially owned by the Company constitutes all property and assets necessary to carry on the Business as it is currently conducted.

(ag)    **Tax Matters** -

    (i)    Adequate provision has been made by the Company for any unpaid current and deferred Taxes, whether or not disputed, as at October 31, 2003. The amounts included in the Interim Balance Sheet for current and deferred Taxes receivable (if any) are recoverable by the Company in the ordinary course. Any Tax instalments due in respect of the current taxation year of the Company have been made as required. Except to the extent provided for, the Company is not liable for any Taxes. U.S. federal and state income tax assessments or reassessments have been received by the Company covering all past periods through the 2002 fiscal year, and the Company has paid all such assessments and reassessments, or where permitted by law, security therefor has been provided and have paid all other Taxes due and payable by them on or before the date hereof. There are no notices of objection or appeals outstanding with respect to any assessment, reassessment or determination of the Company by any Tax Authority. There are no actions, suits, audits, investigations, claims or other proceedings pending or threatened, against the Company in respect of any Taxes, and

there are no facts or circumstances to the knowledge of the Sellers, or acts, omissions, events, transactions or series of transactions (including the transactions contemplated by this Agreement) occurring wholly or partly on or before the Time of Closing, which could give rise to any such actions, suits, audits, proceedings, investigations or claims.   There are no agreements, waivers or other arrangements providing for an extension of time with respect to the filing of any Tax return or the payment of any Taxes by the Company.

(ii)     The Company has on a timely basis filed all Tax returns, information returns, elections or designations in respect of any Taxes required to be filed by them under any Tax legislation.   All such filings are true and accurate in all material respects, and no such filing has contained any material misstatement or omitted any statement of material fact that should have been included therein. The Company has not and is not required to file any Tax returns, information returns or designations in any jurisdiction outside the United States.

(iii)    The Company has withheld and remitted to the proper Authority, or where permitted by law, provided security for, on a timely basis and in a form required under the appropriate Tax legislation all amounts in respect of Taxes, including income taxes, pension plan contributions, unemployment and disability insurance premiums and any other deductions and contributions, required to be withheld and remitted by them, together with the employer's share of same, if any, all within the prescribed times.   The Company has filed in complete and accurate form all information and other returns required pursuant to any Tax legislation within the prescribed times.

(iv)     There is no deductible outlay or expense owing by the Company to a Person with whom it was not dealing at arm's length at the time the outlay or expense was incurred which is unpaid and which will be included in the Company's income for any taxation year ending on or after the Closing Date.

(v)      The Company does not have any loans or indebtedness outstanding which have been made to shareholders, directors, officers or employees, or former shareholders, directors, officers or employees of the Company or any of the Subsidiaries, or to any Person or Company not dealing at arm's length with the Company.

(vi)     The Company has not, directly or indirectly, transferred property to or acquired property from a Person with whom the Company was not dealing at arm's length for consideration other than consideration equal to the fair market value of the property at the time of the disposition or acquisition thereof.

(vii)    All of the interest which has been paid or is payable by the Company in

respect of their current liabilities and long-term debt is deductible in calculating the Company's income for Tax purposes (except for interest paid or payable in respect of late or insufficient Tax instalments).

(ah)   **Litigation** - There is no suit, action, dispute, civil or criminal litigation, arbitration, legal, administrative or other proceeding or governmental investigation, including appeals and applications for review, in progress, pending or, to the best of the Sellers' knowledge, threatened against the Company or relating to the Business or the assets of the Company.   No circumstances have occurred which would give rise to any such suit, action, dispute, litigation, arbitration, proceeding or investigation, and there is not currently outstanding against the Company any judgment, execution, decree, injunction, rule or order of any Authority, court, tribunal, instrumentality or arbitrator.

(ai)   **Employment Matters** -

(i)     Schedule 3.1(ai) sets forth a true and complete list of all directors, officers and employees of the Company with annual remuneration in excess of $20,000, their respective positions, dates of hire, current salaries, benefits and other remuneration and dates of last salary increases indicating which officers and employees are parties to a written or oral agreement with the Company (including confidentiality and non-competition agreements). Schedule 3.1(ai) also contains a list of all directors, officers and employees which are Related Persons (within the meaning of section 1.1(al)(i) to any of the Sellers and indicating the relationship.  Except as disclosed in Schedule 3.1(ai), the Company is not a party to any written or oral agreement with former or present officers, employees, agents or independent contractors in connection with the Business.

(ii)    The Company has no obligation to reinstate any former officer or employee of the Company.

(iii)   There are no oral contracts of employment entered into with any officers or employees employed by the Company which are not terminable in accordance with applicable law. The Company has not entered into any agreement with any officer or employee employed by the Company with respect to the termination of employment, and no officer or employee employed by the Company has indicated his or her intention to resign.

(iv)   There has been no material change in the directors, officers and employees of the Company, their positions or the terms and conditions of their employment since September 1, 2003,  is not identified in Schedule 3.1(ai), and no such change is pending, anticipated or threatened.

(v)    All wages, salaries, bonuses, commissions, vacation pay and other emoluments relating to the Business or the directors, officers and employees

of the Company are reflected and accrued in the records of the Company.

(vi)     The Company has withheld from each payment made to all of their directors, officers and employees, and their former directors, officers and employees, the amount of all Taxes and other deductions (including income taxes and pension plan, unemployment insurance and disability contributions) required to be withheld, and have paid the same together with the employer's share of same, if any (to the extent required to be paid so that no such amount is past due), to the proper Tax and other receiving officers within the time required under applicable legislation.

(vii)    There are no outstanding, pending, threatened or anticipated assessments, actions, causes of action, claims, complaints, demands, orders, prosecutions or suits against the Company, or its former or present directors, officers or agents pursuant to or under any applicable law, statutes, rules, regulations, ordinances or orders, including social security, unemployment insurance, income tax, employment standards, labor relations, occupational health and safety, human rights, workers' compensation and equal pay.

(viii)   The Company has not made any agreement, directly or indirectly, with any labor union, employee association or other similar entity or made commitments to or conducted negotiations with any labor union or employee association or other similar entity with respect to any future agreements. No trade union, employee association or other similar entity holds any bargaining rights with respect to any of the employees of the Company acquired by certification, interim certification, voluntary recognition, designation or successor rights, or has applied to be certified as the bargaining agent of the employees of the Company. To the knowledge of the Sellers, there have been no attempts to organize or establish any labor union, employee association or other similar entity affecting the Company or the Business.

(ix)     The Company has not experienced any strikes, work stoppages, claims of unfair labor practice or other material labor disputes.

(x)      No officer or employee of the Company is eligible for short-term or long-term disability benefits.

(xi)     All of the officers and employees of the Company, including those identified in Schedule 3.1(ai), are in good standing under the terms and conditions of their employment, and the Sellers are not aware of any problem or difficulty associated with any officer or employee, or the employment of any officer or employee.

(aj)  **Federal Employer Identification Number** - The Company's U.S. federal employer identification number is 57-1160595.

(ak)    **Pension and Benefit Matters** -

    (i)    Schedule 3.1(ak) sets forth a true and complete list of all Plans. No Plan has been terminated or partially terminated and all Plans are still in force and effect. All Plans are registered under applicable Pension Legislation and no events have occurred which would affect the registered status of the Plans. All Plans are in good standing under applicable Pension Legislation and the Company has made all filings required by the Pension Authorities and Pension Legislation. The Plans and all investments held by such Plans comply in all respects with all applicable Pension Legislation and Pension Contracts and have been maintained and administered in compliance with all Plan Terms.

    (ii)    All required contributions or premiums to be paid under the Plans have been fully paid when due in accordance with applicable Pension Legislation and Pension Contracts and adequate provision has been made by the Company for all contributions or premiums required to be paid under the Plans accrued to the date hereof. No unfunded liability, solvency deficiency, unpaid special payment or experience deficiency, whether due or not, exists with respect to the Plans.

    (iii)    There have been no withdrawals or transfers of assets from the Plans except to members or beneficiaries in accordance with the Plan Terms or in accordance with approval granted by the Pension Authorities. No actuarial surplus has ever been removed from any Plan or has been used or applied by the Company to fund employer contribution obligations under the Plans.

    (iv)    There are no outstanding Tax liabilities with respect to the Plans.

    (v)    There has been no material change in the value of any Plan since the last valuation which would affect the actuarial report or financial statements, and the actuarial assumptions used have not changed since the last valuation.

    (vi)    No improvements to the Plans have been promised and no such improvements will be made or promised prior to Closing except as may be required by applicable Pension Legislation and Pension Contracts and any such promises of benefit improvements shall be communicated to the Purchaser in writing forthwith and, in any event, prior to Closing.

    (vii)    There are no outstanding actions or claims with respect to the Plans (other than claims for benefits submitted by members or beneficiaries in the normal course), no requests for documents and no litigation, legal action, suit, investigation, claim, counterclaim or proceeding pending or threatened against or affecting any Plan which could have a material adverse effect on the Company, the Business or any Plan maintained as of the Closing Date.

(viii)   None of the Sellers, the Company, or, to the best of the Sellers' knowledge, the administrators or fiduciaries of the Plans, nor the agents of the foregoing has been in breach of any fiduciary obligation with respect to the administration of the Plans or has engaged in any transaction or acted or failed to act in a manner which could subject the Company to any liability for a breach of fiduciary duty under applicable laws.

(ix)   Except as disclosed in Schedule 3.1(ak), no Plan is subject to: (i) Title IV of ERISA; or (ii) the minimum funding requirements of Section 412 of the Code or Section 312 of ERISA.  The Company is in compliance with all provisions of ERISA and all other Pension Legislation and are not subject to any liability or obligation arising under any Pension Legislation or the provisions of any Plan, including liability owed to the Pension Benefit Guaranty Company on account of a termination or partial termination of any Plan, any liability resulting from a "prohibited transaction", any liability for failure to meet minimum funding requirements, any liability related to the termination of any multi-employer pension plan and any liability caused by the non-qualification of any plan under Section 401 of the Code.  Each 401K plan maintained by the Company meets the requirements of Section 401(a) of the Code, the Company has received a favourable determination letter respecting the qualification of each such plan and no event has occurred which would affect the qualification of any such plan.

(x)   The Company has no obligation to provide material post-retirement benefits of any nature to its employees or former employees or their survivors, dependants or beneficiaries, except as may be required by the Consolidated Omnibus Budget Reconciliation Act of 1986 or any other applicable state medical benefits continuation laws, nor will any such obligation to provide such post-retirement benefits be incurred as a result of the transactions contemplated hereby.

(xi)   The Company has not caused there to occur a "mass lay-off" as defined in Section 693.3 of the regulations under the Worker Adjustment and Retention Notification Act (20 CFR 639) at any time in the past.

(al)   **Books and Records** - All records relating to the Business (including customer lists, operating data, files, books and records, correspondence, credit information, research materials, contract documents, records of past sales, supplier lists, employee documents, inventory data, accounts receivable data, financial statements and other similar records) are maintained in accordance with applicable legal requirements.  The records contain complete and accurate records of all matters required to be dealt with in such records.  All financial transactions relating to the Business and the assets of the Company have been fairly and accurately recorded in the records in accordance with GAAP.  The records, including all indentures, mortgages, leases, subleases, quotas, licenses, permits, instruments,

contracts and other documents listed in any of the Schedules that are in the Company's possession or control, or which can be obtained by it, have been delivered to the Purchaser or will be delivered to the Purchaser prior to Closing and are available for inspection by the Purchaser at the Company's head office.

(am)   **Minute Books** - The minute books of the Company contain, and shall on the Closing Date contain, accurate and complete minutes of all meetings and resolutions of their directors, committees of directors and shareholders held since their respective dates of incorporation.  All such resolutions were duly passed and all such meetings were duly held.   Their share certificate books and share certificate and other corporate registers are, and shall be on the Closing Date, complete and accurate.

(an)   **Bank Accounts, etc.** - Schedule 3.1(an) sets forth a true a complete list of each bank or other depository in which the Company maintains any bank account, trust account or safety deposit box and the names of all Persons authorized to draw thereon or who have access thereto.

(ao)   **Contracts with Non-Arm's length Persons** – Other than as set out in Schedule 3.1(ao), there are no existing indentures, mortgages, loans, contracts, agreements, arrangements or understandings to which the Company is a party in which any of the Sellers, any director or officer of any of the Sellers, the Company or any Person not dealing at arm's length with any of the Sellers, the Company, or any director or officer of any of the Sellers or the Company has an interest, directly or indirectly, including arrangements for the payment of management or consulting fees of any kind whatsoever.

(ap)   **Agreements Restricting Business** – The Company is not a party to any lease, license, instrument, contract, agreement, arrangement or understanding which restricts the freedom of the Company to carry on the Business, including any lease, license, instrument, contract, agreement, arrangement or understanding which contains covenants by the Company not to compete in any line of business with any other Person.  However, notwithstanding the foregoing, Purchaser is aware that Sellers are parties to contracts with Trapeze Software, Inc., Trapeze Software Corporation and Trapeze Software, L.L.C. (collectively "Trapeze").  Said contracts are set forth on Schedule 3.1(ap) hereto.

(aq)   **Powers of Attorney** - The Company has not given any irrevocable power of attorney relating to the Business (other than such powers of attorney given in the ordinary and normal course of business with respect to routine matters or as may be necessary or desirable in connection with the consummation of the transactions contemplated hereby) to any Person for any purpose whatsoever.

(ar)   **Outstanding Business Proposals** – Other than the Proposals listed in Schedule 3.1(ar), the Company has no pending or outstanding proposals nor is the Company bound to any person or entity to perform any business after Closing which the Company is not already under contract to perform as listed in Schedule 3.1(aa).

(as)   **Tax ID -** The Social Security Numbers of the Sellers are as follows:

|                      |   |             |
|----------------------|---|-------------|
| Ryan James Larsen    | - | 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 |
| Marsha Louise Madrid | - | 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 |
| Janet Sue Davis   .  | - | 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 |
| Kevin John Dresser   | - | 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 |

(at)   **Disclosure** - All facts, events and circumstances which could reasonably be expected to be material to the Purchaser relating to the condition, operations, affairs or personnel of the Business, or the assets or financial condition of the Company have been disclosed to the Purchaser. All of the information disclosed in each of the Schedules is true, accurate and complete.

**3.2    Representations and Warranties of the Purchaser.**   The Purchaser hereby represents and warrants to the Sellers (and acknowledges that the Sellers are relying on such representations and warranties in completing the transactions contemplated hereby) that:

(a)   **Purchaser's Corporate Matters** - The Purchaser is a Company duly incorporated and organized and is validly subsisting under the laws of the State of California and has all necessary corporate power, authority and capacity to enter into this Agreement and to perform its obligations hereunder.

(b)   **Authorization of Agreement** - This Agreement has been, or will be prior to Closing, duly authorized, executed and delivered by the Purchaser and constitutes, or will constitute, a legal, valid and binding obligation of the Purchaser enforceable against it in accordance with its terms (subject, however, to limitations with respect to the enforcement of remedies, to bankruptcy, reorganization, insolvency, moratorium and other laws relating to or affecting creditors' rights generally and subject to the availability of equitable remedies such as specific performance and injunction).

(c)   **Validity of Transactions** - The execution and delivery of this Agreement by the Purchaser, the consummation of the transactions contemplated hereby and the fulfillment by the Purchaser of the terms, conditions and provisions hereof has not and will not contravene or violate or result in the breach (with or without the giving of notice or lapse of time, or both) or acceleration of any obligations of the Purchaser under: (i) the laws applicable to the Purchaser; (ii) any judgment, order, writ, injunction or decree of any court, tribunal, instrumentality or arbitrator which is presently applicable to the Purchaser; and (iii)the articles, by-laws or any resolutions of the Purchaser, or any amendments thereto or restatements thereof.

(d)    **Tax** - The Purchaser's federal employer identification number is 94-2491705.

(e)    **Shares** - The Purchaser is purchasing the Shares for its own account and not with a view to or for sale in connection with any distribution of the Shares.

(f)    **Board of Directors** – Immediately upon closing, a meeting of the shareholders will be conducted to elect a new Board of Directors ("Board") for the Company. The Purchaser shall be entitled to appoint 3 members of the Board; the Sellers shall be entitled to appoint 2 members to the Board. Appointments shall be made by written notice to the Secretary of the Company. No Seller who is not then an employee of the Company shall be entitled to serve on the Board. In the event the Sellers cannot agree which of the Sellers shall serve on the Board, the Purchaser shall be entitled to appoint the 2 Seller's positions on the Board at the sole discretion of the Purchaser. Thereafter, at each annual meeting of the shareholders of the Company, a new Board will likewise be selected, with the exception that if at least 2 of the Sellers are no longer employed by the Company, the remaining Board positions shall be filled by a vote of the shareholders. In the event any person appointed by Sellers to the Board shall fail during the term of their appointment, for any reason, to remain employed by the Company, that person shall be terminated as a member of the Board.

**3.3    Other Representations and Warranties.** All statements contained in any certificate or other instrument delivered by or on behalf of a party pursuant to or in connection with the transactions contemplated by this Agreement shall be deemed to be representations and warranties made by such party hereunder.

**3.4    No Broker.** Each of the Parties represents and warrants to the others that all negotiations relating to this Agreement and the transactions contemplated hereby have been carried on between them directly and without the intervention of any other party in such manner as to give rise to any valid claims against any of the Parties for a brokerage commission, finder's fee or other like payment.

**3.5    Non-Waiver.** No investigations made by or on behalf of the Purchaser at any time shall have the effect of waiving, diminishing the scope of or otherwise affecting any representation or warranty made by the Sellers herein or pursuant hereto.

**3.6    Indemnification.** Provided that a Seller who is at the time an employee of the Company provides advance written notice to Purchaser's General Counsel regarding any potential action which Seller has reason to believe may cause a violation of that Seller's agreement with another party as detailed in Schedule 3.1(ap) and provided the action is in the course and scope of Seller's employment with the Company after the date of Closing, and if Purchaser received written approval for the action from the Purchaser's General Counsel and then later the Seller becomes a party to litigation from the other party detailed in Schedule 3,1(ap) as a result of this action, then Company shall provide the defence of said litigation on behalf of Seller.

3.6     **Survival of Representations, Warranties and Covenants.**

(a)     The representations and warranties of the Sellers hereunder shall survive the Closing, the execution and delivery hereunder of share or security transfer instruments and other documents of title to the Shares and payment of all consideration therefor, for the benefit of the Purchaser as follows:

    (i)     as to the representations and warranties contained in clauses 3.1 (a), (b), (c), (d), (g), (h), (i), (j), (r), (s) (t) and (aq) indefinitely;

    (ii)    as to Tax matters, until the date following the expiration of all periods allowed for objecting and appealing the determination of any proceedings relating to any assessment or reassessment of the Purchaser or the Company, as the case may be, by any taxing authority in respect of any taxation period ending prior to the Closing or in which the Closing occurs unless a bona fide notice of a claim shall have been made in writing before the expiry of that period, in which case any representation and warranty to which such notice applies shall survive in respect of that claim until the final determination or settlement of that claim; and

    (iii)   as to all other matters, for a period of three years following Closing, unless a bona fide notice of a claim shall have been given in writing before the expiry of that period, in which case any representation and warranty to which such notice applies shall survive in respect of that claim until the final determination or settlement of that claim.

(b)     The representations and warranties of the Purchaser hereunder shall survive the Closing, the execution and delivery hereunder of share or security transfer instruments and other documents of title to the Shares and payment of all consideration therefor, for the benefit of the Sellers as follows:

    (i)     as to the representations and warranties contained in clauses 3.2(a), (b) and (c), indefinitely; and

    (ii)    as to all other matters, for a period of three years following Closing, unless a bona fide notice of a claim shall have been given in writing before the expiry of that period, which case any representation and warranty to which such notice applies shall survive in respect of that claim until the final determination or settlement of that claim.

(c)     Except as otherwise provided in this Agreement, all covenants of the Sellers and the Purchaser, as the case may be, contained in this Agreement or any certificate or other instrument delivered by or on behalf of a party pursuant to or in connection with the transactions contemplated by this Agreement shall survive the Closing for the benefit of the Purchaser or the Sellers, as the case may be, indefinitely.