*EXHIBIT 1 Continued*

**3.7    Non-Dilution –** Purchaser agrees that the Company shall not issue additional shares in the Company after the Closing that will have the impact of diluting the shares that continue to be owned by Sellers, with the exception of Shares which may be issued pursuant to the Stock Option Agreements in Schedule 2.8(b) or the Warrant in Schedule 2.9 and with the further exception that the Company may issue an additional 12 shares to person(s) approved by the Company to receive Stock pursuant to the terms of the Stock Option Plan contained in Schedule 2.8(a) which are vested in accordance with the terms of a Stock Option Agreement between the person and the Company, the terms of which shall be negotiable between the Company and the optionee at the time of the grant.

**3.8    Shareholder Agreement –** The Company and Sellers agree to enter into a Shareholder Agreement, the form of which is contained in Schedule 3.8 prior to Closing.

## ARTICLE IV
## CONDITIONS PRECEDENT

**4.1    Conditions of the Purchaser.**  The obligation of the Purchaser to complete the purchase of the Purchased Shares hereunder shall be subject to the satisfaction of, or compliance with, at or prior to the Closing Time, each of the following conditions (each of which is hereby acknowledged to be inserted for the exclusive benefit of the Purchaser):

(a)    **Representations and Warranties -** All representations and warranties of the Sellers and the Company in this Agreement shall be true and correct at and as of the Closing Time with the same force and effect as if made at and as of such time and date, and the Sellers and the Company shall each have delivered to the Purchaser at the Closing Time a certificate, dated the Closing Date, under corporate seal and duly executed by each Vendor and a senior officer of the Company, acceptable to the Purchaser, to such effect.   The receipt of such certificates and the closing of the transactions contemplated by this Agreement shall not be nor be deemed to be a waiver of the representations and warranties contained in this Agreement, which representations and warranties shall continue in full force and effect for the benefit of the Purchaser as contemplated by Article IX of this Agreement.

(b)    **Performance of Covenants -** Each of the Sellers shall have performed or complied with, in all respects, all of the obligations, covenants and agreements contained in this Agreement which are to be performed or complied with by the Sellers and the Company at or prior to the Closing Time.  Neither the Company nor any Vendor shall be in breach of any covenant on its part contained in this Agreement, and the Sellers and the Company shall each have delivered to the Purchaser at the Closing Time, a certificate, dated the Closing Date, under corporate seal and duly executed by each Vendor and by a senior officer of the Company acceptable to the Purchaser, to such effect.

(c)    **Consents -** All Regulatory Approvals and Consents shall have been obtained in a

form satisfactory to the Purchaser, acting reasonably, and all conditions thereof shall have been complied with at or prior to the Closing Time.

(d) **No Material Adverse Effect** - The execution of this Agreement, the closing or the performance of any terms hereof and the completion of the transactions contemplated by this Agreement shall not have caused the termination of or otherwise materially adversely affected any indenture, mortgage, lease, instrument, contract, agreement, arrangement or understanding to which the Company is a party or by which the Company or any of its property or assets are bound, or any permit, license, registration or authorization necessary for the lawful operation of the Business pursuant to all applicable laws, statutes, regulations, ordinances, rules, policies, guidelines, decrees, orders, notices, directives and other requirements of all Authorities.

(e) **Due Diligence** - The Purchaser shall have been satisfied, in its absolute discretion, with the results of its due diligence review of the Company and the Business including its review of the Reviewed Financial Statements and the Interim Financial Statements.

(f) **No Action to Restrain** - No action or proceeding shall be pending or threatened by any Authority or any other Person (including a party hereto) to restrain or prohibit the completion of the transactions contemplated by this Agreement or to prevent or restrain the Purchaser from carrying on the Business as presently carried on.

(g) **Sellers' Closing Opinions** - The Purchaser shall have received an opinion, dated the Closing, from counsel for the Sellers, substantially in the forms attached as Schedule 4.1(g).

(h) **Directors and Officers** - All directors and officers of the Company shall have resigned in their capacity as directors and officers, and each of the directors and officers shall have executed a form of release, substantially in the form attached as Schedule 4.1(h).

(i) **Employment Agreements** - Satisfactory written agreements shall have been made by the Purchaser with respect to the employment of Ryan James Larsen, Janet Sue Davis and Marsha Louise Madrid.

(j) **Non-Competition Agreements** - Each of the Sellers shall have entered into a Non-Competition Agreement, dated the Closing Date, substantially in the form attached as Schedule 4.1(j).

(k) **Discharge of Encumbrances** - At or prior to the Closing Time, the Sellers shall have provided evidence to the Purchaser of the discharge of all the Encumbrances identified in Schedule 4.1(l) (unless other arrangements satisfactory to the Purchaser's counsel have been made for the discharge of all Encumbrances identified in Schedule 3.1(r).

(d)     **Litigation** - On the Closing Date, there shall be no litigation, governmental investigation or proceeding pending or threatened for the purpose of enjoining or preventing the consummation of any of the transactions contemplated by this Agreement or otherwise claiming that such consummation is improper.

In case any of the foregoing conditions shall not have been performed at or prior to the time of Closing, the Sellers may terminate this Agreement as provided in Section 7.1(e), in which event the Sellers shall be under no obligation to any other party, provided, however, that the aforesaid conditions are for the benefit of the Sellers only and accordingly the Sellers shall be entitled to waive compliance with any of such conditions in whole or in part if they see fit to do so without prejudice to their rights and remedies at law and in equity and also without prejudice to any of their rights of termination in the event of non-performance of any other conditions in whole or in part.

## ARTICLE V
## COVENANTS OF THE PARTIES

**5.1**   **Covenants of the Sellers and the Company.**   Each of the Sellers and the Company jointly and severally covenant and agree with the Purchaser that:

(a)     the business and affairs of the Company shall be carried on in the ordinary and normal course of the business, consistent with past practice, and in compliance with the representations, warranties, covenants and agreements contained in this Agreement and the Sellers and the Company and the Sellers shall use their best efforts to preserve the goodwill of all Persons having business relations with the Company;

(b)     they shall not make, nor permit to be made, any material change in the way the Business or the affairs of the Company are being operated and will not take any action which would interfere with customer or supplier relationships and the future prospects which exist on the date hereof;

(c)     all the representations and warranties contained in this Agreement shall be true and correct at the Closing Time with the same effect as if made at and as of the Closing Time and, without limiting the generality of the foregoing, shall not take or omit to take, nor permit to be taken or omitted, any action which would cause the representations and warranties of the Vendor contained in this Agreement to be untrue;

(d)     they shall ensure that all of the conditions of the Closing to be performed or complied with by any of them shall have been so performed or complied with prior to the Closing Time, to the extent that such conditions are within the control of any of the Sellers or the Company and otherwise shall use their best efforts to so ensure that such conditions are so performed or complied with;

(l)     **Clearance Certificate** – The Sellers shall have provided the Purchaser with a Clearance Certificate or the equivalent which may be required by any state Taxing Authority in order to relieve the Purchaser of any obligation to withhold a portion of the Purchase Price.

(m)     **Receipt of Closing Documentation** - All documentation relating to the transactions contemplated by this Agreement and the due authorization of the performance by each of the Sellers of their obligations under this Agreement shall have been approved by the Purchaser and its counsel, acting reasonably, and the Purchaser shall have received copies of all such documentation or other evidence as it may reasonably request, in form (as to certification and otherwise) and substance satisfactory to the Purchaser and its counsel, acting reasonably.

(n)     **Lease Termination** – The Company shall terminate a real estate lease between the Company and Hawkeye East Enterprises dated April 1, 2003.

**4.2     Sellers' Conditions.**  The obligations of the Sellers to complete the sale of the Shares hereunder shall be subject to the satisfaction of or compliance with, at or before the Closing time, each of the following conditions precedent (each of which is hereby acknowledged to be inserted for the exclusive benefit of the Sellers and may be waived by them in whole or in part):

(a)     **Truth and Accuracy of Representations of Purchaser at Closing Time** - All of the representations and warranties of the Purchaser made in or pursuant to this Agreement, including without limitation the representations and warranties made by the Purchaser and set forth in Article III, shall be true and correct as at the Closing Time and with the same effect as if made at and as of the Closing Time and the Sellers shall have received a certificate from a duly authorized senior officer of the Purchaser confirming, to the best of his knowledge, information and belief, the truth and correctness of the representations and warranties of the Purchaser contained herein.

(b)     **Performance of Obligations** - The Purchaser shall have performed or complied with, in all respects, all of its obligations, covenants and agreements hereunder.

(c)     **Receipt of Closing Documentation** - All documentation relating to the due authorization and completion of the sale and purchase hereunder of the Purchased Shares and all actions and proceedings taken on or prior to the Closing in connection with the performance by the Purchaser of its obligations under this Agreement shall be satisfactory to the Sellers and Sellers' counsel and the Sellers shall have received copies of all such documentation or other evidence as it may reasonably request in order to establish the consummation of the transactions contemplated hereby and the taking of all corporate proceedings in connection therewith in compliance with these conditions, in form (as to certification and otherwise) and substance satisfactory to the Sellers and Sellers' counsel.

(e)   the Company shall pay all payables and collect all receivables in a timely manner in the ordinary and normal course of business consistent with past practice;

(e)   they shall give notice to the Purchaser of any potential defaults or breaches of the representations, warranties or covenants of any of the Sellers or any other matter which may affect the Business or the Company forthwith upon becoming aware of such matters;

(f)   all of the Company's affiliated party accounts, officer loans, and loans due to the Company from the Sellers shall be settled in full and paid out at or prior to Closing;

(g)   from the date hereof, until this transaction terminates, the Sellers and the Company shall not, engage in any discussions or negotiations with any third party regarding the sale of the Shares or any of the Company's material assets; and

(h)   Purchaser may at its cost have environmental assessments conducted on all Real Property, and may conduct current tank tests for all underground storage tanks.

**5.2   Actions to Satisfy Closing Conditions.**   In addition to the covenants of the Parties set out herein, each of the Parties hereby covenants and agrees to take all such reasonable actions as are within its power to control so as to ensure compliance with any conditions set forth in Article IV hereof which are for the benefit of any other Party.

**5.3   Access for Due Diligence.**   The Company shall permit the Purchaser and its employees, agents, counsels and accountants or other representatives, between the date hereof and the Closing time, without interference to the ordinary conduct of the Business of the Company and at the Purchaser's sole cost and expense, to have free and unrestricted access during normal business hours to the premises and to all the books, accounts, records and other data of the Company (including, without limitation, all corporate, accounting and tax records of the Company) and to the properties and assets of the Company and to furnish with respect to the Business, properties and assets of the Company as the Purchaser shall from time to time reasonably request to enable confirmation of the matters warranted in Section 3.1 hereof. Without limiting the generality of the foregoing, it is agreed that the accounting representatives of the Purchaser shall be afforded ample opportunity to make a full investigation of all aspects of the financial affairs of the Company. Until the Closing Time, and in the event of the termination of this Agreement without consummation of the transactions contemplated hereby, the Purchaser will keep confidential any information (unless readily available from public or published information or sources) obtained from the Company or the Sellers. If this Agreement is so terminated, promptly after such termination, all documents, work papers and other written material obtained from any Person in connection with this Agreement and not theretofore made public (including all copies thereof), shall be returned to the Person which provided such material.

**5.4   Financial Statements.**   Projected Financial Statements shall be provided by the Sellers and the Company prior to the Closing and Final Financial Statements shall be

prepared by the sellers prior to December 31, 2003 and shall be subject to the review and approval of the Purchaser.

## ARTICLE VI
## INDEMNIFICATION

**6.1   General Indemnification.**   From and after the Closing Date, subject to the limitations in Section 6.2 below, the Sellers, jointly and severally, shall indemnify and hold Purchaser harmless the Purchaser from and against any liabilities, obligations, demands, judgments, losses, costs, damages or expenses whatsoever (including attorneys' fees and disbursements incurred by Purchaser in connection) (collectively, the "Damages") that the Purchaser may sustain, suffer or incur and that result from, arise out of or relate to: (a) any breach of any representation, warranty, covenant or agreement of any of the Sellers contained in this Agreement or any other agreement, instrument or document contemplated by this Agreement (including Non-Competition Agreements); (b) the Sellers' Liabilities; and (c) any and all insurance premiums, charges, assessments and reassessments, including, without limitation, those in respect of workers' compensation, which arise from loss or claims experience prior to the Closing.

**6.2   Limitations.**

(a)   For the purposes of all calculations and claims pursuant to this Article VI, and in particular (but without limitation) calculations with regard to Damages or the amount thereof, any representation or warranty in this Agreement which is qualified by a reference to materiality (as, for example, by the words "material" or "materially" or the phrase "in all material respects") shall be read and interpreted as though no such provision or qualification as to materiality existed.

(b)   Notwithstanding any other provisions of this Agreement, solely in order to avoid duplication, the Purchaser shall not be entitled to collect Damages more than once with respect to the same facts or circumstances regardless of the number of representations, warranties, covenants or other provisions hereof as to which such facts or circumstances may constitute the basis for claiming a breach.

**6.3   Procedure for Claims.**   If the Purchaser desires to seek indemnification under Section 6.1, it shall give notice (a "Claim Notice") to each of the Sellers from which it seeks indemnification (an "Indemnitor"). Any such notice shall briefly explain the nature of the claim and the parties known to be involved, and shall specify the amount thereof. If the matter to which a claim relates shall not have been resolved as of the date of the Claim Notice, the Purchaser shall estimate the amount of the claim in the Claim Notice, but also specify therein that the claim has not yet been liquidated (an "Unliquidated Claim"). If the Purchaser gives a Claim Notice for an Unliquidated Claim, the Purchaser shall also give a second Claim Notice (the "Liquidated Claim Notice") within 60 days after the matter giving rise to the claim becomes finally resolved, and the Second Claim Notice shall specify the amount of the claim. Each Indemnitor to which a Claim Notice is given shall respond to the Purchaser (a "Claim Response") within 30 days (the "Response

Period") after the later of: (i) the date that the Claim Notice is given; or (ii) if a Claim Notice is first given with respect to an Unliquidated Claim, the date on which the Liquidated Claim Notice is given. Any Claim Notice or Claim Response shall be given in accordance with the notice requirements hereunder, and any Claim Response shall specify whether or not the Indemnitor giving the Claim Response disputes the claim described in the Claim Notice. If any Indemnitor fails to give a Claim Response within the Response Period, such Indemnitor shall be deemed not to dispute the claim described in the related Claim Notice. If any Indemnitor elects not to dispute a claim described in a Claim Notice, whether by failing to give a timely Claim Response or otherwise, then the amount of such claim shall be conclusively deemed to be an obligation of such Indemnitor.

**6.4    Third Party Claims.**  If the Purchaser desires to seek indemnification under any part of this Article VI with respect to any actions, claims, suits or other administrative or judicial proceedings (each, an "Action") that may be instituted by a third party it shall give each Indemnitor prompt notice of a third party's institution of such Action. After such notice, any Indemnitor may, or if so requested by the Purchaser, any Indemnitor shall, participate in such Action or assume the defense thereof, with counsel satisfactory to Purchaser; provided, however, that Purchaser shall have the right to participate in the defense of such Action; and provided, further, that the Indemnitor shall not consent to the entry of any judgment or enter into any settlement, except with the written consent of the Purchaser. The Purchaser shall cooperate with the Sellers in all such settlements and defenses and shall take all commercially reasonable efforts without having to make any expenditure to provide the Sellers with access to the books and records and employees of the Company and Subsidiaries as the Sellers may reasonably request. If an Indemnitor does not assume the defense of any Action within 20 days of the date upon which it is requested to do so by the Purchaser, the Purchaser may defend or settle the Action in such manner as it deems appropriate in its sole discretion. Any failure to give prompt notice under this Section 6.4 shall not bar the Purchaser's right to claim indemnification under this Article VI, except to the extent that an Indemnitor shall have been harmed by such failure.

**6.5    Set-Off.**  The payments payable to the Indemnitors and the Covenantors pursuant to Article II or to any subsequent sale of Shares to Seller or any employment agreement between the Parties hereto, shall be subject to set-off and reduction to the extent of all Damages referred to in Section 6.1. In the case of an Unliquidated Claim: (a) if the amount of the claim set out in the Liquidated Claim Notice exceeds the amount previously set-off by the Purchaser in respect of that claim (being the estimate of the amount of the claim set out in the Claim Notice), the payments payable to the Indemnitors and the Covenantors pursuant to Article II shall be subject to set-off and reduction to the extent of the difference; and (b) if the amount of the claim set out in the Liquidated Claim Notice is less than the amount previously set-off by the Purchaser in respect of that claim (being the estimate of the amount of the claim set out in the Claim Notice) the Liquidated Claim Notice shall be accompanied by payment to the Indemnitors in the amount of the difference or, in the case of the Covenantors who are not Indemnitors, payment in the amount of the difference shall be made by the Purchaser as soon as is practicable.

## ARTICLE VII
## TERMINATION

**7.1    Grounds for Termination.**  In addition to any other rights of termination in Section 4.2 or at law, this Agreement may be terminated at any time before the effective time of the Closing (the "Effective Time") (but not after) in the following manner and circumstances:

(a)     by mutual written consent of the Purchaser and the Sellers representing the holders of two-thirds of the Shares as well as three-fourths of the number of Sellers (the "Control Sellers");

(b)     by either the Purchaser or the Sellers, in either case by notice to the other Parties, if the Closing shall not have been consummated on or before November 30, 2003 (the "Termination Date"); provided, however, that the right to terminate this Agreement under this Section 7.1 shall not be available to any Party whose failure to fulfill any obligation under this Agreement has been a cause of, or has resulted in, the failure of the Effective Time to occur on or before the Termination Date;

(c)     by any Party if a court of competent jurisdiction or governmental, regulatory or administrative agency or commission shall have issued a court order (which court order the Parties shall use commercially reasonable efforts to lift or set aside) that permanently restrains, enjoins or otherwise prohibits the sale of the Shares, and such court order shall have become final and non-appealable;

(d)     by the Purchaser if any Seller shall have breached, or failed to comply with, any of its obligations under this Agreement or any representation or warranty made by any Seller shall be incorrect, and such breach, failure or misrepresentation is not cured within 15 days after written notice thereof; and, in either case, any such breaches, failures or misrepresentations, individually or in the aggregate, result or would reasonably be expected to result in a material adverse effect on the Business or the profitability or financial condition of the Company; and

(e)     by the Sellers if the Purchaser shall have breached, or failed to comply with, any of its obligations under this Agreement or any representation or warranty made by the Purchaser shall be incorrect, and such breach, failure or misrepresentation is not cured within 15 days after notice thereof and, in either case, any such breaches, failures or misrepresentations, individually or in the aggregate, result or would reasonably be expected to be material to the Sellers as a whole group.

**7.2    Effect of Termination.**  If this Agreement is terminated pursuant to Section 4.2 or Section 7.1, the agreements contained in Section 5.3 regarding confidentiality, and in Article VIII shall survive the termination hereof, and any Party may pursue any legal or equitable remedies that may be available if such termination is based on a breach by

another Party.

## ARTICLE VIII
## GENERAL

**8.1    Announcements.**  No public announcement or press release concerning the transaction contemplated herein shall be made at any time by the Sellers, the Company or the Purchaser without the prior written consent and joint approval of the Sellers and Purchaser.  Notwithstanding this provision, the Purchaser or the Company may issue a public announcement after the Closing.

**8.2    Confidentiality.**  In the event that the purchase and sale of the Purchased Shares herein provided for is not consummated, the Purchaser shall not use for its own purposes any information, trade secrets or confidential data relating to the Sellers, the Company or the Business, including the customers of the Business, its operations or the methods of conducting the Business, discovered or acquired by the Purchaser, its representatives or auditors, or any of the foregoing as a result of the Sellers making available to the Purchaser or its representatives any information relating to the Sellers, the Company or the Business, and the Purchaser shall not disclose divulge or communicate orally, in writing or otherwise, any such information, trade secrets or confidential data so discovered or acquired to any other person, firm or Company.  Notwithstanding the foregoing, this Section 8.2 shall not apply to: (a) information in the public domain, (b) information acquired by Purchaser from sources other than the Sellers which are not to the knowledge of the Purchaser under any confidentiality obligation of the Sellers or the Company, or (c) information developed by Purchaser or its subsidiaries, associates, affiliates, employees, agents or contractors independently and without reference to information provided by the Sellers hereunder.

**8.3    Arbitration.**   If the Parties do not resolve a dispute respecting any matter contemplated by this Agreement within 20 days of notice of such dispute by the Purchaser to the Sellers or by the Sellers to the Purchaser, the dispute shall be settled by arbitration conducted on a confidential basis under the US Arbitration Act, if applicable, and the then current Commercial Arbitration Rules of the American Arbitration Association (the "Association") strictly in accordance with the terms of this Agreement and the substantive law of the State of California.  Upon submitting the matter to arbitration, the parties shall request that the arbitrator assess the costs of the arbitration to the parties in an equitable manner.  The arbitration shall be conducted at the Association's regional office located in the state and county of San Francisco.  If there is more than one dispute, all disputes shall, to the extent practicable, be combined in one arbitration conducted by one arbitrator.  The arbitration shall be conducted by a single arbitrator who is agreed upon by the parties to the dispute or, in the absence of such agreement, selected by the Association and who is either a member of a national accounting firm familiar with businesses engaged in bus transportation or a retired judge.  Judgment upon the arbitrators' award may be entered and enforced in any court of competent jurisdiction.  Neither party shall institute a proceeding hereunder unless at least 60 days prior thereto such party shall have given written notice to the other party of its intent to do so.

**8.4   Expenses.** The expenses incurred by each party hereto in connection with this Agreement and the transactions provided herein shall be borne by such party and, in particular, all professional fees incurred by the Sellers in connection with the transactions contemplated by this Agreement shall be borne by the Sellers and not charged to the Company so that the Company will bear no expense in connection with this Agreement and the transactions provided for herein.

**8.5   Notices.** Any notice, direction or other document required or permitted to be given hereunder or for the purposes hereof (hereinafter in this Section 8.4 called a "notice") to any Party shall be in writing and shall be sufficiently given if delivered personally or if transmitted by telex, facsimile or other form of recorded communication tested prior to transmission to such Party:

(a)   in the case of a notice to the Sellers:

   Ryan James Larsen, 146 Hwy 173, Atlantic, IA 50022
   Marsha Louise Madrid, 3744 Kinsale Ln SE, Olympia, WA 98501
   Janet Sue Davis, 6417 N 183rd Av., Wadell, AZ 85355
   Kevin John Dresser, 407 Roanoke St, Ste 2, Christiansburg, VA 24073

(b)   in the case of a notice to the Purchaser at:

   MV Transportation, Inc.
   360 Campus Lane Suite 201
   Fairfield, CA  94534

   with a facsimile number of (707) 863-8944
   Attention:  General Counsel

or at such other address as the Party to whom such writing is to be given shall have last notified the Party giving the same in the manner provided in this section.  Any notice delivered in person to the Party to whom it is addressed as hereinbefore provided shall be deemed to have been given and received on the day it is so delivered at such address, provided that if such day is not a Business Day then the notice shall be deemed to have been given and received on the first Business Day next following such day.  Any notice transmitted by telex, facsimile or other form of recorded communication shall be deemed given and received on the Business Day of its transmission.

**8.6   Entire Agreement.** This Agreement, including the Schedules hereto, together with the agreements and other documents to be delivered pursuant hereto, constitute the entire agreement between the Parties pertaining to the subject matter hereof and supersede all prior agreements, understandings, negotiations and discussions, whether oral or written, of the Parties and there are no warranties, representations or other agreements between the Parties in connection with the subject matter hereof except as

specifically set forth herein and therein.

**8.7    Waivers.** No modification, waiver or termination of this Agreement shall be binding unless executed in writing by the Party to be bound thereby. No waiver of any of the provisions of this Agreement, in whole or in part, shall be deemed or shall constitute a waiver of any other provisions hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

**8.8    Applicable Law.** This Agreement and the rights, obligations and relations of the Parties shall be governed by and construed in accordance with the laws in force in the State of California, without regard to provisions concerning conflicts of laws, and the rights and obligations of the parties shall be interpreted accordingly.

Subject to the arbitration provisions herein, the Sellers, Purchaser and the Company agree that exclusive jurisdiction in any action, suit, or proceeding related to any dispute arising under this Agreement and the other agreements relating to this Agreement (for purposes of this Section, a "Dispute") shall be in any United States District Court for the District for the Northern District of California (or, notwithstanding such consent to jurisdiction, if jurisdiction does not lie in said federal court, then the parties consent to jurisdiction of any state court located within such Northern District of California). The Sellers, Purchaser and the Company waive any right to trial by jury or to have a jury participate in resolving any Dispute, whether relating to contract, tort or otherwise.

Subject to the arbitration provisions herein, each of Sellers, Purchaser and the Company hereby consents to the jurisdiction of each United States District Court in the Northern District of California in any action, suit, or proceeding related to a Dispute and agrees that service of process or notice in any such action, suit, or proceeding shall be effective if in writing and sent by certified or registered mail, return receipt requested, postage prepaid, as provided in Section 8.5 of this Agreement.

**8.9    Time.** Time shall be of the essence of this Agreement.

**8.10    Assignment.** Neither this Agreement nor any rights or obligations hereunder shall be assignable by any Parties without the prior written consent of the other Party. Notwithstanding the foregoing, the Purchaser may assign this Agreement to a subsidiary of the Purchaser, without the consent of the Sellers or any other Person, subject to applicable laws. This Agreement shall enure to the benefit of and be binding upon the Parties and their respective successors (including any successor by reason of amalgamation of the Purchaser) and permitted assigns.

**8.11    Further Assurances.** The Parties hereto shall with reasonable diligence do all such things and provide all such reasonable assurances as may be required to consummate the transactions contemplated hereby, and each Party shall provide such further documents or instruments required by any other Party as may be reasonably necessary or desirable to effect the purpose of this Agreement and carry out its provisions, whether before or after the Closing.

**8.12   Severability.**  If any covenant or provision of this Agreement is prohibited in whole or in part in any jurisdiction, such covenant or provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition without invalidating the remaining covenants and provisions hereof and shall, as to such jurisdiction, be deemed to be severed from this Agreement to the extent of such prohibition.

**8.13   Amendments.**  This Agreement may be amended, modified or supplemented only by written instrument duly executed by the Company, the Purchaser and the Sellers except that no such amendment, modification or supplement that imposes an affirmative obligation on a Party shall be binding on such Party unless he, she or it gives its written consent thereto.  Any term or provision of this Agreement may be waived by a written instrument signed by the Purchaser in the case of a term or provision to which the Purchaser is entitled to the benefit or signed by a Seller in the case of a term or provision to which such Seller is entitled to the benefit.

**8.14   Counterparts.**  This Agreement may be executed by the Parties in separate counterparts (and by facsimile transmission) each of which when so executed and transmitted or delivered shall be an original, but all such counterparts shall together constitute one and the same agreement.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF the Parties have hereunto duly executed this Agreement on the date first above written.

_____
Witness

_____
Ryan James Larsen

_____
Witness

_____
Janet Sue Davis

_____
Witness

_____
Marsha Louise Madrid

_____
Witness

_____
Kevin John Dresser

**LOCAL MOTION ITS, INC.**

By: _____
Ryan James Larsen, President

**MV TRANSPORTATION, INC.**

By: _____
Jon Michael Monson, Chief Executive Officer

IN WITNESS WHEREOF the Parties have hereunto duly executed this Agreement on the date first above written.

Witness _____

_____
Witness

Witness _____

Witness _____

Ryan James Larsen _____

_____
Janet Sue Davis

Marsha Louise Madrid _____

Kevin John Dresser _____

**LOCAL MOTION ITS, INC.**

By: _____
    Ryan James Larsen, President

**MV TRANSPORTATION, INC.**

By: _____
    Jon Michael Monson, Chief Executive Officer

IN WITNESS WHEREOF the Parties have hereunto duly executed this Agreement on the date first above written.

| | |
|---|---|
| _____ | _____ |
| Witness | Ryan James Larsen |
| | |
| _____ | _____ |
| Witness | Janet Sue Davis |
| | |
| _____ | _____ |
| Witness | Marsha Louise Madrid |
| | |
| _____ | _____ |
| Witness | Kevin John Dresser |

**LOCAL MOTION ITS, INC.**

By: _____
      Ryan James Larsen, President

**MV TRANSPORTATION, INC.**

By: _____
      Jon Michael Monson, Chief Executive Officer

IN WITNESS WHEREOF the Parties have hereunto duly executed this Agreement on the date first above written.

_____          _____
Witness                                        Ryan James Larsen


_____          _____
Witness                                        Janet Sue Davis

                                              *Marsha Louise Madrid* (signature)
_____
Witness                                        Marsha Louise Madrid


_____          _____
Witness                                        Kevin John Dresser


**LOCAL MOTION ITS, INC.**


By: _____
        Ryan James Larsen, President


**MV TRANSPORTATION, INC.**


By: _____
        Jon Michael Monson, Chief Executive Officer

IN WITNESS WHEREOF the Parties have hereunto duly executed this Agreement on the date first above written.

_____                    _____
Witness                                      Ryan James Larsen


_____                    _____
Witness                                      Janet Sue Davis

_____                    _____
Witness                                      Marsha Louise Madrid


_____                    _____
Witness                                      Kevin John Dresser


**LOCAL MOTION ITS, INC.**


By: _____
        Ryan James Larsen, President


**MV TRANSPORTATION, INC.**

By: _____
        Jon Michael Monson, Chief Executive Officer

IN WITNESS WHEREOF the Parties have hereunto duly executed this Agreement on the date first above written.

_____        _____
Witness                                              Ryan James Larsen


_____        _____
Witness                                              Janet Sue Davis


_____        _____
Witness                                              Marsha Louise Madrid

_____        _____
Witness                                              Kevin John Dresser


**LOCAL MOTION ITS, INC.**


By: _____
         Ryan James Larsen, President


**MV TRANSPORTATION, INC.**

By: _____
         Jon Michael Monson, Chief Executive Officer

**EXHIBIT 2**

## NON-COMPETITION AGREEMENT

This Non-Competition Agreement ("Covenant") is given in connection with the Share Purchase Agreement entered into between the parties this same date by RYAN J. LARSEN, a resident of Iowa, MARSHA L. MADRID, a resident of Washington, KEVIN J. DRESSER, a resident of Virginia, and JANET S. DAVIS, a resident of Arizona (jointly and severally referred to as Shareholders) in favor of MV TRANSPORTATION, INC., a California corporation ("Purchaser"), and LOCAL MOTION ITS, INC., a Virginia corporation ("Company") to be effective on and as of December 1-, 2003 ("Effective Date").

### RECITALS

**WHEREAS,** the Company and Purchaser engage in the business of of paratransit services, consulting services, medical transportation, paratransit brokerage and paratransit software Application Service Provider (ASP).

**WHEREAS,** there are issued and outstanding One Thousand (1,000) shares of the Company's authorized shares of common stock, no par value (the "Capital Stock"). Shareholders jointly own One Thousand (1,000) shares of the Capital Stock, equaling One Hundred percent (100%) of the issued Capital Stock of the Company (the "Stock").

**WHEREAS,** The parties have entered into a Share Purchase Agreement, dated the Effective Date (the "Agreement"). Pursuant to the Agreement, Purchaser shall purchase the 80% of Stock from the Shareholders.

**WHEREAS,** in accordance with the terms of the Agreement, Purchaser and Company desire to obtain from Shareholders, and Shareholders are willing to grant to Purchaser and Company a covenant not to compete.

All capitalized terms in this Covenant shall have the same meanings ascribed to them in the Agreement unless otherwise specifically defined herein.

### ARTICLE I.  COVENANT AGREEMENT

For and in consideration of the above recitals, for consideration provided to Shareholders under the Agreement, and for other good and valuable consideration this Covenant is given by Shareholders and is accepted by Purchaser and the Company on the terms and conditions stated herein.

Section 1.01. <u>Term of Covenant</u>.  This Covenant shall be in force for a period of Sixty (60) calendar months from the Closing Date.

Section 1.02. The Covenant. The Shareholders hereby agree that neither they nor their Affiliates anywhere in all the cities, counties and states within the United States in which Purchaser, Company or any of their subsidiaries, successor or affiliates do or market business (collectively the "Covenant Area") shall, in any manner, directly or indirectly:

1.02.1    Engage in, or become interested in (whether as an owner, stockholder, lender or other investor, director, officer, employee, consultant, broker, agent, trustee, landlord or otherwise) any business which offers to provide services or products substantially similar to or in competition with the Company or Purchaser (including Purchaser's subsidiaries, successor or affiliates) within the Covenant Area; or

1.02.2    Solicit, service, divert or appropriate to any competing business customer or client or other business opportunities of the Company or Purchaser (including Purchaser's subsidiaries, successor or affiliates); or

1.02.3    Attempt to induce any employee of the Company or Purchaser (or Purchaser's subsidiaries, successor or affiliates) to leave such employment.

1.02.4    This Agreement shall not be construed to prohibit Shareholders from engaging as a private consultant on an individual basis to government agencies in the United States, so long as Shareholder is not acting on behalf of any other person on entity, or in partnership or as an employee of any other person or entity and so long as the government agency is not then a customer of the Purchaser (or Purchaser's subsidiaries, successor or affiliates) or Company (except that consulting for a government agency that is a customer of Purchase or Company shall be permitted if such consulting does not involve or is not associated with the service being performed by the Purchaser or Company) .  In the event a Shareholder does engage in consulting permitted by this Section, such Shareholder shall provide prior written notice to Purchaser and Company of the name of the entity and the terms of the engagement.

1.02.5    This Agreement shall not be construed to prohibit Shareholders from working as an employee of a federal, state or local government agency.

1.02.6    At the time of the execution of this Agreement, the Company or Purchaser is not engaged in the business of the development of or sale of computer software for the scheduling, routing, reservation or dispatching of passenger transportation, transit or paratransit vehicles (hereinafter referred to as "Transit Software Business").   In the event a Shareholder leaves the employ of the Company or Purchaser prior to Company or Purchaser beginning the development of the Transit Software Business or prior to the Company or Purchaser acquiring a Transit Software Business, this Agreement shall not be construed to prohibit a Shareholder from

engaging in the Transit Software Business after leaving the employ of the Company or Purchaser. In the event the Company or Purchaser begins the development of or completes an acquisition of a company in the Transit Software Business at any time in the future, this Agreement shall extend to the Transit Software Business for the remaining term hereof.

For purposes of this Section 1.02, the term "Affiliate" shall include any individual, trust, corporation, partnership or other business entity that directly or indirectly through one or more intermediaries, has an equity interest which is owned by Shareholders. For purposes of determining the foregoing, equity interests representing less than five (5%) percent of total outstanding equity shall be ignored and the constructive ownership provisions of Section 318 of the Code shall apply for purposes of determining ownership.

Section 1.03    <u>Divisible by Time and Geographical Area.</u>    The parties hereby agree that, if the restrictive covenants, or any of them, are held to be unreasonable, arbitrary or against public policy, such covenant or covenants shall be considered divisible both as to time and geographical area. Each month of the specified period shall be deemed a separate period of time, and each quarter mile of the Covenant Area shall be deemed a separate geographical area, so that the lesser period of time or geographical area shall remain effective so long as the time or geographical area are not unreasonable, arbitrary, or against public policy. The parties further agree that, in the event any court determines the specified time period or the specified geographical area to be unreasonable, arbitrary, or against public policy, a lesser time period or geographical area which is determined to be reasonable, nonarbitrary and not against public policy may be enforced against the Shareholders.

## ARTICLE 2. REMEDIES

In the event of breach of this Covenant set forth in this instrument, Shareholders hereby acknowledge and stipulate that Purchaser and Company will suffer irreparable damage for any such breach, that any remedy at law for any such breach of this Covenant would be inadequate and that the Purchaser and the Company will be entitled to both (a) a preliminary or permanent injunction to prevent the continuation of such breach, and (b) monetary damages insofar as they can be determined. Nothing contained herein shall be construed to prohibit either the Purchaser or the Company from also pursuing any other remedy, the parties having agreed that all remedies shall be cumulative.

## ARTICLE 3. MISCELLANEOUS

Section 3.01 <u>Attorneys' Fees and Costs</u>. In the event that any party to this Covenant shall initiate or bring an action or other proceeding against any other party to this Covenant to enforce or declare any rights herein created, or to bring about or declare the termination, cancellation, or rescission of this Covenant, the prevailing party

or parties in such action or proceeding shall be entitled to receive from the other party or parties all reasonable attorneys' fees and costs incurred in connection therewith.

Section 3.02. <u>Successors</u>. This Covenant shall be binding upon and shall inure to the benefit of Purchaser and Company and their respective heirs, executors, successors and assigns and to the benefit of the Shareholders and their respective heirs, executors, successors and assigns.

Section 3.03. <u>Headings</u>. Section titles or captions contained in this Covenant are included only as a matter of convenience and reference, and in no way define, limit, extend, or describe the scope of this Covenant or the intent of any provision thereof.

Section 3.04. <u>Assignment</u>. No party hereto may assign this Covenant or any rights or remedies hereunder without the prior written consent of all of the parties hereto.

Section 3.05. <u>Entire Covenant</u>. This Covenant, together with all Exhibits incorporated herein or attached hereto, constitutes the entire agreement between the parties dealing with the specific subject matter treated herein and superseding all negotiations, prior discussions, and written agreements. This Covenant may not be changed, modified, or amended, except by a writing executed by all of the parties.

Section 3.06. <u>Governing Law</u>. This covenant shall be governed by the laws of the State of California.

Section 3.07. <u>Severability</u>. If any provisions of this Covenant shall be held to be invalid or unenforceable for any reason, then, so far as is reasonable possible, the remainder of the Covenant shall be considered valid and operative.

Section 3.08. <u>Waiver</u>. No Waiver of any term, provision or condition of this Covenant in any one or more instances, shall be construed or be deemed to be a further or continuing waiver of any such term, provision, or condition of this Covenant, nor shall it be construed nor shall it constitute a waiver of any other term or provision of this Covenant. No waiver shall be effective unless written and signed by the party or parties making such waiver.

Section 3.09. <u>Interpretation</u>. Should any provision of this Covenant require interpretation by a court of law, it is agreed by the parties that the Court interpreting or construing this Covenant shall not apply a presumption that the terms of this Covenant shall be more strictly construed against one party by reason of the rule of construction that a document is to be construed more strictly against the party who by himself or through his agent prepared such document, it being agreed that the agents of all parties have participated in the preparation of this Agreement.

Section 310. <u>Representation of Counsel</u>. The parties acknowledge that they have each been advised to be represented by independent counsel of their choice in

the negotiation of this Covenant, that they have read this Covenant, and that its meaning and legal consequences have been explained to them.

[SIGNATURES TO FOLLOW]

The parties have signed this Covenant to be effective on and as of the Effective Date stated hereinabove.

"SHAREHOLDERS"

_____
RYAN J. LARSEN

_____
MARSHA L. MADRID

_____
KEVIN J. DRESSER

_____
JANET S. DAVIS

This Covenant is accepted and its terms and conditions are agreed.

MV TRANSPORTATION, INC.,
a California corporation

By: _____

JON MONSON, President/CEO

ATTEST:

_____

JOHN A. BIARD, Secretary

the negotiation of this Covenant, that they have read this Covenant, and that its meaning and legal consequences have been explained to them.

[SIGNATURES TO FOLLOW]

The parties have signed this Covenant to be effective on and as of the Effective Date stated hereinabove.

"SHAREHOLDERS"

_____
RYAN J. LARSEN

_____
MARSHA L. MADRID

_____
KEVIN J. DRESSER

_____
JANET S. DAVIS

This Covenant is accepted and its terms and conditions are agreed.

MV TRANSPORTATION, INC.,
a California corporation

By: _____
        JON MONSON, President/CEO

ATTEST:

        JOHN A. BIARD, Secretary

the negotiation of this Covenant, that they have read this Covenant, and that its meaning and legal consequences have been explained to them.

[SIGNATURES TO FOLLOW]

The parties have signed this Covenant to be effective on and as of the Effective Date stated hereinabove.

"SHAREHOLDERS"

_____

RYAN J. LARSEN

_____

MARSHA L. MADRID

_____

KEVIN J. DRESSER

_____

JANET S. DAVIS

This Covenant is accepted and its terms and conditions are agreed.

MV TRANSPORTATION, INC.,
a California corporation

By: _____

JON MONSON, President/CEO

ATTEST:

JOHN A. BIARD, Secretary

the negotiation of this Covenant, that they have read this Covenant, and that its meaning and legal consequences have been explained to them.

[SIGNATURES TO FOLLOW]

The parties have signed this Covenant to be effective on and as of the Effective Date stated hereinabove.

"SHAREHOLDERS"

_____
RYAN J. LARSEN

_____
MARSHA L. MADRID

_____
KEVIN J. DRESSER

_____
JANET S. DAVIS

This Covenant is accepted and its terms and conditions are agreed.

MV TRANSPORTATION, INC.,
a California corporation

By: _____
      JON MONSON, President/CEO

ATTEST:

      JOHN A. BIARD, Secretary

LOCAL MOTION ITS, INC.,
a Virginia corporation

By: _____

Jon Monson, CEO

ATTEST:

John A. Biard , Secretary

*EXHIBIT 3*

<u>EMPLOYMENT AGREEMENT</u>

THIS EMPLOYMENT AGREEMENT ("**Agreement**") is made and entered into effective as of December 1, 2003 (the "**Effective Date**"), by and between LOCAL MOTION ITS, INC., a Virginia corporation (the "**Company**") and JANET SUE DAVIS ("**Employee**"), with reference to the following:

### B A C K G R O U N D

The Company is in the public and paratransit contracting services, consulting, transportation brokerage and application service provider business, (the "**Business**").

Employee has extensive public transportation operation and technical experience.

The Company now desires to retain the full-time services of Employee as Senior Vice President of the Company and Employee is willing to be employed by the Company in that capacity on the terms and conditions set forth in this Agreement.

NOW THEREFORE, in consideration of the promises herein made and on the terms and subject to the conditions herein contained, the Company and Employee hereby agree as follows:

1.    EMPLOYMENT.    The Company hereby employs Employee on the terms set forth herein and Employee hereby accepts such employment, for a term beginning on the Effective Date and ending on November 30, 2005 (the "**Initial Term**"), unless sooner terminated pursuant to Section 5 below. This Agreement will automatically renew for additional annual terms ("**Renewal Terms**") upon the expiration of the Initial Term, unless either party delivers a notice to the other party, on or before August 1, stating the party's election not to renew this Agreement for the Renewal Term commencing on the following December 1, provided that the foregoing will not affect the Company's rights to terminate this Agreement pursuant to Sections 5.3 or 5.4 below.

2.    DUTIES.    During the period of her employment with the Company hereunder, Employee will be employed as Senior Vice President of the Company and Employee will:

(a)    devote her full business time and attention, and give her best effort and skill solely to the Company's business affairs and interests;

(b)    perform such services and assume such duties and responsibilities appropriate to the positions of Senior Vice President and those

which may from time to time be reasonably assigned to him by the President of the Company, to whom Employee will directly report; and

(c)        in all respects use her best efforts to further, enhance and develop the Company's business affairs, interests and welfare.

3.    COMPENSATION.  In consideration of Employee's services to the Company during the term of this Agreement, Employee will receive the following compensation:

(a)  The Company shall pay Employee a base salary of $145,000 per annum during the period from the Effective Date through November 30, 2004.  Employee's base salary will be paid in equal installments (pro rated for portions of a pay period) on the Company's regular pay days and the Company will withhold from such compensation all applicable federal and state income, social security, disability and other taxes as required by applicable laws.  On December 1, 2004 and annually thereafter, provided this Agreement is extended by both parties, Employee's base salary shall be increased by the Company at its sole discretion after the Company assesses the performance of Employee.

(b)  The Employee and Company agree to negotiate in good faith a written bonus plan for Employee, payable annually, based on the performance of the Employee.

(c)  The Company shall grant Employee an option to acquire shares of Common Stock in the Company pursuant to the Restricted Stock Purchase Agreement, a copy of which is attached to this Agreement as **Exhibit A**.

(d)  The Company shall reimburse Employee for any signing bonus that Employee is legally obligated to repay her prior employer, up to a maximum of $15,000, subject to provision of reasonable documentation of these expenses.

4.  BENEFITS AND REIMBURSEMENTS.

4.1  Employee will, during the term hereof, have the right to receive such benefits as are generally made available to full-time executive officers of the Company.  In addition, or inclusive of such benefits, the Company will provide Employee with the following:

(a)    either (i) the Company's standard medical and dental plan insurance covering Employee and her immediate family, or (ii) upon Employee's election, a maximum of $400 per month allowance for private medical and dental insurance coverage for Employee and her immediate family, *provided that* Employee's election to receive such monthly insurance allowance will not preclude Employee from choosing to receive the coverage provided for in subsection (i), in lieu of such allowance, at a later date;

(b)    in addition to normal holidays recognized by the Company, Employee will be entitled to three weeks paid vacation annually, the earning of which is pro-rated monthly, subject to the consent of the Company as to the timing of such vacation time;

(c)    the Employee may choose to obtain a term life insurance policy on Employee's life at a face amount determined by Employee. The Company shall reimburse employee for that portion of the premium that is attributable to 2 times the employee's base annual salary as listed in 3(a) and amended from time to time. For example, if employee selects a life insurance policy in the amount of 4 times her annual salary, then Company shall reimburse Employee for 50% of the annual premium. It shall be Employee's sole responsibility to and option to place said life insurance policy, and Company shall have no responsibility for Employee's failure or choice to do so, or for any lapse in coverage due to any event. Company's sole obligation under this section shall be to reimburse Employee for premiums paid, if any.

4.2 The Company will reimburse Employee for travel and other out-of-pocket expenses reasonably incurred by Employee in the performance of her duties hereunder, provided that all such expenses will be reimbursed only (i) upon the presentation by Employee to the Company of such documentation as may be reasonably necessary to substantiate that all such expenses were incurred in the performance of her duties, and (ii) if such expenses are consistent with all policies of the Company in effect from time to time as to the kind and amount of such expenses and (iii) the cost of all other reasonable expenses, including without limitation, telephone and cellular phone expenses, DSL Internet Access costs related to the preparation and dissemination of proposals, and costs incurred to entertain clients or prospective clients.

5. TERMINATION OF EMPLOYMENT.

5.1 <u>Death of Employee</u>.    This Agreement will terminate upon the death of Employee.

5.2 <u>Permanent Disability of Employee</u>.    This Agreement will terminate if Employee becomes permanently disabled. Employee will be deemed permanently disabled for the purpose of this Agreement if Employee becomes physically or mentally incapable of performing her duties hereunder for a continuous period of one hundred eighty (180) days, in which event Employee will be deemed permanently disabled upon the expiration of such one hundred eighty (180) day period.

5.3 <u>Employee's Discharge for Cause</u>.    The Company will have the right to terminate Employee's employment hereunder for "Cause" at any time effective upon its giving of written notice setting forth with particularity the facts and circumstances constituting such Cause. For such purposes, "**Cause**" means

the occurrence of one or more of the following: (i) the commission by Employee of any fraudulent, criminal or illegal act, or any act of fraud, embezzlement, theft, bad faith, gross negligence, recklessness or willful misconduct; (ii) gross incompetence or repeated material failure or refusal to perform the duties required by this Agreement and as may be reasonably assigned to Employee by the Chief Executive Officer or Board of Directors from time to time; (iii) conviction of a felony or of any crime of moral turpitude; (iv) any material misrepresentation by Employee to the Company regarding the operation of the business; or (v) breach of any covenant of this Agreement.

5.4    The Company's Right to Terminate At Will.    Subject to the payment to Employee of the severance payments as provided in Section 5.5(b) below, the Company will have the right, exercisable at any time, to terminate Employee's employment with the Company without "Cause" (as defined in Section 5.3 above), immediately upon written notice to Employee.

5.5    Compensation Upon Termination.

(a)    Upon termination of Employee's employment pursuant to this Article 5.1-5.3, Employee will be entitled to only:  (i) the compensation provided for in Section 3(a) hereof for the period of time ending with the date of termination; (ii) "COBRA" benefits to the extent required by applicable law; and (iii) reimbursement for such expenses as Employee may have properly incurred on behalf of the Company as provided in Article 4 above prior to the date of termination.

(b)    If the Company terminates Employee's employment pursuant to Section 5.4 above only, in addition to the amounts payable in Section 5.5 (a) above, Employee will be entitled to receive a severance payment in an amount equal to the remaining salary that would have been paid to Employee during the remainder of her term of employment in the absence of such termination, as provided in Section 3(a) above, regardless of whether provided that such termination occurs during the Initial Term or during a Renewal term.  In the event such termination occurs in during a Renewal term, Employee will be entitled to receive a severance payment in an amount equal to four months salary at the rate as provided in Section 3(a) above or the rate then in effect at the time of termination, whichever is greater.

(c)    The termination of Employee pursuant to Section 5.4 shall not affect Employee's rights as set forth in either 1)  the "Local Motion ITS, Inc. 2003 Stock Option Plan" or 2)  the "Stock Option Agreement under the Local Motion ITS, Inc. 2003 Stock Option Plan", which are Schedules 2.8(a) and 2.8(b), respectively, of that certain "Share Purchase Agreement of even date herewith, to which Local Motion ITS, Inc. is also designated as the "Company".

(d)    The payments set forth in this Section 5.5 will fully discharge all responsibilities of the Company to Employee under this Agreement or relating to

or arising out of the termination of Employee's employment and shall be conditioned upon Employee's execution of a Release Agreement with the Company in substantially the form attached hereto as **Exhibit B**.

6.    UNFAIR COMPETITION BY EMPLOYEE.

6.1    Employee agrees that all trade secrets, confidential or proprietary information with respect to the activities and businesses of the Company, including, without limitation, personnel information, secret processes, know-how, customer lists, employee lists, data bases, ideas, techniques, processes, inventions (whether patentable or not), and other technical plans, business plans, marketing plans, product plans, forecasts, contacts, strategies and information (collectively "**Proprietary Information**") which were learned by Employee in the course of her employment by the Company, and any other Proprietary Information received, developed or learned by Employee hereafter in the course of her future employment by or in association with the Company, are confidential and will be kept and held in confidence and trust as a fiduciary by Employee.  Employee will not use or disclose Proprietary Information of the Company except as necessary in the normal course of the business of the Company for its sole and exclusive benefit, unless Employee is compelled so to disclose under process of law, in which case Employee will first notify the Company promptly after receipt of a demand to so disclose, and will afford the Company the opportunity to contest, prevent or limit such disclosure.

6.2    Employee and the Company acknowledge that:  (i) each covenant and restriction contained in Section 6.1 and Article 7 of this Agreement is necessary, fundamental, and required for the protection of the Company's business; (ii) such relate to matters which are of a special, unique, and extraordinary character that gives each of them a special, unique, and extraordinary value; and (iii) a breach of any such covenant or restriction will result in irreparable harm and damage to the Company which cannot be compensated adequately by a monetary award.  Accordingly, it is expressly agreed that, in addition to all other remedies available at law or in equity, and notwithstanding anything to the contrary in Section 9 below, the Company will be entitled to the immediate remedy of a temporary restraining order, preliminary injunction, or such other form of injunctive or equitable relief as may be used by any court of competent jurisdiction to restrain or enjoin any of the parties to this Agreement from breaching any such covenant or restriction, or otherwise specifically to enforce the provisions contained in Section 6.1 and Article 7 of this Agreement.

7.    PROPRIETARY MATTERS.  Employee expressly understands and agrees that any and all improvements, inventions, discoveries, processes, or know-how related to the business of the Company that are generated or conceived by Employee during the term of this Agreement, whether so generated or conceived during Employee's regular working hours or otherwise, will be the sole and exclusive property of the

Company, and Employee will, whenever requested to do so by the Company (either during the term of this Agreement or thereafter), execute and assign any and all applications, assignments and/or other instruments and do all things which the Company may deem necessary or appropriate in order to apply for, obtain, maintain, enforce and defend patents, copyrights, trade names or trademarks of the United States or of foreign countries for said improvements, inventions, discoveries, processes, or know-how, or in order to assign and convey or otherwise make available to the Company the sole and exclusive right, title, and interest in and to said improvements, inventions, discoveries, processes, know-how, applications, patents, copyrights, trade names or trademarks.

8.    KEY-MAN INSURANCE.  Employee agrees to make herself available and to undergo, at the Company's request and expense, any physical examination or other procedure necessary to allow the Company to obtain a key-man insurance policy on Employee.  If the Company obtains such policy, it will maintain the policy at its expense and all proceeds will be the sole property of the Company.

9.    ARBITRATION.  The parties will attempt in good faith promptly by negotiations to resolve any dispute or controversy arising out of or relating to this Agreement or to the employment or termination of Employee by the Company.  If a party intends to be accompanied at a negotiation meeting by an attorney, the other party will be given at least three working days' notice of such intention and may also be accompanied by an attorney.  All negotiations pursuant to this clause are confidential and will be treated as compromise and settlement negotiations for purposes of the Federal Rules of Evidence and state rules of evidence.

In the event the parties are unable to settle such controversy amicably through negotiations, the dispute will be submitted to binding arbitration before a single arbitrator in accordance with the Employment Dispute Resolution Rules of the American Arbitration Association provided that:  (i) the arbitrator will be instructed and empowered to take whatever steps to expedite the arbitration as he or she deems reasonable; (ii) each party will bear its own costs in connection with the arbitration; provided that the costs of the arbitrator will be borne by the party who the arbitrator determines not to have prevailed in the matter; (iii) the arbitrator's judgment will be final and binding upon the parties, except that it may be challenged on the grounds of fraud or gross misconduct; (iv) except for damages arising out of a breach of Section 6.1 or of Article 7 above, the arbitrator is not empowered to award damages in excess of compensatory damages and each party hereby irrevocably waives any damages in excess of compensatory damages; and (v) the arbitration will be held in San Francisco, California.  Judgment upon any verdict in arbitration may be entered in any court of competent jurisdiction.  The parties hereby consent to the jurisdiction of, and proper venue in, the federal and state courts located in Tucson, Arizona.

Unless otherwise expressly set forth in this Agreement, the procedures specified in this Section 9 will be the sole and exclusive procedures for the resolution of disputes and controversies between the parties arising out of or relating to this Agreement; provided, however, that a party may seek a preliminary injunction or other provisional judicial relief if in its judgment such action is necessary to avoid irreparable damage or to preserve the status quo. Despite such action the parties will continue to participate in good faith in the procedures specified in this Section 9.

**The parties hereby waive any and all rights they may have to trial by jury as to any disputes arising out of this Agreement.**

10. MISCELLANEOUS.

10.1  Governing Law; Interpretation.  This Agreement will be governed by the substantive laws of the State of Virginia applicable to contracts entered into and fully performed in such jurisdiction. The headings and captions of the Articles and Sections of this Agreement are for convenience only and in no way define, limit or extend the scope or intent of this Agreement or any provision hereof. This Agreement will be construed as a whole, according to its fair meaning, and not in favor of or against any party, regardless of which party may have initially drafted certain provisions set forth herein.

10.2  Assignment.  This Agreement is personal to Employee and he may not assign any of her rights or delegate any of her obligations hereunder without first obtaining the prior written consent of the Chief Executive Officer of the Company.

10.3  Notices.  Any notice, request, claim or other communication required or permitted hereunder will be in writing and will be deemed to have been duly given if delivered by hand or if sent by certified mail, postage and certification prepaid, to Employee at her residence (as noted in the Company's records), or to the Company at its address as set forth below its signature on the signature page of this Agreement, or to such other address or addresses as either party may have furnished to the other in writing in accordance herewith.

10.4  Severability.  In the event any provision of this Agreement or the application of any such provision to either of the parties is held by a court of competent jurisdiction to be contrary to law, such provision will be deemed amended to the extent necessary to comply with such law, and the remaining provisions of this Agreement will remain in full force and effect.

10.5  Entire Agreement; Amendments.  This Agreement (together with the Stock Option Agreement and any other exhibits and attachments hereto) constitutes the final and complete expression of all of the terms of the understanding and agreement between the parties to this Agreement with respect to the subject matter hereof, and this Agreement replaces and

supersedes any and all prior or contemporaneous negotiations, communications, understandings, obligations, commitments, agreements or contracts, whether written or oral, between the parties respecting the subject matter hereof. Except as provided in Section 10.4 above, this Agreement may not be modified, amended, altered or supplemented except by means of the execution and delivery of a written instrument mutually executed by both parties.

      10.6 <u>Attorneys' Fees</u>. In the event it becomes necessary for any party to initiate legal action or any other proceeding to enforce, defend or construe such party's rights or obligations under this Agreement, the prevailing party will be entitled to its reasonable costs and expenses, including attorneys' fees, incurred in connection with such action or proceeding.

[TEXT CONTINUED NEXT PAGE]

11. Employee Acknowledgment. Employee acknowledges that he has been given the opportunity to consult with legal counsel concerning the rights and obligations arising under this Agreement (including for purposes of this Section 11, the Stock Option Agreement), that he has read and understands each and every provision of this Agreement, and that he is fully aware of the legal effect and implications of this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

LOCAL MOTION ITS, INC.                          Janet Sue Davis:

By:
JON  MONSON,  CHIEF  EXECUTIVE
OFFICER

*EXHIBIT 4*

## AMENDMENT TO EMPLOYMENT AGREEMENT

This Amendment to Employment Agreement is made and effective this 13th day of January, 2005 by and between Local Motion ITS, Inc. ("Company") and Janet Davis ("Employee").

**WHEREAS,** Company and Employee entered into an Employment Agreement on the 1st day of December, 2003; and

**WHEREAS,** Company and Employee desire to modify certain aspects of this Agreement;

**NOW THEREFORE,** in consideration of the foregoing, Company and Employee agree to modify the Agreement dated December 1, 2003 in the following particulars only:

1. Section 2, Duties, is amended to add the following: "In addition to duties for Local Motion ITS, Inc., Employee shall serve, beginning January 13, 2005 as a Regional Vice President for MV Contract Transportation, Inc. and perform duties as assigned by the President of MV Contract Transportation, Inc. and its sole director.

2. Section 3(a) is modified to reflect an annual salary of $170,000 effective January 13, 2005.

3. Section 4.1(c) is modified to reflect that the Company will reimburse Employee for term life insurance in the amount of three times her annual salary rather than two times her annual salary.

4. Section 4.2(d) added to reflect that the Employee is entitled to a $500 vehicle allowance on a monthly basis.

5. In addition to the compensation in this Agreement, Employee will be entitled to participate in the MV Transportation, Inc. Regional Vice President Short Term Incentive Plan, which shall be from time to time modified by the Company.

With the exception of the changes herein, the terms of the Agreement between Company and Employee remain unchanged.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to Agreement to be duly executed as of the day and year first above written.

LOCAL MOTION ITS, INC.                                      Janet Sue Davis:

By:_____          _____
JON MONSON, CHIEF EXECUTIVE
OFFICER

**EXHIBIT 5**

## AMENDMENT TO EMPLOYMENT AGREEMENT

This Amendment to Employment Agreement is made and effective this 1st day of January, 2006 by and between Local Motion ITS, Inc. ("Company") and Janet Davis ("Employee").

**WHEREAS,** Company and Employee entered into an Employment Agreement on the 1st day of December, 2003; and

**WHEREAS,** Company and Employee amended the Agreement on January 13, 2005; and

**WHEREAS,** Company and Employee desire to modify certain aspects of this Agreement;

**NOW THEREFORE,** in consideration of the foregoing, Company and Employee agree to modify the Agreement dated December 1, 2003, as amended, in the following particulars only:

1. Local Motion ITS, Inc. hereby assigns the Agreement, as amended, to MV Public Transportation, Inc. and Employee accepts said assignment and understands that MV Public Transportation, Inc. shall henceforth be the employer of Employee and shall hereinafter be referred to as "Company" with respect to this Agreement.

2. Section 2, Duties, is amended as follows:  Effective January 1, 2006 Employee shall be the Executive Vice President Information Technology for the Company and shall serve in no other capacity.  Employee shall report to the Chief Executive Officer of the Company or his designee.

3. Section 3(a) is modified to reflect an annual salary of $225,000 effective January 1, 2006.

4. Employee will be no longer be entitled to participate in the MV Transportation, Inc. Regional Vice President Short Term Incentive Plan.  Employee shall be entitled to receive such bonus as approved from time to time by the Compensation Committee of the Board of Directors of MV Transportation, Inc. for the position of Employee.

5. Article 5.5(b), is modified to reflect that in the event of termination of Employee's employment by the Company, not for cause, the Company shall provide Employee a minimum of 365 days advance written notice of such termination.  If Employee is not provided three-hundred sixty-five (365) days advance written notice, Employee shall be entitled to severance payments determined as follows:  (i)  The maximum amount of severance paid shall be 365 calendar days, based on a severance amount per calendar day, determined by dividing the Employee's then biweekly base salary by 14; (ii) Severance payments shall start on the Employee's first day after the Company's involuntary termination of Employee's employment and shall end on the 365th day after a written notice of termination is provided (by example, if a 90 day written notice of termination is provided, then Employee shall be entitled to 275 days of severance); (iii), Severance payments shall be made on a bi-weekly basis, payable on the Company's normal pay dates; (iv) Severance payments shall be subject to normal payroll tax withholdings and other withholdings as required by law; (v) In the event Employee

obtains employment or becomes self-employed, or obtains income for personal service in any other manner during the severance period, the amount of severance payments due Employee by the Company shall be reduced by the amount of gross income derived from such other employment or self-employment (Employee agrees to report said income to the Company during the severance period); (vi) Notwithstanding any other provision of this Agreement, Employee shall not be entitled to any severance payments until the Employee has executed a release agreement substantially in the form contained in Exhibit "A" hereto; and, (vii) Notwithstanding any other provision of this Agreement, Employee shall not be entitled to receive any severance payments in the event Employee, subsequent to the Company's notice of termination not for cause, fails to fulfill his assigned duties or report to work as required prior to the effective date of termination, or in the event Employee accepts employment (as employee or contractor) by any person, company or organization then in competition with the Company during the period of severance payments.

6. Section 4.2(d) is amended to reflect that Company shall provide an automobile allowance equal to the monthly payment on a vehicle owned by Employee, such payment to be for a minimum term of 60 months at an interest rate not to exceed 7% with a purchase price not to exceed $50,000. In the event the automobile is more than $50,000, the Company will pay a pro-rata amount of the payment based on the ratio of $50,000 to the total cost. Furthermore, Company shall reimburse cost of employee's auto insurance for said vehicle and the cost of fuel and maintenance on said vehicle.

7. Employee's cell phone allowance will be $250.00 per month on the month the Company's current contract for Employee's Sprint Wireless card is expired and shut off.

8. In the future, if the Company caused payroll deductions for medical insurance, the Employee's salary will be increased a like amount.

9. Employee is entitled to life insurance in the amount of 3 times her annual salary paid by the Company, provided the Employee takes all steps to obtain coverage.

With the exception of the changes herein, the terms of the Agreement between Company and Employee remain unchanged.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to Agreement to be duly executed as of the day and year first above written.

LOCAL MOTION ITS, INC.                          Janet Sue Davis:

By:_____

   JON MONSON, CHIEF EXECUTIVE
OFFICER

MV PUBLIC TRANSPORTATION, INC.

By:_____
   JON MONSON, CHIEF EXECUTIVE OFFICER