ORIGINAL FILED
NOV -9 2007
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing

1  Dale C. Campbell, State Bar No. 99173
   Charles L. Post, State Bar No. 160443
2  James Kachmar, State Bar No. 216781
   **weintraub** genshlea chediak
3  a law corporation
   400 Capitol Mall, 11th Floor
4  Sacramento, California 95814
   (916) 558-6000 – Main
5  (916) 446-1611 – Facsimile

6  Attorneys for Plaintiffs
   MV Transportation, Inc. and
7  MV Public Transportation, Inc.

8

9              UNITED STATES DISTRICT COURT

10             NORTHERN DISTRICT OF CALIFORNIA

11                 SAN FRANCISCO DIVISION

12                                           CV 07    5712

13 MV TRANSPORTATION, INC., a California    ) Case No.
   corporation; and MV PUBLIC               )
14 TRANSPORTATION, a California             ) **MEMORANDUM OF POINTS AND**
   corporation,                             ) **AUTHORITIES IN SUPPORT OF**
15                                           ) **PLAINITFFS' EX PARTE APPLICATION**
              Plaintiffs,                    ) **FOR TEMPORARY RESTRAIING**
16                                           ) **ORDER AND ORDER TO SHOW CAUSE**
         vs.                                 )
17                                           ) Date:
   JANET DAVIS; and DOES 1 through 20,       ) Time:
18 inclusive,                                ) Dept:
                                             )
19            Defendants.                    ) Complaint Filed:
                                             )
20 _____  )

21

22

23

24

25

26

27

28

{12700/15923/CLP/0995085.DOC;}                      MPAs ISO Pls' Ex Parte
                                                    App. for TRO and OSC

TABLE OF CONTENTS

I. INTRODUCTION..................................................................................................1

II. FACTUAL BACKGROUND................................................................................2

    A. MV Purchases Local Motion's Business and Goodwill..............................2

    B. Davis Covenants Not to Compete with MV................................................4

    C. The Goodwill MV Purchased Included Experience in
       Transit Software Development...................................................................5

    D. Davis Transitions into an Influential Executive Role for MV....................6

    E. MV's Development of Proprietary Software..............................................8

    F. Davis Resigns and Unlawfully Competes................................................10

    G. Davis's Violation of Non-Competition Agreement Harms MV...............11

    H. Davis Had Other Job Offers that Would Not Have Breached Her
       Non-Competition Agreement....................................................................13

    I. MV Has Provided Davis with Proper Notice............................................14

III. ARGUMENT......................................................................................................15

    A. The Court Should: (1) Issue A Temporary Restraining Order Prohibiting Davis
       From (a) Soliciting and (b) Using Or Disclosing MV's Trade Secret
       And/Or Proprietary Information In Violation Of Law And The
       Confidentiality Provisions Of Her Employment Agreement; and
       (2) Issue A Preliminary Injunction Prohibiting Those Acts And Davis'
       Continued Employment With Veolia Transportation And Any Further
       Violation Of The Non-Competition Agreement Plaintiff Is Entitled To
       Injunctive Relief.......................................................................................15

        1. Plaintiff Will Prevail On The Merits Of Its Claims........................16

           a. Davis Has Solicited And Has Stated She Will Continue To
             Solicit MV Employees In Violation Of The Share Purchase
             Agreement............................................................................16

           b. Davis is in Breach of The Non-Solicitation Agreement By Her
             Solicitation of Christopher Bryan to Join Her at Veolia...................17

  c. Statements by Veolia to MV Clients Show that Veolia and Davis Plan to Utilize her Knowledge of MV's Trade Secret and/or Proprietary Information to Compete Against MV........18

  d. The Non-Competition Agreement Signed By Davis Is Enforceable Because It Supported The Sale Of Goodwill..............................18

  e. The Non Competition Agreement Is Reasonable In Scope...............20

 2. Davis Is In Breach Of The Non Competition Agreement.........................21

 3. The Balance of the Hardships Falls Squarely in Favor of MV.....................22

  a. MV Will Be Irreparably Harmed If The Court Does Not Issue A Temporary Restraining Order And Preliminary Injunction Enjoining Davis From Violating The Non Competition Agreement......22

   i. MV Will Not Receive The Benefit Of The Protections Granted In The Share Purchase Agreement And The Non-Competition Agreement If The Court Does Not Grant Injunctive Relief................................................................23

   ii. MV is Irreparably Damaged By Davis' Unlawful Solicitation Of Local Motion Employees.............................................23

  b. The Parties Recognized the Intangible Value Of Goodwill And The Irreparable Harm MV Would Suffer If Davis Violated The Non-Competition Agreement..................................................24

 4. Davis Will Not Suffer Harm If The Temporary Restraining Order And Preliminary Injunction Are Granted............................................24

IV. CONCLUSION................................................................................25

## TABLE OF AUTHORITIES

**Page**

**_Federal Authority_**

*Arcamuzi v. Continental Air Lines, Inc.*
 819 F.2d 935 (9th Cir. 1987) ............................................................. 15

*Department of Parks and Recreation for the State of California v. Bazaar del Mundo*
 448 F.3d 1118 (9th Cir. 2006) ........................................................... 15

*Hollingsworth Solderless Terminal Co. v. Turley*
 622 F.2d 1324 (9th Cir. 1980) ........................................................... 18

*Kaiser Trading Co. v. Associated Metals & Minerals Corp.*
 321 F. Supp. 923 (N.D. Cal. 1970) .................................................... 16

*Latona v. Aetna U.S. Healthcare Inc.,*
 82 F.Supp.2d 1089 (C. D. 1999) ....................................................... 18

**_State Authority_**

*Bramwell v. Airport Blue Print Company*
 154 Cal.App.2d 57 (1957) ................................................................. 16

*Brown v. Kling*
 101 Cal. 295 (1894) ..................................................................... 16, 18

*Ex parte Lyons*
 27 Cal.App.2d 293 (1938) ............................................................ 19, 20

*Fleming v. Ray-Suzuki, Inc*
 225 Cal.App.3d 574 (1990) ............................................................... 21

*Gordon v. Landau*
 49 Cal.2d 690 (1958) ......................................................................... 18

*Handyspot Co. of Northern Cal. v. Buegeleisen*
 128 Cal.App.2d 191 (1954) ............................................................... 19

*Harvey v. White*
 213 Cal.App.2d 275 (1963) ............................................................... 16

*Hill Medical Corp. v. Wycoff*
 86 Cal.App.4th 895 (2001) ................................................................ 19

*Hunt v. Superior Court*
 21 Cal.4th 964 (1999) ....................................................................... 16

*In re Marriage of Foster*
 42 Cal.App.3d 577 (1974) ............................................................ 19, 20

*Laird v. Steinman*
    97 Cal.App.2d 781 (2d Dist. 1950) ............................................................................ 19

*Loral v. Corp v. Moyes*
    174 Cal.App.3d 268 (1950) ....................................................................................... 17

*Mahlstedt v. Fugit*
    79 Cal.App.2d 562 (1947) ................................................................................... 19, 20

*Monogram Industries, Inc., v. Sar Industries*
    64 Cal.App.3d 692 (1976) ........................................................... 17, 20, 21, 22, 23, 24

*Muggill v. Reuben H. Donnelley Corp.*
    62 Cal.2d 239 (1965) ................................................................................................ 18

*Shoemaker v. County of Los Angeles*
    37 Cal.App.4th 618 (1995) ........................................................................................ 22

*Strategix, Ltd., v. Infocrossing West, Inc.*
    142 Cal.App.4th 1068 (2006) .................................................................................... 23

*Streeter v. Rush*
    25 Cal. 67 (1864) ................................................................................................ 18, 20

*Tahoe Keys Property Owners' Assn. v. State Water Resources Control Bd.*
    23 Cal.App.4th 1459 (1994) ...................................................................................... 22

*Vacco Industries, Inc. v. Van Den Berg*
    5 Cal.App.4th 34 (1992). .................................................................................... 19, 21

**State Statutes**

California Business and Professions Code
    § 14100 ...................................................................................................................... 19
    § 16601 ............................................................................................... 18, 20, 21, 22, 23

Plaintiffs MV Transportation, Inc. and MV Public Transportation, Inc. (hereinafter, "MV" or "Plaintiffs") hereby move this Court for: (1) a Temporary Restraining Order prohibiting defendant Janet Davis ("Davis") from further violating the terms of a non-solicitation agreement between her and MV, her former employer, from using and/or disclosing MV's trade secret and/or proprietary information; and (2) an Order to Show Cause why a preliminary injunction should not issue prohibiting Davis from any further violation of the non-solicitation provision and from any further violation of a non-competition agreement by continuing to solicit MV employees, continuing employment with Veolia Transportation ("Veolia"), one of MV's primary competitors, and disclosing to Veolia, or any other third party, MV's confidential proprietary information

## I. INTRODUCTION

In 2003, Davis and the other three shareholders of Local Motion ITS, Inc. ("Local Motion") sold the goodwill and control of Local Motion to MV. As part of that sale, Local Motion's shareholders (the "Sellers") agreed to protect the goodwill sold to MV by executing non-competition agreements covenanting not to compete against MV and not to solicit any of MV's employees for 60 months following the close of the sale. Davis also agreed to remain as an employee and executed an employment agreement in which Davis agreed that MV's processes, systems, data bases and know-how were confidential and proprietary to MV and that Davis would keep that information in confidence and trust as a fiduciary of MV. Davis agreed that her breach of any of those covenants would cause MV irreparable injury and entitle MV to injunctive relief.

On Wednesday, October 10, 2007, with slightly more than a year left on her non-competition/non-solicitation agreement, Davis resigned her employment at MV, stating that she had accepted employment at Veolia, MV's competitor. Davis advised that she negotiated a "package deal" for herself and another valuable MV employee, Christopher Bryan ("Bryan"), for him to join Davis at Veolia. MV's investigation has revealed that Davis negotiated the "package deal" with Veolia while employed at MV in breach of her obligations under the non-solicitation provisions of the Non-Competition Agreement and in breach of her duties as an officer and employee of MV.

///

1  Davis served as MV's executive vice president of information technology for several
2  years. As such, she acquired knowledge about MV's proprietary transportation management
3  software and applications. Veolia has made public statements after it hired Davis that it could
4  now provide the same functionality as MV's proprietary software. MV seeks a temporary
5  restraining order and preliminary injunction prohibiting Davis from disclosing to Veolia, or any
6  other third party, MV's proprietary information as she agreed in the Employment Agreement with
7  MV.

8  MV seeks an immediate temporary order prohibiting Davis from (1) soliciting MV
9  employees for employment (in violation of §1.02.3 of the non-compete provision of the Share
10  Purchase Agreement); and (2) using or disclosing MV's proprietary trade secret information (in
11  violation of §6.1 of her employment agreement). MV also seeks issuance of an order to show
12  cause why a preliminary injunction should not issue prohibiting her from those acts and
13  prohibiting her from continued employment with one of MV's major competitor's in violation of
14  the non-compete provisions of the Share Purchase Agreement.

## II. FACTUAL BACKGROUND

MV Transportation, Inc. and its subsidiaries employ more than 10,000 employees who work in more than 120 locations, offering a wide array of transportation solutions to public and private entities throughout 25 states. Declaration of Jon Monson filed herewith ("Monson Decl."), ¶2. A portion of MV's business includes providing and developing paratransit services, consulting services, medical transportation, paratransit brokerage, and paratransit software application service. In 2003, MV decided to expand its services in those areas. In furtherance of that goal, MV sought to acquire the business and goodwill of Local Motion who was involved in providing the same line of services in the paratransit and medial transportation fields. Monson Decl., ¶¶3, 5.

### A. MV Purchases Local Motion's Business and Goodwill

On or about December 5, 2003, MV, Local Motion, and Local Motion's four (4) shareholders entered into a Share Purchase Agreement whereby MV purchased the control and goodwill of Local Motion by acquiring eighty percent (80%) of the issued and outstanding shares of Local Motion. Monson Decl., ¶4, Exh. A thereto. The sellers of Local Motion were Davis,

Ryan Larsen, Marsha Moore, and Kevin John Dresser. Monson Decl., ¶3. The consideration paid by MV to acquire Local Motion included:

(a) the sum of $50,000 paid to the four shareholders;

(b) Davis's and the three other individual sellers' agreement to enter into, and each did execute, a Non-Competition Agreement as required by section 4.1(j) of the Share Purchase Agreement to protect the goodwill being sold to MV under the Agreement. MV paid an additional aggregate sum of $100,000 as additional consideration under the Share Purchase Agreement in recognition of the sellers' sale of goodwill and execution of the Non-Competition Agreement.

(c) an additional sum to be determined based upon the later-appraised value of real estate located in Elk Horn, Iowa; and

(d) hiring Davis, Moore, and Larsen as employees of Local Motion upon completion of the merger. Monson Decl., ¶5, and Exh. A, p. 12 at ¶2.1 and 2.2.

The Share Purchase Agreement specifically references the importance of Local Motion's goodwill as a component of the sale. Monson Decl., ¶4. Davis and the other sellers covenanted in section 5.1(a) of the Share Purchase Agreement that:

(a) The business and affairs of the company shall be carried on in the ordinary normal course of business, consistent with past practice, and in compliance with the representations, warranties, covenants and agreements contained in the agreement and the sellers and the company and the sellers shall use their best efforts to preserve the good will of all persons having business relations with the company.

(b) [Sellers] shall not make, nor permit to be made, any material changes in the way the business or affairs of the company are being operated and will not take any action which would interfere with customer or supplier relationships and the future prospects which exist on the date hereof.

Monson Decl., ¶4, and Exh. A, p. 37 at ¶5.1(a) and (b).

At the time of the sale, Local Motion was marketing its services nationwide and MV was operating nationwide. Declaration of Marsha Moore dated November 7, 2007 and filed herewith ("Moore Decl."), ¶ 8.

The Share Purchase Agreement was structured so that the sellers would become employed by MV and would execute 60-month non-compete agreements. Monson Decl., ¶5. The sale was

also structured to allow the three former shareholders of Local Motion who would continue as employees under MV to retain a minority incentive interest in Local Motion's operations. For example, Davis was provided a seven and one-half percent (7-1/2%) interest in Local Motion after the sale to MV. Monson Decl., ¶5. Over the next several years, that incentive failed to achieve the expected results and, by 2005, MV assumed essentially all of Local Motion's business operations, customer relationships and activities. Monson Decl., ¶6. Local Motion continued in form because it holds title to real property and to complete the performance of one contract which predated the sale. Local Motion has used MV employees to execute all of its obligations and business operations since 2005. Monson Decl., ¶6.

**B. Davis Covenants Not to Compete with MV.**

Pursuant to the terms of the Non-Competition Agreement, Davis agreed:

(a) that MV and Local Motion are both engaged in the business of paratransit services, consulting services, medical transportation, paratransit brokerage, and was a paratransit software application service provider; Monson Decl., Exh. B Recital at p. 1

(b) that the term of the Non-Competition Agreement shall be in force for a period of sixty (60) calendar months from the Closing Date; Monson Decl., Exh. B, p.1 at § 1.01

(c) the area covered by the Non-Competition Agreement includes all cities, counties, and states within the United States in which MV, Local Motion, or any of their subsidiaries, successor, affiliates do or market business; Monson Decl., Exh. B, p. 2 at § 1.02

(d) that Davis shall not in any manner directly or indirectly:

(i) engage in, or become interested in (whether as an owner, stockholder, lender or other investor, director, officer, employee, consultant, broker, agent, trustee, landlord or otherwise) any business which offers to supply services or products substantially similar to or in competition with MV including its subsidiaries, successors or affiliates within the covenant area; Monson Decl., Exh. B, p. 2 at § 1.02.1

(ii) solicit, service, divert or appropriate to any competing business customer or client or other business opportunities of MV including its subsidiaries, successors or affiliates; Monson Decl., Exh. B, p. 2 at § 1.02.2 or

(iii)   attempt to induce any employee of MV to leave such employment;

Monson Decl., Exh. B, p. 3 at § 1.02.03.

Davis further agreed that:

"In the event of breach of this covenant set forth in this instrument, shareholder is hereby acknowledge and stipulate that purchaser and company will suffer irreparable damage for any such breach, that any remedy at law for any such breach of this covenant would be inadequate in that the purchaser or the company would be entitled to both (a) a preliminary or permanent injunction to prevent the continuation of such breach, and (b) monetary damages insofar as they can be determined. Nothing contained herein shall be construed to prohibit either the purchaser or the company from also pursing any other remedy, the parties having agreed that all remedies shall be cumulative."

Monson Decl., Exh. B, p. 3 at Art. II.

Davis agreed that she would not become involved, either directly or indirectly, in any business that offers to provide services or products substantially similar to, or in competition with, Local Motion or with MV, "including [MV's] subsidiaries, successor, or affiliates," during the term of the covenant. Monson Decl., Exh. B, p. 2 at § 1.02.1. At the time of the acquisition and since, MV and its subsidiaries and affiliates provided public transit services broader than just paratransit services, consulting services, medical transportation, paratransit brokerage, and paratransit software application service provider business engaged in by Local Motion. Monson Decl., ¶¶ 2 and 5.

**C. The Goodwill MV Purchased Included Experience in Transit Software Development.**

The shareholders of Local Motion had a history of experience in the transportation management software business. Marsha Moore founded her own transportation management software company known as On-Line Data Products and hired Davis and Bryan as employees of On-Line Data Products. Moore Decl., ¶ 3. Moore sold On-Line Data Products to a large transportation management software company known as The Trapeze Group in 1999. Davis, Bryan and Moore each joined Trapeze as employees. Moore semi-retired in 1999, but Davis and Bryan remained in full employment with Trapeze. Moore Decl., ¶¶ 4-5.

Davis subsequently left the employment of Trapeze and went to work for Medicaid Transportation Company where she worked with Ryan Larsen, who later became the founder of

Local Motion. The Medicaid Transportation Company ceased operations at the division where Davis and Ryan Larsen worked. Davis went back to work for Trapeze and Ryan Larsen started Local Motion. Approximately one month after its formation, Davis joined Local Motion as a shareholder employee. Moore joined Local Motion as a shareholder employee in or about March 2003. Moore Decl., ¶ 6.

At the time of the acquisition, MV and Local Motion contemplated developing computer software for the scheduling, routing, reservation, or dispatching of passenger transportation, transit, or paratransit vehicles, referred to as the "Transit Software Business." Davis understood and agreed that entering into the software development business was part of the goodwill and future business expansion for MV was acquiring. Accordingly, Davis agreed in the Non-Competition Agreement that, in the event MV or Local Motion subsequently begun the development or completes an acquisition of a company in the Transit Software Business, Davis agreed that the Non-Competition Agreement would then extend to the Transit Software Business for the remaining term of the Non-Competition Agreement. Monson Decl., Exh. B, p. 2 at § 1.02.6. MV negotiated for this valuable protection since it was MV's plan and intent to enter into the Transit Software Business either directly or through its subsidiary Local Motion. MV knew that Davis, Moore, and Larsen had experience in the Transit Software Business, and MV was acquiring the goodwill of Local Motion in order to advance its desire and to enter into the Transit Software Business. Monson Decl., ¶4.

**D. Davis Transitions into an Influential Executive Role for MV.**

Davis remained an employee of Local Motion after the merger. Davis's Employment Agreement provided that she would serve as senior vice president of Local Motion for an initial term of two years with automatic annual renewals unless either party provided notice on or before August 1, electing not to renew the Employment Agreement. Monson Decl., Exh. C, § 1.

Two other seller shareholders, Marsha Moore and Ryan Larsen, executed similar employment agreements with Local Motion. Monson Decl., at ¶5. The fourth Local Motion shareholder, Kevin Dresser, was principally a financier of Local Motion and was not involved in operations and did not become an employee of Local Motion. Moore Decl., ¶ 7. One of the first

employees hired by Local Motion after the sale to MV was Christopher Bryan, who had worked with Marsha Moore and Davis since at least 1994. Moore Decl., ¶ 8.

Davis continued in her role as senior vice president of Local Motion until approximately January 2005 when Davis's Employment Agreement was amended. Monson Decl., ¶ 7. From December 2003 to January 2005, Local Motion had attempted grow its volume of business in the public and paratransit contracting services, consulting, transportation brokerage, and application service provider business. Local Motion was not succeeding in those efforts as a subsidiary of MV. MV altered its business strategy and elected to attempt to grow the medical and paratransit transportation business within MV. Monson Decl., ¶ 6; Moore Decl., ¶ 9. Davis's Employment Agreement was amended on January 13, 2005 to expand her responsibilities to include duties as the regional vice president for MV Contract Transportation, Inc. and to perform duties assigned to her by the president of MV Contract Transportation, Inc. Monson Decl., ¶ 7. As regional vice president of MV Contract Transportation, Inc., Davis was responsible for overseeing MV Contract Transportation, Inc.'s daily operations in the Eastern region of the United States. As regional vice president, Davis became familiar with, and was responsible for, implementing all of MV's proprietary processes, methods, and systems unique to MV. Monson Decl., ¶ 7.

Davis continued in this dual capacity as senior vice president of Local Motion and as regional vice president for MV Contract Transportation, Inc. until January 1, 2006, when Davis's Employment Agreement was further amended. Monson Decl., ¶8. The January 1, 2006 Amendment to Employment Agreement effectuated an assignment by Local Motion of the entire Employment Agreement, as previously amended, to MV Public Transportation, Inc., another wholly-owned subsidiary of MV, and Davis accepted this assignment and expressly understood that MV Public Transportation, Inc. would be her employer. Effective January 1, 2006, Davis assumed the position of Executive Vice President Information Technology for MV Public Transportation, Inc. Monson Decl., ¶8, Exh. E.

Davis continued as executive vice president of information technology until approximately July 2007, when her title was changed to vice president of information technology. Monson Decl., ¶8. Davis became knowledgeable about MV's operations across the country. Davis, in her

capacity as regional vice president for MV Contract Transportation, Inc. was responsible for overseeing all of MV's operations in the eastern region of the United States, including New York, New Jersey, Maryland, Rhode Island, and Pennsylvania. Similarly, as executive vice president of information technology, Davis was responsible for overseeing MV's information technology operations for all of the United States. Monson Decl., ¶8.

In January 2006, after Davis became MV's executive vice president information technology, she was exposed to and became responsible for overseeing and managing the information technology operations for all of MV and its subsidiaries. Monson Decl., ¶8. As such, Davis became intimately knowledgeable about MV's IT infrastructure, including both hardware and software applications. Davis also participated in high level executive strategic short and long range planning meetings. Monson Decl., ¶8; Moore Decl., ¶14.

### E.  MV's Development of Proprietary Software

One of the original reasons MV acquired Local Motion was to permit MV to operate Local Motion as its subsidiary providing medical transportation, paratransit services and brokerage and paratransit software application services as well as to augment MV's existing activities in these areas. MV also intended to use Local Motion to develop proprietary software and other information services programming for the transportation industry. Monson Decl., ¶5. MV's interest in acquiring the control and goodwill of Local Motion was based, in part, on the background, experience and technical skills of Marsha Moore, Davis and Brian Larsen in the transportation software and developing and implementing transportation software services. Monson Decl., ¶5 and Moore Decl., ¶¶3-6. This is exactly why MV insisted upon including, and Davis agreed to include, section 1.02.6 in her Non-Competition Agreement that specifically references the fact that MV and Local Motion contemplated developing computer software for the scheduling, routing, reservation or dispatching of passenger transportation, transit or paratransit vehicles and expanded the scope of the Non-Competition Agreement to include those areas within the scope of the Non-Competition Agreement in the event MV or Local Motion developed that business. Monson Decl., ¶5, Exh. B, § 1.02.06.

///

Local Motion attempted to expand its business into the Medicaid transportation service business but was not very successful in expanding the scope of its business, and its employees were reassigned to work directly for MV. Marsha Moore was reassigned to work directly with MV to develop MV's own proprietary transportation management software for improving and facilitating the management of public and private transportation systems. MV's proprietary software was developed under the direct supervision of Marsha Moore as MV's executive vice president of research and development. Moore Decl., ¶¶9-11.

The proprietary software that MV has developed includes both stand-alone transportation management programs and customized application that interface with the Trapeze scheduling software. Moore Decl., ¶12. MV's proprietary software includes a series of tools that allow MV and its clients to identify potential trouble spots in "real time" to allow for implementation of prompt fixes, allows employees to perform at higher levels by providing simplified real time schedule and routing information; provides automated information systems accessible to passengers to allow for better passenger experience; and provides improved real time performance reports to MV's executives for quicker managerial response. Moore Decl., ¶12. Many officers and employees of MV contributed to the development of MV's proprietary software. MV developed its proprietary software based upon the unique knowledge and experience of MV's officers and employees, which MV's Information Technology Department integrated into the functionality and user interfaces of MV's transportation management software and applications. Moore Decl., ¶13.

Davis, both in her capacity as regional vice president of MV Contract Transportation, Inc., as well as in her role as executive vice president of information technology for all of MV, became familiar with, and participated with, numerous other MV officers and employees in the development of the custom design, functionality, and user interfaces of MV's proprietary public transportation management software. Monson Decl., ¶8; Moore Decl., ¶14. MV's proprietary software provides it with a competitive advantage over its competitors due to the uniqueness of its user interface and management reports capabilities. Hockman Decl., ¶7.

///

### F. Davis Resigns and Unlawfully Competes.

On or about October 10, 2007, Davis informed MV that she was resigning her employment with MV. Monson Decl., ¶9; Declaration of Kevin Klika filed herewith ("Klika Decl."), ¶2; and Moore Decl., ¶15. The following day, Christopher Bryan, who worked under Davis's supervision also gave his notice. Moore Decl., ¶¶1-5. Bryan was initially hired by Local Motion on or about January 19, 2004. During the time he was employed by MV, Bryan was employed as a director of information technology. Davis and Bryan informed MV that they would be working for Veolia. Declaration of Sean Kimble filed herewith ("Kimble Decl."), ¶7. Veolia is a large private transportation provider and is a direct competitor of MV in all of its markets. Monson Decl., ¶ 9.

On Thursday, October 11, 2007 Marsha Moore asked Davis if there was anything that MV could do so she would stay with the company. Davis stated that there was nothing MV could do since she had negotiated a "package deal" involving her and Bryan to join Veolia. Moore told Davis that she heard Davis was taking eight people with her. Davis responded by stating, "I believe you [MV] will lose eight people in the near future." Moore Decl., ¶15.

On October 18, 2007, Davis informed MV executive vice president Sean Kimble that she had accepted a position with Veolia in exactly the "same role" as she had played at MV. Kimble Decl., ¶9. Davis also told Kimble that Davis and Bryan had offers of employment from Google, but they were a package deal and Bryan did not want to go to Google. Kimble Decl., ¶11.

Following Davis's resignation of her employment with MV, MV reviewed Davis's email account on its servers. Monson Decl., ¶11. MV has a written policy that all MV computers, email accounts, data, and information provided to MV employees remain the property of MV and are subject to review by MV at any time. Monson Decl., ¶10. An employee is required to check a box each time the employee logs onto any MV computer indicating that the employee has read and understands the MV email policy. Monson Decl., ¶10, Exh. F.

In the course of MV's review of Davis's email account MV found evidence that Davis had, in fact, solicited Christopher Bryan to go with her to Veolia and negotiated a "package deal" with Veolia to include herself and Bryan just as Davis had told Marsha Moore and Sean Kimble. This evidence includes:

(a) an email dated September 28, 2007 from Davis to Mark Joseph. Mark Joseph is identified on Veolia's website as the CEO and vice chairman of Veolia. Davis's email confirming that she negotiated and arranged employment with Veolia for herself and her MV subordinate, Mr. Bryan. The email states:

> "I just want you to know I appreciate your efforts. Christopher and I will do everything to not disappoint you. We are both becoming very excited about our new move and our opportunity to improve both your service and your bottom line."

Monson Decl., ¶ 12a, Exh. G.

(b) an email dated October 1, 2007 from Davis to Alan Moldawer, general counsel at Veolia, providing the email address of her MV subordinate Mr. Bryan, for Veolia to "forward his [Mr. Bryan's] offer letter." Monson Decl., ¶12b, Exh. H.

(c) a copy of a draft "SENIOR EXECUTIVE EMPLOYMENT AGREEMENT" between Davis and Veolia. Monson Decl., ¶12c, Exh. I.

**G. Davis's Violation of Non-Competition Agreement Harms MV.**

MV is already experiencing the adverse effects of Davis's breach of her Non-Competition Agreement and her wrongful solicitation of Christopher Bryan. MV currently provides transportation services to Access Services, a paratransit provider in Cincinnati, Ohio. *See* Declaration of Bodie Lyon filed herewith ("Lyon Decl.") at ¶3. MV's contract expires in February 2008 and Access Services is beginning the bid process for a successor contract. Declaration of Chad Hockman filed herewith. Hockman Decl. at ¶4. On October 12, 2007, Access Services held an informational meeting for interested bidders. Veolia and MV both had employees present during the informational meeting. During the meeting, the representative from Access Services advised the bidders that the computer interfaces visible on the scheduling monitors were proprietary to MV and, if the new contract was awarded to a provider other than MV, the new provider would be required to supply its own software in order to satisfy the contract requirements. In response, one of the Veolia representatives stated, "Don't worry, we have that covered." Lyon Decl., ¶6; Hockman Decl., ¶5.

///

After the informational meeting, the director of Access Services approached Bodie Lyon and Chad Hockman, MV's regional vice president for the Central Region and the general manager of MV operations in Cincinnati, respectively, and told them that the Veolia representative informed her that Davis and Mr. Bryan were leaving MV and joining Veolia. This was the first time either Lyon or Hockman heard that Davis or Bryan was leaving MV. Lyon Decl., ¶7; Hockman Decl., ¶6. MV was quite concerned because Bryan had been MV's point of contact with Access Services for all information technology and automated transportation services. Lyon Decl., ¶¶ 7 and 8. Bryan worked closely with Access Services installing MV's proprietary software applications to support Access Services' paratransit services. Lyon Decl., ¶ 8. MV's proprietary customers' applications are instrumental for Access Services to assure efficient arrival, departure and on-time performance. MV's custom applications also provide management tools for Access Services to include service and performance. In fact, the Access America representative commented, during the pre-bid meeting, about the quality of custom management reports generated through MV's proprietary software. Lyon Decl., ¶ 9.

Davis is exploiting her breach of the Non-Competition Agreement as evidenced by Veolia's statements that now Veolia can provide customized software to perform as does MV's proprietary software since it hired Davis and Mr. Bryan. In fact, while Mr. Lyon was meeting with the Access Services representative in her office, Mr. Bryan telephoned Access Services and advised her that he was leaving MV to join Veolia. Lyon Decl., ¶ 8. This is not a mere coincidence that Mr. Bryan happened to call Access Services to advise them that he was joining Veolia on the same date and at the same time the Veolia representatives were at the pre-bid meeting touting the fact that it had hired Davis and Bryan away from MV.

MV's proprietary software applications are used by it to market, attract and secure new clients. The proprietary software is also very valuable asset of MV to retain clients, such as Access Services. No one else in the industry has software with the capabilities that are currently being provided by MV's proprietary software. Hockman Decl., ¶ 7 and Lyon Decl., ¶¶ 7-9. Lyon immediately called MV's president, Jon Monson, and confirmed that Davis and Bryan were leaving MV. Lyon Decl., ¶7.

### H. Davis Had Other Job Offers that Would Not Have Breached Her Non-Competition Agreement.

Davis had other job opportunities presented to her which would not have resulted in a breach of her Non-Competition Agreement. Prior to accepting and negotiating a "package deal" for herself and Christopher Bryan, Davis had an opportunity to work for Google. Davis advised Kevin Klika, president of MV Public Transportation, Inc., that Davis had had serious discussions with Google to work on a project that would allow individuals to plan regional and cross-country trips using public land-based transportation. Davis advised Klika that she was leaning toward the Google opportunity. Davis either expressly stated or strongly implied that Google had made her an offer of employment. Klika Decl., ¶ 2.

At the time of Davis's exit interview with Sean Kimble, she provided more detail about the Google offer. Davis admitted that Google made Davis and Bryan a joint offer, but Mr. Bryan did not want to go to Google. Since Davis and Bryan were a "package deal," they went to Veolia, a direct competitor of MV, in conscious disregard of MV's contractual rights. Klika Decl., ¶11.

During Davis's conversation with Klika, Davis claimed that she had her attorney review the Non-Competition Agreement with MV. Klika Decl., ¶2. Davis was well aware of her contractual obligations and, apparently, elected to take the risk that her election to accept a job which violated the express terms of her Non-Competition Agreement would not be enjoined by a court of law, as Davis had specifically agreed would be appropriate. Monson Decl., Exh. B, Art. II.

Davis also negotiated a defense and indemnification provision with Veolia such that she will not suffer any harm in the event MV enforces the provisions of the Non-Competition Agreement. The final version of Davis's Employment Agreement with Veolia that resides on MV's computer, includes a provision whereby Veolia agreed to indemnify Davis for any cost incurred by her in defending against any legal claims from MV "as well as any judgment awarding damages entered by a court of competent jurisdiction (or in arbitration, in favor of her current employer against her by reason of her leaving her employment . . . ."[1] Moreover, Veolia reserved

---

[1] MV Transportation reserves the right to "monitor" electronic mail messages and to disclose email messages to third parties. (See Monson Decl., Exh. E.)

the right to participate in said defense and the decisions to be made regarding settlement and/or appeal. Monson Decl., Exh. I, p. 4 at ¶ 3(g). The indemnification provision reads, in its entirety:

> "(g) <u>Defense Costs</u>. The Employee has advised the Company that she has received independent legal advice that non-competition restrictions in her current agreements with her current employer are likely unenforceable under applicable law. However, recognizing that her current employer may attempt to enforce such purported restrictions against her, the Company agrees to indemnify the Employee for all reasonable costs incurred by her in defending any such legal attempts, including reasonable attorneys fees, as well as any judgment awarding damages entered by a court of competent jurisdiction (or in arbitration) in favor or her current employer against her by reason of her leaving her employment, said judgment being final and not subject to further appeal. The Company shall have the right to participate in said defense and the decisions to be made regarding settlement and/or appeal."

Davis was well aware of the restrictions in the Non-Competition Agreement and decided to accept employment in breach of those provisions and, in order to protect herself from the inevitable lawsuit from MV, negotiated a defense and indemnification provision with her new employer. Davis has mitigated any hardship she might otherwise claim as a result of the imposition of a temporary restraining order enjoining her from soliciting MV employees and using or disclosing MV's trade secret and/or proprietary information and preliminary injunction enjoining her from those acts, and any continuing employment with Veolia.

### I.  MV Has Provided Davis with Proper Notice

The Share Purchase Agreement permits MV to seek injunctive relief to enforce its rights without prejudice to its right to proceed by arbitration. Monson Decl., Exh. B, Art. II. Additionally, section 8.3 of the Share Purchase Agreement and section 9 of Davis' Employment Agreement provides that any dispute under the Agreement shall proceed by binding arbitration, excepting the Parties' reserved right to seek temporary and preliminary injunctive relief through court action. On or about November 6, 2007, MV notified Davis of the existence of an arbitrable disputes clause under the Share Purchase Agreement, the Non-Competition Agreement, and the Employment Agreement and that MV would also seek injunctive relief from this Court. See Monson Decl., ¶13, Exh. J; Post Decl., ¶¶2 and 3.

///

///

///