*EXHIBIT "A" continued*

**ARTICLE VII**
**TERMINATION**

**7.1    Grounds for Termination.** In addition to any other rights of termination in Section 4.2 or at law, this Agreement may be terminated at any time before the effective time of the Closing (the "Effective Time") (but not after) in the following manner and circumstances:

(a)    by mutual written consent of the Purchaser and the Sellers representing the holders of two-thirds of the Shares as well as three-fourths of the number of Sellers (the "Control Sellers");

(b)    by either the Purchaser or the Sellers, in either case by notice to the other Parties, if the Closing shall not have been consummated on or before November 30, 2003 (the "Termination Date"); provided, however, that the right to terminate this Agreement under this Section 7.1 shall not be available to any Party whose failure to fulfill any obligation under this Agreement has been a cause of, or has resulted in, the failure of the Effective Time to occur on or before the Termination Date;

(c)    by any Party if a court of competent jurisdiction or governmental, regulatory or administrative agency or commission shall have issued a court order (which court order the Parties shall use commercially reasonable efforts to lift or set aside) that permanently restrains, enjoins or otherwise prohibits the sale of the Shares, and such court order shall have become final and non-appealable;

(d)    by the Purchaser if any Seller shall have breached, or failed to comply with, any of its obligations under this Agreement or any representation or warranty made by any Seller shall be incorrect, and such breach, failure or misrepresentation is not cured within 15 days after written notice thereof; and, in either case, any such breaches, failures or misrepresentations, individually or in the aggregate, result or would reasonably be expected to result in a material adverse effect on the Business or the profitability or financial condition of the Company; and

(e)    by the Sellers if the Purchaser shall have breached, or failed to comply with, any of its obligations under this Agreement or any representation or warranty made by the Purchaser shall be incorrect, and such breach, failure or misrepresentation is not cured within 15 days after notice thereof and, in either case, any such breaches, failures or misrepresentations, individually or in the aggregate, result or would reasonably be expected to be material to the Sellers as a whole group.

**7.2    Effect of Termination.** If this Agreement is terminated pursuant to Section 4.2 or Section 7.1, the agreements contained in Section 5.3 regarding confidentiality, and in Article VIII shall survive the termination hereof, and any Party may pursue any legal or equitable remedies that may be available if such termination is based on a breach by

another Party.

## ARTICLE VIII
## GENERAL

**8.1    Announcements.**  No public announcement or press release concerning the transaction contemplated herein shall be made at any time by the Sellers, the Company or the Purchaser without the prior written consent and joint approval of the Sellers and Purchaser.  Notwithstanding this provision, the Purchaser or the Company may issue a public announcement after the Closing.

**8.2    Confidentiality.**  In the event that the purchase and sale of the Purchased Shares herein provided for is not consummated, the Purchaser shall not use for its own purposes any information, trade secrets or confidential data relating to the Sellers, the Company or the Business, including the customers of the Business, its operations or the methods of conducting the Business, discovered or acquired by the Purchaser, its representatives or auditors, or any of the foregoing as a result of the Sellers making available to the Purchaser or its representatives any information relating to the Sellers, the Company or the Business, and the Purchaser shall not disclose divulge or communicate orally, in writing or otherwise, any such information, trade secrets or confidential data so discovered or acquired to any other person, firm or Company.  Notwithstanding the foregoing, this Section 8.2 shall not apply to: (a) information in the public domain, (b) information acquired by Purchaser from sources other than the Sellers which are not to the knowledge of the Purchaser under any confidentiality obligation of the Sellers or the Company, or (c) information developed by Purchaser or its subsidiaries, associates, affiliates, employees, agents or contractors independently and without reference to information provided by the Sellers hereunder.

**8.3    Arbitration.**  If the Parties do not resolve a dispute respecting any matter contemplated by this Agreement within 20 days of notice of such dispute by the Purchaser to the Sellers or by the Sellers to the Purchaser, the dispute shall be settled by arbitration conducted on a confidential basis under the US Arbitration Act, if applicable, and the then current Commercial Arbitration Rules of the American Arbitration Association (the "Association") strictly in accordance with the terms of this Agreement and the substantive law of the State of California.  Upon submitting the matter to arbitration, the parties shall request that the arbitrator assess the costs of the arbitration to the parties in an equitable manner.  The arbitration shall be conducted at the Association's regional office located in the state and county of San Francisco.  If there is more than one dispute, all disputes shall, to the extent practicable, be combined in one arbitration conducted by one arbitrator.  The arbitration shall be conducted by a single arbitrator who is agreed upon by the parties to the dispute or, in the absence of such agreement, selected by the Association and who is either a member of a national accounting firm familiar with businesses engaged in bus transportation or a retired judge.  Judgment upon the arbitrators' award may be entered and enforced in any court of competent jurisdiction.  Neither party shall institute a proceeding hereunder unless at least 60 days prior thereto such party shall have given written notice to the other party of its intent to do so.

**8.4    Expenses.**  The expenses incurred by each party hereto in connection with this Agreement and the transactions provided herein shall be borne by such party and, in particular, all professional fees incurred by the Sellers in connection with the transactions contemplated by this Agreement shall be borne by the Sellers and not charged to the Company so that the Company will bear no expense in connection with this Agreement and the transactions provided for herein.

**8.5    Notices.**  Any notice, direction or other document required or permitted to be given hereunder or for the purposes hereof (hereinafter in this Section 8.4 called a "notice") to any Party shall be in writing and shall be sufficiently given if delivered personally or if transmitted by telex, facsimile or other form of recorded communication tested prior to transmission to such Party:

(a)    in the case of a notice to the Sellers:

> Ryan James Larsen, 146 Hwy 173, Atlantic, IA 50022
> Marsha Louise Madrid, 3744 Kinsale Ln SE, Olympia, WA 98501
> Janet Sue Davis, 6417 N 183rd Av., Wadell, AZ 85355
> Kevin John Dresser, 407 Roanoke St, Ste 2, Christiansburg, VA 24073

(b)    in the case of a notice to the Purchaser at:

> MV Transportation, Inc.
> 360 Campus Lane Suite 201
> Fairfield, CA  94534
>
> with a facsimile number of (707) 863-8944
> Attention:  General Counsel

or at such other address as the Party to whom such writing is to be given shall have last notified the Party giving the same in the manner provided in this section.  Any notice delivered in person to the Party to whom it is addressed as hereinbefore provided shall be deemed to have been given and received on the day it is so delivered at such address, provided that if such day is not a Business Day then the notice shall be deemed to have been given and received on the first Business Day next following such day.  Any notice transmitted by telex, facsimile or other form of recorded communication shall be deemed given and received on the Business Day of its transmission.

**8.6    Entire Agreement.**  This Agreement, including the Schedules hereto, together with the agreements and other documents to be delivered pursuant hereto, constitute the entire agreement between the Parties pertaining to the subject matter hereof and supersede all prior agreements, understandings, negotiations and discussions, whether oral or written, of the Parties and there are no warranties, representations or other agreements between the Parties in connection with the subject matter hereof except as

specifically set forth herein and therein.

**8.7    Waivers.** No modification, waiver or termination of this Agreement shall be binding unless executed in writing by the Party to be bound thereby.  No waiver of any of the provisions of this Agreement, in whole or in part, shall be deemed or shall constitute a waiver of any other provisions hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

**8.8    Applicable Law.** This Agreement and the rights, obligations and relations of the Parties shall be governed by and construed in accordance with the laws in force in the State of California, without regard to provisions concerning conflicts of laws, and the rights and obligations of the parties shall be interpreted accordingly.

Subject to the arbitration provisions herein, the Sellers, Purchaser and the Company agree that exclusive jurisdiction in any action, suit, or proceeding related to any dispute arising under this Agreement and the other agreements relating to this Agreement (for purposes of this Section, a "Dispute") shall be in any United States District Court for the District for the Northern District of California (or, notwithstanding such consent to jurisdiction, if jurisdiction does not lie in said federal court, then the parties consent to jurisdiction of any state court located within such Northern District of California). The Sellers, Purchaser and the Company waive any right to trial by jury or to have a jury participate in resolving any Dispute, whether relating to contract, tort or otherwise.

Subject to the arbitration provisions herein, each of Sellers, Purchaser and the Company hereby consents to the jurisdiction of each United States District Court in the Northern District of California in any action, suit, or proceeding related to a Dispute and agrees that service of process or notice in any such action, suit, or proceeding shall be effective if in writing and sent by certified or registered mail, return receipt requested, postage prepaid, as provided in Section 8.5 of this Agreement.

**8.9    Time.** Time shall be of the essence of this Agreement.

**8.10    Assignment.** Neither this Agreement nor any rights or obligations hereunder shall be assignable by any Parties without the prior written consent of the other Party. Notwithstanding the foregoing, the Purchaser may assign this Agreement to a subsidiary of the Purchaser, without the consent of the Sellers or any other Person, subject to applicable laws.  This Agreement shall enure to the benefit of and be binding upon the Parties and their respective successors (including any successor by reason of amalgamation of the Purchaser) and permitted assigns.

**8.11    Further Assurances.** The Parties hereto shall with reasonable diligence do all such things and provide all such reasonable assurances as may be required to consummate the transactions contemplated hereby, and each Party shall provide such further documents or instruments required by any other Party as may be reasonably necessary or desirable to effect the purpose of this Agreement and carry out its provisions, whether before or after the Closing.

**8.12   Severability.**  If any covenant or provision of this Agreement is prohibited in whole or in part in any jurisdiction, such covenant or provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition without invalidating the remaining covenants and provisions hereof and shall, as to such jurisdiction, be deemed to be severed from this Agreement to the extent of such prohibition.

**8.13   Amendments.**  This Agreement may be amended, modified or supplemented only by written instrument duly executed by the Company, the Purchaser and the Sellers except that no such amendment, modification or supplement that imposes an affirmative obligation on a Party shall be binding on such Party unless he, she or it gives its written consent thereto.  Any term or provision of this Agreement may be waived by a written instrument signed by the Purchaser in the case of a term or provision to which the Purchaser is entitled to the benefit or signed by a Seller in the case of a term or provision to which such Seller is entitled to the benefit.

**8.14   Counterparts.**  This Agreement may be executed by the Parties in separate counterparts (and by facsimile transmission) each of which when so executed and transmitted or delivered shall be an original, but all such counterparts shall together constitute one and the same agreement.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF the Parties have hereunto duly executed this Agreement on the date first above written.

_____
Witness

_____
Ryan James Larsen

_____
Witness

_____
Janet Sue Davis

_____
Witness

_____
Marsha Louise Madrid

_____
Witness

_____
Kevin John Dresser

**LOCAL MOTION ITS, INC.**

By: _____
Ryan James Larsen, President

**MV TRANSPORTATION, INC.**

By: _____
Jon Michael Monson, Chief Executive Officer

12/24/2000  07:00    4005154707            MCS                    PAGE  02

IN WITNESS WHEREOF the Parties have hereunto duly executed this Agreement on the date first above written.

Witness

Witness

Witness

Witness

Ryan James Larsen

Janet Sue Davis

Marsha Louise Madrid

Kevin John Dresser

**LOCAL MOTION ITS, INC.**

By: _____
    Ryan James Larsen, President

**MV TRANSPORTATION, INC.**

By: _____
    Jon Michael Monson, Chief Executive Officer

IN WITNESS WHEREOF the Parties have hereunto duly executed this Agreement on the date first above written.

Witness _____     Ryan James Larsen _____

Witness _____     _Janet Sue Davis_ (signature)
                                        Janet Sue Davis

Witness _____     Marsha Louise Madrid _____

Witness _____     Kevin John Dresser _____

**LOCAL MOTION ITS, INC.**

By: _____
     Ryan James Larsen, President

**MV TRANSPORTATION, INC.**

By: _____
     Jon Michael Monson, Chief Executive Officer

IN WITNESS WHEREOF the Parties have hereunto duly executed this Agreement on the date first above written.

Witness
_____

_____
Ryan James Larsen

Witness
_____

_____
Janet Sue Davis

Witness

_____
Marsha Louise Madrid

Witness
_____

_____
Kevin John Dresser

LOCAL MOTION ITS, INC.

By: _____
Ryan James Larsen, President

MV TRANSPORTATION, INC.

By: _____
Jon Michael Monson, Chief Executive Officer

IN WITNESS WHEREOF the Parties have hereunto duly executed this Agreement on the date first above written.

_____        _____
Witness                        Ryan James Larsen

_____        _____
Witness                        Janet Sue Davis

_____        _____
Witness                        Marsha Louise Madrid

_____        _____
Witness                        Kevin John Dresser

**LOCAL MOTION ITS, INC.**

By: _____
    Ryan James Larsen, President

**MV TRANSPORTATION, INC.**

By: _____
    Jon Michael Monson, Chief Executive Officer

IN WITNESS WHEREOF the Parties have hereunto duly executed this Agreement on the date first above written.

_____          _____
Witness                          Ryan James Larsen


_____          _____
Witness                          Janet Sue Davis


_____          Marsha Louise Madrid
Witness


_____          _____
Witness                          Kevin John Dresser


**LOCAL MOTION ITS, INC.**

By: _____
    Ryan James Larsen, President


**MV TRANSPORTATION, INC.**

By: _____
    Jon Michael Monson, Chief Executive Officer



## NON-COMPETITION AGREEMENT

This Non-Competition Agreement ("Covenant") is given in connection with the Share Purchase Agreement entered into between the parties this same date by RYAN J. LARSEN, a resident of Iowa, MARSHA L. MADRID, a resident of Washington, KEVIN J. DRESSER, a resident of Virginia, and JANET S. DAVIS, a resident of Arizona (jointly and severally referred to as Shareholders) in favor of MV TRANSPORTATION, INC., a California corporation ("Purchaser"), and LOCAL MOTION ITS, INC., a Virginia corporation ("Company") to be effective on and as of December 1-, 2003 ("Effective Date").

## RECITALS

**WHEREAS,** the Company and Purchaser engage in the business of of paratransit services, consulting services, medical transportation, paratransit brokerage and paratransit software Application Service Provider (ASP).

**WHEREAS,** there are issued and outstanding One Thousand (1,000) shares of the Company's authorized shares of common stock, no par value (the "Capital Stock"). Shareholders jointly own One Thousand (1,000) shares of the Capital Stock, equaling One Hundred percent (100%) of the issued Capital Stock of the Company (the "Stock").

**WHEREAS,** The parties have entered into a Share Purchase Agreement, dated the Effective Date (the "Agreement").   Pursuant to the Agreement, Purchaser shall purchase the 80% of Stock from the Shareholders.

**WHEREAS,** in accordance with the terms of the Agreement,  Purchaser and Company desire to obtain from Shareholders, and Shareholders are willing to grant to Purchaser and Company a covenant not to compete.

All capitalized terms in this Covenant shall have the same meanings ascribed to them in the Agreement unless otherwise specifically defined herein.

## ARTICLE I. COVENANT AGREEMENT

For and in consideration of the above recitals, for consideration provided to Shareholders under the Agreement, and for other good and valuable consideration this Covenant is given by Shareholders and is accepted by Purchaser and the Company on the terms and conditions stated herein.

Section 1.01. Term of Covenant.  This Covenant shall be in force for a period of Sixty (60) calendar months from the Closing Date.

Section 1.02. The Covenant. The Shareholders hereby agree that neither they nor their Affiliates anywhere in all the cities, counties and states within the United States in which Purchaser, Company or any of their subsidiaries, successor or affiliates do or market business (collectively the "Covenant Area") shall, in any manner, directly or indirectly:

1.02.1      Engage in, or become interested in (whether as an owner, stockholder, lender or other investor, director, officer, employee, consultant, broker, agent, trustee, landlord or otherwise) any business which offers to provide services or products substantially similar to or in competition with the Company or Purchaser (including Purchaser's subsidiaries, successor or affiliates) within the Covenant Area; or

1.02.2      Solicit, service, divert or appropriate to any competing business customer or client or other business opportunities of the Company or Purchaser (including Purchaser's subsidiaries, successor or affiliates); or

1.02.3      Attempt to induce any employee of the Company or Purchaser (or Purchaser's subsidiaries, successor or affiliates) to leave such employment.

1.02.4      This Agreement shall not be construed to prohibit Shareholders from engaging as a private consultant on an individual basis to government agencies in the United States, so long as Shareholder is not acting on behalf of any other person on entity, or in partnership or as an employee of any other person or entity and so long as the government agency is not then a customer of the Purchaser (or Purchaser's subsidiaries, successor or affiliates) or Company (except that consulting for a government agency that is a customer of Purchase or Company shall be permitted if such consulting does not involve or is not associated with the service being performed by the Purchaser or Company) .  In the event a Shareholder does engage in consulting permitted by this Section, such Shareholder shall provide prior written notice to Purchaser and Company of the name of the entity and the terms of the engagement.

1.02.5      This Agreement shall not be construed to prohibit Shareholders from working as an employee of a federal, state or local government agency.

1.02.6      At the time of the execution of this Agreement, the Company or Purchaser is not engaged in the business of the development of or sale of computer software for the scheduling, routing, reservation or dispatching of passenger transportation, transit or paratransit vehicles (hereinafter referred to as "Transit Software Business").   In the event a Shareholder leaves the employ of the Company or Purchaser prior to Company or Purchaser beginning the development of the Transit Software Business or prior to the Company or Purchaser acquiring a Transit Software Business, this Agreement shall not be construed to prohibit a Shareholder from

engaging in the Transit Software Business after leaving the employ of the Company or Purchaser. In the event the Company or Purchaser begins the development of or completes an acquisition of a company in the Transit Software Business at any time in the future, this Agreement shall extend to the Transit Software Business for the remaining term hereof.

For purposes of this Section 1.02, the term "Affiliate" shall include any individual, trust, corporation, partnership or other business entity that directly or indirectly through one or more intermediaries, has an equity interest which is owned by Shareholders. For purposes of determining the foregoing, equity interests representing less than five (5%) percent of total outstanding equity shall be ignored and the constructive ownership provisions of Section 318 of the Code shall apply for purposes of determining ownership.

Section 1.03    Divisible by Time and Geographical Area.    The parties hereby agree that, if the restrictive covenants, or any of them, are held to be unreasonable, arbitrary or against public policy, such covenant or covenants shall be considered divisible both as to time and geographical area. Each month of the specified period shall be deemed a separate period of time, and each quarter mile of the Covenant Area shall be deemed a separate geographical area, so that the lesser period of time or geographical area shall remain effective so long as the time or geographical area are not unreasonable, arbitrary, or against public policy. The parties further agree that, in the event any court determines the specified time period or the specified geographical area to be unreasonable, arbitrary, or against public policy, a lesser time period or geographical area which is determined to be reasonable, nonarbitrary and not against public policy may be enforced against the Shareholders.

## ARTICLE 2. REMEDIES

In the event of breach of this Covenant set forth in this instrument, Shareholders hereby acknowledge and stipulate that Purchaser and Company will suffer irreparable damage for any such breach, that any remedy at law for any such breach of this Covenant would be inadequate and that the Purchaser and the Company will be entitled to both (a) a preliminary or permanent injunction to prevent the continuation of such breach, and (b) monetary damages insofar as they can be determined. Nothing contained herein shall be construed to prohibit either the Purchaser or the Company from also pursuing any other remedy, the parties having agreed that all remedies shall be cumulative.

## ARTICLE 3. MISCELLANEOUS

Section 3.01 Attorneys' Fees and Costs.    In the event that any party to this Covenant shall initiate or bring an action or other proceeding against any other party to this Covenant to enforce or declare any rights herein created, or to bring about or declare the termination, cancellation, or rescission of this Covenant, the prevailing party

or parties in such action or proceeding shall be entitled to receive from the other party or parties all reasonable attorneys' fees and costs incurred in connection therewith.

Section 3.02. Successors.  This Covenant shall be binding upon and shall inure to the benefit of Purchaser and Company and their respective   heirs, executors, successors and assigns and to the benefit of the Shareholders and their respective heirs, executors, successors and assigns.

Section 3.03. Headings.  Section titles or captions contained in this Covenant are included only as a matter of convenience and reference, and in no way define, limit, extend, or describe the scope of this Covenant or the intent of any provision thereof.

Section 3.04. Assignment.  No party hereto may assign this Covenant or any rights or remedies hereunder without the prior written consent of all of the parties hereto.

Section 3.05. Entire  Covenant.   This Covenant, together with all Exhibits incorporated herein or attached hereto, constitutes the entire agreement between the parties dealing with the specific subject matter treated herein and superseding all negotiations, prior discussions, and written agreements.  This Covenant may not be changed, modified, or amended, except by a writing executed by all of the parties.

Section 3.06. Governing Law.  This covenant shall be governed by the laws of the State of California.

Section 3.07. Severability.  If any provisions of this Covenant shall be held to be invalid or unenforceable for any reason, then, so far as is reasonable possible, the remainder of the Covenant shall be considered valid and operative.

Section 3.08. Waiver.  No Waiver of any term, provision or condition of this Covenant in any one or more instances, shall be construed or be deemed to be a further or continuing waiver of any such term, provision, or condition of this Covenant, nor shall it be construed nor shall it constitute a waiver of any other term or provision of this Covenant.  No waiver shall be effective unless written and signed by the party or parties making such waiver.

Section 3.09. Interpretation.   Should any provision of this Covenant require interpretation by a court of law, it is agreed by the parties that the Court interpreting or construing this Covenant shall not apply a presumption that the terms of this Covenant shall be more strictly construed against one party by reason of the rule of construction that a document is to be construed more strictly against the party who by himself or through his agent prepared such document, it being agreed that the agents of all parties have participated in the preparation of this Agreement.

Section 310.  Representation of Counsel.   The parties acknowledge that they have each been advised to be represented by independent counsel of their choice in

the negotiation of this Covenant, that they have read this Covenant, and that its meaning and legal consequences have been explained to them.

[SIGNATURES TO FOLLOW]

The parties have signed this Covenant to be effective on and as of the Effective Date stated hereinabove.

"SHAREHOLDERS"

_____
RYAN J. LARSEN

_____
MARSHA L. MADRID

_____
KEVIN J. DRESSER

_____
JANET S. DAVIS

This Covenant is accepted and its terms and conditions are agreed.

MV TRANSPORTATION, INC.,
a California corporation

By: _____
JON MONSON, President/CEO

ATTEST:

_____
JOHN A. BIARD, Secretary

the negotiation of this Covenant, that they have read this Covenant, and that its meaning and legal consequences have been explained to them.

[SIGNATURES TO FOLLOW]

The parties have signed this Covenant to be effective on and as of the Effective Date stated hereinabove.

"SHAREHOLDERS"

_____
RYAN J. LARSEN

_____
MARSHA L. MADRID

_____
KEVIN J. DRESSER

_____
JANET S. DAVIS

This Covenant is accepted and its terms and conditions are agreed.

MV TRANSPORTATION, INC.,
a California corporation

By _____
JON MONSON, President/CEO

ATTEST:

JOHN A. BIARD, Secretary

the negotiation of this Covenant, that they have read this Covenant, and that its meaning and legal consequences have been explained to them.

[SIGNATURES TO FOLLOW]

The parties have signed this Covenant to be effective on and as of the Effective Date stated hereinabove.

"SHAREHOLDERS"

_____
RYAN J. LARSEN


_____
MARSHA L. MADRID


_____
KEVIN J. DRESSER


_____
JANET S. DAVIS


This Covenant is accepted and its terms and conditions are agreed.

MV TRANSPORTATION, INC.,
a California corporation

By: _____

JON MONSON, President/CEO

_____

ATTEST:

JOHN A. BIARD, Secretary

12/24/2008   07:11   4605154707   MCS   PAGE 965

the negotiation of this Covenant, that they have read this Covenant, and that its meaning and legal consequences have been explained to them.

[SIGNATURES TO FOLLOW]

The parties have signed this Covenant to be effective on and as of the Effective Date stated hereinabove.

"SHAREHOLDERS"

_____

RYAN J. LARSEN

_____

MARSHA L. MADRID

_____

KEVIN J. DRESSER

_____

JANET S. DAVIS

This Covenant is accepted and its terms and conditions are agreed.

MV TRANSPORTATION, INC.,
a California corporation

By: _____

JON MONSON, President/CEO

_____

ATTEST:

JOHN A. BIARD, Secretary

LOCAL MOTION ITS, INC.,
a Virginia corporation

By:

Jon Monson, CEO

ATTEST:

John A. Biard , Secretary



## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT ("**Agreement**") is made and entered into effective as of December 1, 2003 (the "**Effective Date**"), by and between LOCAL MOTION ITS, INC., a Virginia corporation (the "**Company**") and JANET SUE DAVIS ("**Employee**"), with reference to the following:

### BACKGROUND

The Company is in the public and paratransit contracting services, consulting, transportation brokerage and application service provider business, (the "**Business**").

Employee has extensive public transportation operation and technical experience.

The Company now desires to retain the full-time services of Employee as Senior Vice President of the Company and Employee is willing to be employed by the Company in that capacity on the terms and conditions set forth in this Agreement.

NOW THEREFORE, in consideration of the promises herein made and on the terms and subject to the conditions herein contained, the Company and Employee hereby agree as follows:

1.    EMPLOYMENT.  The Company hereby employs Employee on the terms set forth herein and Employee hereby accepts such employment, for a term beginning on the Effective Date and ending on November 30, 2005 (the "**Initial Term**"), unless sooner terminated pursuant to Section 5 below.  This Agreement will automatically renew for additional annual terms ("**Renewal Terms**") upon the expiration of the Initial Term, unless either party delivers a notice to the other party, on or before August 1, stating the party's election not to renew this Agreement for the Renewal Term commencing on the following December 1, provided that the foregoing will not affect the Company's rights to terminate this Agreement pursuant to Sections 5.3 or 5.4 below.

2.    DUTIES.  During the period of her employment with the Company hereunder, Employee will be employed as Senior Vice President of the Company and Employee will:

(a)  devote her full business time and attention, and give her best effort and skill solely to the Company's business affairs and interests;

(b)    perform such services and assume such duties and responsibilities appropriate to the positions of Senior Vice President and those

which may from time to time be reasonably assigned to him by the President of the Company, to whom Employee will directly report; and

(c)        in all respects use her best efforts to further, enhance and develop the Company's business affairs, interests and welfare.

3.    COMPENSATION.  In consideration of Employee's services to the Company during the term of this Agreement, Employee will receive the following compensation:

(a)  The Company shall pay Employee a base salary of $145,000 per annum during the period from the Effective Date through November 30, 2004.  Employee's base salary will be paid in equal installments (pro rated for portions of a pay period) on the Company's regular pay days and the Company will withhold from such compensation all applicable federal and state income, social security, disability and other taxes as required by applicable laws.   On December 1, 2004 and annually thereafter, provided this Agreement is extended by both parties, Employee's base salary shall be increased by the Company at its sole discretion after the Company assesses the performance of Employee.

(b)  The Employee and Company agree to negotiate in good faith a written bonus plan for Employee, payable annually, based on the performance of the Employee.

(c)  The Company shall grant Employee an option to acquire shares of Common Stock in the Company pursuant to the Restricted Stock Purchase Agreement, a copy of which is attached to this Agreement as **Exhibit A**.

(d)  The Company shall reimburse Employee for any signing bonus that Employee is legally obligated to repay her prior employer, up to a maximum of $15,000, subject to provision of reasonable documentation of these expenses.

4.  BENEFITS AND REIMBURSEMENTS.

4.1  Employee will, during the term hereof, have the right to receive such benefits as are generally made available to full-time executive officers of the Company.  In addition, or inclusive of such benefits, the Company will provide Employee with the following:

(a)        either (i) the Company's standard medical and dental plan insurance covering Employee and her immediate family, or (ii) upon Employee's election, a maximum of $400 per month allowance for private medical and dental insurance coverage for Employee and her immediate family, *provided that* Employee's election to receive such monthly insurance allowance will not preclude Employee from choosing to receive the coverage provided for in subsection (i), in lieu of such allowance, at a later date;

(b)    in addition to normal holidays recognized by the Company, Employee will be entitled to three weeks paid vacation annually, the earning of which is pro-rated monthly, subject to the consent of the Company as to the timing of such vacation time;

(c)    the Employee may choose to obtain a term life insurance policy on Employee's life at a face amount determined by Employee. The Company shall reimburse employee for that portion of the premium that is attributable to 2 times the employee's base annual salary as listed in 3(a) and amended from time to time. For example, if employee selects a life insurance policy in the amount of 4 times her annual salary, then Company shall reimburse Employee for 50% of the annual premium. It shall be Employee's sole responsibility to and option to place said life insurance policy, and Company shall have no responsibility for Employee's failure or choice to do so, or for any lapse in coverage due to any event. Company's sole obligation under this section shall be to reimburse Employee for premiums paid, if any.

4.2  The Company will reimburse Employee for travel and other out-of-pocket expenses reasonably incurred by Employee in the performance of her duties hereunder, provided that all such expenses will be reimbursed only (i) upon the presentation by Employee to the Company of such documentation as may be reasonably necessary to substantiate that all such expenses were incurred in the performance of her duties, and (ii) if such expenses are consistent with all policies of the Company in effect from time to time as to the kind and amount of such expenses and (iii) the cost of all other reasonable expenses, including without limitation, telephone and cellular phone expenses, DSL Internet Access costs related to the preparation and dissemination of proposals, and costs incurred to entertain clients or prospective clients.

5. TERMINATION OF EMPLOYMENT.

5.1  Death of Employee.  This Agreement will terminate upon the death of Employee.

5.2  Permanent Disability of Employee.  This Agreement will terminate if Employee becomes permanently disabled. Employee will be deemed permanently disabled for the purpose of this Agreement if Employee becomes physically or mentally incapable of performing her duties hereunder for a continuous period of one hundred eighty (180) days, in which event Employee will be deemed permanently disabled upon the expiration of such one hundred eighty (180) day period.

5.3  Employee's Discharge for Cause.  The Company will have the right to terminate Employee's employment hereunder for "Cause" at any time effective upon its giving of written notice setting forth with particularity the facts and circumstances constituting such Cause. For such purposes, "**Cause**" means

the occurrence of one or more of the following: (i) the commission by Employee of any fraudulent, criminal or illegal act, or any act of fraud, embezzlement, theft, bad faith, gross negligence, recklessness or willful misconduct; (ii) gross incompetence or repeated material failure or refusal to perform the duties required by this Agreement and as may be reasonably assigned to Employee by the Chief Executive Officer or Board of Directors from time to time; (iii) conviction of a felony or of any crime of moral turpitude; (iv) any material misrepresentation by Employee to the Company regarding the operation of the business; or (v) breach of any covenant of this Agreement.

      5.4  <u>The Company's Right to Terminate At Will</u>.  Subject to the payment to Employee of the severance payments as provided in Section 5.5(b) below, the Company will have the right, exercisable at any time, to terminate Employee's employment with the Company without "Cause" (as defined in Section 5.3 above), immediately upon written notice to Employee.

      5.5  <u>Compensation Upon Termination</u>.

      (a)  Upon termination of Employee's employment pursuant to this Article 5.1-5.3, Employee will be entitled to only:  (i) the compensation provided for in Section 3(a) hereof for the period of time ending with the date of termination; (ii) "COBRA" benefits to the extent required by applicable law; and (iii) reimbursement for such expenses as Employee may have properly incurred on behalf of the Company as provided in Article 4 above prior to the date of termination.

      (b)  If the Company terminates Employee's employment pursuant to Section 5.4 above only, in addition to the amounts payable in Section 5.5 (a) above, Employee will be entitled to receive a severance payment in an amount equal to the remaining salary that would have been paid to Employee during the remainder of her term of employment in the absence of such termination, as provided in Section 3(a) above, regardless of whether provided that such termination occurs during the Initial Term or during a Renewal term.  In the event such termination occurs in during a Renewal term, Employee will be entitled to receive a severance payment in an amount equal to four months salary at the rate as provided in Section 3(a) above or the rate then in effect at the time of termination, whichever is greater.

      (c)  The termination of Employee pursuant to Section 5.4 shall not affect Employee's rights as set forth in either 1)  the "Local Motion ITS, Inc. 2003 Stock Option Plan" or 2)  the "Stock Option Agreement under the Local Motion ITS, Inc. 2003 Stock Option Plan", which are Schedules 2.8(a) and 2.8(b), respectively, of that certain "Share Purchase Agreement of even date herewith, to which Local Motion ITS, Inc. is also designated as the "Company".

      (d)  The payments set forth in this Section 5.5 will fully discharge all responsibilities of the Company to Employee under this Agreement or relating to

or arising out of the termination of Employee's employment and shall be conditioned upon Employee's execution of a Release Agreement with the Company in substantially the form attached hereto as **Exhibit B**.

6.    UNFAIR COMPETITION BY EMPLOYEE.

6.1    Employee agrees that all trade secrets, confidential or proprietary information with respect to the activities and businesses of the Company, including, without limitation, personnel information, secret processes, know-how, customer lists, employee lists, data bases, ideas, techniques, processes, inventions (whether patentable or not), and other technical plans, business plans, marketing plans, product plans, forecasts, contacts, strategies and information (collectively "**Proprietary Information**") which were learned by Employee in the course of her employment by the Company, and any other Proprietary Information received, developed or learned by Employee hereafter in the course of her future employment by or in association with the Company, are confidential and will be kept and held in confidence and trust as a fiduciary by Employee.    Employee will not use or disclose Proprietary Information of the Company except as necessary in the normal course of the business of the Company for its sole and exclusive benefit, unless Employee is compelled so to disclose under process of law, in which case Employee will first notify the Company promptly after receipt of a demand to so disclose, and will afford the Company the opportunity to contest, prevent or limit such disclosure.

6.2    Employee and the Company acknowledge that:    (i) each covenant and restriction contained in Section 6.1 and Article 7 of this Agreement is necessary, fundamental, and required for the protection of the Company's business; (ii) such relate to matters which are of a special, unique, and extraordinary character that gives each of them a special, unique, and extraordinary value; and (iii) a breach of any such covenant or restriction will result in irreparable harm and damage to the Company which cannot be compensated adequately by a monetary award.    Accordingly, it is expressly agreed that, in addition to all other remedies available at law or in equity, and notwithstanding anything to the contrary in Section 9 below, the Company will be entitled to the immediate remedy of a temporary restraining order, preliminary injunction, or such other form of injunctive or equitable relief as may be used by any court of competent jurisdiction to restrain or enjoin any of the parties to this Agreement from breaching any such covenant or restriction, or otherwise specifically to enforce the provisions contained in Section 6.1 and Article 7 of this Agreement.

7.    PROPRIETARY MATTERS.    Employee expressly understands and agrees that any and all improvements, inventions, discoveries, processes, or know-how related to the business of the Company that are generated or conceived by Employee during the term of this Agreement, whether so generated or conceived during Employee's regular working hours or otherwise, will be the sole and exclusive property of the

Company, and Employee will, whenever requested to do so by the Company (either during the term of this Agreement or thereafter), execute and assign any and all applications, assignments and/or other instruments and do all things which the Company may deem necessary or appropriate in order to apply for, obtain, maintain, enforce and defend patents, copyrights, trade names or trademarks of the United States or of foreign countries for said improvements, inventions, discoveries, processes, or know-how, or in order to assign and convey or otherwise make available to the Company the sole and exclusive right, title, and interest in and to said improvements, inventions, discoveries, processes, know-how, applications, patents, copyrights, trade names or trademarks.

8.    KEY-MAN INSURANCE.  Employee agrees to make herself available and to undergo, at the Company's request and expense, any physical examination or other procedure necessary to allow the Company to obtain a key-man insurance policy on Employee.  If the Company obtains such policy, it will maintain the policy at its expense and all proceeds will be the sole property of the Company.

9.    ARBITRATION.  The parties will attempt in good faith promptly by negotiations to resolve any dispute or controversy arising out of or relating to this Agreement or to the employment or termination of Employee by the Company.  If a party intends to be accompanied at a negotiation meeting by an attorney, the other party will be given at least three working days' notice of such intention and may also be accompanied by an attorney.  All negotiations pursuant to this clause are confidential and will be treated as compromise and settlement negotiations for purposes of the Federal Rules of Evidence and state rules of evidence.

In the event the parties are unable to settle such controversy amicably through negotiations, the dispute will be submitted to binding arbitration before a single arbitrator in accordance with the Employment Dispute Resolution Rules of the American Arbitration Association provided that: (i) the arbitrator will be instructed and empowered to take whatever steps to expedite the arbitration as he or she deems reasonable; (ii) each party will bear its own costs in connection with the arbitration; provided that the costs of the arbitrator will be borne by the party who the arbitrator determines not to have prevailed in the matter; (iii) the arbitrator's judgment will be final and binding upon the parties, except that it may be challenged on the grounds of fraud or gross misconduct; (iv) except for damages arising out of a breach of Section 6.1 or of Article 7 above, the arbitrator is not empowered to award damages in excess of compensatory damages and each party hereby irrevocably waives any damages in excess of compensatory damages; and (v) the arbitration will be held in San Francisco, California.  Judgment upon any verdict in arbitration may be entered in any court of competent jurisdiction.  The parties hereby consent to the jurisdiction of, and proper venue in, the federal and state courts located in Tucson, Arizona.

Unless otherwise expressly set forth in this Agreement, the procedures specified in this Section 9 will be the sole and exclusive procedures for the resolution of disputes and controversies between the parties arising out of or relating to this Agreement; provided, however, that a party may seek a preliminary injunction or other provisional judicial relief if in its judgment such action is necessary to avoid irreparable damage or to preserve the status quo. Despite such action the parties will continue to participate in good faith in the procedures specified in this Section 9.

**The parties hereby waive any and all rights they may have to trial by jury as to any disputes arising out of this Agreement.**

10. MISCELLANEOUS.

10.1    Governing Law; Interpretation.    This Agreement will be governed by the substantive laws of the State of Virginia applicable to contracts entered into and fully performed in such jurisdiction. The headings and captions of the Articles and Sections of this Agreement are for convenience only and in no way define, limit or extend the scope or intent of this Agreement or any provision hereof. This Agreement will be construed as a whole, according to its fair meaning, and not in favor of or against any party, regardless of which party may have initially drafted certain provisions set forth herein.

10.2    Assignment.    This Agreement is personal to Employee and he may not assign any of her rights or delegate any of her obligations hereunder without first obtaining the prior written consent of the Chief Executive Officer of the Company.

10.3    Notices.    Any notice, request, claim or other communication required or permitted hereunder will be in writing and will be deemed to have been duly given if delivered by hand or if sent by certified mail, postage and certification prepaid, to Employee at her residence (as noted in the Company's records), or to the Company at its address as set forth below its signature on the signature page of this Agreement, or to such other address or addresses as either party may have furnished to the other in writing in accordance herewith.

10.4    Severability.    In the event any provision of this Agreement or the application of any such provision to either of the parties is held by a court of competent jurisdiction to be contrary to law, such provision will be deemed amended to the extent necessary to comply with such law, and the remaining provisions of this Agreement will remain in full force and effect.

10.5    Entire Agreement; Amendments.    This Agreement (together with the Stock Option Agreement and any other exhibits and attachments hereto) constitutes the final and complete expression of all of the terms of the understanding and agreement between the parties to this Agreement with respect to the subject matter hereof, and this Agreement replaces and

supersedes any and all prior or contemporaneous negotiations, communications, understandings, obligations, commitments, agreements or contracts, whether written or oral, between the parties respecting the subject matter hereof. Except as provided in Section 10.4 above, this Agreement may not be modified, amended, altered or supplemented except by means of the execution and delivery of a written instrument mutually executed by both parties.

10.6 <u>Attorneys' Fees</u>. In the event it becomes necessary for any party to initiate legal action or any other proceeding to enforce, defend or construe such party's rights or obligations under this Agreement, the prevailing party will be entitled to its reasonable costs and expenses, including attorneys' fees, incurred in connection with such action or proceeding.

[TEXT CONTINUED NEXT PAGE]

11. <u>Employee Acknowledgment</u>. Employee acknowledges that he has been given the opportunity to consult with legal counsel concerning the rights and obligations arising under this Agreement (including for purposes of this Section 11, the Stock Option Agreement), that he has read and understands each and every provision of this Agreement, and that he is fully aware of the legal effect and implications of this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

LOCAL MOTION ITS, INC.

By:

JON MONSON, CHIEF EXECUTIVE OFFICER

Janet Sue Davis:



## AMENDMENT TO EMPLOYMENT AGREEMENT

This Amendment to Employment Agreement is made and effective this 13th day of January, 2005 by and between Local Motion ITS, Inc. ("Company") and Janet Davis ("Employee").

**WHEREAS,** Company and Employee entered into an Employment Agreement on the 1st day of December, 2003; and

**WHEREAS,** Company and Employee desire to modify certain aspects of this Agreement;

**NOW THEREFORE,** in consideration of the foregoing, Company and Employee agree to modify the Agreement dated December 1, 2003 in the following particulars only:

1. Section 2, Duties, is amended to add the following: "In addition to duties for Local Motion ITS, Inc., Employee shall serve, beginning January 13, 2005 as a Regional Vice President for MV Contract Transportation, Inc. and perform duties as assigned by the President of MV Contract Transportation, Inc. and its sole director.

2. Section 3(a) is modified to reflect an annual salary of $170,000 effective January 13, 2005.

3. Section 4.1(c) is modified to reflect that the Company will reimburse Employee for term life insurance in the amount of three times her annual salary rather than two times her annual salary.

4. Section 4.2(d) added to reflect that the Employee is entitled to a $500 vehicle allowance on a monthly basis.

5. In addition to the compensation in this Agreement, Employee will be entitled to participate in the MV Transportation, Inc. Regional Vice President Short Term Incentive Plan, which shall be from time to time modified by the Company.

With the exception of the changes herein, the terms of the Agreement between Company and Employee remain unchanged.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to Agreement to be duly executed as of the day and year first above written.

LOCAL MOTION ITS, INC.                          Janet Sue Davis:

By:_____

JON MONSON, CHIEF EXECUTIVE
OFFICER



## AMENDMENT TO EMPLOYMENT AGREEMENT

This Amendment to Employment Agreement is made and effective this 1st day of January, 2006 by and between Local Motion ITS, Inc. ("Company") and Janet Davis ("Employee").

**WHEREAS,** Company and Employee entered into an Employment Agreement on the 1st day of December, 2003; and

**WHEREAS,** Company and Employee amended the Agreement on January 13, 2005; and

**WHEREAS,** Company and Employee desire to modify certain aspects of this Agreement;

**NOW THEREFORE,** in consideration of the foregoing, Company and Employee agree to modify the Agreement dated December 1, 2003, as amended, in the following particulars only:

1. Local Motion ITS, Inc. hereby assigns the Agreement, as amended, to MV Public Transportation, Inc. and Employee accepts said assignment and understands that MV Public Transportation, Inc. shall henceforth be the employer of Employee and shall hereinafter be referred to as "Company" with respect to this Agreement.

2. Section 2, Duties, is amended as follows: Effective January 1, 2006 Employee shall be the Executive Vice President Information Technology for the Company and shall serve in no other capacity. Employee shall report to the Chief Executive Officer of the Company or his designee.

3. Section 3(a) is modified to reflect an annual salary of $225,000 effective January 1, 2006.

4. Employee will be no longer be entitled to participate in the MV Transportation, Inc. Regional Vice President Short Term Incentive Plan. Employee shall be entitled to receive such bonus as approved from time to time by the Compensation Committee of the Board of Directors of MV Transportation, Inc. for the position of Employee.

5. Article 5.5(b), is modified to reflect that in the event of termination of Employee's employment by the Company, not for cause, the Company shall provide Employee a minimum of 365 days advance written notice of such termination. If Employee is not provided three-hundred sixty-five (365) days advance written notice, Employee shall be entitled to severance payments determined as follows: (i) The maximum amount of severance paid shall be 365 calendar days, based on a severance amount per calendar day, determined by dividing the Employee's then biweekly base salary by 14; (ii) Severance payments shall start on the Employee's first day after the Company's involuntary termination of Employee's employment and shall end on the 365th day after a written notice of termination is provided (by example, if a 90 day written notice of termination is provided, then Employee shall be entitled to 275 days of severance); (iii) Severance payments shall be made on a bi-weekly basis, payable on the Company's normal pay dates; (iv) Severance payments shall be subject to normal payroll tax withholdings and other withholdings as required by law; (v) In the event Employee

obtains employment or becomes self-employed, or obtains income for personal service in any other manner during the severance period, the amount of severance payments due Employee by the Company shall be reduced by the amount of gross income derived from such other employment or self-employment (Employee agrees to report said income to the Company during the severance period); (vi) Notwithstanding any other provision of this Agreement, Employee shall not be entitled to any severance payments until the Employee has executed a release agreement substantially in the form contained in Exhibit "A" hereto; and, (vii) Notwithstanding any other provision of this Agreement, Employee shall not be entitled to receive any severance payments in the event Employee, subsequent to the Company's notice of termination not for cause, fails to fulfill his assigned duties or report to work as required prior to the effective date of termination, or in the event Employee accepts employment (as employee or contractor) by any person, company or organization then in competition with the Company during the period of severance payments.

6.  Section 4.2(d) is amended to reflect that Company shall provide an automobile allowance equal to the monthly payment on a vehicle owned by Employee, such payment to be for a minimum term of 60 months at an interest rate not to exceed 7% with a purchase price not to exceed $50,000. In the event the automobile is more than $50,000, the Company will pay a pro-rata amount of the payment based on the ratio of $50,000 to the total cost. Furthermore, Company shall reimburse cost of employee's auto insurance for said vehicle and the cost of fuel and maintenance on said vehicle.

7.  Employee's cell phone allowance will be $250.00 per month on the month the Company's current contract for Employee's Sprint Wireless card is expired and shut off.

8.  In the future, if the Company caused payroll deductions for medical insurance, the Employee's salary will be increased a like amount.

9.  Employee is entitled to life insurance in the amount of 3 times her annual salary paid by the Company, provided the Employee takes all steps to obtain coverage.


With the exception of the changes herein, the terms of the Agreement between Company and Employee remain unchanged.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to Agreement to be duly executed as of the day and year first above written.


LOCAL MOTION ITS, INC.                          Janet Sue Davis:

By: _____                     _____
    JON MONSON, CHIEF EXECUTIVE
OFFICER


MV PUBLIC TRANSPORTATION, INC.

By: _____
    JON MONSON, CHIEF EXECUTIVE OFFICER



**MV Transportation Electronic Mail Policy**
*April 1, 2002*

## POLICY:

Electronic mail systems are the property of MVT and are subject to the same restrictions and conditions as all other company property. Electronic mail must be utilized in a responsible and cost-effective manner for business purposes in compliance with the attached standards set forth below. Company equipment and services should be used for company business. Violations of this policy are subject to disciplinary action, up to, and including termination.

The following standards have been developed to assist in interpreting this policy.

## ELECTRONIC MAIL USAGE STANDARDS:

### USAGE:

- Use of the company electronic mail system for non-company business, including but not limited to chain letters or petitions, is against company policy. If chain letters are received, they should be deleted and not forwarded.

- The electronic mail system at MVT should not be used to communicate any derogatory, defamatory, obscene or in any way inappropriate messages, in any fashion. Examples of inappropriate system use include, but are not limited to, soliciting personal business opportunities and sending or receiving copyrighted material without the author's permission.

- An important component of responsible electronic mail usage is care in drafting, proofreading, addressing, and awareness of the general rule; not to write anything in an electronic mail message that you would not put in regular hard copy form.

### PRIVACY:

- Keep in mind Electronic mail is not private or confidential. You do not have the right of privacy with respect to use of a company computer or any messages generated or received through the company's electronic mail system. Deletion of a message or file may not fully eliminate the message from the company's mail system.

- The company reserves the right to monitor electronic mail messages for unusual or inappropriate activity, or in the event of an emergency situation. In addition, the company reserves the right to disclose electronic mail messages to third parties without the employee's permission.

- Electronic mail messages should be treated as confidential by other employees and accessed only by the intended recipient or with the intended recipient's express permission.

### MANAGEMENT OF MAIL AS A COMPANY ASSET:

- Electronic mail messages should be retained for a period of time consistent with their business purpose. Electronic mail that is no longer being used for any business purposes should be deleted, in order to cost-effectively use storage devices within MVT's computer systems.

- Electronic mail messages which may be relevant to the subject matter of any pending or threatened company litigation must not be deleted without the Legal General Counsel Division's express written permission.

- Keep your password private and don't share it not distribute it to any third party.  It is recommended that you change your password every 60 days.  Do not write your logon ID and password on a post-it note or keep it with your computer, especially if you travel with a portable computer.

- When sending electronic mail outside of the company with a file attachment, you need to ensure that the information you are sending over the Internet is not considered "confidential" or "sensitive information,"

- If you receive a file attachment with an electronic mail message that has an ".exe" file extension, do not click on the file, as it may contain a virus.  Contact the Support Desk for assistance.

- Ensure that virus protection software is operative at all times on your Desktop or Laptop computer, if you are going to send mail within the company or outside of the company which, that  includes attachments in the electronic mail message.

The company reserves the right to revise these policies and standards at any time without notice, as may be required necessary.

# MV Corporate Policy Statement

Please read and abide by the MV Transportation, Inc. Corporate Policy Statement on Internet usage, Newsgroup, and Electronic Mail.

This policy is available for reading or download at:

## MV Transportation, Inc. Corporate Policy Statement

Thank You.

I agree to abide by the Corporate Policy Statement while using this computer.



**From:** Janet Davis
**Sent:** Friday, September 28, 2007 3:48 PM
**To:** Joseph, Mark
**Subject:** New Position

I just want you to know I appreciate your efforts in this matter . Christopher and I will do everything to not disappoint you.  We are both becoming very excited about our new move and our opportunity to improve both your service and your bottom line.

Janet Davis
(623) 826 -0067
Executive Vice President, IT



**From:** Janet Davis [mailto:tojanetd@YAHOO.COM]
**Sent:** Monday, October 01, 2007 7:20 PM
**To:** alan.moldawer@veoliatransportation.com
**Cc:** cbryan@satx.rr.com
**Subject:** Christopher's email

As you requested, this is the appropriate email to forward his offer letter.

Janet Davis
(623) 826 -0067
Executive Vice President, IT





| Employee Name: | Janet Davis |
| Effective Date: | November 1, 2007 |
| Title: | Vice President, Business Improvement |
| Initial Term of Agreement: | Five (5) Years |
| Annual Base Salary: | $250,000 |
| Short Term Incentive Plan Target: | 36% |
| Annual Paid Time Off: | Four (4) Weeks |

## SENIOR EXECUTIVE EMPLOYMENT AGREEMENT

**THIS EMPLOYMENT AGREEMENT** is made the Effective Date set forth above by and between Janet Davis (the "Employee") and Veolia Transportation, Inc. (the "Company").

**WHEREAS,** the Company desires to employ the Employee and the Employee desires to be employed by the Company upon the terms and conditions set forth herein.

**NOW, THEREFORE,** in consideration of the mutual promises and conditions set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.  <u>Employment.</u>  The Company hereby employs the Employee, and the Employee hereby agrees to be employed by the Company, in the position stated above, upon the terms and conditions set forth in this Agreement.  In accepting the terms and conditions set forth herein, the Employee and the Company understand and agree, as of the Effective Date hereof, as follows: (i) she is not presently under contract elsewhere, whether as an employee, consultant or as an independent contractor that is not employment "at will"; (ii) she is subject to an non-competition or other restrictive covenant that she and the Company believe is invalid or unenforceable and would not in any way prohibit or restrict the Employee from being employed by the Company or fulfilling her duties and responsibilities hereunder; and (iii) except as permitted in this Agreement, she will not hereafter enter into any employment or consulting contract with a party not affiliated with the Company, whether as an employee, consultant or as an independent contractor, during her Employment by the Company.

2.  <u>Duties.</u>

    (a)  The Employee will serve in the position with the Company set forth on the top of the first page of this Agreement, with such duties and responsibilities as are associated with this position, and in such other positions and with such other duties as may be requested by the Chief Executive Officer or Board of Directors of the Company from time to time.

The Employee will devote her entire business time, attention, skill and energy (excepting participation in a local service club or organization, or similar community-oriented activities, vacation time, holidays, sick days, disability and the like) exclusively to the business of the Company as directed, will use her commercially reasonable best efforts to promote the success of the business, and will cooperate fully with and carry-out all of the legitimate requests of the Company in the advancement of the best interests of the Company.

(b)    The Employee shall, during her employment with the Company: (i) comply with all policies of the Company including, but not limited to, the Company's Code of Business Conduct.   As a member of senior management of the Company, Employee shall have the responsibility, along with others, for implementing and maintaining an effective legal and ethical compliance program, to set examples of ethical behavior, to uphold the highest standards of business conduct, and to foster a climate of legal and ethical compliance within the Company consistent with the Veolia Transportation Code of Business Conduct and the Guiding Principles and Values of Veolia Environnement.

3.    Compensation and Benefits

(a)    Base Salary.   As annual compensation for the Employee's faithful performance hereunder, the Company will pay to the Employee a minimum initial annual Base Salary in cash equal to the amount set forth on the top of the first page of this Agreement (the "Base Salary"), payable in accordance with the Company's standard payroll practices as may be in effect from time to time. The Company shall review the Employee's Base Salary, beginning in January, 2009, and annually thereafter, and at any other time the parties deem desirable and, in light of any such review, may (but shall not be obligated to) in the discretion of the Company, authorize a change in such Base Salary taking into account any change in the Employee's then-current duties and responsibilities, increases in the cost of living, past performance by the Employee, and any other pertinent factors the Company may determine appropriate.  Any change in Base Salary in accordance with this Section 3(a) shall become the new "Base Salary" for purposes of this Agreement.

(b)    Initial Bonus.   Ninety (90) days of employment following the final ratification of this Agreement, the Company will pay the Employee a signing bonus of $30,000.

(c)    Annual Bonus.  In addition to the Employee's Base Salary referred to in Section 3(a), throughout her employment, the Employee will be eligible to participate in the Company's Short Term Incentive Program as then in effect (the "STIP") in order to provide the Employee the opportunity to earn annual cash bonus payments, as may be determined pursuant to the terms and conditions of such STIP.  Additionally, or alternatively, the parties may from time to time agree to other bonus targets to be set in

writing between the parties.  The target amount of bonus payments available under the STIP will be 36% of the Employee's Base Salary Except as otherwise provided herein, all such bonuses will be paid, if at all, in the sole discretion of the Company and the Employee must be employed by the Company at the time of the bonus award.  All such bonuses shall be awarded and paid to the Employee no later than March 15 immediately following the calendar year to which such bonus is related.  For 2007, the annual bonus award shall be prorated, crediting the Employee with two months of employment for 2007.  In addition to this discretionary incentive bonus, the Employee shall receive for each completed year of employment with the Company, a non-discretionary bonus of $20,000.  All of the foregoing bonuses are wages subject to the usual and customary withholdings required by law or as authorized by the Employee.

(c)    <u>Automobile Benefits</u>.  In accordance with Company policy, as amended from time to time, Employee shall receive a monthly automobile allowance of $500 as long as that benefit is generally made available to similarly situated employees.

(d)    <u>Vacation and Sick Leave</u>.  In accordance with standard Company policies and applicable state law in effect from time to time (and subject to change at any time without notice), the Employee shall receive throughout her employment the following:  i) 4 weeks of paid time off (annual vacation), ii) necessary personal days and sick leave, and iii) certain paid holidays as determined by the Company.  To the extent permitted by law, vacation and sick leave are paid time off and not "wages" or compensable as wages.  They are only available to the Employee while she is employed by the Company and are "use it or lose it" benefits, meaning that at the conclusion of each calendar year or upon termination of employment, any unused vacation or sick leave is forfeited.

(e)    <u>Regular Reimbursed Business Expenses.</u> The Company shall reimburse the Employee for all properly accountable out-of-pocket expenses and disbursements reasonably incurred by the Employee in the performance of the Employee's duties and responsibilities, in accordance with Company established standard policies in effect from time to time.

(f)    <u>Employee Benefit Plans</u>.  The Employee shall be eligible to participate in those benefits under the Company's benefit plans generally made available to similarly-situated employees of the Company, including, without limitation, the Company's non-qualified pre-tax deferred savings program for senior executives, senior executive stock options (within the sole discretion of VE and the Company's Board of Directors), group-term life insurance, medical, dental, vision and hospitalization insurance, disability insurance and accidental death or dismemberment insurance. The Company reserves the right to modify or terminate at any time any benefit plans maintained or instituted by the Company.

(g)    Defense Costs.  The Employee has advised the Company that she has received independent legal advice that non-competition restrictions in her current agreements with her current employer are likely unenforceable under applicable law.  However, recognizing that her current employer may attempt to enforce such purported restrictions against her, the Company agrees to indemnify the Employee for all reasonable costs incurred by her in defending any such legal attempts, including reasonable attorneys fees, as well as any judgment awarding damages entered by a court of competent jurisdiction (or in arbitration) in favor or her current employer against her by reason of her leaving her employment, said judgment being final and not subject to further appeal.  The Company shall have the right to participate in said defense and the decisions to be made regarding settlement and/or appeal.

(h)    Office.  The Employee will be required to travel frequently (at Company expense) and attend to meetings on a regular basis at the Company headquarters in the Chicago area.  The Employee will be allowed to conduct her business for the Company out of her residence in Waddell, Arizona.  Office space will also be made available to her in the VTOD offices in the Phoenix area, at which time she will utilize the VTOD office space as her principal office location until otherwise reasonably determined by the Company.

4.    Term and Termination of Employment.  The term of this Agreement shall be five (5) years from the Effective Date, subject to such extensions and renewals as the parties may agree upon in writing hereafter and subject to earlier termination, upon the occurrence of any of the following events:

(a)    Termination by the Company Without Cause.    These provisions notwithstanding, the employment of the Employee with the Company is "at will", subject to the benefits to which the Employee is entitled herein in the event of termination for reasons other than "Cause" or her voluntary termination.  Accordingly, the Company may remove the Employee at any time without Cause (as defined in Section 4(c)); provided, however, that, in the event that such notice is given, the Employee shall be under no obligation to render any additional services to the Company and shall be allowed to seek other employment, subject to the terms, conditions and covenants of this Agreement. If the Company terminates the Employee's employment without Cause, the Employee shall be entitled to receive the following:

(i)    The Company shall pay to the Employee, as a lump sum, all amounts earned or accrued subject to the limitations set forth under Section 3 above, that had not yet been paid as of the date of termination, including all due and unpaid STIP bonuses and/or other bonuses, if any, attributable to prior years;

(ii)    The Employee shall receive all other benefits accrued or earned in accordance with the terms of any applicable benefit plans and

-4-

programs of the Company described Section 3(a) and (b) above, and reimbursement of business expenses described in Section 3(e), through the date of her termination; and

(iii)    Contingent upon execution by the Employee of an agreement in form and substance satisfactory to the Company mutually releasing any and all claims between the Company and the Employee, the Company shall pay the Employee severance pay in an amount equal to (i) the lesser of: twelve (12) months Base Salary or the Base Salary for the remaining Term, payable in the same installments as the Base Salary would have been paid had the Employee's employment continued; and (ii) the amount of the last STIP bonus (or other bonus paid as an alternative to the STIP bonus), payable in a lump sum within thirty (30) days of such termination, pro rated for the period of the current calendar year up to the date of Termination. In addition, the Company shall pay 80% of the amount due for continued COBRA coverage for the Employee under the Company's medical and dental plans and the Employee shall pay the remaining 20%, should he or she elect such coverage, for the period during which the Employee is entitled to receive continued Base Salary installments under (i) above.

(c)    <u>Termination by the Company for Cause</u>. The Company may terminate the Employee's employment at any time for Cause upon written notice to the Employee, in which event all payments under this Agreement shall cease, except for: (a) as a lump sum, Base Salary to the extent already accrued and unpaid up to the date of her termination and (b) all benefits accrued or earned before her termination in accordance with the terms of any applicable benefit plans and programs of the Company described in Sections 3(a) and (b) above, and reimbursement of business expenses described in Section 3(e) incurred prior to the date of her termination. The Employee shall forfeit any STIP that has not yet been paid as of the date of termination for Cause. The Employee shall not be entitled to any severance pay in the event the Employee is terminated for Cause. "Cause" shall mean (i) the Employee's deliberate neglect of her employment duties, (ii) the Employee's commission of an illegal or immoral act or omission that brings or could be reasonably expected to bring ill-repute or criticism upon the Company including, without limitation, violations of Company policies prohibiting unlawful discrimination and harassment, (iii) a material violation of the Company's Code of Business Conduct or standards of ethical behavior, or (iv) any other material breach of this Agreement.

(d)    <u>Voluntary Termination by the Employee</u>. In the event the Employee shall voluntarily terminate her employment prior to the end of the Term other than for Good Reason, she shall be required to give not less than sixty (60) days notice in order to transition the duties and responsibilities of her position. Upon such termination, the Employee shall be entitled to any accrued but unpaid Base Salary and benefits described in Sections 3(a)

-5-

and (b), and reimbursement of business expenses described in Section 3(e). The Employee shall not be entitled to any severance pay in the event the Employee voluntarily terminates her employment.

(e)  <u>Termination by the Employee for Good Reason</u>. The Employee shall have the right to resign for "good reason" upon not less than sixty (60) calendar days' prior written notice to the Company following the event that gives rise to the Employee's right to resign for good reason. "Good reason" is defined as, without the Employee's consent (a) the Employee's duties or levels of responsibility are materially reduced, (b) the Employee's Base Salary is substantially reduced, or (c) the Employee is required to relocate her principal residence and does not agree to such relocation. If the Employee resigns for good reason and executes an agreement that mutually releasing any and all claims between the Company and the Employee (except for those claims reserved herein), she will be entitled to receive the same compensation and benefits as provided in Section 4(a), above, for Termination by the Company Without Cause.

(f)  <u>Disability</u>. The Company may terminate the Employee's employment if the Employee is unable to perform the essential functions of her position with or without reasonable accommodation during the Term for a period of three (3) consecutive months because of physical or mental injury or illness ("Disability") (such consecutive period not being deemed interrupted because Employee performs such functions for less than ten (10) consecutive days if followed by inability to so perform due to the same injury or illness), subject to any limitations imposed by federal, state or local laws.  The Company will provide a reasonable accommodation to the Employee with a Disability as defined by the federal Americans with Disabilities Act and applicable state or local laws, if such reasonable accommodation would not impose an undue hardship to the Company and would enable the Employee to satisfactorily perform the essential functions of the position. The Employee agrees, in the event of a dispute under this Section 2.5 relating to the Employee's Disability, to submit to a physical examination by a licensed physician jointly selected by the Board and the Employee.  If the Company terminates the Employee's employment for Disability, the Employee shall be entitled to receive the following:

(i)  The Company shall pay to the Employee, as a lump sum, all amounts earned or accrued, under Section 3, that had not yet been paid as of the date of termination, including a pro-rated share of her STIP bonus, or such alternative bonus for the year, if any, determined by the Board and all unpaid STIP and/or other bonuses, if any, attributable to prior years; and

(ii)  The Employee shall receive all other benefits accrued or earned in accordance with the terms of any applicable benefit plans and programs of the Company described in Sections 3(a) and (b)

through the date of her termination, and reimbursement of business expenses described in Section 3(e) incurred prior to the date of her termination. The Employee shall not be entitled to any severance pay in the event she is terminated for Disability.

(g)     <u>Death</u>.  If the Employee dies while employed by the Company, the Company shall pay to the Employee's executor, legal representative, administrator or designated beneficiary, as applicable and as a lump sum, all amounts earned or accrued, under Sections 3(a) and (b) above, that had not yet been paid as of the date of her death, including a pro-rated share of her STIP or Annual Bonus for the year, if any, determined by the Board, all unpaid Annual Bonuses, if any, attributable to prior years, and all benefits accrued or earned before or upon her death in accordance with the terms of any applicable benefit plans and programs of the Company described in Section 3 above, and reimbursement of business expenses described in Section 3(e) incurred prior to the date of her death.  Except as otherwise set forth above, the Company shall have no further liability or obligation under this Agreement to the Employee's executors, legal representatives, administrators, heirs or assigns or any other person claiming under or through the Employee, including (but not limited to) no liability for any severance pay.

5.     <u>Restrictive Covenants</u>.  For purposes of this Section 5 and the following Section 6, all references to the "Company" shall be deemed to include all of Veolia Transportation, Inc. and/or any of their subsidiaries.

(a)     <u>Competitive Activity.</u>    The Company's business relationships are established and maintained at great effort and expense.  By virtue of her employment with the Company, the Employee will have extensive exposure to and personal contact with the Company's clients, customers, suppliers, joint venturers, acquisition targets and other Company employees, and will be able to establish or continue, on behalf of the Company, personal or direct relationships between himself and those clients, customers, suppliers, joint venturers acquisition targets and other Company employees ("Company Relationships").    The Employee acknowledges that these Company Relationships are valuable assets of critical importance to the Company.  The Employee acknowledges that improper appropriation of or interference with the Company Relationships could cause substantial and irreparable harm to the Company, the value of which would be difficult to quantify.  Therefore, in consideration of employment by the Company, and the compensation and other benefits provided and to be provided to the Employee under this Agreement, the Employee agrees that, except as otherwise provided herein, or unless otherwise permitted by the Company in writing, she shall not, at any time during employment by the Company or for a period of twenty-four (24) months immediately following termination of employment with the Company for any reason, engage in any of the following activities:

(i)   Directly or indirectly, either individually or as an employee, agent, partner, shareholder, consultant, or in any other capacity, participate in, engage in, or have a financial or other interest in any Venture in Competition within the United States (the "Geographical Area");   provided, however, that ownership of less than two percent (2.0%) interest in a corporation whose shares of stock are traded on a recognized stock exchange or traded on the over-the-counter markets shall not be deemed a violation of this section. "Venture in Competition" is defined to mean any business that provides or proposes to provide public transit service by bus, other motor vehicle, or rail, or any for-hire ground transportation service, and/or management of the same or school bus.   Nothing herein shall be construed to limit employment by any public transit agency or authority, except those agencies or authorities with which the Company has a contractual relationship or had a contractual relationship within 12 months preceding termination of employment.

(ii)   Influence or attempt to influence any person or entity which has a past, present or prospective business relationship with the Company to terminate, fail to enter into, or not renew such business relationship;

(iii)   Hire or attempt to hire for or on behalf of any person or entity any person who is employed by the Company or to attempt to influence any employee of the Company to terminate employment with the Company;

(iv)   Contact, directly or indirectly, any existing, or prospective customer or client of the Company to whom a bid or proposal has been submitted or prepared for submission during the term of the Employee's employment with the Company, for the purpose of providing or soliciting to provide transportation services identified in subpart 5 (a)(i) above;

(v)   The parties acknowledge that, with respect to the conduct of the Employee after the employment relationship with the Company has terminated, the persons or entities referred to in this Paragraph 5 as customers or clients shall, without limitation, be those with, for, or to whom the Company provided public airport transportation, transit or ground transportation for hire or had contracts to do so, or those to or from whom the Company submitted or received bids for public transit or ground transportation for hire not otherwise excluded from these covenants by other provisions of this Agreement, within the twelve (12) months preceding the date of termination of the employment relationship between the Employee and the Company.

(b)   Protected Information

(i)     Further, the Employee acknowledges that by virtue of her employment, the Employee will have access to confidential and proprietary information concerning the Company's trade secrets, current operations and development plans which information is not generally available to the public or the trade, is of a special and unique value and (a) is proprietary to, about or created by the Company, (b) gives the Company a competitive business advantage or the opportunity of obtaining such advantage or the disclosure of which could be detrimental to the interests of the Company, (c) is designated by the Company as Confidential Information (as that term is defined below), is known by the Employee to be considered confidential by the Company, or from all of the relevant circumstances should reasonably be assumed by the Employee to be confidential to the Company, (d) was provided to the Company with the expectation that it be held in confidence, or (e) is not generally known by persons not associated with the Company.  Such Confidential Information may include, without limitation: (A) books and records relating to operations, finance, account, sales personnel and management; (B) policies and matters relating particularly to operations such as vendor information (including vendor characteristics, services, prices, lists and agreements); internal cost information such as the costs of providing products, services and equipment, operating costs and pricing matters; internal service and operational manuals and the manner and methods of conducting the business of the Company; (C) scientific and engineering secrets, "know how", secret processes or machines, inventions and computer programs (including documentation of such programs); (D) the names of customers and their representatives; contracts (including their contents and parties); customer services and the type, quantity, specifications and content of products or services purchased, leased, licensed or received; price and cost data; business development and bidding techniques or quoting policies and procedures; marketing techniques; route sheets; and (E) business opportunities, marketing or business diversification plans, forecasts and forecast assumptions and volumes, future plans and potential strategies (including, without limitation, acquisition prospects) (collectively, "Confidential Information").  The Employee acknowledges and agrees that all such information is "Confidential Information".

(ii)    The Employee further acknowledges and agrees that, in addition to the fiduciary obligations that the Employee owes to the Company by virtue of the Employee's employment by the Company, the Employee shall occupy a position of trust and confidence with respect to the affairs and business of the Company as incorporated or reflected in the Confidential Information.  In view of the foregoing and of the consideration to be provided to the Employee,

-9-

while employed by the Company and in reasonable perpetuity thereafter, the Employee agrees to hold all Confidential Information in the strictest confidence and not disclose any Confidential information to any person inside or outside the Company except (a) when the Employee discloses Confidential Information in the proper course of the Employee's services to the Company, (b) when such Confidential Information becomes generally known to the public other than through a breach of this Agreement, or (c) when the Employee is required to disclose any Confidential Information pursuant to any valid legal process in which case A) the Employee shall immediately notify the Veolia Transportation, General Counsel of any such legal process in order to enable the Company to contest such legal process's validity, B) shall fully cooperate at the Company's expense with any efforts by the Company to limit the extent of such disclosure and C) shall disclose only so much of such Confidential Information as is necessary to comply with the legal process. The Employee further agrees that the Employee shall not use, copy or transfer Confidential Information other than in the proper course of the Employee's services to the Company, its subsidiaries and its affiliates.

(iii)    On the date Employee terminates employment with the Company or, at any time upon request by the Company, the Employee (or the Employee's heirs or personal representatives) shall deliver promptly to the Company (a) all Confidential Information; provided, however, that, if the Employee has personal notes, diaries, rolodexes and correspondence that contain or reflect Confidential Information as well as information personal to the Employee, the Employee may destroy those portions of such materials containing Confidential Information rather than returning them to the Company and; provided, further, that the Employee may retain personal notes, diaries, rolodexes and correspondence to the extent that they do not contain or reflect Confidential Information; and (b) all other property of the Company which the Employee (or the Employee's heirs or personal representatives) may then possess or have under the Employee's (or the Employee's heirs or personal representatives) control.

(c)    Discoveries and Works. (i)  All discoveries and works made or conceived by the Employee during Employee's employment by the Company, jointly or with others, that relate to the public transportation or for hire ground transportation activities of the Company ("Discoveries and Works") shall be owned by the Company. Discoveries and Works shall include, without limitation, inventions, computer programs (including documentation of such programs), technical improvements, processes, drawings and works of authorship.   The Employee shall (a) promptly notify, make full disclosure to, and execute and deliver any documents requested by the Company to evidence or better assure title to such Discoveries and Works in the Company, (b) assist the Company in obtaining or maintain for itself

-10-

at its own expense United States and foreign patents, copyrights, trade secret protection or other protection of any and all such Discoveries and Works, and promptly execute all applications or other endorsements necessary or appropriate to maintain patents and other rights for the Company and to protect its title thereto. Any Discoveries and Works that relate to the public transportation or for hire ground transportation activities of the Company and which, within six (6) months after the termination of Employee's employment with the Company, are made, disclosed, reduced to a tangible or written form or description, or are reduced to practice by the Employee and which pertain to work performed by the Employee during her employment by the Company shall, as between the Employee and the Company, be presumed to have been made during Employee's employment by the Company.

(d)    Further Inducement.  The Employee gives the undertakings set forth in this Section 5 as a further inducement to the Company to enter into this Agreement and acknowledges that the consideration to which the Employee is entitled has been determined accordingly.  The Company acknowledges that the Employee gives these undertakings in reliance upon the promises made by the Company in Paragraphs 3 and 4 above (and that said undertakings are dependent upon the performance of its promises under paragraphs 3 and 4 to the extent required of the Company as provided therein) that these promises are given by the Company in part as consideration for the undertakings of the Employee made in this Paragraph.

(e)    Reasonableness.  The Employee acknowledges and agrees that, solely for the purposes of determining the enforceability of this Section 5 (and not for the purposes of determining the amount of money damages or for any other reason), (i) the covenants of this Section 5 are reasonable on their face; and (ii) such restrictions have been designed to be reasonable and are no greater than required for the reasonable protection of the Company.

6.    Enforcement of Covenants and Right to Injunction.  The Employee acknowledges that a breach of any of the covenants set forth in Section 5 will likely cause irreparable damage to the Company for which there is no adequate remedy at law.  Therefore, in event of a breach of a covenant set forth in Section 5 by the Employee, the Company shall be entitled, in addition to any other remedies available at law or in equity or through procedures set forth in Subsection 10(c), to specific performance and injunctive relief, both preliminary and permanent, enjoining or restraining such breach, and the Employee consents to the issuance thereof upon proof of breach by the Company without any requirement of posting bond by any court of competent jurisdiction.  In the event an action is brought by either party under this section for specific performance or injunctive relief, the losing party shall be responsible for the payment of both parties' costs, including attorney's fees.

7.    Severability of Covenants.  The Company and the Employee acknowledge and

agree that this Agreement is and shall be divisible and separate so that, if any provision or provisions of this Agreement shall be held to be unreasonable, unlawful or unenforceable, such a determination shall not impair the remaining provisions of this Agreement. If any provision of this Agreement is, as a matter of law or equity, too broad or unreasonable in duration, scope or character of restriction to be enforced, such provision shall be modified to the extent necessary that any such provision or portion thereof shall be legally enforceable to the fullest extent permitted by law.   The parties to this Agreement hereby expressly authorize any court of competent jurisdiction to enforce any such provision or portion thereof or to modify any such provision or portion thereof so that any such provision or portion thereof shall be enforced by such court to the fullest extent permitted by law.

8.    <u>Governing Law and Venue</u>. The parties agree that this Agreement shall be subject to, governed by and construed pursuant to the laws of the State of Illinois and that the language of all parts of this Agreement shall in all cases be construed in whole, according to its fair meaning and intent, and not strictly for or against either of the parties hereto. The parties hereto agree that any action under or related to this Agreement shall be heard and determined exclusively in the Courts of the State of Illinois. Although the Employee's principal residence at the time of the execution of this Agreement is the State of California, the parties intend that the laws of the State of Illinois apply for all purposes, including the enforceability of the covenants and right to injunction set forth herein for violations thereof.

9.    <u>Notices</u>. In any case where any notice or other communication is required or permitted to be given hereunder (including without limitation, any change to the information set forth in this Section 9), such notice or communication shall be in writing and (i) personally delivered; (ii) sent postage prepaid registered or certified mail, return receipt requested, (iii) sent by recognized overnight courier; or (iv) transmitted by facsimile, with a copy sent by postage prepaid registered or certified mail, return receipt requested or by recognized overnight courier as follows:

(a)    Employee, to:      the address set forth on the signature page hereto.

(b)    Company, to:      Mark L. Joseph, CEO
                          2015 Spring Road, Suite 750
                          Oakbrook, Illinois 60523

       With a copy to:
                          Alan B. Moldawer
                          Executive Vice President and General Counsel
                          2015 Spring Road, Suite 750
                          Oakbrook, Illinois 60523

10.   <u>Miscellaneous</u>.

(a)    <u>Entire Agreement</u>.  This Agreement constitutes the entire understanding between the Company and the Employee relating to the terms of

-12-

employment of the Employee set forth herein and supersedes and cancels all prior written and oral agreements and understandings with respect to the subject matter of this Agreement.  This Agreement may not be modified, supplemented, waived or amended in any respect by any verbal statement, representation or agreement made by any director, officer, employee or representative of the Company.  This Agreement may only be amended by written agreement executed by the Employee and by an officer of the Company or any of the Company who is expressly authorized, as the case may be, to execute such document.

(b)    Withholding Taxes.  All amounts payable to or on behalf of the Employee under this Agreement shall be subject to applicable withholding of income, wage and other taxes in accordance with applicable law.

(c)    Arbitration.  Except as otherwise provided in paragraph 6, or as otherwise provided by law, any dispute, controversy or claim arising out of or relating to this Agreement, including, without limitation, claims brought under the Fair Labor Standards Act, Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1866, the National Labor Relations Act, the Americans With Disabilities Act, the Rehabilitation Act of 1973, federal Executive Order 11246; and/or any other similar federal, state or local statute, law, ordinance, regulation or order, including, but not limited to, actions in common law, in equity, contract or tort, including, but not limited to, claims for back pay, front pay, wages, bonuses, vacation pay, fringe benefits, any form of discrimination (including, but not limited to, claims of race, color, sex, handicap, disability, religion, or national origin but excluding age discrimination), emotional distress, breach of contract, interference with contract, breach of implied covenant, breach of implied covenant of good faith and fair dealing, tortuous inducement of breach of contract, negligent interference with and/or inducement of breach of contract, pain and suffering, physical injuries, compensatory or punitive damages, interest, attorneys' fees, severance pay, vacation pay, claims, liquidated damages, sick pay, disability pay, and/or any other benefit, defamation, workers' compensation claims, reinstatement, re-employment or future employment, and/or service letter claims or challenges to the enforceability of this Subsection 10(c) shall be settled by binding arbitration in the State of Illinois  (or such other location as the Company and the Employee may mutually agree), conducted in accordance with the Employment Rules of the American Arbitration Association, as such rules are in effect on the date of delivery of demand for arbitration.  The arbitration of any such issue, including the determination of the amount of damages, shall be to the exclusion of any court of law, except that any award may be enforced by resort to the appropriate court of competent jurisdiction.  In the event of arbitration between the parties arising out of this Agreement, the Company shall pay the cost of the arbitrator and each party shall otherwise bear its own costs in the Arbitration including without limitation attorney and expert witness fees.

(d)    Counterparts.  This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this

Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

(e)     Assignment.  This Agreement and the Employee's rights and obligations hereunder are not assignable by the Employee.  The Company may assign or transfer all (but not less than all) of this Agreement and the Company's rights and obligations hereunder, upon prior notice to and consent by the Employee, to any financially solvent (i) subsidiary or affiliate or (ii) any person, whether or not a subsidiary or affiliate, in conjunction with the sale, merger, consolidation, business combination, reorganization, recapitalization, restructuring or other similar transaction involving the Company; provided that, in the case of either clause (i) or (ii) the assignee or transferee shall acknowledge in writing, delivered to the Employee, in form and content reasonably satisfactory to the Employee, that the provisions of this Agreement are accepted by such person as binding, whereupon all references to the Company hereunder shall be deemed to refer with equal effect to such person.  This Agreement shall be binding upon and inure to the benefit of the executors, administrators and heirs of the Employee and the successors, legal representatives and assigns of the Company and, except for such persons, this Agreement does not construe any right or benefit on any person not a party hereto.

(f)     Waiver.  The failure of a party to insist upon strict adherence to any term of this Agreement on any occasion shall not be considered a waiver thereof or deprive the party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.  The waiver by any party of a breach of any term or condition of the Agreement shall not operate as nor be construed as a waiver of any subsequent breach thereof or as a waiver of a breach of any other term or condition of this Agreement.

(g)     Headings.  Section headings are used herein for convenience of reference only and shall not be deemed to limit, characterize or in any way affect the meaning of any provision of this Agreement.  References to Section and Subsections refer to those provisions of this Agreement.

(h)     Survivorship.  The respective rights and obligations of the Employee (including, but not limited to the non-competition, non-solicitation and confidentiality undertakings of Section 5) and the Company shall survive any termination of the Employee's employment and the expiration and/or termination of this Agreement (whatever the reason of such termination and/or expiration) to the fullest extent necessary to the intended preservation of such rights and obligations.

(i)     Section 409A of the Internal Revenue Code.  Notwithstanding anything herein to the contrary, no payments will be made or benefits provided under this Agreement in violation of section 409A(2)(b)(i) of the Internal Revenue Code of 1986 (the "Code").  The Company and the Employee shall amend this Agreement as necessary to exempt the payments or benefits from

-14-

section 409A of the Code and/or preserve the intended tax treatment of the benefits.

**IN WITNESS WHEREOF**, the Company and the Employee have executed this Agreement as of the year and day first above written.

Veolia Transportation, Inc.

By: _____
Title: _____

_____
_____
Witness                                                        Employee

_____

_____
Address





**MV Public Transportation Inc.**
360 Campus Lane, Suite 201
Fairfield, California 94534
707 • 863 • 8980
(facsimile) 707 • 863 • 8944
www.mvtransit.com

November 7, 2007

*Via Email – janetd@yahoo.com and*
*Federal Express*

Janet Davis
6417 N. 83rd Avenue
Wadell, AZ 85355

Dear Janet:

As you know, I was disappointed to hear of your resignation from MV Public Transportation, Inc. I am sorry you felt seeking employment with another company was your best alternative. Notwithstanding my regret over the state of relations between MV and you, MV contracted for and wishes to receive the full period of non-competition you agreed to when you and the other shareholders of Local Motion ITS, Inc. sold that company's good will to MV. There is slightly more than a year left on that obligation. If you have not already received it, I expect that you will soon receive a letter from MV's counsel notifying you of MV's objection to your breach of that agreement.

That said, I want you to know that MV is willing to reemploy you in the same position that you resigned on October 10, 2007. MV was serious in its purchase of Local Motion's good will. It also understands that its offer of employment was a part of that bargain. MV is ready and willing to reemploy you. I hope you will seriously consider this alternative.

Very truly yours,

Jon Monson
Chief Executive Officer

*We Provide Freedom*