```
 1  L. Eric Dowell, Arizona SBN 011458
    Alec Hillbo, Arizona SBN 020185
 2  OGLETREE, DEAKINS, NASH,
 3  SMOAK & STEWART, P.C., SBN 00504800
    2415 East Camelback Road, Suite 800
 4  Phoenix, Arizona 85016
 5  Telephone: (602) 778-3700
    Fax: (602) 778-3750
 6  eric.dowell@OgletreeDeakins.com
 7  alec.hillbo@OgletreeDeakins.com

 8  Attorneys for Defendant Janet Davis
```

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| MV TRANSPORTATION, INC., a California corporation; and MV PUBLIC TRANSPORTATION, INC., a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>JANET DAVIS; and DOES 1 through 20, inclusive,<br><br>Defendant. | No. CV-07-5712 (PJH)<br><br>**DECLARATION OF JANET DAVIS** |

1.   I declare that I am over the age of eighteen and the facts stated herein are based on my personal knowledge. If called as a witness, I could and would competently testify to the matters stated herein.

2.   I reside in Arizona. I live in Waddell, Arizona and work out of my home office. I have lived there for twelve years. For the entire time that I worked for MV Transportation, I resided in Wadell.

3.   I have been in the transportation business since approximately 1980. I started with the City of Glendale, Arizona and became the manager of the paratransit,

1  airport, and fixed route systems. I was with the City of Glendale approximately eleven years.

4. After the City of Glendale, I worked as an independent consultant for Online Data (a U.S. software development company) in approximately 1991. With Online Data I handled consulting services and installation of PASS software in paratransit scheduling.

5. In 1995, Online Data was sold to Trapeze (an international software development company). I became a direct employee of Trapeze for approximately eight years, assisting with software design and implementation and providing operational consulting services throughout the world predominantly in paratransit services. I left Trapeze in approximately 2002 to go back to operational work with Dyntek providing call center services and scheduling for non-emergency medical transportation in Virginia.

6. In approximately April 2003, Ryan Larsen, Kevin Dresser, and I formed Local Motion, ITS where I was one of three shareholders. Marsha Moore later joined Local Motion as another shareholder.

7. Local Motion was a Virginia-based corporation that operated as a broker that facilitated transportation for medical purposes. As a broker, Local Motion's business was to work directly with medical insurance services to facilitate scheduling transportation to and from medical services through the use of contracted providers of the transportation. Local Motion did not provide transportation services like those provided by MV Transportation.

8. During the short time of its operation, Local Motion secured one customer, Carenet, a company based in Hampton Road, Virginia. That customer created revenue of approximately $413,000 per year with net revenue of $20,000 to $25,000 per year. Local Motion had sent out only one or two other bids to prospective customers at the time MV purchased 80% of the company. Local Motion did not have any other customers and had no other anticipated customers at the time MV purchased a portion of

the business. To my knowledge, MV continues to service the Carenet account in Hampton Road, Virginia.

9. At the time of the sale to MV, Local Motion only had five employees, including Larsen, Marsha Moore, and myself. There was another owner, Kevin Dresser, but he was not involved in the operations of Local Motion and was not an employee.

10. Local Motion was not in the business of developing software and never had any intent to develop software.

11. MV and the owners of Local Motion negotiated the partial sale of Local Motion in December 2003. The negotiations took place remotely. Ryan Larsen resided in Iowa, Kevin Dresser resided in Virginia, and I resided in Arizona. Local Motion was only in business seven months before the four shareholders sold 80% of the shares to MV. After the partial sale to MV, I retained 7.5% of the stock in Local Motion.

12. MV purportedly attempted to expand Local Motion's business into contracting services but failed in its efforts. MV ceased Local Motion's operations in 2005 in that I was told that the Board shut down the business.

13. MV's primary focus is the provision of paratransit transportation services. Paratransit services refers to public transportation, under the Americans with Disabilities Act, for individuals with disabilities who have no ability to transport themselves. Paratransit services comprise the vast majority of MV's business. MV operates only within the United States.

14. With Local Motion, I was in charge of facilitating the operation in Hampton Road, Virginia when we secured the contract.

15. When MV purchased Local Motion, I was assigned to providing services for MV as well as Local Motion. In January 2005, I was reassigned to vice-president in charge of contracts in the Northeast for MV. I worked in New York State, New York City, Philadelphia, and Baltimore.

16. In or about January 2006, I was promoted to Vice-President of Information Technology for MV. My job duties did not include research and development. I did not have any access to any software code development.

17. While I worked for MV, I worked out of my home in Waddell, Arizona. I traveled infrequently to California to visit MV's headquarters in Sacramento, California and a couple of their operational sites.

18. A former MV employee, John Smolenski, recommended me and Christopher Bryan to Mark Joseph, the CEO of Veolia. Mr. Joseph called me directly to discuss possible employment. After I initially talked with Mr. Joseph about possible employment with Veolia, he traveled to Phoenix and we met again to discuss my possible employment with Veolia.

19. Veolia independently sought to hire me and Mr. Bryan. I believe Mark Joseph contacted Christopher Bryan directly and I understand that Veolia independently researched my background and Mr. Bryan's background by contacting Trapeze.

20. At no time did I solicit or induce Christopher Bryan to leave MV's employ and join Veolia. Mr. Joseph had asked me for Mr. Bryan's e-mail address, which I provided, but I did not ask Mr. Bryan to join Veolia and I did not offer him a position. I did not negotiate any of the terms of his employment for him and we were not a package deal. I informed Mr. Joseph that I would join Veolia regardless of whether Veolia offered employment to Mr. Bryan or whether Mr. Bryan accepted an offer of employment.

21. I started work with Veolia Transportation on October 23, 2007 as Vice-President of Business Improvement. Veolia is based in Chicago, Illinois. Veolia is an international transportation provider offering rail, fixed route, and paratransit services.

22. At no time did I say that I was taking eight people with me to Veolia. I simply advised MV that I was unhappy with the direction of the company and that I felt others were similarly unhappy and that morale was low. I advised MV that several others had told me they were unhappy with their employment at MV and would leave if

they had other opportunities. I told MV that MV should address the poor employee morale issues or they could lose other employees. I said employees might be leaving because of morale issues, not because I or anyone at Veolia was attempting to recruit them. I have not solicited or induced anyone to leave the employment of MV.

23. I have not taken any confidential information of MV or anyone else and I have not solicited any customers of MV. I have not disclosed any MV information for a project for a company called Access Services nor did I help on any bidding for Access Services. In fact, Veolia did not ultimately bid on the project offered by Access Services and this decision not to bid occurred before I or anyone at Veolia had knowledge of this lawsuit.

24. Veolia had the ability to prepare and develop software for clients before I joined Veolia. Veolia also contracts with Trapeze for transportation software.

25. Contrary to MV's allegations, I did not have an offer from Google.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on November 19, 2007, in Waddell, Arizona.

*/s/ Janet Davis*