## SHARE PURCHASE AGREEMENT

**THIS AGREEMENT** is made as of the 5th day of December, 2003.

**B E T W E E N:**

> **Ryan James Larsen, Marsha Louise Madrid, Janet Sue Davis and Kevin John Dresser**
>
> (collectively, the "Sellers")
>
> - and -
>
> **MV TRANSPORTATION, INC.**, a corporation incorporated under the laws of the State of California,
>
> (the "Purchaser")
>
> - and -
>
> **LOCAL MOTION ITS, INC.**, a corporation duly incorporated under the laws of Virginia,
>
> (the "Company").

**WHEREAS** the Sellers collectively are the registered and beneficial owners of and control all of the issued and outstanding shares in the capital stock of the Company (the "Shares");

**AND WHEREAS** the Sellers desire to sell and the Purchaser desires to purchase 80% of the issued and outstanding Shares on the terms and conditions of this Agreement;

**NOW THEREFOR THIS AGREEMENT WITNESSES THAT** in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration (the receipt and sufficiency of which is hereby acknowledged by each of the parties hereto),  the parties hereto agree as follows:

## SHARE PURCHASE AGREEMENT

**THIS AGREEMENT** is made as of the 5th day of December, 2003.

**B E T W E E N:**

> **Ryan James Larsen, Marsha Louise Madrid, Janet Sue Davis and Kevin John Dresser**
>
> (collectively, the "Sellers")
>
> - and -
>
> **MV TRANSPORTATION, INC.**, a corporation incorporated under the laws of the State of California,
>
> (the "Purchaser")
>
> - and -
>
> **LOCAL MOTION ITS, INC.**, a corporation duly incorporated under the laws of Virginia,
>
> (the "Company").

**WHEREAS** the Sellers collectively are the registered and beneficial owners of and control all of the issued and outstanding shares in the capital stock of the Company (the "Shares");

**AND WHEREAS** the Sellers desire to sell and the Purchaser desires to purchase 80% of the issued and outstanding Shares on the terms and conditions of this Agreement;

**NOW THEREFOR THIS AGREEMENT WITNESSES THAT** in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration (the receipt and sufficiency of which is hereby acknowledged by each of the parties hereto), the parties hereto agree as follows:

12/5/03

2

# SHARE PURCHASE AGREEMENT

**THIS AGREEMENT** is made as of the 5th day of December, 2003.

**BETWEEN:**

> **Ryan James Larsen, Marsha Louise Madrid, Janet Sue Davis and Kevin John Dresser**
>
> (collectively, the "Sellers")
>
> - and -
>
> **MV TRANSPORTATION, INC.,** a corporation incorporated under the laws of the State of California,
>
> (the "Purchaser")
>
> - and -
>
> **LOCAL MOTION ITS, INC.,** a corporation duly incorporated under the laws of Virginia,
>
> (the "Company").

**WHEREAS** the Sellers collectively are the registered and beneficial owners of and control all of the issued and outstanding shares in the capital stock of the Company (the "Shares");

**AND WHEREAS** the Sellers desire to sell and the Purchaser desires to purchase 80% of the issued and outstanding Shares on the terms and conditions of this Agreement;

**NOW THEREFOR THIS AGREEMENT WITNESSES THAT** in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration (the receipt and sufficiency of which is hereby acknowledged by each of the parties hereto), the parties hereto agree as follows:

12/5/03

3

# SHARE PURCHASE AGREEMENT

**THIS AGREEMENT** is made as of the 5th day of December, 2003.

**B E T W E E N:**

> **Ryan James Larsen, Marsha Louise Madrid, Janet Sue Davis and Kevin John Dresser**
>
> (collectively, the "Sellers")
>
> - and -
>
> **MV TRANSPORTATION, INC.**, a corporation incorporated under the laws of the State of California,
>
> (the "Purchaser")
>
> - and -
>
> **LOCAL MOTION ITS, INC.**, a corporation duly incorporated under the laws of Virginia,
>
> (the "Company").

**WHEREAS** the Sellers collectively are the registered and beneficial owners of and control all of the issued and outstanding shares in the capital stock of the Company (the "Shares");

**AND WHEREAS** the Sellers desire to sell and the Purchaser desires to purchase 80% of the issued and outstanding Shares on the terms and conditions of this Agreement;

**NOW THEREFOR THIS AGREEMENT WITNESSES THAT** in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration (the receipt and sufficiency of which is hereby acknowledged by each of the parties hereto), the parties hereto agree as follows:



**ARTICLE I**
**INTERPRETATION**

**1.1    Definitions**.  Whenever used in this Agreement, unless there is something in the subject matter or context inconsistent therewith, the following words and terms shall have the respective meanings ascribed to them:

(a)    "**Agreement**" means this Share Purchase Agreement, including the Schedules listed in Section 1.3, and all amendments hereto and restatements hereof;

(b)    "**Authority**" means any governmental or regulatory authority, body, agency or department, whether federal, state, county or local, having jurisdiction over the any of the Sellers, the Company or the Business or any aspect thereof;

(c)    "**Business**" means all of the business of paratransit services, consulting services, medical transportation, paratransit brokerage and paratransit software Application Service Provider (ASP) services provided in the United States of America.

(d)    "**Business Day**" means a day other than a Saturday, Sunday or any day on which the principal commercial banks located at San Francisco, California are not open for business during normal banking hours;

(e)    "**Closing**" means the completion of the sale to and purchase by the Purchaser of the Shares hereunder by the Sellers, by the transfer and delivery of documents of title to the Shares and the payment of the Purchase Price in accordance with the terms of this Agreement;

(f)    Not applicable.

(g)    "**Closing Date**" means December 1, 2003 or such other date as the Parties may agree upon;

(h)    "**Closing Time**" means 10:00 A.M. on the Closing Date, or such other time as the Parties may agree upon;

(i)    "**Code**" means the Internal Revenue Code of 1986, as amended;

(j)    "**Consents**" means all consents or approvals from any party to an indenture, mortgage, lease, quota, permit, instrument, license, contract, agreement, arrangement or understanding to which the Company or any of the Sellers is a party or by which any of them or the assets of the Company is bound, required for the execution of this Agreement, the Closing or the performance of any terms hereof and the completion of the transactions contemplated by this Agreement;

(k)    Not applicable.

(l)     "**Encumbrance**" shall include any mortgage, deed of trust, lien, pledge, charge, security interest, restriction, claim, encumbrance, right to use or acquire, ownership interest, action or demand of any nature whatsoever;

(m)    "**Environmental Laws**" shall include all applicable federal, state, regional, municipal or local laws, statutes, regulations, ordinances, rules, policies, guidelines, decrees, orders, authorizations, approvals, notices, licenses, permits, directives or other requirements of any Authority, court, tribunal or other similar body, relating to environmental or occupational health and safety matters;

(n)     "**Environmental Orders**" means applicable orders, decisions, directions, notices and the like rendered by any Authority under or pursuant to any Environmental Laws;

(o)     "**Environmental Permits**" means all permits, certificates, approvals, certificates of approval, registrations and licenses issued by any Authority and relating to or required for the operation of the Business and the Property in compliance with all Environmental Laws and Environmental Orders;

(p)     "**ERISA**" means the Employee Retirement Income Security Act, as amended;

(q)     Not Applicable.

(r)     "**GAAP**" means generally accepted accounting principles applied in the United States in a manner consistent with prior periods;

(s)     "**Hazardous Substances**" means poly-chlorinated biphenyl wastes, asbestos, urea formaldehyde foam insulation, petroleum, petroleum by-products and any other substance or material that is prohibited, controlled or regulated under any Environmental Laws;

(t)     "**Hazardous Waste**" means any contaminants, pollutants and dangerous substances, including asbestos, liquid waste, special waste, toxic substances, hazardous or toxic chemicals, Hazardous Substances and "hazardous substances" "hazardous wastes" or "hazardous materials" as defined in or pursuant to any Environmental Laws;

(u)     Not applicable.

(v)     "**Financial Statements**" means the financial statements of the Company, consisting of a  balance sheet as of November 30, 2003 and a  statement of income (loss), and a statement of cash flows for the eight months November 30, 2003 , all of which are set out in Schedule 3.1(l);

(w)    Not applicable.

6

(x)   **"Parties"** means the Sellers, the Company and the Purchaser, collectively; and **"Party"** means any one of them;

(y)   **"Pension Authorities"** means the applicable federal and state pension Authorities, including the Internal Revenue Service;

(z)   **"Pension Contracts"** means texts and amendments to all Plans and all collective bargaining agreements, employment contracts, trust and funding agreements and applicable insurance contracts of the Company;

(aa)  **"Pension Legislation"** means ERISA and all other applicable state or federal pension benefits legislation including, where applicable, the Code;

(ab)  **"Person"** includes any individual, corporation, limited liability company, partnership, trustee or trust, unincorporated association, organization, syndicate, executor, administrator or other legal or personal representative or other legal entity and pronouns have a similarly extended meaning;

(ac)  **"Personal Property Leases"** means all of the leases, subleases, licenses, agreements and other arrangements and instruments relating to equipment, office equipment, furniture, machinery, vehicles, fixtures, computer hardware and software and other personal property and fixtures to which the Company is a party or by which the Company is bound, including those set out in Schedule 3.1(x).

(ad)  **"Plan Terms"** means the terms and conditions of all Plan texts and amendments thereto;

(ae)  **"Plans"** means all pension and employee benefit plans established or maintained for, or to which the Company has contributed to in respect of, any officers, employees and former officers and employees of the Company or predecessor companies and their beneficiaries, including, where applicable: (i) the assets and funds maintained to provide benefits under or related to Plans; and (ii) Plan Terms;

(af)  **"Predecessors"** means any owner, occupier or Person who previously had charge, management or control of the Real Property or any other real property which has been at any time under the control of the Company or where the Company carries on or has carried on the Business, or any part thereof;

(ag)  **"Purchase Price"** means the price to be paid by the Purchaser to the Sellers for the purchase of the Shares, as set out in Article II of this Agreement;

(ah)  **"Purchaser's Adjustment Amount"** means the amount which the final shareholder's deficit of the Company is less than $199,600.00.

(ai)  **"Real Property"** means all of the real property owned by the Company, including the real property described in Schedule 3.1(s);

(aj)  **"Real Property Leases"** means all of the leases, subleases, licenses, agreements and other arrangements and instruments relating to real property to which the Company is a party or by which the Company is bound, copies of which are included in Schedule 3.1(s1);

(ak)  **"Regulatory Approvals"** means all approvals, permits, sanctions, rulings, orders, declarations or consents from any Authority or self-regulatory organization within or outside of the United States required for the execution of this Agreement, the Closing or the performance of any terms hereof and the completion of the transactions contemplated by this Agreement;

(al)  **"Related Persons"** or "persons related to each other" means (i) individuals connected by blood relationship, marriage or adoption, (ii) a corporation and: (A) the person who controls the corporation, if any; (B) any member of a related group that controls the corporation, if any; and (C) any person related to a person described in (A) or (B) above, (iii) any two corporations if: (A) they are controlled by the same person or group of persons; (B) they are each controlled by one person and the two control persons are related to each other; (C) one corporation is controlled by one person who is related to any member of a related group that controls the other corporation; (D) one corporation is controlled by one person who is related to each member of an unrelated group that controls the other corporation; (E) one corporation is controlled by a related group, any member of which is related to each member of an unrelated group that controls the other corporation; or (F) both corporations are controlled by unrelated groups and each member of one unrelated group is related to at least one member of the other unrelated group, (iv) a trust and its settlor, its beneficiaries and any Person the trust controls; and (vii) a partnership and any partner that controls it.

(am)  **"Release"** means a releasing, spilling, emitting, depositing, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, disposing or dumping which is in breach of any Environmental Law, Environmental Regulation or Environmental Order;

(an)  **"Shareholders Deficit"** means the amount by which the liabilities of the Company exceed the assets of the Company in accordance with United States Generally Accepted Accounting Principals.

(ao)  **"Shareholders Equity´** means the amount that by which the assets of the Company exceed the liabilities of the Company in accordance with United States Generally Accepted Accounting Principals.

(ap)  **"Shares"** means all of the issued and outstanding shares in the capital stock of the Company;

(aq)  **"Tax"** means all federal, state and local governmental taxes, levies, duties,

assessments, reassessments and other charges of any nature whatsoever, whether direct or indirect, including income tax, franchise tax, profits tax, gross receipts tax, Company tax, commodity tax, sales and use tax, wage tax, payroll tax, worker's compensation levy, capital tax, stamp duty, real and personal property tax, land transfer tax, customs or excise duty, fuel tax, excise tax, turnover or value added tax on goods sold or services rendered, withholding tax, pension plan, social security and unemployment insurance charges or retirement contributions, and any interest, fines, additions to tax and penalties thereon;

(ar)    Not Applicable.

(as)    **"Sellers' knowledge"** (and similar phrases such as "to the knowledge of the Sellers") means facts or matters which are or were actually known to each of the Sellers having reviewed all relevant records and made all due enquiries of all appropriate officers and employees of the Corporation and all other Persons to whom enquiries ought reasonably be made in the circumstances, or which should have been known to any of the Sellers if they had reviewed all relevant records and made all such due enquiries; and

(at)    Not Applicable.

Terms defined in the preamble to this Agreement shall have the same meanings in this Agreement as ascribed to them in the preamble.

**1.2    Construction.**  In this Agreement:

(a)    words denoting the singular include the plural and vice versa, and words denoting any gender include all genders;

(b)    the word "includes" or "including" shall mean "includes without limitation" or "including without limitation", respectively;

(a)    Related Persons shall be deemed not to deal at arm's length with each other and Persons who are not Related Persons shall be deemed not to deal at arm's length with each other where a common mind directs the bargaining for both such Persons as parties to any transaction and where both such Persons act in concert without separate interests;

(b)    any reference to a statute shall mean the statute in force, as amended from time to time, and any regulation in force thereunder, unless otherwise expressly provided;

(c)    the use of headings is for convenience of reference only and shall not affect the construction of this Agreement;

(d)    references herein to Articles, Sections, subsections, clauses, and Schedules are references to Articles, Sections, subsections and clauses of and Schedules to this

Agreement unless the context otherwise requires;

(e)     when calculating the period of time within which or following which any act is to be done or step taken, the date which is the reference day in calculating such period shall be excluded. If the last day of such period is not a Business Day, the period shall end on the next Business Day;

(f)     all dollar amounts are expressed in U.S. funds;

(g)     any tender of documents or money under this Agreement may be made upon the parties or their respective counsel and money may be tendered by bank draft (in U.S. funds), by negotiable check payable in U.S. funds and certified at the payee's request by a U.S. bank or by wire transfer of immediately available funds payable at par in the United States; and

(h)     all accounting terms shall have the meanings ascribed to them in accordance with generally accepted accounting principles, and all references to "generally accepted accounting principles" shall be deemed to be, unless otherwise specified, reference to accounting principles which are generally accepted in the United States.

{The remainder of this page is deliberately blank}

**1.3    Schedules.**  The following schedules are incorporated into this Agreement as if they were set out in full herein, and shall be deemed to be an integral part of this Agreement:

| | | |
|---|---|---|
| Schedule 2.2 | - | Purchase Price Distribution |
| Schedule 2.8(a) | - | Form of Company Stock Option Plan |
| Schedule 2.8(b) | - | Form of Stock Option Agreements |
| Schedule 3.1(b) | - | Corporate Matters |
| Schedule 3.1(e) | - | Regulatory Approvals and Consents |
| Schedule 3.1(g) | - | Shares/Capitalization |
| Schedule 3.1(k) | - | Permits, Licenses, Registrations and Authorizations |
| Schedule 3.1(l) | - | Financial Statements |
| Schedule 3.1(m) | - | Liabilities, performance bonds, letters of credit |
| Schedule 3.1(r) | - | Encumbrances |
| Schedule 3.1(s) | - | Real Property |
| Schedule 3.1(s1) | | Real Estate Leases |
| Schedule 3.1(t) | - | Environmental Matters |
| Schedule 3.1(u) | - | Fixed Assets |
| Schedule 3.1(w) | - | Vehicles |
| Schedule 3.1(x) | - | Personal Property Leases |
| Schedule 3.1(y) | - | Accounts Receivable |
| Schedule 3.1(aa) | - | Revenue Contracts |
| Schedule 3.1(ab) | - | Insurance Policies |
| Schedule 3.1(ac) | - | Intellectual Property |
| Schedule 3.1(ad) | - | Material Contracts |
| Schedule 3.1(ae) | | Purchasing Contracts |
| Schedule 3.1(ai) | - | Employment Matters |
| Schedule 3.1(ak) | - | Pension and Benefit Matters |
| Schedule 3.1(an) | - | Bank Accounts |
| Schedule 3.1(ao) | - | Contracts with Non-Arms Length Persons |
| Schedule 3.1(ap) | - | Non-Compete    Agreements    with    other    Parties |
| Schedule 3.1(ar) | | Schedule of Outstanding Proposals |
| Schedule 3.8 | | Form of Shareholder Agreement |
| Schedule 4.1(g) | - | Form of Sellers' Closing Opinion |
| Schedule 4.1(h) | - | Form of Release |
| Schedule 4.1(j) | - | Form of Non-Competition Agreement |
| Schedule 4.1(k) | - | Form of Employment Agreements |
| Schedule 4.1(l) | - | Encumbrances to be Discharged |

## ARTICLE II
## PURCHASE AND SALE

**2.1    Purchase and Sale.** Subject to the terms and conditions of this Agreement, the Sellers shall sell, transfer and deliver to the Purchaser and the Purchaser shall purchase 800 Shares (the "Purchased Shares"), representing 80% of the issued and outstanding Shares of the Company, for a total purchase price of FIFTY THOUSAND DOLLARS ($50,000). The Purchase Price shall be adjusted in accordance with the provisions of Section 2.7.

**2.2    Payment.** Subject to the terms and conditions of this Agreement, at Closing the Purchaser shall pay the sum of $50,000.00 (subject to subsequent adjustment as provided in Section 2.7) to the Sellers in accordance with Schedule 2.2 (the "Closing Cash Payment").

**2.3    Non-Competition Payments.** In consideration of each of the Sellers, Ryan James Larsen, Marsha Louise Madrid, Janet Sue Davis and Kevin John Dresser (hereinafter collectively, the "Covenantors") entering into the Non-Competition Agreements, as required by Section 4.1(j), the Purchaser shall pay to the Covenantors the aggregate sum of ONE HUNDRED THOUSAND DOLLARS ($100,000.00) (the "NC Funds") in one instalment of $100,000.00 payable on the Closing.

**2.4    Closing.** The Closing shall take place on or about December 1, 2003. At Closing the Sellers shall transfer and deliver to the Purchaser the stock certificates representing the Purchased Shares duly endorsed in blank for transfer or accompanied by irrevocable stock transfer powers of attorney duly executed in blank, in either case by the holders of record thereof. The Sellers shall take such steps as shall be necessary to cause the Company to enter the Purchaser or its nominee upon the books of the Company as the holder of the Purchased Shares and to issue one or more share certificates to the Purchaser representing the Purchased Shares.

**2.5    Tender.** Any tender of documents hereunder may be made upon the Parties or, in the case of any Sellers not present at Closing, upon agent, and money shall be tendered by certified check bank draft or wire transfer of federal funds in accordance with the respective instructions provided by the Sellers, at the sole discretion of the Purchaser.

**2.6    Sellers' Liabilities.** Notwithstanding that the Purchaser is purchasing the Purchased Shares, and notwithstanding anything in this Agreement, it is agreed by the Parties that the Sellers shall retain: (a) all matters, claims, actions, suits, administrative and judicial proceedings, debts, liabilities, obligations, costs and expenses whatsoever and howsoever arising, direct or indirect, known or unknown, contingent or absolute, express or implied, asserted or unasserted, statutory or otherwise resulting from, arising out of or relating to the period prior to the Closing Date and (b) any and all Taxes imposed upon or with respect to the Company or its assets, operations or activities relating to the period up to and including the Closing Date (collectively, the "Sellers' Liabilities."). Sellers' liabilities shall not include normal trade payables and accrued payroll expense which shall

remain a liability of the Company after closing.

**2.7    Purchase Price Adjustment.** The Purchase Price in Section 2.1 and the Payment in Section 2.2 shall be increased by the appraised value of the real property listed in Schedule 3.1(s) herein.  The Purchaser and Sellers shall each retain a real estate appraiser experienced in the appraisal of commercial real estate to conduct an independent appraisal of the value of the land and building of the real property in Schedule 3.1(s).  When the appraisals from the Purchaser's appraiser and Sellers' appraiser are received, if the amount of difference between the two appraisals is fifteen percent (15%) or less, the two appraisals will be averaged and said average value shall be added to the cash purchase price paid by Purchaser to Sellers at Closing.  Purchaser shall bear the cost of the appraisals.  In the event the difference between the appraisal of the Purchaser's appraiser and the Sellers' appraiser is greater than fifteen percent (15%), then Purchaser and Sellers shall attempt to negotiate an amount acceptable to the parties.  In the event the parties are unable to agree, then the Purchaser's appraiser and the Sellers' appraiser shall agree to the appointment of a third appraiser, not affiliated to Purchaser, Sellers, the Purchaser's appraiser or the Sellers' appraiser.    The third appraiser's appraisal shall be final and determine the amount of the Purchase Price adjustment for the real property listed in Schedule 3.1(s).  Purchaser and Sellers shall instruct all appraisers to consider the impact of the restrictions contained in Schedule 3.1(s) herein when establishing the appraised value of the real property.  In the event a third appraisal is necessary, the Purchaser and Sellers agree to divide the cost of this appraisal equally.

In the event the independent appraisal of the real estate is not completed by the date of closing, the Purchaser shall place in escrow, with the law firm Gaw, Van Male, Smith, Myers & Miroglio (the "Escrow Agent") the sum of TWO HUNDRED THOUSAND DOLLARS ($200,000.00).  Upon receipt of the independent appraisal, the Escrow Agent shall disburse to Sellers within three business days a sum equal to the amount of the appraisal and shall return any amount not disbursed to Sellers to Purchaser within three business days.  The cost of fees of the Escrow Agent shall be borne by Purchaser.  The distribution of proceeds to Sellers shall be in accordance with the instructions in Schedule 2.2 herein.

The Purchaser shall also pay to Sellers the Purchaser's Adjustment Amount at Closing based on the Projected Financial Statement of Sellers and Company as of November 30, 2003 as detailed in Schedule 3.3(l).  Sellers and Company shall prepare, no later than December 31, 2003, a Final Financial Statement as of November 30, 2003.  In the event the shareholder's deficit in the Final Financial Statement is different than the Projected Financial Statement, then an adjustment to the Purchaser's Adjustment Amount shall be made after the receipt and approval of the Final Financial Statement by Purchaser.  An additional payment, calculated on the change in the amount of the shareholders deficit between the Projected Financial Statement and the Final Financial Statement will be made by Purchaser to Sellers in the event the shareholders deficit in the Final Financial Statement is less than the shareholders deficit in the Projected Financial Statement.  Likewise, if the shareholders deficit in the Financial Statement is greater than the

shareholders deficit in the Projected Financial Statement, then Sellers shall pay to Purchaser and amount equal to the difference between the shareholder deficit in the Projected Financial Statement and the shareholder deficit in the Final Financial Statement.

**2.8     Stock Option Plan –** Immediately following the Closing, the Company shall adopt an incentive stock option plan as set forth in Schedule 2.8(a) herein.  The Company shall also enter into stock option agreements with Ryan James Larsen, Janet Sue Davis, Marsha Louise Madrid and Kevin John Dresser as set forth in Schedule 2.8(b) herein.

**2.9     Dividend –** In the event the pre-tax income of the Company from the date of Closing to December 31, 2006 exceeds One Million Dollars ($1,000,000), then the Company shall declare a cash dividend equal to twenty-five percent (25%) of the amount of pre-tax income in excess of $1,000,000 during the period from Closing to December 31, 2006.   Said dividend amount shall be divided by the number of outstanding common shares of the Company as of February 1, 2007 and the per-share dividend shall be paid to all shareholders of record as of February 1, 2007.  For purposed of this Section 2.9 only Pre-Tax income will exclude any revenue earned and expenses incurred from consulting services performed for MVT or any of its affiliates or subsidiaries.

**ARTICLE III**
**REPRESENTATIONS AND WARRANTIES**

**3.1     Representations and Warranties of the Sellers and the Company.**  Each of the Sellers and the Company jointly and severally represent and warrant to the Purchaser (and acknowledge that the Purchaser is relying on such representations and warranties in completing the transactions contemplated hereby) that:

(a)     **Sellers' Corporate Matters** - Each of the Sellers has all necessary authority and capacity to enter into this Agreement and to perform its obligations hereunder.

(b)     **Corporate Matters of the Company** - The Company is a Corporation duly incorporated and organized and is validly existing and in good standing under the laws of the State of Virginia.  The Company has all necessary corporate power, authority and capacity to own or lease its property and assets and to carry on the Business as currently conducted. Neither the nature of the Business nor the location or character of the property and assets owned or leased by the Company requires the Company to be registered, licensed or otherwise qualified in any jurisdiction other than the jurisdictions set out in Schedule 3.1(b).

(c)     **Authorization of Agreement** - This Agreement has been duly authorized, executed and delivered by each of the Sellers and the Company and constitutes a legal, valid and binding obligation of each of them, enforceable against each of them in accordance with its terms.

(d)     **Validity of Transactions –** Subject only to the receipt of the Consents set out in Schedule 3.1(e), the Sellers have the exclusive right to dispose of the Purchased

Shares as provided for in this Agreement.  The execution and delivery of this Agreement by each of the Sellers and the Company, the consummation of the transactions contemplated hereby and the fulfillment by each of the Sellers and the Company of the terms, conditions and provisions hereof has not and will not:

(i)     contravene or violate or (with or without the giving of notice or lapse of time, or both) result in the breach or acceleration of or constitute a default under any obligations of any of the Sellers or the Company under: (a) the laws applicable to any of the Sellers or the Company, (b) any judgment, order, writ, injunction or decree of any Authority, court, tribunal, instrumentality or arbitrator applicable to any of the Sellers or the Company, (c) the articles, by-laws or any resolutions of any of the Sellers or the Company, or any amendments thereto or restatements thereof, or (d) the provisions of any indenture, mortgage, lease, quota, license, permit, instrument, contract, agreement, employment agreement, arrangement or understanding to which any of the Sellers or the Company is a party or by which any of them or the property or assets of any of them are bound;

(ii)    relieve any other party to, or grantor of, an indenture, mortgage, lease, sublease, instrument, contract, quota, license, permit, agreement, arrangement or understanding with, or of, the Company, of its material obligations thereunder or enable it to terminate its material obligations thereunder; or

(iii)   result in the creation or imposition of any Encumbrance on the assets of the Company or on the Shares.

(e)   **Regulatory Approvals** - No Regulatory Approval, or filing or registration with any Authority is required to be made or obtained by any of the Sellers or the prior to the consummation of the transactions contemplated hereby, except as set out in Schedule 3.1(e).

(f)   **Consents** - Except as set out in Schedule 3.1(e), no Consent is required to be obtained by any of the Sellers or the Company prior to the consummation of the transactions contemplated hereby.

(g)   **Capitalization** - The authorized and issued and outstanding share capital of the Company is set out in Schedule 3.1(g).  The Shares have been duly and validly issued and are issued and outstanding as fully paid and non-assessable shares in the capital of the Company.  There are no outstanding securities convertible into or exchangeable or exercisable for any shares of the capital stock of the Company. The Company has no outstanding rights to subscribe for or to purchase, or any options for the purchase of, or any agreements providing for the issuance of, any shares of its capital stock or any securities convertible into or exchangeable or exercisable for any shares of its capital stock.  The Purchased Shares constitute, and on the Closing Date shall constitute, eighty percent (80%) of the issued and

outstanding Shares in the capital of the Company. There are no stock transfer restrictions imposed by the Company or known by the Sellers that could affect the transfer of the Purchased Shares to the Purchaser which have not been waived or complied with.

(h)     **Ownership of Shares of the Company** - Each Seller is the sole legal and beneficial owner of and has good and marketable title to the Shares set out beside the name of such vendor in Schedule 3.1(g), free and clear from all Encumbrances (other than the rights of the Purchaser hereunder). There is no agreement, contract, option, commitment, right of privilege or other right of another binding upon, or which at any time in the future may become binding upon, any of the Sellers to sell, transfer, assign, pledge, subject to lien, charge, grant a security interest in, mortgage or in any other way dispose of or encumber any of the Shares other than pursuant to this Agreement.

(i)     **Subsidiaries** - The Company does not own, either directly or indirectly, and has not agreed to acquire any of the outstanding shares or securities convertible into shares of any other corporation, including any subsidiary, and has no participating interest in any partnership, joint venture or other business enterprise. The Company does not have and has never had any subsidiary.

(j)     **Compliance with Law** - The Sellers have caused the Company to conduct, and the Company has conducted, the Business in compliance with all laws, statutes, regulations, ordinances, rules, policies, guidelines, decrees, orders, authorizations, approvals, notices, quotas, licenses, permits, directives, judgments or other requirements applicable to the Business. The Company is in compliance with and will have filed all reports or returns required under all laws, statutes, regulations, ordinances, rules, policies, guidelines, decrees, orders, authorizations, approvals, notices, quotas, licenses, permits, directives, judgments or other requirements applicable to them and the Business.

(k)     **Permits, Licenses, Registrations and Authorizations** - The Company is the sole legal and beneficial holder of all permits, licenses, registrations and authorizations necessary for the lawful operation of the Business as currently conducted pursuant to all applicable laws, statutes, regulations, ordinances, rules, policies, guidelines, decrees, orders, notices, directives and other requirements of all Authorities and copies of all such permits, licenses and authorizations have been delivered to the Purchaser. Schedule 3.1(k) sets forth a true and complete list of all such permits, licenses, registrations and authorizations. All such permits, licenses, registrations and authorizations are valid and subsisting and in good standing. No violations have been recorded in respect of any such licenses, permits, registrations and authorizations, and no proceeding is pending or threatened to revoke, limit or adversely affect the use of any thereof.

(l)     Not Applicable.

(m)    **Absence of Undisclosed Liabilities** - Schedule 3.1(m) contains a description of all financial performance bonds, letters of credit and other instruments, agreements and understandings under which the Company may have a contingent liability. Except to the extent set out in Schedule 3.1(m) and except as reflected or reserved against in the Interim Balance Sheet, the Company does not have any outstanding indebtedness, liabilities or obligations (whether accrued, absolute, contingent or otherwise) or any outstanding commitments or obligations of any kind (whether or not such obligations or commitments are currently considered liabilities of the Company under generally accepted accounting principles).

(n)    **Absence of Guarantees** - The Company has not given nor agreed to give, and is not a party to nor bound by, any guarantee of indebtedness, indemnity, bond or suretyship or other obligation of any Person, or any other commitment by which the Company is, or is contingently, responsible for such indebtedness, indemnity, bond, suretyship or other obligation except as specifically provided for or referred to in this Agreement or in any Schedule.

(o)    **Promissory Notes** - The Company has requested pay-out statements from each of the Noteholders of the Company, namely:

    (i)     Kevin John Dresser in respect of the promissory note having a principal amount of $110,600;

    (ii)    Ryan James Larsen in respect of the promissory note having a principal amount of $26,900;

    (iii)   Marsha Louise Madrid in respect of the promissory note having a principal amount of $24,000.00;

    (iv)    Janet Sue Davis in respect of the promissory note having a principal amount of $5,000

requesting that each of such Persons advise the Company of the amounts that such Persons would require to be paid out in full and discharge the notes payable or credit facilities between such Persons and the Company (including any prepayment penalties or costs) and the Company will provide the responses received from such Noteholders to the Purchaser forthwith upon receipt thereof and, in any event, prior to Closing.  The Sellers agree that the Buyer shall deduct from the Purchase Price, the Non-Competition Payments and the Purchase Price Adjustment at closing funds to pay-off the Noteholders and the Noteholders shall, at closing, certify that said Notes have been paid in full and that no additional principal or interest amounts are due to Noteholders.

(p)    **Absence of Changes** – Since September 25, 2003 there has not been:

    (i)     any adverse change in the condition, operations, affairs, personnel or future

prospects of the Business as currently conducted, or the assets or financial condition of the Company other than changes in the ordinary and normal course of business, none of which has been, either alone or together with all other such changes, materially adverse to any of them; or

(ii)    any damage, destruction or loss, labor trouble or other event, development or condition of any character (whether or not covered by insurance) in the aggregate adversely affecting the Business, or the assets or financial condition of the Company,

and the Business has been conducted in the ordinary and normal course of business, consistent with past practice.

(q)    **Absence of Unusual Transactions.**  Since September 25, 2003, the Company has neither agreed to nor authorized or otherwise become committed to:

(i)    acquire or initiate a new business or undertaking or assume a commitment or obligation (by written agreement or otherwise) or enter into any commitment or transaction not in the ordinary and normal course of business consistent with past practice or disclosed to Purchaser in writing;

(ii)    transfer, assign, sell or otherwise dispose of any of the assets disclosed in the Reviewed Balance Sheet or cancel any debts or claims except in the ordinary and normal course of business consistent with past practice;

(iii)    incur or assume any obligation or liability (fixed or contingent) except unsecured current obligations and liabilities incurred in the ordinary and normal course of business consistent with past practice;

(iv)    discharge or satisfy any lien or encumbrance, or pay any obligation or liability (fixed or contingent) other than liabilities disclosed in the Reviewed Balance Sheet and liabilities incurred since the date thereof in the ordinary and normal course of business consistent with past practice;

(v)    mortgage, pledge, subject to lien, charge, grant a security interest in or otherwise encumber any of its property or assets (whether tangible or intangible);

(vi)    issue or sell any shares, warrants, bonds, debentures or other corporate securities of the Company, or issue, grant or deliver any right, option or other commitment for the issuance of any such securities, except the transfer of all shares owned by Stacey Larsen to Ryan James Larsen;

(vii)    declare or make any payment of a dividend or other distribution in respect of any shares in its capital, or purchase or redeem any such shares, or effect any subdivision, consolidation or reclassification of any such shares, or

repay in full or in part any shareholder loans;

(viii)   suffer an operating loss or any extraordinary loss or waive any rights of material or substantial value;

(ix)   amend or change or take any action to amend or change its incorporating documents or by-laws;

(x)   amend, revise, renew or terminate any indenture, mortgage, lease, instrument, license, contract, agreement, arrangement or understanding to which the Company was or is a party or which may affect the Business or any trade name, business name, trademark, proposed trademark, certificate mark, distinguishing guise, industrial design, copyright or patent, whether domestic or foreign and whether registered or unregistered, relating to the Business, except in the ordinary and normal course of business consistent with past practice;

(xi)   terminate the employment of any director, officer or employee of the Company except in the ordinary and normal course of business, consistent with past practice;

(xii)   enter into any employment, labor, consulting or service contract except in the ordinary and normal course of business consistent with past practice;

(xiii)   make any general wage or salary increase, or pay any bonus or extraordinary payment to the personnel which it employs or to any other Person other than those increases, bonuses or payments in respect of which the written approval of the Purchaser has been obtained;

(xiv)   pay or become liable for any management fee or any other fee or charge whatsoever to the Sellers or any Person who is an associate or affiliate or Related Person of any of the Sellers;

(xv)   enter into any transaction, indenture, mortgage, lease, instrument, license, contract, agreement, arrangement or understanding with any Person with whom the Company does not act at arm's length;

(xvi)   lend money to any of the Sellers or any other Person;

(xvii)   make or commit to make any single capital expenditure or series of capital expenditures in excess of $10,000 or any lease commitment where the item(s) leased has a fair market value in excess of $10,000 at the inception of the lease, other than those capital expenditures and lease commitments in respect of which the written consent of the Purchaser has been obtained; or

(xviii)  initiate or settle any litigation to which the Company was or may become a party.

(r)  **Title to Assets** - The Company is the sole legal and beneficial owner of and has good and marketable title to all of its assets (whether tangible or intangible), including those assets reflected on the Reviewed Balance Sheet or acquired since the date of the Reviewed Balance Sheet (except as since transferred, sold or otherwise disposed of in the ordinary and normal course of business), free and clear from all Encumbrances other than those identified in Schedule 3.1(r). There is no agreement, contract, option, commitment, right of privilege or other right of another binding upon, or which at any time in the future may become binding upon, the Company to sell, transfer, assign, pledge, charge, subject to lien, grant a security interest in, mortgage or in any other way dispose of or encumber any of their assets other than in the ordinary and normal course of business. There is not now any basis upon which the assets of the Company might become subject to any further Encumbrance.

(s)  **Real Property** -

(i)  The Company is the legal or beneficial owner of the unencumbered real property listed in Schedule 3.1(s).

(ii)  The Company is a party to the lease of real property. A complete, true and accurate copy of each lease is enclosed as Schedule 3.1(s1).

(iii)  The buildings and operations of the Company do not encroach on the property of others. All such buildings are suitable for the purposes for which they are used, and all buildings and the operations of the Company thereon conform to all applicable zoning, use and other laws, ordinances and regulations. Until the Time of Closing, the Company shall maintain all of the Real Property, including the buildings and improvements thereon, in at least its current condition. The Company has received no order or directive of any applicable department of building, safety, health or any other city, county, state or federal authority that any work, repairs, maintenance or improvement be performed on the Real Property, nor has any such order or directive been threatened. There is no pending or threatened condemnation or other similar proceeding or assessment affecting the Real Property or any part thereof, nor, to the Sellers' knowledge, is any such proceeding or assessment being contemplated by any Authority. Other than the restrictions contained in Schedule 3.1(s), there are no other restrictions on the sale, transfer or use of said Real Property.

(iv)  The Sellers, individually and collectively, warrant to Purchaser that the real property is, as of the date of closing, free and clear of all liens and encumbrances and that the Company has free and clear title to the real property listed in Schedule 3.1(s). Sellers, when purchasing said real property, did not purchase a policy of title insurance. Sellers, individually

and collectively, indemnify Purchaser and Company from any defect in title to said real property to the extent that Purchaser and Company would have been protected if Sellers or Company purchased a policy of title insurance commercially available in the State of Iowa upon close of escrow of the purchase of the real property by the Company.

(v)     The Sellers warrant that a policy of all risk property insurance is in full force and effect to protect the real property listed in Schedule 3.1(s) as of the date of Closing.

(t)     **Environmental Matters -**

(i)     The Business has been and is being carried on, and the Real Property and any other property which has been at any time under the control of the Company has been and is, in compliance with all, and does not violate and has never violated any, Environmental Laws, Environmental Orders or common law respecting environmental or public or workers health and safety matters.

(ii)    None of the Real Property or any other real property which has been at any time under the control of the Company has been used by any Person: (A) to generate, manufacture, receive, refine, treat, transport, use, handle, store, dispose of, transfer, produce or process Hazardous Waste; or (B) as a landfill or waste disposal site.

(iii)   The Company has maintained all environmental operating documents, manifests and other records in the manner and for the time periods required by Environmental Laws.

(iv)    The Company has not conducted any environmental audits except as disclosed in Schedule 3.1(t) (for the purposes hereof "environmental audits" means any evaluations, assessments, studies or tests performed relating to environmental matters, including any results of soil, ground water, air or water quality samples and any associated reports, whether prepared by the Company, its agents or employees or any other Person whomsoever); to the extent they are in the possession or control of the Company or its agents or consultants, correct and complete copies of said environmental audits have been or shall be delivered to the Purchaser prior to Closing.

(v)     The Company is in compliance with all Environmental Orders and Environmental Permits issued to them and holds all Environmental Permits it is required to hold pursuant to Environmental Laws; correct and complete copies of all said Environmental Orders and Environmental Permits have been or shall be delivered to the Purchaser prior to Closing;

(vi)    The Company has not received any written notice, nor to the Sellers' knowledge, is there any claim or allegation, that the Company is a

"potentially responsible party" for a waste disposal site pursuant to the Comprehensive Environmental Response, Compensation and Liability Act or any other Environmental Laws.

(vii)    No Hazardous Substances are stored on or in any of the Real Property or which has not at any time been under the control of the Company.

(viii)   The Company has not failed to report to the proper governmental authority the occurrence of each event which is required to be so reported by any Environmental Laws and the Sellers have provided or shall prior to Closing provide the Purchaser with correct and complete copies of all such reports and all correspondence relating thereto.

(ix)    The Company has not received any notification that any work, repairs, construction or capital expenditures are required to be made in respect of any of the assets owned or used by them or any of them as a condition of continued compliance with any Environmental Laws, Environmental Orders or Environmental Permits.

(x)     All underground storage tanks and vessels, associated piping and appurtenances under the Real Property or any of the facilities of the Company situated on the Real Property, either currently or at any time in the past, have been maintained and operated in compliance with all Environmental Laws, Environmental Orders and Environmental Permits and have not leaked.

(xi)    The Company has not received any written or oral notice of any alleged non-compliance with or has been charged with or convicted of an offence for non-compliance with any Environmental Laws or Environmental Orders or any other damage to the environment or human health, or has been fined or otherwise sentenced or settled any prosecution short of conviction and there is no fact which could give rise to a notice of non-compliance with any Environmental Laws or Environmental Orders.

(xii)   The Company has neither caused nor permitted nor has any knowledge of any Predecessor having caused or permitted the Release of any Hazardous Waste on or off-site from the Real Property or any other real property which has been at any time under the control of the Company or where the Company carries on or has carried on the Business, and all wastes and substances disposed of, treated or stored by the Company or any Predecessor in any location, whether hazardous or non-hazardous, have been and are disposed of, treated and stored in compliance with all Environmental Laws, Environmental Orders and Environmental Permits.

(u) **Fixed Assets** - Schedule 3.1(u) sets forth a true and complete list of all machinery, equipment, furniture, office equipment, computer hardware and software and other personal property and fixtures, wherever situate, legally and beneficially owned by the Company with a net book value in excess of $500. There is no basis upon which any such assets may become subject to any Encumbrances. The Company possesses all such assets.

(v) **Condition of Assets** - All machinery, equipment, furniture, office equipment, computer hardware and software and other personal property and fixtures, including those set out in Schedule 3.1(u), used in or in connection with the Business are in good condition, repair and (where applicable) proper working order.

(w) **Vehicles** - Schedule 3.1(w) sets out a list of all vehicles owned, leased or operated by the Company. All such vehicles are in good condition, repair and working order, have been maintained in accordance with the Company's current written vehicle maintenance policy, a copy of which has been provided to the Purchaser, and comply with all applicable laws, regulations and guidelines respecting its operation and bears a current Safety Standards Certificate (if required by applicable laws, regulations or guidelines). The Company possesses all such vehicles.

(x) **Leases of Personal Property** - Schedule 3.1(x) sets forth a true and complete list of all equipment, office equipment, furniture, machinery, vehicles, fixtures, computer hardware and software and other personal property and fixtures in the possession or custody of the Company which is leased, subleased, held under license or similar arrangement or instrument, or subject to an agreement to lease, sublease, license or similarly held, together with the Personal Property Leases relating thereto. Each Personal Property Lease is in good standing and in full force and effect without amendment, and the Company is entitled to all benefits, rights and privileges thereunder. Each Personal Property Lease constitutes a valid and binding obligation of the parties thereto, enforceable in accordance with its terms. None of the parties to any Personal Property Lease is in breach of its obligations thereunder, and no act or event has occurred which, with notice or lapse of time, or both, would constitute a breach thereof. All of the Personal Property Leases were entered into in the ordinary course of business. Neither the Company nor its respective counsel has received notice that any party has breached, intends to breach or intends to discontinue any such Personal Property Lease.

(y) **Accounts Receivable** - Schedule 3.1(y) sets forth a true and complete aged listing of the trade accounts receivable, notes and other receivables of the Company as at November 30, 2003.

(z) **Collectability of Accounts Receivable** - The accounts receivable of the Company at October 31, 2003 are, and all other accounts receivable at the Time of Closing shall be, good and collectible at their aggregate recorded amounts less all reserves for doubtful accounts recorded in respect thereof (subject to no defense, counterclaim or set-off) and are or will be *bona fide* accounts receivable created in

the ordinary and normal course of business.

(aa)    **Revenue Contracts** - Schedule 3.1(aa) sets out all contracts pursuant to which the Company is to conduct business.

(ab)    **Insurance** - The Company has insured the Business and the assets of the Company as set forth in Schedule 3.1(ab).  Such insurance coverage shall be continued in full force and effect (with all premiums paid) up to and including the Closing Date.  The Company is not in default, whether as to the payment of premiums or otherwise, under the provisions contained in any insurance policy identified in Schedule 3.1(ab) and has not failed to give any notice or present any claim under any such insurance policy in due and timely fashion.  Nothing has been done or omitted to be done by the Company that could make any policy of insurance void or voidable.  The Company has no liability for any retrospective insurance premiums or costs. The Company has no material outstanding liabilities nor is it the subject of any material outstanding claims which liabilities or claims are normally covered by insurance policies but which are not covered by the Company's insurance.  The Company does not self-insure any risk related to the Business.

(ac)    **Intellectual Property** - Schedule 3.1(ac) sets out all domestic and foreign trade names, business names, trademarks, proposed trademarks, certification marks, distinguishing guises, industrial designs, copyright licenses and exploitation agreements, inventions, patents, other intellectual property, whether or not registered, and all applications in respect thereof relating to the Business, including particulars of any registration in respect thereof and, where unregistered, the date of first use thereof.  The Company has all other proprietary rights, trade processes and secrets necessary for the conduct of, or that are used in the Business (such rights, processes and secrets together with the intellectual property referred to in Schedule 3.1(ad) being referred to herein as the "Intellectual Property").   The Company is the sole legal and beneficial owner of and has the sole right to use the Intellectual Property and the Intellectual Property is free and clear from all Encumbrances other than those identified in Schedule 3.1(ad). The Company has neither used nor enforced, nor failed to use or enforce, any of the Intellectual Property in any manner which could limit its validity or result in its invalidity. The Company has not granted and is not obligated to grant any license or sublicense to any third party permitting the use of the Intellectual Property.  There has been no infringement or violation of the Company's rights in and to the Intellectual Property, nor any claim of adverse ownership, invalidity or other opposition to conflict with any of the Intellectual Property and the Company is not and has not been engaged in any activity that violates or infringes any intellectual property rights of a third party (including the use of computer software).

(ad)    **Material Contracts** - Except for the Personal Property Leases referred to in Schedule 3.1(x), the revenue contracts referred to in Schedule 3.1(aa) and the written employment contracts referred to in Schedule 3.1(ai), the Company is not a

party to or bound by any indenture, mortgage, loan, banking agreement, credit facility, lease, sublease, instrument, license, contract, agreement, arrangement or understanding, whether oral or written, with an aggregate value in excess of $1,000, other than the contracts and agreements referred to in Schedule 3.1(ad). Each indenture, mortgage, loan credit facility, banking agreement, lease, sublease, instrument, license, contract, agreement, arrangement and understanding to which the Company is bound, including those set out in Schedule 3.1(ad), is in good standing and in full force and effect without amendment, and the Company is entitled to all benefits, rights and privileges thereunder. Each such contract or agreement (other than those contracts and agreements which are not in writing) is in good standing and in full force and effect and constitutes a valid and binding obligation of the parties thereto, enforceable in accordance with its terms. None of the parties to any such contract or agreement is in breach or default of its obligations thereunder, and no act or event has occurred which, with notice or lapse of time, or both, would constitute a breach thereof. All such contracts or agreements were entered into in the ordinary course of business. Neither the Company nor its respective counsel has received notice that any party has breached, intends to breach or intends to discontinue any such contract or agreement.

(ae)     **Contracts to Purchase** - Except as set out in Schedule 3.1(ae), the Company is not a party to any contract to purchase goods or services with a value in excess of $1,000 per year.

(af)     **Sufficiency of Assets** - The assets legally and beneficially owned by the Company constitutes all property and assets necessary to carry on the Business as it is currently conducted.

(ag)     **Tax Matters** -

(i)      Adequate provision has been made by the Company for any unpaid current and deferred Taxes, whether or not disputed, as at October 31, 2003. The amounts included in the Interim Balance Sheet for current and deferred Taxes receivable (if any) are recoverable by the Company in the ordinary course. Any Tax instalments due in respect of the current taxation year of the Company have been made as required. Except to the extent provided for, the Company is not liable for any Taxes. U.S. federal and state income tax assessments or reassessments have been received by the Company covering all past periods through the 2002 fiscal year, and the Company has paid all such assessments and reassessments, or where permitted by law, security therefor has been provided and have paid all other Taxes due and payable by them on or before the date hereof. There are no notices of objection or appeals outstanding with respect to any assessment, reassessment or determination of the Company by any Tax Authority. There are no actions, suits, audits, investigations, claims or other proceedings pending or threatened, against the Company in respect of any Taxes, and

there are no facts or circumstances to the knowledge of the Sellers, or acts, omissions, events, transactions or series of transactions (including the transactions contemplated by this Agreement) occurring wholly or partly on or before the Time of Closing, which could give rise to any such actions, suits, audits, proceedings, investigations or claims. There are no agreements, waivers or other arrangements providing for an extension of time with respect to the filing of any Tax return or the payment of any Taxes by the Company.

(ii)     The Company has on a timely basis filed all Tax returns, information returns, elections or designations in respect of any Taxes required to be filed by them under any Tax legislation. All such filings are true and accurate in all material respects, and no such filing has contained any material misstatement or omitted any statement of material fact that should have been included therein. The Company has not and is not required to file any Tax returns, information returns or designations in any jurisdiction outside the United States.

(iii)    The Company has withheld and remitted to the proper Authority, or where permitted by law, provided security for, on a timely basis and in a form required under the appropriate Tax legislation all amounts in respect of Taxes, including income taxes, pension plan contributions, unemployment and disability insurance premiums and any other deductions and contributions, required to be withheld and remitted by them, together with the employer's share of same, if any, all within the prescribed times. The Company has filed in complete and accurate form all information and other returns required pursuant to any Tax legislation within the prescribed times.

(iv)    There is no deductible outlay or expense owing by the Company to a Person with whom it was not dealing at arm's length at the time the outlay or expense was incurred which is unpaid and which will be included in the Company's income for any taxation year ending on or after the Closing Date.

(v)     The Company does not have any loans or indebtedness outstanding which have been made to shareholders, directors, officers or employees, or former shareholders, directors, officers or employees of the Company or any of the Subsidiaries, or to any Person or Company not dealing at arm's length with the Company.

(vi)    The Company has not, directly or indirectly, transferred property to or acquired property from a Person with whom the Company was not dealing at arm's length for consideration other than consideration equal to the fair market value of the property at the time of the disposition or acquisition thereof.

(vii)   All of the interest which has been paid or is payable by the Company in

respect of their current liabilities and long-term debt is deductible in calculating the Company's income for Tax purposes (except for interest paid or payable in respect of late or insufficient Tax instalments).

(ah)    **Litigation** - There is no suit, action, dispute, civil or criminal litigation, arbitration, legal, administrative or other proceeding or governmental investigation, including appeals and applications for review, in progress, pending or, to the best of the Sellers' knowledge, threatened against the Company or relating to the Business or the assets of the Company. No circumstances have occurred which would give rise to any such suit, action, dispute, litigation, arbitration, proceeding or investigation, and there is not currently outstanding against the Company any judgment, execution, decree, injunction, rule or order of any Authority, court, tribunal, instrumentality or arbitrator.

(ai)    **Employment Matters -**

(i)    Schedule 3.1(ai) sets forth a true and complete list of all directors, officers and employees of the Company with annual remuneration in excess of $20,000, their respective positions, dates of hire, current salaries, benefits and other remuneration and dates of last salary increases indicating which officers and employees are parties to a written or oral agreement with the Company (including confidentiality and non-competition agreements). Schedule 3.1(ai) also contains a list of all directors, officers and employees which are Related Persons (within the meaning of section 1.1(al)(i) to any of the Sellers and indicating the relationship. Except as disclosed in Schedule 3.1(ai), the Company is not a party to any written or oral agreement with former or present officers, employees, agents or independent contractors in connection with the Business.

(ii)    The Company has no obligation to reinstate any former officer or employee of the Company.

(iii)    There are no oral contracts of employment entered into with any officers or employees employed by the Company which are not terminable in accordance with applicable law. The Company has not entered into any agreement with any officer or employee employed by the Company with respect to the termination of employment, and no officer or employee employed by the Company has indicated his or her intention to resign.

(iv)    There has been no material change in the directors, officers and employees of the Company, their positions or the terms and conditions of their employment since September 1, 2003, is not identified in Schedule 3.1(ai), and no such change is pending, anticipated or threatened.

(v)    All wages, salaries, bonuses, commissions, vacation pay and other emoluments relating to the Business or the directors, officers and employees

of the Company are reflected and accrued in the records of the Company.

(vi)     The Company has withheld from each payment made to all of their directors, officers and employees, and their former directors, officers and employees, the amount of all Taxes and other deductions (including income taxes and pension plan, unemployment insurance and disability contributions) required to be withheld, and have paid the same together with the employer's share of same, if any (to the extent required to be paid so that no such amount is past due), to the proper Tax and other receiving officers within the time required under applicable legislation.

(vii)    There are no outstanding, pending, threatened or anticipated assessments, actions, causes of action, claims, complaints, demands, orders, prosecutions or suits against the Company, or its former or present directors, officers or agents pursuant to or under any applicable law, statutes, rules, regulations, ordinances or orders, including social security, unemployment insurance, income tax, employment standards, labor relations, occupational health and safety, human rights, workers' compensation and equal pay.

(viii)   The Company has not made any agreement, directly or indirectly, with any labor union, employee association or other similar entity or made commitments to or conducted negotiations with any labor union or employee association or other similar entity with respect to any future agreements.  No trade union, employee association or other similar entity holds any bargaining rights with respect to any of the employees of the Company acquired by certification, interim certification, voluntary recognition, designation or successor rights, or has applied to be certified as the bargaining agent of the employees of the Company.  To the knowledge of the Sellers, there have been no attempts to organize or establish any labor union, employee association or other similar entity affecting the Company or the Business.

(ix)     The Company has not experienced any strikes, work stoppages, claims of unfair labor practice or other material labor disputes.

(x)      No officer or employee of the Company is eligible for short-term or long-term disability benefits.

(xi)     All of the officers and employees of the Company, including those identified in Schedule 3.1(ai), are in good standing under the terms and conditions of their employment, and the Sellers are not aware of any problem or difficulty associated with any officer or employee, or the employment of any officer or employee.

(aj)  **Federal Employer Identification Number** - The Company's U.S. federal employer identification number is 57-1160595.

(ak)  **Pension and Benefit Matters -**

(i)   Schedule 3.1(ak) sets forth a true and complete list of all Plans. No Plan has been terminated or partially terminated and all Plans are still in force and effect. All Plans are registered under applicable Pension Legislation and no events have occurred which would affect the registered status of the Plans. All Plans are in good standing under applicable Pension Legislation and the Company has made all filings required by the Pension Authorities and Pension Legislation. The Plans and all investments held by such Plans comply in all respects with all applicable Pension Legislation and Pension Contracts and have been maintained and administered in compliance with all Plan Terms.

(ii)  All required contributions or premiums to be paid under the Plans have been fully paid when due in accordance with applicable Pension Legislation and Pension Contracts and adequate provision has been made by the Company for all contributions or premiums required to be paid under the Plans accrued to the date hereof. No unfunded liability, solvency deficiency, unpaid special payment or experience deficiency, whether due or not, exists with respect to the Plans.

(iii) There have been no withdrawals or transfers of assets from the Plans except to members or beneficiaries in accordance with the Plan Terms or in accordance with approval granted by the Pension Authorities. No actuarial surplus has ever been removed from any Plan or has been used or applied by the Company to fund employer contribution obligations under the Plans.

(iv)  There are no outstanding Tax liabilities with respect to the Plans.

(v)   There has been no material change in the value of any Plan since the last valuation which would affect the actuarial report or financial statements, and the actuarial assumptions used have not changed since the last valuation.

(vi)  No improvements to the Plans have been promised and no such improvements will be made or promised prior to Closing except as may be required by applicable Pension Legislation and Pension Contracts and any such promises of benefit improvements shall be communicated to the Purchaser in writing forthwith and, in any event, prior to Closing.

(vii) There are no outstanding actions or claims with respect to the Plans (other than claims for benefits submitted by members or beneficiaries in the normal course), no requests for documents and no litigation, legal action, suit, investigation, claim, counterclaim or proceeding pending or threatened against or affecting any Plan which could have a material adverse effect on the Company, the Business or any Plan maintained as of the Closing Date.

(viii)   None of the Sellers, the Company, or, to the best of the Sellers' knowledge, the administrators or fiduciaries of the Plans, nor the agents of the foregoing has been in breach of any fiduciary obligation with respect to the administration of the Plans or has engaged in any transaction or acted or failed to act in a manner which could subject the Company to any liability for a breach of fiduciary duty under applicable laws.

(ix)    Except as disclosed in Schedule 3.1(ak), no Plan is subject to: (i) Title IV of ERISA; or (ii) the minimum funding requirements of Section 412 of the Code or Section 312 of ERISA. The Company is in compliance with all provisions of ERISA and all other Pension Legislation and are not subject to any liability or obligation arising under any Pension Legislation or the provisions of any Plan, including liability owed to the Pension Benefit Guaranty Company on account of a termination or partial termination of any Plan, any liability resulting from a "prohibited transaction", any liability for failure to meet minimum funding requirements, any liability related to the termination of any multi-employer pension plan and any liability caused by the non-qualification of any plan under Section 401 of the Code. Each 401K plan maintained by the Company meets the requirements of Section 401(a) of the Code, the Company has received a favourable determination letter respecting the qualification of each such plan and no event has occurred which would affect the qualification of any such plan.

(x)     The Company has no obligation to provide material post-retirement benefits of any nature to its employees or former employees or their survivors, dependants or beneficiaries, except as may be required by the Consolidated Omnibus Budget Reconciliation Act of 1986 or any other applicable state medical benefits continuation laws, nor will any such obligation to provide such post-retirement benefits be incurred as a result of the transactions contemplated hereby.

(xi)    The Company has not caused there to occur a "mass lay-off" as defined in Section 693.3 of the regulations under the Worker Adjustment and Retention Notification Act (20 CFR 639) at any time in the past.

(al)   **Books and Records** - All records relating to the Business (including customer lists, operating data, files, books and records, correspondence, credit information, research materials, contract documents, records of past sales, supplier lists, employee documents, inventory data, accounts receivable data, financial statements and other similar records) are maintained in accordance with applicable legal requirements. The records contain complete and accurate records of all matters required to be dealt with in such records. All financial transactions relating to the Business and the assets of the Company have been fairly and accurately recorded in the records in accordance with GAAP. The records, including all indentures, mortgages, leases, subleases, quotas, licenses, permits, instruments,

contracts and other documents listed in any of the Schedules that are in the Company's possession or control, or which can be obtained by it, have been delivered to the Purchaser or will be delivered to the Purchaser prior to Closing and are available for inspection by the Purchaser at the Company's head office.

(am) **Minute Books** - The minute books of the Company contain, and shall on the Closing Date contain, accurate and complete minutes of all meetings and resolutions of their directors, committees of directors and shareholders held since their respective dates of incorporation. All such resolutions were duly passed and all such meetings were duly held. Their share certificate books and share certificate and other corporate registers are, and shall be on the Closing Date, complete and accurate.

(an) **Bank Accounts, etc.** - Schedule 3.1(an) sets forth a true a complete list of each bank or other depository in which the Company maintains any bank account, trust account or safety deposit box and the names of all Persons authorized to draw thereon or who have access thereto.

(ao) **Contracts with Non-Arm's length Persons** – Other than as set out in Schedule 3.1(ao), there are no existing indentures, mortgages, loans, contracts, agreements, arrangements or understandings to which the Company is a party in which any of the Sellers, any director or officer of any of the Sellers, the Company or any Person not dealing at arm's length with any of the Sellers, the Company, or any director or officer of any of the Sellers or the Company has an interest, directly or indirectly, including arrangements for the payment of management or consulting fees of any kind whatsoever.

(ap) **Agreements Restricting Business** – The Company is not a party to any lease, license, instrument, contract, agreement, arrangement or understanding which restricts the freedom of the Company to carry on the Business, including any lease, license, instrument, contract, agreement, arrangement or understanding which contains covenants by the Company not to compete in any line of business with any other Person. However, notwithstanding the foregoing, Purchaser is aware that Sellers are parties to contracts with Trapeze Software, Inc., Trapeze Software Corporation and Trapeze Software, L.L.C. (collectively "Trapeze"). Said contracts are set forth on Schedule 3.1(ap) hereto.

(aq) **Powers of Attorney** - The Company has not given any irrevocable power of attorney relating to the Business (other than such powers of attorney given in the ordinary and normal course of business with respect to routine matters or as may be necessary or desirable in connection with the consummation of the transactions contemplated hereby) to any Person for any purpose whatsoever.

(ar)    **Outstanding Business Proposals** – Other than the Proposals listed in Schedule 3.1(ar), the Company has no pending or outstanding proposals nor is the Company bound to any person or entity to perform any business after Closing which the Company is not already under contract to perform as listed in Schedule 3.1(aa).

(as)    **Tax ID -** The Social Security Numbers of the Sellers are as follows:

| | | |
|---|---|---|
| Ryan James Larsen | - | 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 |
| Marsha Louise Madrid | - | 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 |
| Janet Sue Davis | - | 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 |
| Kevin John Dresser | - | 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 |

(at)    **Disclosure** - All facts, events and circumstances which could reasonably be expected to be material to the Purchaser relating to the condition, operations, affairs or personnel of the Business, or the assets or financial condition of the Company have been disclosed to the Purchaser. All of the information disclosed in each of the Schedules is true, accurate and complete.

**3.2    Representations and Warranties of the Purchaser.** The Purchaser hereby represents and warrants to the Sellers (and acknowledges that the Sellers are relying on such representations and warranties in completing the transactions contemplated hereby) that:

(a)    **Purchaser's Corporate Matters** - The Purchaser is a Company duly incorporated and organized and is validly subsisting under the laws of the State of California and has all necessary corporate power, authority and capacity to enter into this Agreement and to perform its obligations hereunder.

(b)    **Authorization of Agreement** - This Agreement has been, or will be prior to Closing, duly authorized, executed and delivered by the Purchaser and constitutes, or will constitute, a legal, valid and binding obligation of the Purchaser enforceable against it in accordance with its terms (subject, however, to limitations with respect to the enforcement of remedies, to bankruptcy, reorganization, insolvency, moratorium and other laws relating to or affecting creditors' rights generally and subject to the availability of equitable remedies such as specific performance and injunction).

(c)    **Validity of Transactions** - The execution and delivery of this Agreement by the Purchaser, the consummation of the transactions contemplated hereby and the fulfillment by the Purchaser of the terms, conditions and provisions hereof has not and will not contravene or violate or result in the breach (with or without the giving of notice or lapse of time, or both) or acceleration of any obligations of the Purchaser under: (i) the laws applicable to the Purchaser; (ii) any judgment, order, writ, injunction or decree of any court, tribunal, instrumentality or arbitrator which is presently applicable to the Purchaser; and (iii)the articles, by-laws or any resolutions of the Purchaser, or any amendments thereto or restatements thereof.

(d)     **Tax** - The Purchaser's federal employer identification number is 94-2491705.

(e)     **Shares** - The Purchaser is purchasing the Shares for its own account and not with a view to or for sale in connection with any distribution of the Shares.

(f)     **Board of Directors –** Immediately upon closing, a meeting of the shareholders will be conducted to elect a new Board of Directors ("Board") for the Company. The Purchaser shall be entitled to elect a new Board of Directors ("Board") for the Company. The Purchaser shall be entitled to appoint 3 members of the Board; the Sellers shall be entitled to appoint 2 members to the Board. Appointments shall be made by written notice to the Secretary of the Company. No Seller who is not then an employee of the Company shall be entitled to serve on the Board. In the event the Sellers cannot agree which of the Sellers shall serve on the Board, the Purchaser shall be entitled to appoint the 2 Seller's positions on the Board at the sole discretion of the Purchaser. Thereafter, at each annual meeting of the shareholders of the Company, a new Board will likewise be selected, with the exception that if at least 2 of the Sellers are no longer employed by the Company, the remaining Board positions shall be filled by a vote of the shareholders. In the event any person appointed by Sellers to the Board shall fail during the term of their appointment, for any reason, to remain employed by the Company, that person shall be terminated as a member of the Board.

**3.3     Other Representations and Warranties.** All statements contained in any certificate or other instrument delivered by or on behalf of a party pursuant to or in connection with the transactions contemplated by this Agreement shall be deemed to be representations and warranties made by such party hereunder.

**3.4     No Broker.** Each of the Parties represents and warrants to the others that all negotiations relating to this Agreement and the transactions contemplated hereby have been carried on between them directly and without the intervention of any other party in such manner as to give rise to any valid claims against any of the Parties for a brokerage commission, finder's fee or other like payment.

**3.5     Non-Waiver.** No investigations made by or on behalf of the Purchaser at any time shall have the effect of waiving, diminishing the scope of or otherwise affecting any representation or warranty made by the Sellers herein or pursuant hereto.

**3.6     Indemnification.** Provided that a Seller who is at the time an employee of the Company provides advance written notice to Purchaser's General Counsel regarding any potential action which Seller has reason to believe may cause a violation of that Seller's agreement with another party as detailed in Schedule 3.1(ap) and provided the action is in the course and scope of Seller's employment with the Company after the date of Closing, and if Purchaser received written approval for the action from the Purchaser's General Counsel and then later the Seller becomes a party to litigation from the other party detailed in Schedule 3,1(ap) as a result of this action, then Company shall provide the defence of said litigation on behalf of Seller.

3.6     **Survival of Representations, Warranties and Covenants.**

(a)     The representations and warranties of the Sellers hereunder shall survive the Closing, the execution and delivery hereunder of share or security transfer instruments and other documents of title to the Shares and payment of all consideration therefor, for the benefit of the Purchaser as follows:

  (i)     as to the representations and warranties contained in clauses 3.1 (a), (b), (c), (d), (g), (h), (i), (j), (r), (s) (t) and (aq) indefinitely;

  (ii)    as to Tax matters, until the date following the expiration of all periods allowed for objecting and appealing the determination of any proceedings relating to any assessment or reassessment of the Purchaser or the Company, as the case may be, by any taxing authority in respect of any taxation period ending prior to the Closing or in which the Closing occurs unless a bona fide notice of a claim shall have been made in writing before the expiry of that period, in which case any representation and warranty to which such notice applies shall survive in respect of that claim until the final determination or settlement of that claim; and

  (iii)   as to all other matters, for a period of three years following Closing, unless a bona fide notice of a claim shall have been given in writing before the expiry of that period, in which case any representation and warranty to which such notice applies shall survive in respect of that claim until the final determination or settlement of that claim.

(b)     The representations and warranties of the Purchaser hereunder shall survive the Closing, the execution and delivery hereunder of share or security transfer instruments and other documents of title to the Shares and payment of all consideration therefor, for the benefit of the Sellers as follows:

  (i)     as to the representations and warranties contained in clauses 3.2(a), (b) and (c), indefinitely; and

  (ii)    as to all other matters, for a period of three years following Closing, unless a bona fide notice of a claim shall have been given in writing before the expiry of that period, which case any representation and warranty to which such notice applies shall survive in respect of that claim until the final determination or settlement of that claim.

(c)     Except as otherwise provided in this Agreement, all covenants of the Sellers and the Purchaser, as the case may be, contained in this Agreement or any certificate or other instrument delivered by or on behalf of a party pursuant to or in connection with the transactions contemplated by this Agreement shall survive the Closing for the benefit of the Purchaser or the Sellers, as the case may be, indefinitely.

**3.7    Non-Dilution –** Purchaser agrees that the Company shall not issue additional shares in the Company after the Closing that will have the impact of diluting the shares that continue to be owned by Sellers, with the exception of Shares which may be issued pursuant to the Stock Option Agreements in Schedule 2.8(b) or the Warrant in Schedule 2.9 and with the further exception that the Company may issue an additional 12 shares to person(s) approved by the Company to receive Stock pursuant to the terms of the Stock Option Plan contained in Schedule 2.8(a) which are vested in accordance with the terms of a Stock Option Agreement between the person and the Company, the terms of which shall be negotiable between the Company and the optionee at the time of the grant.

**3.8    Shareholder Agreement –** The Company and Sellers agree to enter into a Shareholder Agreement, the form of which is contained in Schedule 3.8 prior to Closing.

## ARTICLE IV
## CONDITIONS PRECEDENT

**4.1    Conditions of the Purchaser.**  The obligation of the Purchaser to complete the purchase of the Purchased Shares hereunder shall be subject to the satisfaction of, or compliance with, at or prior to the Closing Time, each of the following conditions (each of which is hereby acknowledged to be inserted for the exclusive benefit of the Purchaser):

(a)    **Representations and Warranties** - All representations and warranties of the Sellers and the Company in this Agreement shall be true and correct at and as of the Closing Time with the same force and effect as if made at and as of such time and date, and the Sellers and the Company shall each have delivered to the Purchaser at the Closing Time a certificate, dated the Closing Date, under corporate seal and duly executed by each Vendor and a senior officer of the Company, acceptable to the Purchaser, to such effect.  The receipt of such certificates and the closing of the transactions contemplated by this Agreement shall not be nor be deemed to be a waiver of the representations and warranties contained in this Agreement, which representations and warranties shall continue in full force and effect for the benefit of the Purchaser as contemplated by Article IX of this Agreement.

(b)    **Performance of Covenants** - Each of the Sellers shall have performed or complied with, in all respects, all of the obligations, covenants and agreements contained in this Agreement which are to be performed or complied with by the Sellers and the Company at or prior to the Closing Time.  Neither the Company nor any Vendor shall be in breach of any covenant on its part contained in this Agreement, and the Sellers and the Company shall each have delivered to the Purchaser at the Closing Time, a certificate, dated the Closing Date, under corporate seal and duly executed by each Vendor and by a senior officer of the Company acceptable to the Purchaser, to such effect.

(c)    **Consents** - All Regulatory Approvals and Consents shall have been obtained in a

form satisfactory to the Purchaser, acting reasonably, and all conditions thereof shall have been complied with at or prior to the Closing Time.

(d)    **No Material Adverse Effect** - The execution of this Agreement, the closing or the performance of any terms hereof and the completion of the transactions contemplated by this Agreement shall not have caused the termination of or otherwise materially adversely affected any indenture, mortgage, lease, instrument, contract, agreement, arrangement or understanding to which the Company is a party or by which the Company or any of its property or assets are bound, or any permit, license, registration or authorization necessary for the lawful operation of the Business pursuant to all applicable laws, statutes, regulations, ordinances, rules, policies, guidelines, decrees, orders, notices, directives and other requirements of all Authorities.

(e)    **Due Diligence** - The Purchaser shall have been satisfied, in its absolute discretion, with the results of its due diligence review of the Company and the Business including its review of the Reviewed Financial Statements and the Interim Financial Statements.

(f)    **No Action to Restrain** - No action or proceeding shall be pending or threatened by any Authority or any other Person (including a party hereto) to restrain or prohibit the completion of the transactions contemplated by this Agreement or to prevent or restrain the Purchaser from carrying on the Business as presently carried on.

(g)    **Sellers' Closing Opinions** - The Purchaser shall have received an opinion, dated the Closing, from counsel for the Sellers, substantially in the forms attached as Schedule 4.1(g).

(h)    **Directors and Officers** - All directors and officers of the Company shall have resigned in their capacity as directors and officers, and each of the directors and officers shall have executed a form of release, substantially in the form attached as Schedule 4.1(h).

(i)    **Employment Agreements** - Satisfactory written agreements shall have been made by the Purchaser with respect to the employment of Ryan James Larsen, Janet Sue Davis and Marsha Louise Madrid.

(j)    **Non-Competition Agreements** - Each of the Sellers shall have entered into a Non-Competition Agreement, dated the Closing Date, substantially in the form attached as Schedule 4.1(j).

(k)    **Discharge of Encumbrances** - At or prior to the Closing Time, the Sellers shall have provided evidence to the Purchaser of the discharge of all the Encumbrances identified in Schedule 4.1(l) (unless other arrangements satisfactory to the Purchaser's counsel have been made for the discharge of all Encumbrances identified in Schedule 3.1(r).

(d)    **Litigation** - On the Closing Date, there shall be no litigation, governmental investigation or proceeding pending or threatened for the purpose of enjoining or preventing the consummation of any of the transactions contemplated by this Agreement or otherwise claiming that such consummation is improper.

In case any of the foregoing conditions shall not have been performed at or prior to the time of Closing, the Sellers may terminate this Agreement as provided in Section 7.1(e), in which event the Sellers shall be under no obligation to any other party, provided, however, that the aforesaid conditions are for the benefit of the Sellers only and accordingly the Sellers shall be entitled to waive compliance with any of such conditions in whole or in part if they see fit to do so without prejudice to their rights and remedies at law and in equity and also without prejudice to any of their rights of termination in the event of non-performance of any other conditions in whole or in part.

## ARTICLE V
## COVENANTS OF THE PARTIES

**5.1    Covenants of the Sellers and the Company.**    Each of the Sellers and the Company jointly and severally covenant and agree with the Purchaser that:

(a)    the business and affairs of the Company shall be carried on in the ordinary and normal course of the business, consistent with past practice, and in compliance with the representations, warranties, covenants and agreements contained in this Agreement and the Sellers and the Company and the Sellers shall use their best efforts to preserve the goodwill of all Persons having business relations with the Company;

(b)    they shall not make, nor permit to be made, any material change in the way the Business or the affairs of the Company are being operated and will not take any action which would interfere with customer or supplier relationships and the future prospects which exist on the date hereof;

(c)    all the representations and warranties contained in this Agreement shall be true and correct at the Closing Time with the same effect as if made at and as of the Closing Time and, without limiting the generality of the foregoing, shall not take or omit to take, nor permit to be taken or omitted, any action which would cause the representations and warranties of the Vendor contained in this Agreement to be untrue;

(d)    they shall ensure that all of the conditions of the Closing to be performed or complied with by any of them shall have been so performed or complied with prior to the Closing Time, to the extent that such conditions are within the control of any of the Sellers or the Company and otherwise shall use their best efforts to so ensure that such conditions are so performed or complied with;

(l)    **Clearance Certificate** – The Sellers shall have provided the Purchaser with a Clearance Certificate or the equivalent which may be required by any state Taxing Authority in order to relieve the Purchaser of any obligation to withhold a portion of the Purchase Price.

(m)    **Receipt of Closing Documentation** - All documentation relating to the transactions contemplated by this Agreement and the due authorization of the performance by each of the Sellers of their obligations under this Agreement shall have been approved by the Purchaser and its counsel, acting reasonably, and the Purchaser shall have received copies of all such documentation or other evidence as it may reasonably request, in form (as to certification and otherwise) and substance satisfactory to the Purchaser and its counsel, acting reasonably.

(n)    **Lease Termination** – The Company shall terminate a real estate lease between the Company and Hawkeye East Enterprises dated April 1, 2003.

**4.2    Sellers' Conditions.** The obligations of the Sellers to complete the sale of the Shares hereunder shall be subject to the satisfaction of or compliance with, at or before the Closing time, each of the following conditions precedent (each of which is hereby acknowledged to be inserted for the exclusive benefit of the Sellers and may be waived by them in whole or in part):

(a)    **Truth and Accuracy of Representations of Purchaser at Closing Time** - All of the representations and warranties of the Purchaser made in or pursuant to this Agreement, including without limitation the representations and warranties made by the Purchaser and set forth in Article III, shall be true and correct as at the Closing Time and with the same effect as if made at and as of the Closing Time and the Sellers shall have received a certificate from a duly authorized senior officer of the Purchaser confirming, to the best of his knowledge, information and belief, the truth and correctness of the representations and warranties of the Purchaser contained herein.

(b)    **Performance of Obligations** - The Purchaser shall have performed or complied with, in all respects, all of its obligations, covenants and agreements hereunder.

(c)    **Receipt of Closing Documentation** - All documentation relating to the due authorization and completion of the sale and purchase hereunder of the Purchased Shares and all actions and proceedings taken on or prior to the Closing in connection with the performance by the Purchaser of its obligations under this Agreement shall be satisfactory to the Sellers and Sellers' counsel and the Sellers shall have received copies of all such documentation or other evidence as it may reasonably request in order to establish the consummation of the transactions contemplated hereby and the taking of all corporate proceedings in connection therewith in compliance with these conditions, in form (as to certification and otherwise) and substance satisfactory to the Sellers and Sellers' counsel.

(e)     the Company shall pay all payables and collect all receivables in a timely manner in the ordinary and normal course of business consistent with past practice;

(e)     they shall give notice to the Purchaser of any potential defaults or breaches of the representations, warranties or covenants of any of the Sellers or any other matter which may affect the Business or the Company forthwith upon becoming aware of such matters;

(f)     all of the Company's affiliated party accounts, officer loans, and loans due to the Company from the Sellers shall be settled in full and paid out at or prior to Closing;

(g)     from the date hereof, until this transaction terminates, the Sellers and the Company shall not, engage in any discussions or negotiations with any third party regarding the sale of the Shares or any of the Company's material assets; and

(h)     Purchaser may at its cost have environmental assessments conducted on all Real Property, and may conduct current tank tests for all underground storage tanks.

**5.2    Actions to Satisfy Closing Conditions.**  In addition to the covenants of the Parties set out herein, each of the Parties hereby covenants and agrees to take all such reasonable actions as are within its power to control so as to ensure compliance with any conditions set forth in Article IV hereof which are for the benefit of any other Party.

**5.3    Access for Due Diligence.**  The Company shall permit the Purchaser and its employees, agents, counsels and accountants or other representatives, between the date hereof and the Closing time, without interference to the ordinary conduct of the Business of the Company and at the Purchaser's sole cost and expense, to have free and unrestricted access during normal business hours to the premises and to all the books, accounts, records and other data of the Company (including, without limitation, all corporate, accounting and tax records of the Company) and to the properties and assets of the Company and to furnish with respect to the Business, properties and assets of the Company as the Purchaser shall from time to time reasonably request to enable confirmation of the matters warranted in Section 3.1 hereof. Without limiting the generality of the foregoing, it is agreed that the accounting representatives of the Purchaser shall be afforded ample opportunity to make a full investigation of all aspects of the financial affairs of the Company. Until the Closing Time, and in the event of the termination of this Agreement without consummation of the transactions contemplated hereby, the Purchaser will keep confidential any information (unless readily available from public or published information or sources) obtained from the Company or the Sellers.  If this Agreement is so terminated, promptly after such termination, all documents, work papers and other written material obtained from any Person in connection with this Agreement and not theretofore made public (including all copies thereof), shall be returned to the Person which provided such material.

**5.4    Financial Statements.**  Projected Financial Statements shall be provided by the Sellers and the Company prior to the Closing and Final Financial Statements shall be

prepared by the sellers prior to December 31, 2003 and shall be subject to the review and approval of the Purchaser.

## ARTICLE VI
## INDEMNIFICATION

**6.1    General Indemnification.**    From and after the Closing Date, subject to the limitations in Section 6.2 below, the Sellers, jointly and severally, shall indemnify and hold Purchaser harmless the Purchaser from and against any liabilities, obligations, demands, judgments, losses, costs, damages or expenses whatsoever (including attorneys' fees and disbursements incurred by Purchaser in connection) (collectively, the "Damages") that the Purchaser may sustain, suffer or incur and that result from, arise out of or relate to: (a) any breach of any representation, warranty, covenant or agreement of any of the Sellers contained in this Agreement or any other agreement, instrument or document contemplated by this Agreement (including Non-Competition Agreements); (b) the Sellers' Liabilities; and (c) any and all insurance premiums, charges, assessments and reassessments, including, without limitation, those in respect of workers' compensation, which arise from loss or claims experience prior to the Closing.

**6.2    Limitations.**

(a)    For the purposes of all calculations and claims pursuant to this Article VI, and in particular (but without limitation) calculations with regard to Damages or the amount thereof, any representation or warranty in this Agreement which is qualified by a reference to materiality (as, for example, by the words "material" or "materially" or the phrase "in all material respects") shall be read and interpreted as though no such provision or qualification as to materiality existed.

(b)    Notwithstanding any other provisions of this Agreement, solely in order to avoid duplication, the Purchaser shall not be entitled to collect Damages more than once with respect to the same facts or circumstances regardless of the number of representations, warranties, covenants or other provisions hereof as to which such facts or circumstances may constitute the basis for claiming a breach.

**6.3    Procedure for Claims.**    If the Purchaser desires to seek indemnification under Section 6.1, it shall give notice (a "Claim Notice") to each of the Sellers from which it seeks indemnification (an "Indemnitor"). Any such notice shall briefly explain the nature of the claim and the parties known to be involved, and shall specify the amount thereof. If the matter to which a claim relates shall not have been resolved as of the date of the Claim Notice, the Purchaser shall estimate the amount of the claim in the Claim Notice, but also specify therein that the claim has not yet been liquidated (an "Unliquidated Claim"). If the Purchaser gives a Claim Notice for an Unliquidated Claim, the Purchaser shall also give a second Claim Notice (the "Liquidated Claim Notice") within 60 days after the matter giving rise to the claim becomes finally resolved, and the Second Claim Notice shall specify the amount of the claim. Each Indemnitor to which a Claim Notice is given shall respond to the Purchaser (a "Claim Response") within 30 days (the "Response

Period") after the later of: (i) the date that the Claim Notice is given; or (ii) if a Claim Notice is first given with respect to an Unliquidated Claim, the date on which the Liquidated Claim Notice is given. Any Claim Notice or Claim Response shall be given in accordance with the notice requirements hereunder, and any Claim Response shall specify whether or not the Indemnitor giving the Claim Response disputes the claim described in the Claim Notice. If any Indemnitor fails to give a Claim Response within the Response Period, such Indemnitor shall be deemed not to dispute the claim described in the related Claim Notice. If any Indemnitor elects not to dispute a claim described in a Claim Notice, whether by failing to give a timely Claim Response or otherwise, then the amount of such claim shall be conclusively deemed to be an obligation of such Indemnitor.

**6.4    Third Party Claims.** If the Purchaser desires to seek indemnification under any part of this Article VI with respect to any actions, claims, suits or other administrative or judicial proceedings (each, an "Action") that may be instituted by a third party it shall give each Indemnitor prompt notice of a third party's institution of such Action. After such notice, any Indemnitor may, or if so requested by the Purchaser, any Indemnitor shall, participate in such Action or assume the defense thereof, with counsel satisfactory to Purchaser; provided, however, that Purchaser shall have the right to participate in the defense of such Action; and provided, further, that the Indemnitor shall not consent to the entry of any judgment or enter into any settlement, except with the written consent of the Purchaser. The Purchaser shall cooperate with the Sellers in all such settlements and defenses and shall take all commercially reasonable efforts without having to make any expenditure to provide the Sellers with access to the books and records and employees of the Company and Subsidiaries as the Sellers may reasonably request. If an Indemnitor does not assume the defense of any Action within 20 days of the date upon which it is requested to do so by the Purchaser, the Purchaser may defend or settle the Action in such manner as it deems appropriate in its sole discretion. Any failure to give prompt notice under this Section 6.4 shall not bar the Purchaser's right to claim indemnification under this Article VI, except to the extent that an Indemnitor shall have been harmed by such failure.

**6.5    Set-Off.** The payments payable to the Indemnitors and the Covenantors pursuant to Article II or to any subsequent sale of Shares to Seller or any employment agreement between the Parties hereto, shall be subject to set-off and reduction to the extent of all Damages referred to in Section 6.1. In the case of an Unliquidated Claim: (a) if the amount of the claim set out in the Liquidated Claim Notice exceeds the amount previously set-off by the Purchaser in respect of that claim (being the estimate of the amount of the claim set out in the Claim Notice), the payments payable to the Indemnitors and the Covenantors pursuant to Article II shall be subject to set-off and reduction to the extent of the difference; and (b) if the amount of the claim set out in the Liquidated Claim Notice is less than the amount previously set-off by the Purchaser in respect of that claim (being the estimate of the amount of the claim set out in the Claim Notice) the Liquidated Claim Notice shall be accompanied by payment to the Indemnitors in the amount of the difference or, in the case of the Covenantors who are not Indemnitors, payment in the amount of the difference shall be made by the Purchaser as soon as is practicable.

## ARTICLE VII
## TERMINATION

**7.1    Grounds for Termination.**  In addition to any other rights of termination in Section 4.2 or at law, this Agreement may be terminated at any time before the effective time of the Closing (the "Effective Time") (but not after) in the following manner and circumstances:

(a)    by mutual written consent of the Purchaser and the Sellers representing the holders of two-thirds of the Shares as well as three-fourths of the number of Sellers (the "Control Sellers");

(b)    by either the Purchaser or the Sellers, in either case by notice to the other Parties, if the Closing shall not have been consummated on or before November 30, 2003 (the "Termination Date"); provided, however, that the right to terminate this Agreement under this Section 7.1 shall not be available to any Party whose failure to fulfill any obligation under this Agreement has been a cause of, or has resulted in, the failure of the Effective Time to occur on or before the Termination Date;

(c)    by any Party if a court of competent jurisdiction or governmental, regulatory or administrative agency or commission shall have issued a court order (which court order the Parties shall use commercially reasonable efforts to lift or set aside) that permanently restrains, enjoins or otherwise prohibits the sale of the Shares, and such court order shall have become final and non-appealable;

(d)    by the Purchaser if any Seller shall have breached, or failed to comply with, any of its obligations under this Agreement or any representation or warranty made by any Seller shall be incorrect, and such breach, failure or misrepresentation is not cured within 15 days after written notice thereof; and, in either case, any such breaches, failures or misrepresentations, individually or in the aggregate, result or would reasonably be expected to result in a material adverse effect on the Business or the profitability or financial condition of the Company; and

(e)    by the Sellers if the Purchaser shall have breached, or failed to comply with, any of its obligations under this Agreement or any representation or warranty made by the Purchaser shall be incorrect, and such breach, failure or misrepresentation is not cured within 15 days after notice thereof and, in either case, any such breaches, failures or misrepresentations, individually or in the aggregate, result or would reasonably be expected to be material to the Sellers as a whole group.

**7.2    Effect of Termination.**  If this Agreement is terminated pursuant to Section 4.2 or Section 7.1, the agreements contained in Section 5.3 regarding confidentiality, and in Article VIII shall survive the termination hereof, and any Party may pursue any legal or equitable remedies that may be available if such termination is based on a breach by

another Party.

## ARTICLE VIII
## GENERAL

**8.1    Announcements.**  No public announcement or press release concerning the transaction contemplated herein shall be made at any time by the Sellers, the Company or the Purchaser without the prior written consent and joint approval of the Sellers and Purchaser.  Notwithstanding this provision, the Purchaser or the Company may issue a public announcement after the Closing.

**8.2    Confidentiality.**  In the event that the purchase and sale of the Purchased Shares herein provided for is not consummated, the Purchaser shall not use for its own purposes any information, trade secrets or confidential data relating to the Sellers, the Company or the Business, including the customers of the Business, its operations or the methods of conducting the Business, discovered or acquired by the Purchaser, its representatives or auditors, or any of the foregoing as a result of the Sellers making available to the Purchaser or its representatives any information relating to the Sellers, the Company or the Business, and the Purchaser shall not disclose divulge or communicate orally, in writing or otherwise, any such information, trade secrets or confidential data so discovered or acquired to any other person, firm or Company.  Notwithstanding the foregoing, this Section 8.2 shall not apply to: (a) information in the public domain, (b) information acquired by Purchaser from sources other than the Sellers which are not to the knowledge of the Purchaser under any confidentiality obligation of the Sellers or the Company, or (c) information developed by Purchaser or its subsidiaries, associates, affiliates, employees, agents or contractors independently and without reference to information provided by the Sellers hereunder.

**8.3    Arbitration.**  If the Parties do not resolve a dispute respecting any matter contemplated by this Agreement within 20 days of notice of such dispute by the Purchaser to the Sellers or by the Sellers to the Purchaser, the dispute shall be settled by arbitration conducted on a confidential basis under the US Arbitration Act, if applicable, and the then current Commercial Arbitration Rules of the American Arbitration Association (the "Association") strictly in accordance with the terms of this Agreement and the substantive law of the State of California.  Upon submitting the matter to arbitration, the parties shall request that the arbitrator assess the costs of the arbitration to the parties in an equitable manner.  The arbitration shall be conducted at the Association's regional office located in the state and county of San Francisco.  If there is more than one dispute, all disputes shall, to the extent practicable, be combined in one arbitration conducted by one arbitrator. The arbitration shall be conducted by a single arbitrator who is agreed upon by the parties to the dispute or, in the absence of such agreement, selected by the Association and who is either a member of a national accounting firm familiar with businesses engaged in bus transportation or a retired judge.  Judgment upon the arbitrators' award may be entered and enforced in any court of competent jurisdiction.  Neither party shall institute a proceeding hereunder unless at least 60 days prior thereto such party shall have given written notice to the other party of its intent to do so.

**8.4    Expenses.**  The expenses incurred by each party hereto in connection with this Agreement and the transactions provided herein shall be borne by such party and, in particular, all professional fees incurred by the Sellers in connection with the transactions contemplated by this Agreement shall be borne by the Sellers and not charged to the Company so that the Company will bear no expense in connection with this Agreement and the transactions provided for herein.

**8.5    Notices.**  Any notice, direction or other document required or permitted to be given hereunder or for the purposes hereof (hereinafter in this Section 8.4 called a "notice") to any Party shall be in writing and shall be sufficiently given if delivered personally or if transmitted by telex, facsimile or other form of recorded communication tested prior to transmission to such Party:

(a)    in the case of a notice to the Sellers:

        Ryan James Larsen, 146 Hwy 173, Atlantic, IA 50022
        Marsha Louise Madrid, 3744 Kinsale Ln SE, Olympia, WA 98501
        Janet Sue Davis, 6417 N 183rd Av., Wadell, AZ 85355
        Kevin John Dresser, 407 Roanoke St, Ste 2,  Christiansburg, VA 24073

(b)    in the case of a notice to the Purchaser at:

        MV Transportation, Inc.
        360 Campus Lane Suite 201
        Fairfield, CA  94534

        with a facsimile number of (707) 863-8944
        Attention:  General Counsel

or at such other address as the Party to whom such writing is to be given shall have last notified the Party giving the same in the manner provided in this section.  Any notice delivered in person to the Party to whom it is addressed as hereinbefore provided shall be deemed to have been given and received on the day it is so delivered at such address, provided that if such day is not a Business Day then the notice shall be deemed to have been given and received on the first Business Day next following such day.  Any notice transmitted by telex, facsimile or other form of recorded communication shall be deemed given and received on the Business Day of its transmission.

**8.6    Entire Agreement.**  This Agreement, including the Schedules hereto, together with the agreements and other documents to be delivered pursuant hereto, constitute the entire agreement between the Parties pertaining to the subject matter hereof and supersede all prior agreements, understandings, negotiations and discussions, whether oral or written, of the Parties and there are no warranties, representations or other agreements between the Parties in connection with the subject matter hereof except as

specifically set forth herein and therein.

**8.7    Waivers.** No modification, waiver or termination of this Agreement shall be binding unless executed in writing by the Party to be bound thereby. No waiver of any of the provisions of this Agreement, in whole or in part, shall be deemed or shall constitute a waiver of any other provisions hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

**8.8    Applicable Law.** This Agreement and the rights, obligations and relations of the Parties shall be governed by and construed in accordance with the laws in force in the State of California, without regard to provisions concerning conflicts of laws, and the rights and obligations of the parties shall be interpreted accordingly.

Subject to the arbitration provisions herein, the Sellers, Purchaser and the Company agree that exclusive jurisdiction in any action, suit, or proceeding related to any dispute arising under this Agreement and the other agreements relating to this Agreement (for purposes of this Section, a "Dispute") shall be in any United States District Court for the District for the Northern District of California (or, notwithstanding such consent to jurisdiction, if jurisdiction does not lie in said federal court, then the parties consent to jurisdiction of any state court located within such Northern District of California). The Sellers, Purchaser and the Company waive any right to trial by jury or to have a jury participate in resolving any Dispute, whether relating to contract, tort or otherwise.

Subject to the arbitration provisions herein, each of Sellers, Purchaser and the Company hereby consents to the jurisdiction of each United States District Court in the Northern District of California in any action, suit, or proceeding related to a Dispute and agrees that service of process or notice in any such action, suit, or proceeding shall be effective if in writing and sent by certified or registered mail, return receipt requested, postage prepaid, as provided in Section 8.5 of this Agreement.

**8.9    Time.** Time shall be of the essence of this Agreement.

**8.10   Assignment.** Neither this Agreement nor any rights or obligations hereunder shall be assignable by any Parties without the prior written consent of the other Party. Notwithstanding the foregoing, the Purchaser may assign this Agreement to a subsidiary of the Purchaser, without the consent of the Sellers or any other Person, subject to applicable laws. This Agreement shall enure to the benefit of and be binding upon the Parties and their respective successors (including any successor by reason of amalgamation of the Purchaser) and permitted assigns.

**8.11   Further Assurances.** The Parties hereto shall with reasonable diligence do all such things and provide all such reasonable assurances as may be required to consummate the transactions contemplated hereby, and each Party shall provide such further documents or instruments required by any other Party as may be reasonably necessary or desirable to effect the purpose of this Agreement and carry out its provisions, whether before or after the Closing.

**8.12    Severability.**  If any covenant or provision of this Agreement is prohibited in whole or in part in any jurisdiction, such covenant or provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition without invalidating the remaining covenants and provisions hereof and shall, as to such jurisdiction, be deemed to be severed from this Agreement to the extent of such prohibition.

**8.13    Amendments.**  This Agreement may be amended, modified or supplemented only by written instrument duly executed by the Company, the Purchaser and the Sellers except that no such amendment, modification or supplement that imposes an affirmative obligation on a Party shall be binding on such Party unless he, she or it gives its written consent thereto.  Any term or provision of this Agreement may be waived by a written instrument signed by the Purchaser in the case of a term or provision to which the Purchaser is entitled to the benefit or signed by a Seller in the case of a term or provision to which such Seller is entitled to the benefit.

**8.14    Counterparts.**   This Agreement may be executed by the Parties in separate counterparts (and by facsimile transmission) each of which when so executed and transmitted or delivered shall be an original, but all such counterparts shall together constitute one and the same agreement.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF the Parties have hereunto duly executed this Agreement on the date first above written.

_____          _____
Witness                             Ryan James Larsen


_____          _____
Witness                             Janet Sue Davis


_____          _____
Witness                             Marsha Louise Madrid


_____          _____
Witness                             Kevin John Dresser


**LOCAL MOTION ITS, INC.**

By: _____
     Ryan James Larsen, President


**MV TRANSPORTATION, INC.**

By: _____
     Jon Michael Monson, Chief Executive Officer

IN WITNESS WHEREOF the Parties have hereunto duly executed this Agreement on the date first above written.

Witness _____          Ryan James Larsen _____

Witness _____          Janet Sue Davis _____

Witness _____          Marsha Louise Madrid _____

Witness _____          Kevin John Dresser _____

**LOCAL MOTION ITS, INC.**

By: _____
      Ryan James Larsen, President

**MV TRANSPORTATION, INC.**

By: _____
      Jon Michael Monson, Chief Executive Officer

IN WITNESS WHEREOF the Parties have hereunto duly executed this Agreement on the date first above written.

Witness _____          Ryan James Larsen _____

Witness _____          Janet Sue Davis _____

Witness _____          Marsha Louise Madrid _____

Witness _____          Kevin John Dresser _____

**LOCAL MOTION ITS, INC.**

By: _____
Ryan James Larsen, President

**MV TRANSPORTATION, INC.**

By: _____
Jon Michael Monson, Chief Executive Officer

IN WITNESS WHEREOF the Parties have hereunto duly executed this Agreement on the date first above written.

_____          _____
Witness                          Ryan James Larsen


_____          _____
Witness                          Janet Sue Davis

                                 *Marsha Louise Madrid*
_____
Witness                          Marsha Louise Madrid


_____          _____
Witness                          Kevin John Dresser


                                 **LOCAL MOTION ITS, INC.**


                                 By: _____
                                     Ryan James Larsen, President


                                 **MV TRANSPORTATION, INC.**

                                 By _____
                                     Jon Michael Monson, Chief Executive Officer

IN WITNESS WHEREOF the Parties have hereunto duly executed this Agreement on the date first above written.

Witness _____          _____
                                          Ryan James Larsen

Witness _____          _____
                                          Janet Sue Davis

Witness                                   Marsha Louise Madrid

Witness _____          _____
                                          Kevin John Dresser

**LOCAL MOTION ITS, INC.**

By: _____
    Ryan James Larsen, President

**MV TRANSPORTATION, INC.**

By: _____
    Jon Michael Monson, Chief Executive Officer

IN WITNESS WHEREOF the Parties have hereunto duly executed this Agreement on the date first above written.

_____
Witness

_____
Witness

_____
Witness

_____
Witness

_____
Ryan James Larsen

_____
Janet Sue Davis

_____
Marsha Louise Madrid

_____
Kevin John Dresser

**LOCAL MOTION ITS, INC.**

By: _____
    Ryan James Larsen, President

**MV TRANSPORTATION, INC.**

By: _____
    Jon Michael Monson, Chief Executive Officer

# SCHEDULE 2.2

## Schedule 2.2

### Purchase Price Distribution

**Payments**

| | |
|---|---|
| Share Purchase Price | $50,000.00 |
| Non-Competition Agreements | $100,000.00 |
| Estimated Payment for Real Estate | $200,000.00 |
| Estimated Payment for Purchasers Adjustment | $16,500.00 |
| **Total Payments by Purchaser** | $366,500.00 |

**Distribution of Proceeds to Sellers**

| | |
|---|---|
| Escrow Account for Real Estate | $200,000.00 |
| Payment in Full of Marsha Madrid Note | $24,000.00 |
| Payment in Full of Janet Davis Note | $5,000.00 |
| Payment in Full of Kevin Dresser Note | $110,600.00 |
| Payment in Full of Ryan Larsen Note | $26,900.00 |
| Total Distribution of Proceeds | $366,500.00 |

**Distribution of Additional Payment From Escrow Account Upon Receipt of Appraisal of Real Property Pursuant to Section 2.7 of the Share Purchase Agreement**

1. In the event the Appraisal for the Real Property is $150,000.00 or less, 100% of the Additional Payment shall be paid to Kevin John Dresser (the payment being equal to the appraisal amount) from the Escrow Account. The balance of the funds in the Escrow Account shall be returned to Purchaser.

2. With respect to any disbursement to Kevin John Dresser ("Dresser"), Dresser shall not directly receive any funds pursuant to this Agreement. All of Dresser's funds shall be held by the law firm Gaw, Van Male, Smith, Myers, and Miroglio (the escrow agent) under section 1031 of the Internal Revenue Code on behalf of Dresser. Escrow Agent will be notified by



## Schedule 2.2

### Purchase Price Distribution

**Payments**

| | |
|---|---|
| Share Purchase Price | $50,000.00 |
| Non-Competition Agreements | $100,000.00 |
| Estimated Payment for Real Estate | $200,000.00 |
| Estimated Payment for Purchasers Adjustment | $16,500.00 |
| | |
| Total Payments by Purchaser | $366,500.00 |

**Distribution of Proceeds to Sellers**

| | |
|---|---|
| Escrow Account for Real Estate | $200,000.00 |
| Payment in Full of Marsha Madrid Note | $24,000.00 |
| Payment in Full of Janet Davis Note | $5,000.00 |
| Payment in Full of Kevin Dresser Note | $110,600.00 |
| Payment in Full of Ryan Larsen Note | $26,900.00 |
| | |
| Total Distribution of Proceeds | $366,500.00 |

**Distribution of Additional Payment From Escrow Account Upon Receipt of Appraisal of Real Property Pursuant to Section 2.7 of the Share Purchase Agreement**

1. In the event the Appraisal for the Real Property is $150,000.00 or less, 100% of the Additional Payment shall be paid to Kevin John Dresser (the payment being equal to the appraisal amount) from the Escrow Account. The balance of the funds in the Escrow Account shall be returned to Purchaser.

2. With respect to any disbursement to Kevin John Dresser ("Dresser"), Dresser shall not directly receive any funds pursuant to this Agreement. All of Dresser's funds shall be held by the law firm Gaw, Van Male, Smith, Myers, and Miroglio (the escrow agent) under section 1031 of the Internal Revenue Code on behalf of Dresser. Escrow Agent will be notified by



## Schedule 2.2

### Purchase Price Distribution

**Payments**

| | |
|---|---|
| Share Purchase Price | $50,000.00 |
| Non-Competition Agreements | $100,000.00 |
| Estimated Payment for Real Estate | $200,000.00 |
| Estimated Payment for Purchasers Adjustment | $16,500.00 |
| **Total Payments by Purchaser** | **$366,500.00** |

**Distribution of Proceeds to Sellers**

| | |
|---|---|
| Escrow Account for Real Estate | $200,000.00 |
| Payment in Full of Marsha Madrid Note | $24,000.00 |
| Payment in Full of Janet Davis Note | $5,000.00 |
| Payment in Full of Kevin Dresser Note | $110,600.00 |
| Payment in Full of Ryan Larsen Note | $26,900.00 |
| **Total Distribution of Proceeds** | **$366,500.00** |

**Distribution of Additional Payment From Escrow Account Upon Receipt of Appraisal of Real Property Pursuant to Section 2.7 of the Share Purchase Agreement**

1. In the event the Appraisal for the Real Property is $150,000.00 or less, 100% of the Additional Payment shall be paid to Kevin John Dresser (the payment being equal to the appraisal amount) from the Escrow Account. The balance of the funds in the Escrow Account shall be returned to Purchaser.

2. With respect to any disbursement to Kevin John Dresser ("Dresser"), Dresser shall not directly receive any funds pursuant to this Agreement. All of Dresser's funds shall be held by the law firm Gaw, Van Male, Smith, Myers, and Miroglio (the escrow agent) under section 1031 of the Internal Revenue Code on behalf of Dresser. Escrow Agent will be notified by

## Schedule 2.2

## Purchase Price Distribution

**Payments**

| | |
|---|---|
| Share Purchase Price | $50,000.00 |
| Non-Competition Agreements | $100,000.00 |
| Estimated Payment for Real Estate | $200,000.00 |
| Estimated Payment for Purchasers Adjustment | $16,500.00 |
| | |
| Total Payments by Purchaser | $366,500.00 |

**Distribution of Proceeds to Sellers**

| | |
|---|---|
| Escrow Account for Real Estate | $200,000.00 |
| Payment in Full of Marsha Madrid Note | $24,000.00 |
| Payment in Full of Janet Davis Note | $5,000.00 |
| Payment in Full of Kevin Dresser Note | $110,600.00 |
| Payment in Full of Ryan Larsen Note | $26,900.00 |
| | |
| Total Distribution of Proceeds | $366,500.00 |

**Distribution of Additional Payment From Escrow Account Upon Receipt of Appraisal of Real Property Pursuant to Section 2.7 of the Share Purchase Agreement**

1. In the event the Appraisal for the Real Property is $150,000.00 or less, 100% of the Additional Payment shall be paid to Kevin John Dresser (the payment being equal to the appraisal amount) from the Escrow Account. The balance of the funds in the Escrow Account shall be returned to Purchaser.

2. With respect to any disbursement to Kevin John Dresser ("Dresser"), Dresser shall not directly receive any funds pursuant to this Agreement. All of Dresser's funds shall be held by the law firm Gaw, Van Male, Smith, Myers, and Miroglio (the escrow agent) under section 1031 of the Internal Revenue Code on behalf of Dresser. Escrow Agent will be notified by

## Schedule 2.2

### Purchase Price Distribution

**Payments**

| | |
|---|---:|
| Share Purchase Price | $50,000.00 |
| Non-Competition Agreements | $100,000.00 |
| Estimated Payment for Real Estate | $200,000.00 |
| Estimated Payment for Purchasers Adjustment | $16,500.00 |
| | |
| Total Payments by Purchaser | $366,500.00 |

**Distribution of Proceeds to Sellers**

| | |
|---|---:|
| Escrow Account for Real Estate | $200,000.00 |
| Payment in Full of Marsha Madrid Note | $24,000.00 |
| Payment in Full of Janet Davis Note | $5,000.00 |
| Payment in Full of Kevin Dresser Note | $110,600.00 |
| Payment in Full of Ryan Larsen Note | $26,900.00 |
| | |
| Total Distribution of Proceeds | $366,500.00 |

**Distribution of Additional Payment From Escrow Account Upon Receipt of Appraisal of Real Property Pursuant to Section 2.7 of the Share Purchase Agreement**

1. In the event the Appraisal for the Real Property is $150,000.00 or less, 100% of the Additional Payment shall be paid to Kevin John Dresser (the payment being equal to the appraisal amount) from the Escrow Account. The balance of the funds in the Escrow Account shall be returned to Purchaser.

2. With respect to any disbursement to Kevin John Dresser ("Dresser"), Dresser shall not directly receive any funds pursuant to this Agreement. All of Dresser's funds shall be held by the law firm Gaw, Van Male, Smith, Myers, and Miroglio (the escrow agent) under section 1031 of the Internal Revenue Code on behalf of Dresser. Escrow Agent will be notified by



Dresser's legal representative, John Dalton, P.C., as to where to move money due to seller upon a completed and acceptable appraisal.

3.  In the event the Appraisal for the Real Property is $150,000.01 or greater, then a payment of $150,000.00 shall be made to Kevin John Dresser and the amount of the appraisal in excess of $150,000.00 shall be divided and paid equally to Ryan John Larsen, Marsha Louise Madrid and Janet Sue Davis.  The balance of the funds in the Escrow Account shall be returned to Purchaser.



Dresser's legal representative, John Dalton, P.C., as to where to move money due to seller upon a completed and acceptable appraisal.

3. In the event the Appraisal for the Real Property is $150,000.01 or greater, then a payment of $150,000.00 shall be made to Kevin John Dresser and the amount of the appraisal in excess of $150,000.00 shall be divided and paid equally to Ryan John Larsen, Marsha Louise Madrid and Janet Sue Davis. The balance of the funds in the Escrow Account shall be returned to Purchaser.



Dresser's legal representative, John Dalton, P.C.; as to where to move money due to seller upon a completed and acceptable appraisal.

3. In the event the Appraisal for the Real Property is $150,000.01 or greater, then a payment of $150,000.00 shall be made to Kevin John Dresser and the amount of the appraisal in excess of $150,000.00 shall be divided and paid equally to Ryan John Larsen, Marsha Louise Madrid and Janet Sue Davis. The balance of the funds in the Escrow Account shall be returned to Purchaser.

12/5/03

Dresser's legal representative, John Dalton, P.C., as to where to move money due to seller upon a completed and acceptable appraisal.

3.  In the event the Appraisal for the Real Property is $150,000.01 or greater, then a payment of $150,000.00 shall be made to Kevin John Dresser and the amount of the appraisal in excess of $150,000.00 shall be divided and paid equally to Ryan John Larsen, Marsha Louise Madrid and Janet Sue Davis.  The balance of the funds in the Escrow Account shall be returned to Purchaser.

12/05/03

Dresser's legal representative, John Dalton, P.C., as to where to move money due to seller upon a completed and acceptable appraisal.

3. In the event the Appraisal for the Real Property is $150,000.01 or greater, then a payment of $150,000.00 shall be made to Kevin John Dresser and the amount of the appraisal in excess of $150,000.00 shall be divided and paid equally to Ryan John Larsen, Marsha Louise Madrid and Janet Sue Davis. The balance of the funds in the Escrow Account shall be returned to Purchaser.

K.D.

# SCHEDULE 2.8(a)

LOCAL MOTION ITS, INC.
2003 STOCK OPTION PLAN

1.  **Adoption and Purpose of the Plan**.  This stock option plan, to be known as the "Local Motion ITS 2003 Stock Option Plan" (but referred to herein as the "**Plan**") has been adopted by the Board of Directors (the "**Board**") of Local Motion ITS, Inc., a Virginia corporation (the "**Company**"), and is subject to the approval of its shareholders pursuant to section 7 below.  The purpose of this Plan is to advance the interests of the Company and its shareholders by enabling the Company to attract and retain qualified directors, officers, employees and certain independent contractors, consultants and advisors by providing them with an opportunity for investment in the Company.  The options that may be granted hereunder ("**Options**") represent the right by the grantee thereof (each, including any permitted transferee pursuant to section 6.7 below, an "**Optionee**") to acquire shares of the Company's common stock ("**Shares**" which if acquired pursuant to the exercise of an Option will be referred to as "**Option Shares**") subject to the terms and conditions of this Plan and a written agreement between the Company and the Optionee to evidence each such Option (an "**Option Agreement**").

2.  **Certain Definitions**.  The defined terms set forth in Exhibit A attached hereto and incorporated herein (together with other capitalized terms defined elsewhere in this Plan) will govern the interpretation of this Plan.

3.  **Eligibility**.  The Company may grant Options under this Plan only to (i) persons who, at the time of such grant, are directors, officers or employees of the Company and/or any of its Subsidiaries, (ii) former officers and lenders of the Company and (iii) natural persons who, at the time of such grant, are independent contractors, consultants or advisors to the Company and/or any of its Subsidiaries and who perform bona fide services on its behalf other than in connection with capital raising transactions (collectively, "**Eligible Participants**").  No person will be an Eligible Participant following his or her "Termination of Eligibility Status" as defined in Exhibit "A" hereto, and no Option may be granted to any person other than an Eligible Participant.

4.  **Option Pool; Shares Reserved for Options**.  In no event (except as provided in Section 8) will the Company issue, in the aggregate, more than Two Hundred Eighty Seven (287) Shares (the "**Option Pool**") pursuant to the exercise of all Options granted under this Plan, inclusive of those Option Shares that may be reacquired by the Company by repurchase or otherwise.  At all times while Options granted under this Plan are outstanding, the Company will reserve for issuance for the purposes hereof a sufficient number of authorized and unissued Shares to fully satisfy the Company's obligations under all such outstanding Options.

5.  **Administration**.  This Plan will be administered and interpreted by the

Board, or by a committee consisting of two or more members of the Board, appointed by the Board for such purpose (the Board, or such committee, referred to herein as the "**Administrator**"). Subject to the express terms and conditions hereof, the Administrator is authorized to prescribe, amend and rescind rules and regulations relating to this Plan, and to make all other determinations necessary or advisable for its administration and interpretation. Specifically, the Administrator will have full and final authority in its discretion, subject to the specific limitations on that discretion as are set forth herein and in the Certificate of Incorporation and Bylaws of the Company, at any time:

(a) to select and approve the Eligible Participants to whom Options will be granted from time to time hereunder;

(b) to determine the Fair Market Value of the Shares as of the Grant Date for any Option that is granted hereunder;

(c) with respect to each Option it decides to grant, to determine the terms and conditions of that Option, to be set forth in the Option Agreement evidencing that Option (the form of which also being subject to approval by the Administrator), which may vary from the "default" terms and conditions set forth in section 6 below, except to the extent otherwise provided in this Plan and to make any amendments to such Option Agreement as may also be agreed upon by the Optionee, including, without limitation, as follows:

(i) the total number of Option Shares that may be acquired by the Optionee pursuant to the Option;

(ii) if the Option satisfies the conditions under Section 422(b) of the Code, whether the Option will be treated as an ISO to the maximum extent permissible under the Code;

(iii) the per share purchase price to be paid to the Company by the Optionee to acquire the Option Shares issuable upon exercise of the Option (the "**Option Price**"), *provided that* the Option Price will not be less than 85% of the Fair Market Value of the Shares as of the Grant Date (not less than 100% of the Fair Market Value of the Shares as of the Grant Date in the case of ISO's), unless the Optionee is a 10% Shareholder, in which case the Option Price will not be less than 110% of such Fair Market Value;

(iv) the maximum period or term during which the Option will be exercisable (the "**Option Term**"), *provided that* in no event may the Option Term be longer than 10 years from the Grant Date;

(v) the maximum period following any Termination of Eligibility Status, whether resulting from an Optionee's death, Disability or any other reason, during which period (the "**Grace**

Period") the Option will be exercisable, subject to Vesting and to the expiration of the Option Term, *provided that* in no event may the Administrator designate a Grace Period that is shorter than six (6) months after such Termination of Eligibility Status by reason of the Optionee's death, or thirty (30) days after such Termination of Eligibility for any other reason, except in the event of a Termination for Cause, in which case no Grace Period will be required (i.e., the Option would terminate immediately);

(vi)    whether to accept a promissory note or other form of legal consideration in addition to cash as payment of all or a portion of the Option Price and/or Tax Withholding Liability to be paid by the Optionee upon the exercise of an Option granted hereunder;

(vii)    the conditions (e.g., the passage of time or the occurrence of events), if any, that must be satisfied prior to the vesting of the right to exercise all or specified portions of an Option (such portions being described as the number of Option Shares, or the percentage of the total number of Option Shares that may be acquired by the Optionee pursuant to the Option; the vested portion being referred to as a "**Vested Option**" and the unvested portion being referred to as an "**Unvested Option**"), *provided that* no such conditions (except an Optionee's Termination of Eligibility Status, after which no Unvested Option will become a Vested Option) may be imposed which prevents an Optionee who is an employee, but who is neither an officer or director, of the Company or any of its Subsidiaries, from purchasing at least 20% of the Option Shares initially subject to the Option as of the first anniversary of the Grant Date, and as of each anniversary thereafter, such that by the fifth anniversary of the Grant Date (assuming no such Termination of Eligibility Status) the entire Option would be deemed a Vested Option; and (viii)    in addition, or as an alternative, to imposing conditions on the right to exercise an Option as provided in section 5(c)(vii) above, whether any portion of the Option Shares acquired by an Optionee upon exercise of an Option will be subject to repurchase by the Company or its assigns pursuant to section 6.8(c) below at the Option Price paid for such Shares or at some other price that may be less than the Fair Market Value of such Shares (such Shares, if subject to repurchase at less than Fair Market Value, being referred to as "**Unvested Shares**") following a Termination of Eligibility Status or other designated event, and the conditions (e.g., the passage of time or the occurrence of events), if any, that must be satisfied for such Shares to be no longer subject to such right of repurchase at less than Fair Market Value (such Shares being referred to as "**Vested Shares**"); *provided that* no such conditions (except an Optionee's Termination of Eligibility Status, after which no Unvested Shares will become

Vested Shares) may be imposed which prevent Unvested Shares held by an employee, who is neither an officer or director, of the Company and/or any of its Subsidiaries, from becoming Vested Shares at the rate of at least twenty percent (20%) per year following the Grant Date, such that by the fifth anniversary of the Grant Date (assuming no earlier Termination of Eligibility Status) all of the Shares would be deemed Vested Shares; and

(d)  to delegate all or a portion of the Administrator's authority under sections 5(a), (b) and (c) above to one or more members of the Board who also are executive officers of the Company, subject to such restrictions and limitations as the Administrator may decide to impose on such delegation.

6.  **Default Terms and Conditions of Option Agreements**.  Unless otherwise expressly provided in an Option Agreement based on the Administrator's determination pursuant to section 5(c) above, the following terms and conditions will be deemed to apply to each Option as if expressly set forth in the Option Agreement:

6.1  ISO.  No portion of an Option will be treated as an ISO unless treatment as an ISO is expressly provided for in an Option Agreement and such portion of the Option satisfies the conditions of Section 422(b) of the Code.

6.2  Option Term.  The Option Term will be for a period of ten (10) years beginning on the Grant Date, except that in the case of an ISO granted to a 10% Shareholder, the Option Term will be for a period of five (5) years beginning on the Grant Date.

6.3  Grace Periods.  The Company shall not be obligated to notify any Optionee as to the expiration of a Grace Period.  Following a Termination of Eligibility Status:

(a) the Grace Period will be thirty (30) days, unless the Termination of Eligibility Status is a result of a Termination for Cause or the death of the Optionee;

(b) the Grace Period will be one (1) year if the Termination of Eligibility Status is a result of the death of the Optionee; and

(c) the Option will terminate, and there will be no Grace Period, effective immediately as of the date and time of a Termination for Cause of the Optionee, regardless of whether the Option is Vested or Unvested.

6.4  Vesting.  The Option initially will be deemed an entirely Unvested Option, but the Option will become a fully Vested Option as of December 31, 2006 (the "**Vesting Date**"); *provided that* there will be no vesting on such date if the Optionee suffers a Termination of Eligibility Status prior to such date.

6.5 <u>Exercise of the Option; Issuance of Share Certificate</u>.

(a) The portion of the Option that is a Vested Option may be exercised by giving written notice thereof to the Company, on such form as may be specified by the Administrator, but in any event stating: the Optionee's intention to exercise the Option; the date of exercise; the number of full Option Shares to be purchased; the amount and form of payment of the Option Price; and such assurances of the Optionee's investment intent as the Company may require to ensure that the transaction complies in all respects with the requirements of the 1933 Act and other applicable securities laws. The notice of exercise will be signed by the person or persons exercising the Option. In the event that the Option is being exercised by the representative of the Optionee, the notice will be accompanied by proof satisfactory to the Company of the representative's right to exercise the Option. The notice of exercise will be accompanied by full payment of the Option Price for the number of Option Shares to be purchased, in United States dollars, in cash, by check made payable to the Company, or by delivery of such other form of payment (if any) as may be approved by the Administrator in the particular case. The Option may not be exercised until it becomes a Vested Option.

(b) To the extent required by applicable federal, state, local or foreign law, and as a condition to the Company's obligation to issue any Shares upon the exercise of the Option in full or in part, the Optionee will make arrangements satisfactory to the Company for the payment of any applicable Tax Withholding Liability that may arise by reason of or in connection with such exercise. Such arrangements may include, in the Company's sole discretion, that the Optionee tender to the Company the amount of such Tax Withholding Liability, in cash, by check made payable to the Company, or by delivery of such other form of payment (if any) as may be approved by the Administrator in the particular case.

(c) After receiving a proper notice of exercise and payment of the applicable Option Price and Tax Withholding Liability, the Company will cause to be issued a certificate or certificates for the Option Shares as to which the Option has been exercised, registered in the name of the person rightfully exercising the Option and the Company will cause such certificate or certificates to be delivered to such person or into escrow as provided in section 6.8(d), below.

6.6 <u>Compliance with Law</u>. Notwithstanding any other provision of this Plan, Options may be granted pursuant to this Plan, and Option Shares may be issued pursuant to the exercise thereof by an Optionee, only after and on the condition that there has been compliance with all applicable federal and state securities laws. The Company will not be required to list, register or qualify any Option Shares upon any securities exchange, under any applicable state, federal or foreign law or regulation, or with the Securities and Exchange Commission or

any state agency, or secure the consent or approval of any governmental regulatory authority, except that if at any time the Board determines, in its discretion, that such listing, registration or qualification of the Option Shares, or any such consent or approval, is necessary or desirable as a condition of or in connection with the exercise of an Option and the purchase of Option Shares thereunder, that Option may not be exercised, in whole or in part, unless and until such listing, registration, qualification, consent or approval is effected or obtained free of any conditions that are not acceptable to the Board, in its discretion. However, the Company will seek to register or qualify with, or as may be provided by applicable local law, file for and secure an exemption from such registration or qualification requirements from, the applicable securities administrator and other officials of each jurisdiction in which an Eligible Participant would be granted an Option hereunder prior to such grant.

6.7 <u>Restrictions on Transfer</u>.

(a) <u>Options Nontransferable</u>. No Option will be transferable by an Optionee other than by will or the laws of descent and distribution. During the lifetime of a natural person who is granted an Option under this Plan, the Option will be exercisable only by him or her. Notwithstanding anything else in this Plan to the contrary, no Option Agreement will contain any provision which is contrary to, or which modifies, the provisions of this section 6.7(a).

(b) <u>Prohibited Transfers</u>. Prior to the Initial Public Offering, no Holder of any Option Shares may Transfer such Shares, or any interest therein: (i) except as expressly provided in this Plan; and (ii) other than in full compliance with all applicable securities laws and any applicable restrictions on Transfer provided in the Company's Certificate of Incorporation and/or Bylaws, which will be deemed incorporated by reference into this Plan. All Transfers of Option Shares not complying with the specific limitations and conditions set forth in this section 6.7 and section 6.8 below are expressly prohibited. Any prohibited Transfer is void and of no effect, and no purported transferee in connection therewith will be recognized as a Holder of Option Shares for any purpose whatsoever. Should such a Transfer purport to occur, the Company may refuse to carry out the Transfer on its books, attempt to set aside the Transfer, enforce any undertakings or rights under this Plan, or exercise any other legal or equitable remedy.

(c) <u>Permitted Transfers</u>. In the case of a Permitted Transfer, the rights of first refusal and purchase of the Company set forth in sections 6.8(a) and 6.8(b) below will not apply. For such purposes, a "**Permitted Transfer**" means any of the following: (i) a Transfer by will or under the laws of descent and distribution; or (ii) a Transfer by a Holder of Option Shares to his or her ancestors, descendants or spouse (other than pursuant to a decree of divorce, dissolution or separate maintenance, a

property settlement, or a separation agreement or any similar agreement or arrangement with a spouse, except for *bona fide* estate planning purposes), or to a trust, partnership, limited liability company, custodianship or other fiduciary account for the benefit of the Holder and/or such ancestors, descendants or spouse, including any Transfer in the form of a distribution from any such trust, partnership, limited liability company, custodianship or other fiduciary account to any of the foregoing permitted beneficial owners or beneficiaries thereof.

(d)  <u>Conditions to Transfer</u>.  It will be a condition to any Transfer of any Option Shares that:

(i)  the transferee of the Shares will execute such documents as the Company may reasonably require to ensure that the Company's rights under this Plan, and any applicable Option Agreement, are adequately protected with respect to such Shares, including, without limitation, the transferee's agreement to be bound by all of the terms and conditions of this Plan and such Agreement, as if he or she were the original Holder of such Shares; and

(ii)  the Company is satisfied that such Transfer complies in all respects with the requirements imposed by applicable state and federal securities laws and regulations.

(e)  <u>Market Standoff</u>.  If in connection with any public offering of securities of the Company (or any Successor Entity), the underwriter or underwriters managing such offering so requests, then each Optionee and each Holder of Option Shares will agree to not sell or otherwise Transfer any such Shares (other than Shares if and to the extent included in such underwriting) without the prior written consent of such underwriter, for such period of time as may be requested by the underwriter commencing on the effective date of the registration statement filed with the Securities and Exchange Commission in connection with such offering, and will agree to cooperate with such underwriter to execute any related documentation as required by such underwriter.

6.8  <u>Rights of Purchase and First Refusal</u>.  The Company will have the following rights of purchase and first refusal with respect to Option Shares:

(a)  <u>Right of First Refusal</u>.  If any Holder proposes to Transfer any Option Shares prior to the Initial Public Offering, other than in the case of a Permitted Transfer pursuant to section 6.7(c) above or an Involuntary or Donative Transfer subject to section 6.8(b) below, the Company will have an assignable right of first refusal to purchase such Shares on the terms and conditions set out in this section 6.8(a).  If the Company (or its assignee) elects to exercise all or part of such right, it will

do so with respect to any particular Transfer of Shares in the following manner:

(i) Before any such Transfer, the Holder proposing to Transfer such Shares will deliver a notice of proposed Transfer (a "**Proposed Transfer Notice**") to the Company stating: the number of Option Shares that the Holder proposes to Transfer and the Holder's *bona fide* intention to Transfer such Shares; the names and addresses of the Holder, the proposed transferee and subsequently such other information regarding such transferee as the Company reasonably requests; the manner and date of such proposed Transfer; and the *bona fide* cash price and/or other consideration (and the fair market value thereof) per share, if any, that such Transferee has offered to pay Holder for such Shares (the "**Offered Price**") as well as such other terms, including payment terms, and conditions, if any, as were included in such offer (the "**Offered Terms**").

(ii) The Company (or its assignee) may exercise its right of first refusal under this section 6.8(a) at any time not more than thirty (30) days after the Company has received the Proposed Transfer Notice with respect to such Shares. If the Company (or its assignee) elects to exercise such purchase rights it will do so by delivering to the Holder of such Shares a notice of such election, specifying the number of Shares to be purchased and a closing date that is no more than thirty (30) days after receipt of the Proposed Transfer Notice (or such later date as the transferee may have offered or on which the Transfer is otherwise scheduled to occur).

(iii) At the closing of the sale of the Shares to the Company (or its assignee), to be held at its principal executive offices, the Company (or its assignee) will pay the Holder of the Shares, in cash, the purchase price equal to the Offered Price (*provided, however, that* if the Shares being transferred are Unvested Shares, the purchase price will equal the Option Price per Share paid upon the exercise of the Option to purchase such Unvested Shares), subject to an appropriate adjustment as determined in good faith by the Company to take into account any deferred payment terms that were included in the Offered Terms, except in the case of a Transfer of Option Shares without consideration; *provided that* if the Offered Price includes any non-cash consideration, the value thereof for purposes of this section 6.8(a) will be determined in good faith by the Board.

(iv) If the Company (including its assignees) fails or refuses to exercise its rights under this section 6.8(a) with respect

to any Shares that are the subject of any Proposed Transfer Notice, then the Holder will have the right to Transfer such Shares to the transferee named in such Notice at the Offered Price and upon such Offered Terms as were set forth in such Notice; *provided that* such Transfer must be completed within ninety (90) days after the Company has received the Proposed Transfer Notice with respect to such Shares.

(b)    Following an Involuntary or Donative Transfer. Following any Involuntary Transfer or Donative Transfer (other than a Permitted Transfer) of Option Shares (the "**Transferred Shares**") prior to the Initial Public Offering, the Company will have the assignable right to purchase from the transferee of the Transferred Shares ("**Transferee**") all or a portion of such Shares for a purchase price that is equal to the Fair Market Value of those Shares as of the date of such Transfer (*provided, however, that* if the Shares being transferred are Unvested Shares, the purchase price will equal the Option Price per Share paid upon the exercise of the Option to purchase such Unvested Shares).    If the Company (or its assignee) elects to exercise such right, it will do so in the following manner:

(i)    Promptly after such Transfer, the transferor of the Transferred Shares will deliver, or will cause the Transferee to deliver, a notice (a "**Completed Transfer Notice**") to the Company stating:    the number of Transferred Shares; the names and addresses of the transferor and the Transferee, and subsequently such other information regarding the Transferee as the Company reasonably requests; and the manner, circumstances and date of such Transfer.

(ii)    The Company (or its assignee) may exercise its purchase rights under this section 6.8(b) at any time not more than ninety (90) days after the Company has received the Completed Transfer Notice with respect to the Transferred Shares.    If the Company (or its assignee) elects to exercise such purchase rights it will do so by delivering to the Transferee a notice of such election, specifying the number of Transferred Shares to be purchased and a closing date that is no more than sixty (60) days after the giving of such notice.

(iii)    At such closing, to be held at the Company's principal executive offices, the Company (or its assignee) will pay the Transferee the purchase price specified in this section 6.8(b).

(c)    Following a Termination of Eligibility Status.    Following any Termination of Eligibility Status of the original Holder of any Option Shares, the Company will have the assignable right (but not the obligation)

to purchase from the current Holder of those Option Shares (except to the extent that such Shares previously were transferred in a transaction as to which section 6.8(a) or (b) applied), all or a portion of such Shares, if any, that are Unvested Shares as of the date of Termination of Eligibility Status for a purchase price that is equal to the Option Price per Share payable for those Shares upon the exercise of the Option.  Such right will be exercisable in the following manner:

(i)   The Company (or its assignee) may exercise its right of repurchase under this section 6.8(c) at any time not more than ninety (90) days after the effective date of such Termination of Eligibility Status (or in the case of Shares issued upon the exercise of Options after such Termination of Eligibility Status, a period of ninety (90) days after the date of the exercise).  If the Company (or its assignee) elects to exercise such purchase rights it will do so by delivering to the Holder of such Shares a notice of such election, specifying the number of Shares to be purchased and a closing date that is within such ninety (90) day period, *provided that* if the Holder of the Shares is not an employee of the Company or any of its Subsidiaries, or is an officer, director or affiliate thereof, the Option Agreement may provide that the period during which such purchase of the Shares must take place may be longer than ninety (90) days.

(ii)   At such closing, the Company (or its assignee) will pay the Holder of the Shares the purchase price, as specified in this section 6.8(c), in cash, or by cancellation of indebtedness to the Company, if any, incurred by the original Holder of the Option Shares to purchase such Shares, or both, at a closing to be held at the Company's principal executive offices on the date specified in such notice, *provided that* if the Holder of the Shares is not an employee of the Company or any of its Subsidiaries, or is an officer, director or affiliate thereof, the Option Agreement may provide that the purchase price may be paid, in whole or in part, with a promissory note from the Company (or its assignee).

(d)   Escrow.  For purposes of facilitating the enforcement of the restrictions on Transfer set forth in this Plan or in any Option Agreement, the Administrator may, at its discretion, require the Holder of Option Shares to deliver the certificate(s) for such Shares with a stock power executed by him or her and by his or her spouse (if required for Transfer), in blank, to the Secretary of the Company or his or her designee, to hold said certificate(s) and stock power(s) in escrow and to take all such actions and to effectuate all such Transfers and/or releases as are in accordance with the terms of this Plan.  The certificates may be held in escrow so long as the Option Shares whose ownership they evidence are subject to any right of repurchase or first refusal under this

Plan or under an Option Agreement, and will be released by the escrow holder to an Optionee (or to any permitted transferee of the Optionee) when they are no longer subject to any right of repurchase or first refusal under this Plan or under the Option Agreement. Each Optionee, by exercising an Option, thereby acknowledges that the Secretary of the Company (or his or her designee) is so appointed as the escrow holder with the foregoing authorities as a material inducement to the grant of an Option under this Plan, that the appointment is coupled with an interest, and that it accordingly will be irrevocable. The escrow holder will not be liable to any party to an Option Agreement (or to any other party) for any actions or omissions unless the escrow holder is grossly negligent relative thereto. The escrow holder may rely upon any letter, notice or other document executed by any signature purported to be genuine.

(e) <u>Resolution of Disputes</u>. If there is a dispute concerning the fair market value of the consideration offered or accepted for the Option Shares or the Fair Market Value of the Option Shares, in connection with the exercise by the Company of its rights under this section 6.8, the dispute will be resolved by the independent certified public accounting firm that audited or prepared without audit the Company's last regular annual financial statement and the determination of that firm will be binding on the parties in the absence of fraud.

6.9  <u>Change of Control Transactions</u>. In the event of a Change of Control Transaction, the Company shall endeavor to cause the Successor Entity in such transaction either to assume all of the Options which have been granted hereunder and which are outstanding as of the consummation of such transaction ("**Closing**"), or to issue (or cause to be issued) in substitution thereof comparable options of such Successor Entity (or of its parent or its Subsidiary), in each case each Option Agreement automatically will be deemed amended to conform to any such assumption or substitution. If the Successor Entity is unwilling to either assume such Options or grant comparable options in substitution for such Options, on terms that are acceptable to the Company as determined by the Board in the exercise of its discretion, then the Board may cancel all outstanding Options, and terminate this Plan, effective as of the Closing, *provided that* it will notify all Optionees of the proposed Change of Control Transaction a reasonable amount of time prior to the Closing so that each Optionee will be given the opportunity to exercise the Vested portion of his or her Option prior to the Closing. Any Unvested Options will Vest under this scenario and the Optionees will be given the opportunity to exercise the Vested Options prior to the Closing.  (Additionally we need to deal with any dividends that would have been earned per our earn-out agreement but haven't been strictly because the 3 years wasn't up, i.e. we have made > 1000000 but it is only 2 years into the deal when the company is sold to a 3rd party)

For purposes of this section 6.9, the term "**Change of Control Transaction**" means a Business Combination in which less than fifty percent (50%) of the

outstanding voting securities of the Successor Entity immediately following the Closing of the Business Combination transaction are beneficially held by those persons and entities who beneficially held the voting securities of the Company immediately prior to such transaction as a result of or in exchange for such voting securities of the Company held immediately prior to such transaction; the term "**Business Combination**" means a transaction or series of related transactions consummated within any period of ninety (90) days resulting in (A) the sale of all or substantially all of the assets of the Company, or (B) a merger or consolidation or other reorganization in which the Company or a Subsidiary is a party.

6.10    Additional Restrictions on Transfer; Investment Intent.    By accepting an Option and/or Option Shares under this Plan, the Optionee will be deemed to represent, warrant and agree that, unless a registration statement is in effect with respect to the offer and sale of Option Shares: (i) neither the Option nor any such Shares will be freely tradable and must be held indefinitely unless such Option and such Shares are either registered under the 1933 Act or an exemption from such registration is available; (ii) the Company is under no obligation to register the Option or any such Shares; (iii) upon exercise of the Option, the Optionee will purchase the Option Shares for his or her own account and not with a view to distribution within the meaning of the 1933 Act, other than as may be effected in compliance with the 1933 Act and the rules and regulations promulgated thereunder; (iv) no one else will have any beneficial interest in the Option Shares; (v) the Optionee has no present intention of disposing of the Option Shares at any particular time; and (vi) neither the Option nor the Shares have been qualified under the securities laws of any state and may only be offered and sold pursuant to an exception from qualification under applicable state securities laws.

6.11    Stock Certificates; Legends.    Certificates representing Option Shares will bear all legends required by law and necessary or appropriate in the Administrator's discretion to effectuate the provisions of this Plan and of the applicable Option Agreement.    The Company may place a "stop transfer" order against Option Shares until full compliance with all restrictions and conditions set forth in this Plan, in any applicable Option Agreement and in the legends referred to in this section 6.11.

6.12    Notices.    Any notice to be given to the Company under the terms of an Option Agreement will be addressed to the Company at its principal executive office, Attention:  Corporate Secretary, or at such other address as the Company may designate in writing.    Any notice to be given to an Optionee will be addressed to him or her at the address provided to the Company by the Optionee.    Any such notice will be deemed to have been duly given if and when enclosed in a properly sealed envelope, addressed as aforesaid, deposited, postage prepaid, in a post office or branch post office regularly maintained by the local postal authority.

6.13  <u>Other Provisions</u>.  Each Option Agreement may contain such other terms, provisions and conditions, including restrictions on the Transfer of Option Shares, and rights of the Company to repurchase such Shares, not inconsistent with this Plan and applicable law, as may be determined by the Administrator in its sole discretion.

6.14  <u>Specific Performance</u>.  Under those circumstances in which the Company chooses to timely exercise its rights to repurchase Option Shares as provided herein or in any Option Agreement, the Company will be entitled to receive such Shares *in specie* in order to have the same available for future issuance without dilution of the holdings of other shareholders of the Company. By accepting Option Shares, the Holder thereof therefore acknowledges and agrees that money damages will be inadequate to compensate the Company and its shareholders if such a repurchase is not completed as contemplated hereunder and that the Company will, in such case, be entitled to a decree of specific performance of the terms hereof or to an injunction restraining such holder (or such Holder's personal representative) from violating this Plan or the relevant Option Agreement, in addition to any other remedies that may be available to the Company at law or in equity.

7.  **Term of the Plan**.  This Plan will become effective on the date of its adoption by the Board, *provided that* this Plan is approved by the shareholders of the Company (excluding Option Shares issued by the Company pursuant to the exercise of Options granted under this Plan) within 12 months before or after that date.  If this Plan is not so approved by the shareholders of the Company within that 12-month period of time, any Options granted under this Plan will be rescinded and will be void.  This Plan will expire on December 31, 2006, unless it is terminated earlier pursuant to section 11 of this Plan, after which no more Options may be granted under this Plan, although all outstanding Options granted prior to such expiration or termination will remain subject to the provisions of this Plan, and no such expiration or termination of this Plan will result in the expiration or termination of any such Option prior to the expiration or early termination of the applicable Option Term.

8.  **Adjustments Upon Changes in Stock**.  In the event of any change in the outstanding Shares of the Company as a result of a stock split, reverse stock split, stock bonus or distribution, recapitalization, combination or reclassification, appropriate proportionate adjustments will be made in:  (i) the aggregate number of Shares that are reserved for issuance in the Option Pool pursuant to section 4 above, under outstanding Options or future Options granted hereunder; (ii) the Option Price and the number of Option Shares that may be acquired under each outstanding Option granted hereunder; and (iii) other rights and matters determined on a per share basis under this Plan or any Option Agreement evidencing an outstanding Option granted hereunder.  Any such adjustments will be made only by the Board, and when so made will be effective, conclusive and binding for all purposes with respect to this Plan and all Options then outstanding.  No such adjustments will be required by reason of the issuance or

sale by the Company for cash or other consideration of additional Shares or securities convertible into or exchangeable for Shares.

9. **Modification, Extension and Renewal of Options**.  Subject to the terms and conditions and within the limitations of this Plan, the Administrator may modify, extend or renew outstanding Options granted under this Plan, or accept the surrender of outstanding Options (to the extent not theretofore exercised) and authorize the granting of new Options in substitution therefor (to the extent not theretofore exercised).  Notwithstanding the foregoing, however, no modification of any Option will, without the consent of the Optionee, alter or impair any rights or obligations under any outstanding Option.

10. **Governing Law;  Venue**.  The internal laws of the State of California (irrespective of its or any other jurisdiction's choice of law principles) will govern the validity of this Plan, the construction of its terms and the interpretation of the rights and duties of the parties hereunder and under any Option Agreement.  Any party may seek to enforce its rights under this Plan or any Option Agreement entered into under this Plan in any court of competent jurisdiction located within the judicial district in which the Company has its principal place of business.

11. **Amendment and Discontinuance**.  The Board may amend, suspend or discontinue this Plan at any time or from time to time; *provided that* no action of the Board will, without the approval of the shareholders of the Company, materially increase (other than by reason of an adjustment pursuant to section 8 hereof) the maximum aggregate number of Option Shares in the Option Pool, materially increase the benefits accruing to Eligible Participants, or materially modify the category of, or eligibility requirements for persons who are Eligible Participants. However, no such action may alter or impair any Option previously granted under this Plan without the consent of the Optionee, nor may the number of Option Shares in the Option Pool be reduced to a number that is less than the aggregate number of Option Shares (i) that may be issued pursuant to the exercise of all outstanding and unexpired Options granted hereunder, and (ii) that have been issued and are outstanding pursuant to the exercise of Options granted hereunder.

12. **Information Provided by Company**.  Prior to the date on which the Company is required to file its annual financial statements with the Securities and Exchange Commission under the Securities Exchange Act of 1934, the Company annually will provide the Company's financial statements (which statements need not be audited) to each Optionee who is an employee of the Company or any of its Subsidiaries, and each Optionee will, by virtue of entering into an Option Agreement, be deemed to have agreed (and to cause any investment advisors to whom the Optionee proposes to make such information available to agree) to keep such information confidential and not to use, disclose or copy such information for any purpose whatsoever other than determining whether to exercise an Option.  The Company deems such financial statements to be the valuable trade secrets of the Company, and in the event of any wrongful use, disclosure or other breach of the obligation to maintain the confidentiality of such financial information, the Company may seek to enforce all of its available legal and equitable rights and remedies, and may notify local law enforcement officials that a criminal misappropriation of the Company's trade secrets has taken place.

13. **No Shareholder Rights**.  No rights or privileges of a shareholder in the Company are conferred by reason of the granting of an Option.  No Optionee will become a shareholder in the Company with respect to any Option Shares unless and until the Option has been properly exercised and the Option Price fully paid as to the portion of the Option exercised.

14. **Copies of Plan**.  A copy of this Plan will be delivered to each Optionee at or before the time he, she or it executes an Option Agreement.

Local Motion ITS, Inc.
2003 STOCK OPTION PLAN

Exhibit A
Definitions

1.   "**10% Shareholder**" means a person who owns, either directly or indirectly by virtue of the ownership attribution provisions set forth in Section 424(d) of the Code at the time he or she is granted an Option, stock possessing more than 10% of the total combined voting power or value of all classes of stock of the Company and/or its Subsidiaries.

2.   "**1933 Act**" means the Securities Act of 1933, as amended.

3.   "**Administrator**" has the meaning set forth in section 5 of the Plan.

4.   "**Board**" has the meaning set forth in section 1 of the Plan.

5.   "**Business Combination**" has the meaning set forth in section 6.9 of the Plan.

6.   "**Change of Control Transaction**" has the meaning set forth in section 6.9 of the Plan.

7.   "**Closing**" has the meaning set forth in section 6.9 of the Plan.

8.   "**Code**" means the Internal Revenue Code of 1986, as amended (references herein to Sections of the Code are intended to refer to Sections of the Code as enacted at the time of the Plan's adoption by the Board and as subsequently amended, or to any substantially similar successor provisions of the Code resulting from recodification, renumbering or otherwise).

9.   "**Company**" has the meaning set forth in section 1 of the Plan.

10.   "**Completed Transfer Notice**" has the meaning set forth in section 6.8(b) of the Plan.

11.   "**Donative Transfer**" with respect to Option Shares means any voluntary Transfer with donative or charitable intent by a transferor other than for value or the payment of consideration to the transferor.

12.   "**Eligible Participants**" has the meaning set forth in section 3 of the Plan.

13.   "**Fair Market Value**" means, with respect to the Shares and as of the date that is relevant to such a determination a determination of fair market value in accordance with the terms of Section 1.1 of a Shareholder Agreement executed between the Company and Optionee.

14. "**Grace Period**" has the meaning set forth in section 5(c)(v) of the Plan.

15. "**Grant Date**" means, with respect to an Option, the date on which the Option Agreement evidencing that Option is entered into between the Company and the Optionee, or such other date as may be set forth in that Option Agreement as the "Grant Date" which will be the effective date of that Option Agreement.

16. "**Holder**" means the holder of any Option Shares.

17. "**Initial Public Offering**" means the closing of the first sale of securities of the Company, or of any Successor Entity, to the public, through a firm commitment underwriting, for an aggregate price (exclusive of underwriters' discounts and commissions and expenses of the offering) of at least fifteen million dollars ($15,000,000), pursuant to an effective registration statement filed with the Securities and Exchange Commission under the 1933 Act.

18. "**Involuntary Transfer**" with respect to Option Shares means any of the following:  (A) an assignment of the Shares for the benefit of creditors of the transferor; (B) a Transfer by operation of law; (C) an execution of judgment against the Shares or the acquisition of record or beneficial ownership of Shares by a lender or creditor; (D) a Transfer pursuant to any decree of divorce, dissolution or separate maintenance, any property settlement, any separation agreement or any other agreement with a spouse (except for *bona fide* estate planning purposes) under which any Shares are Transferred or awarded to the spouse of the transferor or are required to be sold; (E) a Transfer resulting from the filing by the transferor of a petition for relief, or the filing of an involuntary petition against the transferor, under the bankruptcy laws of the United States or of any other nation; or (F) a Transfer (even if volitional) constituting a pledge or the imposition of an encumbrance.

19. "**ISO**" means an "incentive stock option" as defined in Section 422 of the Code.

20. "**Offered Price**" has the meaning set forth in section 6.8(a) of the Plan.

21. "**Offered Terms**" has the meaning set forth in section 6.8(a) of the Plan.

22. "**Option Agreement**" has the meaning set forth in section 1 of the Plan.

23. "**Option Pool**" has the meaning set forth in section 4 of the Plan.

24. "**Option Price**" has the meaning set forth in section 5(c)(iii) of the Plan.

25.   "**Option Shares**" has the meaning set forth in section 1 of the Plan, *provided that* for purposes of section 6.7 and section 6.8 of the Plan, the term "**Option Shares**" includes all Shares issued by the Company to a Holder (or his, her or its predecessor) by reason of such holdings, including any securities which may be acquired as a result of a stock split, stock dividend, and other distributions of Shares in the Company made upon, or in exchange for, other securities of the Company.

26.   "**Option Term**" has the meaning set forth in section 5(c)(iv) of the Plan.

27.   "**Optionee**" has the meaning set forth in section 1 of the Plan.

28.   "**Options**" has the meaning set forth in section 1 of the Plan.

29.   "**Permitted Transfer**" has the meaning set forth in section 6.7(c) of the Plan.

30.   "**Plan**" has the meaning set forth in section 1 of the Plan.

31.   "**Proposed Transfer Notice**" has the meaning set forth in section 6.8(a) of the Plan.

32.   "**Shares**" has the meaning set forth in section 1 of the Plan.

33.   "**Subsidiary**" has the same meaning as "subsidiary corporation" as defined in Section 424(f) of the Code.

34.   "**Successor Entity**" means a corporation or other entity that acquires all or substantially all of the assets of the Company, or which is the surviving or parent entity resulting from a Business Combination, as that term is defined in section 6.9 of the Plan.

35.   "**Tax Withholding Liability**" in connection with the exercise of any Option means all federal and state income taxes, social security tax, and any other taxes applicable to the compensation income arising from the transaction required by applicable law to be withheld by the Company.

36.   "**Termination of Eligibility Status**" means (i) in the case of any employee of the Company and/or any of its Subsidiaries, a termination of his or her employment, whether by the employee or employer, and whether voluntary or involuntary, unless said termination is without cause pursuant to Section 5.4 and 5.5(c) of the "Form of Employment Agreement", which is Schedule 4.1(k) to the "Share Purchase Agreement" of even date herewith, , (ii) in the case of any advisor, consultant, former officer or lender or independent contractor to the Company and/or any of its Subsidiaries, December 31, 2006, and (iii) in the case of any director of the Company and/or any of its Subsidiaries, the death of or resignation by the director or his or her removal from the board in the manner

provided by the certificate of incorporation, bylaws or other organic instruments of the Company or Subsidiary or otherwise in accordance with applicable law.

37.  "**Termination for Cause**" means (i) in the case of an Optionee who is an employee of the Company and/or any of its Subsidiaries, a termination by the employer of the Optionee's employment for "cause" as defined by any contract of employment with the Optionee or in the Option Agreement, or if not defined therein, pursuant to the "For Cause Standard" set forth below, (ii) in the case of an Optionee who is an advisor, consultant or independent contractor to the Company and/or any of its Subsidiaries, a termination of the services relationship by the hiring party for "cause" or breach of contract, as defined by any contract between the parties or the Option Agreement, or if not defined therein, pursuant to the "For Cause Standard" set forth below, and (iii) in the case of an Optionee who is a director of the Company and/or any of its Subsidiaries, removal of him or her from the board of directors by action of the shareholders or, if permitted by applicable law and the certificate, bylaws or other organic documents of the Company or the Subsidiary, as the case may be, or pursuant to applicable law, by the other directors), in connection with the good faith determination of the board of directors (or of the Company's or Subsidiary's shareholders if so required, but in either case excluding the vote of the subject individual if he or she is a director or a shareholder) that the Optionee has (all of the following defined as the "For Cause Standard"): engaged in any acts which materially breach any fiduciary duty, employment or service obligation (including to provide services to the Company in a high quality and professional manner) or contractual obligation  to the Company, its parent, any of its Subsidiaries or their shareholders, or in any acts involving dishonesty or moral turpitude or in any acts that materially and adversely affect the business, affairs or reputation of the Company or any of its Subsidiaries.

38.  "**Transfer**" with respect to Option Shares means a voluntary or involuntary sale, assignment, transfer, conveyance, pledge, hypothecation, encumbrance, disposal, loan, gift, attachment or levy of those Shares, including any Involuntary Transfer, Donative Transfer or transfer by will or under the laws of descent and distribution.

39.  "**Transferee**" has the meaning set forth in section 6.8(b) of the Plan.

40.  "**Transferred Shares**" has the meaning set forth in section 6.8(b) of the Plan.

41.  "**Unvested Option**" has the meaning set forth in section 5(c)(vii) of the Plan.

42.  "**Unvested Shares**" has the meaning set forth in section 5(c)(viii) of the Plan.

43. "**Vested Option**" has the meaning set forth in section 5(c)(vii) of the Plan.

44. "**Vested Shares**" has the meaning set forth in section 5(c)(viii) of the Plan.

45. "**Vesting Date**" has the meaning set forth in section 6.4 of the Plan.

# SCHEDULES 2.8(b)

STOCK OPTION AGREEMENT
UNDER THE LOCAL MOTION ITS, INC.
2003 STOCK OPTION PLAN

THIS AGREEMENT is made effective as of December 1, 2003 (the "**Grant Date**"), by and between LOCAL MOTION ITS, Inc., a Virginia corporation (the "**Company**"), and Janet Sue Davis ("**Optionee**").

NOW THEREFORE, THE PARTIES AGREE AS FOLLOWS:

1.   Option Grant.   Subject to all of the terms and conditions of this Agreement and of the Company's 2003 STOCK OPTION PLAN (the "**Option Plan**"), Optionee will have an option (the "**Option**") to purchase shares of the Company's common stock (the "**Option Shares**") on the following terms:

| | |
|---|---|
| Number of Option Shares: | 75 |
| Option Price: | $1.00/share |
| Expiration Date: | Ten years from the Grant Date |
| Vesting Date: | December 31, 2006 |

The Option will be subject to vesting as set forth in Section 6.4 of the Option Plan.  Section 6.4 of the Option Plan provides that the Option will become a fully Vested Option as of the Vesting Date set forth above; *provided that* there will be no vesting on such date if the Optionee suffers a Termination of Eligibility Status prior to such date and *provided further that* additional vesting will be suspended during any period while the Optionee is on a leave of absence from the Company or its Subsidiaries, as determined by the Administrator.

Notwithstanding any other provision of this Agreement, no Option Shares shall be considered Vested Option Shares unless the Company achieves certain financial performance.  On the Vesting Date, if the Options become Vested due to the passage of time, and there has been no Loss of Eligibility, the number of Option Shares to be considered Vested Option Shares and Unvested Option Shares shall be determined by the amount of Net Income achieved by the Company during the period December 1, 2003 through and including December 31, 2006 (the "Performance Period"), as determined by the Company's independent auditors.   In the event the Company's net income during the Performance Period is less than $300,000.00, then all of the Option Shares shall be considered Unvested Option Shares.  In the event the Company's net income during the Performance Period is equal to or greater than $1,000,000.00, then 100% of the Option Shares will be considered Vested Option Shares.  In the event the Company's net income during the Performance Period is equal to or greater than $300,000.00 but less than $1,000,000.00, the number of Option

Shares that will be considered Vested Option Shares will be determined by dividing the Company's net income during the Performance Period by 1,000,000 then multiplying the result by the number of Option Shares. The balance of the Option Share will be considered Unvested Option Shares. By way of example, if the Company's net income during the Performance Period is $820,000, then 82% of the Option Shares will be considered Vested Option Shares and the remaining 18% of the Option Shares shall be considered Unvested Option Shares.

"Net Income" shall be defined in accordance with generally accepted accounting principals. The Company's parent shall not levy a charge for general administrative and overhead costs to the Company at a rate greater than charged to any other subsidiary of the Company. "Net Income" shall not include revenue earned or expenses incurred in the performance of service to MV Transportation, Inc., its successor, assigns, subsidiaries or affiliates.

The Option will NOT be an ISO.

2.    Representations and Warranties of Optionee.    Optionee represents and warrants that Optionee is acquiring the Option, and will acquire any Option Shares obtained upon exercise of the Option, for investment purposes only, for Optionee's own account, and with no view to the distribution thereof.

3.    No Employment or Independent Contractor Rights.    This Agreement gives Optionee no right to be retained as an employee of or independent contractor to the Company and/or its Subsidiaries.

4.    Terms of the Option Plan.    Optionee understands that the Option Plan includes important terms and conditions that apply to the Option. Those terms include:   important conditions to the right of Optionee to exercise the Option; important restrictions on the ability of Optionee to transfer the Option or to Transfer any of the Option Shares received upon exercise of the Option; and early termination of the Option following the occurrence of certain events. OPTIONEE HAS READ THE OPTION PLAN, AGREES TO BE BOUND BY ITS TERMS, AND MAKES EACH OF THE REPRESENTATIONS REQUIRED TO BE MADE BY OPTIONEE UNDER IT. OPTIONEE FURTHER ACKNOWLEDGES THAT THE COMPANY HAS GIVEN NO LEGAL OR TAX ADVICE CONCERNING THE OPTION AND HAS ADVISED OPTIONEE TO CONSULT WITH OPTIONEE'S OWN TAX OR FINANCIAL ADVISOR ABOUT THE TAX TREATMENT OF THE OPTION AND ITS EXERCISE.

5.    Arbitration.    In the event of any dispute concerning the enforcement of this Agreement, the dispute will be submitted to binding arbitration before a single arbitrator in accordance with the Employment Dispute Resolution Rules of the American Arbitration Association provided that:  (i) the arbitrator will be instructed and empowered to take whatever steps to expedite the arbitration as he or she deems reasonable; (ii) each party will bear its own costs in connection with the arbitration, provided that the costs of the arbitrator will be borne by the party who the arbitrator determines not to have prevailed in the matter; (iii) the arbitrator's

judgment will be final and binding upon the parties, except that it may be challenged on the grounds of fraud or gross misconduct; and (iv) the arbitration will be held in San Francisco, California.    Judgment upon any verdict in arbitration may be entered in any court of competent jurisdiction.

6. <u>Miscellaneous</u>.

(a)    <u>Governing Law; Interpretation</u>.  This Agreement will be governed by the substantive laws of the State of California applicable to contracts entered into and fully performed in California.  The headings and captions of the Sections of this Agreement are for convenience only and in no way define, limit or extend the scope or intent of this Agreement or any provision hereof.  This Agreement will be construed as a whole, according to its fair meaning, and not in favor of or against any party, regardless of which party may have initially drafted certain provisions set forth herein.  Capitalized terms and phrases that are not otherwise defined herein will have the meanings given them in the Option Plan.  The terms and conditions of this Agreement will prevail over any expressly conflicting terms and conditions in the Option Plan except to the extent expressly set forth in the Option Plan.

(b)    <u>Assignment</u>.  This Agreement is personal to Optionee and Optionee may not assign any of Optionee's rights or delegate any of Optionee's obligations hereunder without first obtaining the prior written consent of the Company, except as expressly set forth in the Option Plan.

(c)    <u>Severability</u>.  In the event any provision of this Agreement or the application of any such provision to either of the parties is held by a court of competent jurisdiction to be contrary to law, such provision will be deemed amended to the extent necessary to comply with such law, and the remaining provisions of this Agreement will remain in full force and effect.

(d)    <u>Shareholder Agreement.</u>    Any Option Shares, Vested and Unvested, whether or not exercised pursuant to the terms of this Option Agreement shall be subject to all of the terms of the Shareholder Agreement between the Company, MV Transportation, Inc. and the Optionee of even date with this Agreement.

(e)    <u>Entire Agreement; Amendments</u>.  This Agreement constitutes the final and complete expression of all of the terms of the understanding and agreement between the parties hereto with respect to the subject matter hereof, and this Agreement replaces and supersedes any and all prior or contemporaneous negotiations, communications, understandings, obligations, commitments, agreements or contracts, whether written or oral, between the parties respecting the subject matter hereof, including, without limitation, any negotiations, understandings or agreements with respect to participating in the equity (including options thereon) in the Company except to the extent reflected in a share certificate heretofore issued in the name of Optionee or in a fully

executed written option agreement under an established option plan with the Company.   This Agreement may not be modified, amended, altered or supplemented except by means of the execution and delivery of a written instrument mutually executed by both parties.

The parties hereby have entered into this Agreement as of the Grant Date.

LOCAL MOTION ITS, INC.

By: _____
     Jon Michael Monson, Chief Executive Officer

OPTIONEE:

By: _____
     Janet Sue Davis

Attachments: (1) Spousal Consent
            (2) 2003 Stock Option Plan

## CONSENT OF SPOUSE

I am the spouse of Janet Sue Davis, who, together with Local Motion ITS, Inc. (the "**Company**"), has entered into the Stock Option Agreement, to which this Consent is attached. Capitalized terms not defined herein will have the meaning set forth in such agreement.

I have read and understand the Stock Option Agreement and the Company's 2003 Stock Option Plan (the "Option Plan"). I acknowledge that, by execution hereof, I am bound by the Stock Option Agreement and the Option Plan, as to any and all interests I may have in the Option and the Option Shares. In particular, I understand and agree that the Option and the Option Shares (including any interest that I may have therein) are subject to certain repurchase rights in the Company and certain restrictions on transfer.

I also agree with my spouse and the Company that if my spouse and I ever get divorced or enter into any marital property settlement agreement, or if my spouse or I ever seek a decree of separate maintenance, to the extent my spouse has or can obtain assets other than the Option and the Option Shares in amounts and of value sufficient to settle or satisfy any marital property claims I may have in the value of the Option and the Option Shares, I will accept such other assets in settlement of those claims.

I agree that I will not do anything to try to prevent the operation of any part of the Stock Option Agreement or the Option Plan. I acknowledge that I have had an opportunity to obtain independent counsel to advise me concerning the matters contained herein.

Signature

Name: _KENNETH M. WATES_

Date: _12/1/03_

STOCK OPTION AGREEMENT
UNDER THE LOCAL MOTION ITS, INC.
2003 STOCK OPTION PLAN

THIS AGREEMENT is made effective as of December 1, 2003 (the "**Grant Date**"), by and between LOCAL MOTION ITS, Inc., a Virginia corporation (the "**Company**"), and Kevin John Dresser ("**Optionee**").

NOW THEREFORE, THE PARTIES AGREE AS FOLLOWS:

1. <u>Option Grant</u>.  Subject to all of the terms and conditions of this Agreement and of the Company's 2003 STOCK OPTION PLAN (the "**Option Plan**"), Optionee will have an option (the "**Option**") to purchase shares of the Company's common stock (the "**Option Shares**") on the following terms:

| | |
|---|---|
| Number of Option Shares: | 75 |
| Option Price: | $1.00/share |
| Expiration Date: | Ten years from the Grant Date |
| Vesting Date: | December 31, 2006 |

The Option will be subject to vesting as set forth in Section 6.4 of the Option Plan.  Section 6.4 of the Option Plan provides that the Option will become a fully Vested Option as of the Vesting Date set forth above; *provided that* there will be no vesting on such date if the Optionee suffers a Termination of Eligibility Status prior to such date and *provided further that* additional vesting will be suspended during any period while the Optionee is on a leave of absence from the Company or its Subsidiaries, as determined by the Administrator.

Notwithstanding any other provision of this Agreement, no Option Shares shall be considered Vested Option Shares unless the Company achieves certain financial performance.  On the Vesting Date, if the Options become Vested due to the passage of time, and there has been no Loss of Eligibility, the number of Option Shares to be considered Vested Option Shares and Unvested Option Shares shall be determined by the amount of Net Income achieved by the Company during the period December 1, 2003 through and including December 31, 2006 (the "Performance Period"), as determined by the Company's independent auditors.  In the event the Company's net income during the Performance Period is less than $300,000.00, then all of the Option Shares shall be considered Unvested Option Shares.  In the event the Company's net income during the Performance Period is equal to or greater than $1,000,000.00, then 100% of the Option Shares will be considered Vested Option Shares.  In the event the Company's net income during the Performance Period is equal to or greater than $300,000.00 but less than $1,000,000.00, the number of Option

Shares that will be considered Vested Option Shares will be determined by dividing the Company's net income during the Performance Period by 1,000,000 then multiplying the result by the number of Option Shares. The balance of the Option Share will be considered Unvested Option Shares. By way of example, if the Company's net income during the Performance Period is $820,000, then 82% of the Option Shares will be considered Vested Option Shares and the remaining 18% of the Option Shares shall be considered Unvested Option Shares.

"Net Income" shall be defined in accordance with generally accepted accounting principals. The Company's parent shall not levy a charge for general administrative and overhead costs to the Company at a rate greater than charged to any other subsidiary of the Company. "Net Income" shall not include revenue earned or expenses incurred in the performance of service to MV Transportation, Inc., its successor, assigns, subsidiaries or affiliates.

The Option will NOT be an ISO.

2.    Representations and Warranties of Optionee.   Optionee represents and warrants that Optionee is acquiring the Option, and will acquire any Option Shares obtained upon exercise of the Option, for investment purposes only, for Optionee's own account, and with no view to the distribution thereof.

3.    No Employment or Independent Contractor Rights.   This Agreement gives Optionee no right to be retained as an employee of or independent contractor to the Company and/or its Subsidiaries.

4.    Terms of the Option Plan.   Optionee understands that the Option Plan includes important terms and conditions that apply to the Option. Those terms include:  important conditions to the right of Optionee to exercise the Option; important restrictions on the ability of Optionee to transfer the Option or to Transfer any of the Option Shares received upon exercise of the Option; and early termination of the Option following the occurrence of certain events. OPTIONEE HAS READ THE OPTION PLAN, AGREES TO BE BOUND BY ITS TERMS, AND MAKES EACH OF THE REPRESENTATIONS REQUIRED TO BE MADE BY OPTIONEE UNDER IT. OPTIONEE FURTHER ACKNOWLEDGES THAT THE COMPANY HAS GIVEN NO LEGAL OR TAX ADVICE CONCERNING THE OPTION AND HAS ADVISED OPTIONEE TO CONSULT WITH OPTIONEE'S OWN TAX OR FINANCIAL ADVISOR ABOUT THE TAX TREATMENT OF THE OPTION AND ITS EXERCISE.

5.    Arbitration.   In the event of any dispute concerning the enforcement of this Agreement, the dispute will be submitted to binding arbitration before a single arbitrator in accordance with the Employment Dispute Resolution Rules of the American Arbitration Association *provided that*:  (i) the arbitrator will be instructed and empowered to take whatever steps to expedite the arbitration as he or she deems reasonable; (ii) each party will bear its own costs in connection with the arbitration, *provided that* the costs of the arbitrator will be borne by the party who the arbitrator determines not to have prevailed in the matter; (iii) the arbitrator's

judgment will be final and binding upon the parties, except that it may be challenged on the grounds of fraud or gross misconduct; and (iv) the arbitration will be held in San Francisco, California.    Judgment upon any verdict in arbitration may be entered in any court of competent jurisdiction.

6. <u>Miscellaneous</u>.

(a)    <u>Governing Law; Interpretation</u>.  This Agreement will be governed by the substantive laws of the State of California applicable to contracts entered into and fully performed in California.  The headings and captions of the Sections of this Agreement are for convenience only and in no way define, limit or extend the scope or intent of this Agreement or any provision hereof.  This Agreement will be construed as a whole, according to its fair meaning, and not in favor of or against any party, regardless of which party may have initially drafted certain provisions set forth herein.  Capitalized terms and phrases that are not otherwise defined herein will have the meanings given them in the Option Plan.  The terms and conditions of this Agreement will prevail over any expressly conflicting terms and conditions in the Option Plan except to the extent expressly set forth in the Option Plan.

(b)    <u>Assignment</u>.  This Agreement is personal to Optionee and Optionee may not assign any of Optionee's rights or delegate any of Optionee's obligations hereunder without first obtaining the prior written consent of the Company, except as expressly set forth in the Option Plan.

(c)    <u>Severability</u>.  In the event any provision of this Agreement or the application of any such provision to either of the parties is held by a court of competent jurisdiction to be contrary to law, such provision will be deemed amended to the extent necessary to comply with such law, and the remaining provisions of this Agreement will remain in full force and effect.

(d)    <u>Shareholder Agreement.</u>    Any Option Shares, Vested and Unvested, whether or not exercised pursuant to the terms of this Option Agreement shall be subject to all of the terms of the Shareholder Agreement between the Company, MV Transportation, Inc. and the Optionee of even date with this Agreement.

(e)    <u>Entire Agreement; Amendments</u>.  This Agreement constitutes the final and complete expression of all of the terms of the understanding and agreement between the parties hereto with respect to the subject matter hereof, and this Agreement replaces and supersedes any and all prior or contemporaneous negotiations, communications, understandings, obligations, commitments, agreements or contracts, whether written or oral, between the parties respecting the subject matter hereof, including, without limitation, any negotiations, understandings or agreements with respect to participating in the equity (including options thereon) in the Company except to the extent reflected in a share certificate heretofore issued in the name of Optionee or in a fully

executed written option agreement under an established option plan with the Company. This Agreement may not be modified, amended, altered or supplemented except by means of the execution and delivery of a written instrument mutually executed by both parties.

The parties hereby have entered into this Agreement as of the Grant Date.

LOCAL MOTION ITS, INC.

By: _____
       Jon Michael Monson, Chief Executive Officer

OPTIONEE:

By: _____
       Kevin John Dresser

Attachments: (1) Spousal Consent
                      (2) 2003 Stock Option Plan

### CONSENT OF SPOUSE

I am the spouse of Kevin John Dresser, who, together with Local Motion ITS, Inc. (the "**Company**"), has entered into the Stock Option Agreement, to which this Consent is attached. Capitalized terms not defined herein will have the meaning set forth in such agreement.

I have read and understand the Stock Option Agreement and the Company's 2003 Stock Option Plan (the "Option Plan"). I acknowledge that, by execution hereof, I am bound by the Stock Option Agreement and the Option Plan, as to any and all interests I may have in the Option and the Option Shares. In particular, I understand and agree that the Option and the Option Shares (including any interest that I may have therein) are subject to certain repurchase rights in the Company and certain restrictions on transfer.

I also agree with my spouse and the Company that if my spouse and I ever get divorced or enter into any marital property settlement agreement, or if my spouse or I ever seek a decree of separate maintenance, to the extent my spouse has or can obtain assets other than the Option and the Option Shares in amounts and of value sufficient to settle or satisfy any marital property claims I may have in the value of the Option and the Option Shares, I will accept such other assets in settlement of those claims.

I agree that I will not do anything to try to prevent the operation of any part of the Stock Option Agreement or the Option Plan. I acknowledge that I have had an opportunity to obtain independent counsel to advise me concerning the matters contained herein.

Signature ___Penny M. Dresser___

Name: ___PENNY M. DRESSER___

Date: ___12-29-03___

STOCK OPTION AGREEMENT
UNDER THE LOCAL MOTION ITS, INC.
2003 STOCK OPTION PLAN

THIS AGREEMENT is made effective as of December 1, 2003 (the "**Grant Date**"), by and between LOCAL MOTION ITS, Inc., a Virginia corporation (the "**Company**"), and Ryan James Larsen ("**Optionee**").

NOW THEREFORE, THE PARTIES AGREE AS FOLLOWS:

1.  Option Grant.  Subject to all of the terms and conditions of this Agreement and of the Company's 2003 STOCK OPTION PLAN (the "**Option Plan**"), Optionee will have an option (the "**Option**") to purchase shares of the Company's common stock (the "**Option Shares**") on the following terms:

| | |
|---|---|
| Number of Option Shares: | 75 |
| Option Price: | $1.00/share |
| Expiration Date: | Ten years from the Grant Date |
| Vesting Date: | December 31, 2006 |

The Option will be subject to vesting as set forth in Section 6.4 of the Option Plan.  Section 6.4 of the Option Plan provides that the Option will become a fully Vested Option as of the Vesting Date set forth above; *provided that* there will be no vesting on such date if the Optionee suffers a Termination of Eligibility Status prior to such date and *provided further that* additional vesting will be suspended during any period while the Optionee is on a leave of absence from the Company or its Subsidiaries, as determined by the Administrator.

Notwithstanding any other provision of this Agreement, no Option Shares shall be considered Vested Option Shares unless the Company achieves certain financial performance.  On the Vesting Date, if the Options become Vested due to the passage of time, and there has been no Loss of Eligibility, the number of Option Shares to be considered Vested Option Shares and Unvested Option Shares shall be determined by the amount of Net Income achieved by the Company during the period December 1, 2003 through and including December 31, 2006 (the "Performance Period"), as determined by the Company's independent auditors.  In the event the Company's net income during the Performance Period is less than $300,000.00, then all of the Option Shares shall be considered Unvested Option Shares.  In the event the Company's net income during the Performance Period is equal to or greater than $1,000,000.00, then 100% of the Option Shares will be considered Vested Option Shares.  In the event the Company's net income during the Performance Period is equal to or greater than $300,000.00 but less than $1,000,000.00, the number of Option

Shares that will be considered Vested Option Shares will be determined by dividing the Company's net income during the Performance Period by 1,000,000 then multiplying the result by the number of Option Shares. The balance of the Option Share will be considered Unvested Option Shares. By way of example, if the Company's net income during the Performance Period is $820,000, then 82% of the Option Shares will be considered Vested Option Shares and the remaining 18% of the Option Shares shall be considered Unvested Option Shares.

"Net Income" shall be defined in accordance with generally accepted accounting principals. The Company's parent shall not levy a charge for general administrative and overhead costs to the Company at a rate greater than charged to any other subsidiary of the Company. "Net Income" shall not include revenue earned or expenses incurred in the performance of service to MV Transportation, Inc., its successor, assigns, subsidiaries or affiliates.

The Option will NOT be an ISO.

2.    Representations and Warranties of Optionee.  Optionee represents and warrants that Optionee is acquiring the Option, and will acquire any Option Shares obtained upon exercise of the Option, for investment purposes only, for Optionee's own account, and with no view to the distribution thereof.

3.    No Employment or Independent Contractor Rights.  This Agreement gives Optionee no right to be retained as an employee of or independent contractor to the Company and/or its Subsidiaries.

4.    Terms of the Option Plan.  Optionee understands that the Option Plan includes important terms and conditions that apply to the Option. Those terms include:  important conditions to the right of Optionee to exercise the Option; important restrictions on the ability of Optionee to transfer the Option or to Transfer any of the Option Shares received upon exercise of the Option; and early termination of the Option following the occurrence of certain events. OPTIONEE HAS READ THE OPTION PLAN, AGREES TO BE BOUND BY ITS TERMS, AND MAKES EACH OF THE REPRESENTATIONS REQUIRED TO BE MADE BY OPTIONEE UNDER IT. OPTIONEE FURTHER ACKNOWLEDGES THAT THE COMPANY HAS GIVEN NO LEGAL OR TAX ADVICE CONCERNING THE OPTION AND HAS ADVISED OPTIONEE TO CONSULT WITH OPTIONEE'S OWN TAX OR FINANCIAL ADVISOR ABOUT THE TAX TREATMENT OF THE OPTION AND ITS EXERCISE.

5.    Arbitration.  In the event of any dispute concerning the enforcement of this Agreement, the dispute will be submitted to binding arbitration before a single arbitrator in accordance with the Employment Dispute Resolution Rules of the American Arbitration Association provided that:  (i) the arbitrator will be instructed and empowered to take whatever steps to expedite the arbitration as he or she deems reasonable; (ii) each party will bear its own costs in connection with the arbitration, provided that the costs of the arbitrator will be borne by the party who the arbitrator determines not to have prevailed in the matter; (iii) the arbitrator's

judgment will be final and binding upon the parties, except that it may be challenged on the grounds of fraud or gross misconduct; and (iv) the arbitration will be held in San Francisco, California.    Judgment upon any verdict in arbitration may be entered in any court of competent jurisdiction.

6. Miscellaneous.

    (a)    Governing Law; Interpretation.  This Agreement will be governed by the substantive laws of the State of California applicable to contracts entered into and fully performed in California.  The headings and captions of the Sections of this Agreement are for convenience only and in no way define, limit or extend the scope or intent of this Agreement or any provision hereof.  This Agreement will be construed as a whole, according to its fair meaning, and not in favor of or against any party, regardless of which party may have initially drafted certain provisions set forth herein.  Capitalized terms and phrases that are not otherwise defined herein will have the meanings given them in the Option Plan.  The terms and conditions of this Agreement will prevail over any expressly conflicting terms and conditions in the Option Plan except to the extent expressly set forth in the Option Plan.

    (b)    Assignment.  This Agreement is personal to Optionee and Optionee may not assign any of Optionee's rights or delegate any of Optionee's obligations hereunder without first obtaining the prior written consent of the Company, except as expressly set forth in the Option Plan.

    (c)    Severability.  In the event any provision of this Agreement or the application of any such provision to either of the parties is held by a court of competent jurisdiction to be contrary to law, such provision will be deemed amended to the extent necessary to comply with such law, and the remaining provisions of this Agreement will remain in full force and effect.

    (d)    Shareholder Agreement.    Any Option Shares, Vested and Unvested, whether or not exercised pursuant to the terms of this Option Agreement shall be subject to all of the terms of the Shareholder Agreement between the Company, MV Transportation, Inc. and the Optionee of even date with this Agreement.

    (e)    Entire Agreement; Amendments.  This Agreement constitutes the final and complete expression of all of the terms of the understanding and agreement between the parties hereto with respect to the subject matter hereof, and this Agreement replaces and supersedes any and all prior or contemporaneous negotiations, communications, understandings, obligations, commitments, agreements or contracts, whether written or oral, between the parties respecting the subject matter hereof, including, without limitation, any negotiations, understandings or agreements with respect to participating in the equity (including options thereon) in the Company except to the extent reflected in a share certificate heretofore issued in the name of Optionee or in a fully

executed written option agreement under an established option plan with the Company. This Agreement may not be modified, amended, altered or supplemented except by means of the execution and delivery of a written instrument mutually executed by both parties.


The parties hereby have entered into this Agreement as of the Grant Date.


LOCAL MOTION ITS, INC.

By: _____
        Jon Michael Monson, Chief Executive Officer

OPTIONEE:

By: _____
        Ryan James Larsen


Attachments: (1) Spousal Consent
            (2) 2003 Stock Option Plan

## CONSENT OF SPOUSE

I am the spouse of Ryan James Larsen, who, together with Local Motion ITS, Inc. (the "**Company**"), has entered into the Stock Option Agreement, to which this Consent is attached. Capitalized terms not defined herein will have the meaning set forth in such agreement.

I have read and understand the Stock Option Agreement and the Company's 2003 Stock Option Plan (the "Option Plan"). I acknowledge that, by execution hereof, I am bound by the Stock Option Agreement and the Option Plan, as to any and all interests I may have in the Option and the Option Shares. In particular, I understand and agree that the Option and the Option Shares (including any interest that I may have therein) are subject to certain repurchase rights in the Company and certain restrictions on transfer.

I also agree with my spouse and the Company that if my spouse and I ever get divorced or enter into any marital property settlement agreement, or if my spouse or I ever seek a decree of separate maintenance, to the extent my spouse has or can obtain assets other than the Option and the Option Shares in amounts and of value sufficient to settle or satisfy any marital property claims I may have in the value of the Option and the Option Shares, I will accept such other assets in settlement of those claims.

I agree that I will not do anything to try to prevent the operation of any part of the Stock Option Agreement or the Option Plan. I acknowledge that I have had an opportunity to obtain independent counsel to advise me concerning the matters contained herein.

Signature

Name: STACIE J LARSEN

Date: 12/03/03

STOCK OPTION AGREEMENT
UNDER THE LOCAL MOTION ITS, INC.
2003 STOCK OPTION PLAN

THIS AGREEMENT is made effective as of December 1, 2003 (the "**Grant Date**"), by and between LOCAL MOTION ITS, Inc., a Virginia corporation (the "**Company**"), and Marsha Louise Madrid ("**Optionee**").

NOW THEREFORE, THE PARTIES AGREE AS FOLLOWS:

1.   Option Grant.   Subject to all of the terms and conditions of this Agreement and of the Company's 2003 STOCK OPTION PLAN (the "**Option Plan**"), Optionee will have an option (the "**Option**") to purchase shares of the Company's common stock (the "**Option Shares**") on the following terms:

| | |
|---|---|
| Number of Option Shares: | 50 |
| Option Price: | $1.00/share |
| Expiration Date: | Ten years from the Grant Date |
| Vesting Date: | December 31, 2006 |

The Option will be subject to vesting as set forth in Section 6.4 of the Option Plan.  Section 6.4 of the Option Plan provides that the Option will become a fully Vested Option as of the Vesting Date set forth above; *provided that* there will be no vesting on such date if the Optionee suffers a Termination of Eligibility Status prior to such date and *provided further that* additional vesting will be suspended during any period while the Optionee is on a leave of absence from the Company or its Subsidiaries, as determined by the Administrator.

Notwithstanding any other provision of this Agreement, no Option Shares shall be considered Vested Option Shares unless the Company achieves certain financial performance.  On the Vesting Date, if the Options become Vested due to the passage of time, and there has been no Loss of Eligibility, the number of Option Shares to be considered Vested Option Shares and Unvested Option Shares shall be determined by the amount of Net Income achieved by the Company during the period December 1, 2003 through and including December 31, 2006 (the "Performance Period"), as determined by the Company's independent auditors.   In the event the Company's net income during the Performance Period is less than $300,000.00, then all of the Option Shares shall be considered Unvested Option Shares.  In the event the Company's net income during the Performance Period is equal to or greater than $1,000,000.00, then 100% of the Option Shares will be considered Vested Option Shares.  In the event the Company's net income during the Performance Period is equal to or greater than $300,000.00 but less than $1,000,000.00, the number of Option

Shares that will be considered Vested Option Shares will be determined by dividing the Company's net income during the Performance Period by 1,000,000 then multiplying the result by the number of Option Shares. The balance of the Option Share will be considered Unvested Option Shares. By way of example, if the Company's net income during the Performance Period is $820,000, then 82% of the Option Shares will be considered Vested Option Shares and the remaining 18% of the Option Shares shall be considered Unvested Option Shares.

"Net Income" shall be defined in accordance with generally accepted accounting principals. The Company's parent shall not levy a charge for general administrative and overhead costs to the Company at a rate greater than charged to any other subsidiary of the Company. "Net Income" shall not include revenue earned or expenses incurred in the performance of service to MV Transportation, Inc., its successor, assigns, subsidiaries or affiliates.

The Option will NOT be an ISO.

2.    Representations and Warranties of Optionee.  Optionee represents and warrants that Optionee is acquiring the Option, and will acquire any Option Shares obtained upon exercise of the Option, for investment purposes only, for Optionee's own account, and with no view to the distribution thereof.

3.    No Employment or Independent Contractor Rights.  This Agreement gives Optionee no right to be retained as an employee of or independent contractor to the Company and/or its Subsidiaries.

4.    Terms of the Option Plan.  Optionee understands that the Option Plan includes important terms and conditions that apply to the Option. Those terms include:  important conditions to the right of Optionee to exercise the Option; important restrictions on the ability of Optionee to transfer the Option or to Transfer any of the Option Shares received upon exercise of the Option; and early termination of the Option following the occurrence of certain events. OPTIONEE HAS READ THE OPTION PLAN, AGREES TO BE BOUND BY ITS TERMS, AND MAKES EACH OF THE REPRESENTATIONS REQUIRED TO BE MADE BY OPTIONEE UNDER IT. OPTIONEE FURTHER ACKNOWLEDGES THAT THE COMPANY HAS GIVEN NO LEGAL OR TAX ADVICE CONCERNING THE OPTION AND HAS ADVISED OPTIONEE TO CONSULT WITH OPTIONEE'S OWN TAX OR FINANCIAL ADVISOR ABOUT THE TAX TREATMENT OF THE OPTION AND ITS EXERCISE.

5.    Arbitration.  In the event of any dispute concerning the enforcement of this Agreement, the dispute will be submitted to binding arbitration before a single arbitrator in accordance with the Employment Dispute Resolution Rules of the American Arbitration Association *provided that*:  (i) the arbitrator will be instructed and empowered to take whatever steps to expedite the arbitration as he or she deems reasonable; (ii) each party will bear its own costs in connection with the arbitration, *provided that* the costs of the arbitrator will be borne by the party who the arbitrator determines not to have prevailed in the matter; (iii) the arbitrator's

judgment will be final and binding upon the parties, except that it may be challenged on the grounds of fraud or gross misconduct; and (iv) the arbitration will be held in San Francisco, California.    Judgment upon any verdict in arbitration may be entered in any court of competent jurisdiction.

6. <u>Miscellaneous</u>.

(a)    <u>Governing Law; Interpretation</u>.  This Agreement will be governed by the substantive laws of the State of California applicable to contracts entered into and fully performed in California.  The headings and captions of the Sections of this Agreement are for convenience only and in no way define, limit or extend the scope or intent of this Agreement or any provision hereof.  This Agreement will be construed as a whole, according to its fair meaning, and not in favor of or against any party, regardless of which party may have initially drafted certain provisions set forth herein.  Capitalized terms and phrases that are not otherwise defined herein will have the meanings given them in the Option Plan.  The terms and conditions of this Agreement will prevail over any expressly conflicting terms and conditions in the Option Plan except to the extent expressly set forth in the Option Plan.

(b)    <u>Assignment</u>.  This Agreement is personal to Optionee and Optionee may not assign any of Optionee's rights or delegate any of Optionee's obligations hereunder without first obtaining the prior written consent of the Company, except as expressly set forth in the Option Plan.

(c)    <u>Severability</u>.  In the event any provision of this Agreement or the application of any such provision to either of the parties is held by a court of competent jurisdiction to be contrary to law, such provision will be deemed amended to the extent necessary to comply with such law, and the remaining provisions of this Agreement will remain in full force and effect.

(d)    <u>Shareholder Agreement.</u>    Any Option Shares, Vested and Unvested, whether or not exercised pursuant to the terms of this Option Agreement shall be subject to all of the terms of the Shareholder Agreement between the Company, MV Transportation, Inc. and the Optionee of even date with this Agreement.

(e)    <u>Entire Agreement; Amendments</u>.  This Agreement constitutes the final and complete expression of all of the terms of the understanding and agreement between the parties hereto with respect to the subject matter hereof, and this Agreement replaces and supersedes any and all prior or contemporaneous negotiations, communications, understandings, obligations, commitments, agreements or contracts, whether written or oral, between the parties respecting the subject matter hereof, including, without limitation, any negotiations, understandings or agreements with respect to participating in the equity (including options thereon) in the Company except to the extent reflected in a share certificate heretofore issued in the name of Optionee or in a fully

executed written option agreement under an established option plan with the Company. This Agreement may not be modified, amended, altered or supplemented except by means of the execution and delivery of a written instrument mutually executed by both parties.

The parties hereby have entered into this Agreement as of the Grant Date.

LOCAL MOTION ITS, INC.

By: _____
         Jon Michael Monson, Chief Executive Officer

OPTIONEE:

By: *Marsha Louise Madrid* 12/3/03
         Marsha Louise Madrid

Attachments: (1) Spousal Consent
                       (2) 2003 Stock Option Plan

## CONSENT OF SPOUSE

I am the spouse of Marsha Louise Madrid, who, together with Local Motion ITS, Inc. (the "**Company**"), has entered into the Stock Option Agreement, to which this Consent is attached. Capitalized terms not defined herein will have the meaning set forth in such agreement.

I have read and understand the Stock Option Agreement and the Company's 2003 Stock Option Plan (the "Option Plan"). I acknowledge that, by execution hereof, I am bound by the Stock Option Agreement and the Option Plan, as to any and all interests I may have in the Option and the Option Shares. In particular, I understand and agree that the Option and the Option Shares (including any interest that I may have therein) are subject to certain repurchase rights in the Company and certain restrictions on transfer.

I also agree with my spouse and the Company that if my spouse and I ever get divorced or enter into any marital property settlement agreement, or if my spouse or I ever seek a decree of separate maintenance, to the extent my spouse has or can obtain assets other than the Option and the Option Shares in amounts and of value sufficient to settle or satisfy any marital property claims I may have in the value of the Option and the Option Shares, I will accept such other assets in settlement of those claims.

I agree that I will not do anything to try to prevent the operation of any part of the Stock Option Agreement or the Option Plan. I acknowledge that I have had an opportunity to obtain independent counsel to advise me concerning the matters contained herein.

_____

Signature

Name: Richard Madric

Date: 11/30/03

# SCHEDULES 3.1(b)



# Commonwealth of Virginia

## STATE CORPORATION COMMISSION

*Richmond, April 8, 2003*

*This is to certify that the certificate of incorporation of*

## LOCAL MOTION ITS, INC.

*was this day issued and admitted to record in this office and that the said corporation is authorized to transact its business subject to all Virginia laws applicable to the corporation and its business. Effective date: April 8, 2003*



State Corporation Commission
Attest:

*Joel H. Peck*
Clerk of the Commission

CIS0322