# SCHEDULE 3.1(e)

**Schedule 3.1(e)**

**Regulatory Approvals and Consents**

None

# SCHEDULE 3.1(g)

## Schedule 3.1(g)

## Shares/Capitalization

The Company and Sellers certify the following 1000 shares of common stock are issued and outstanding immediately prior to Closing and these shares represent 100% of the issued and outstanding common stock of the Company.

| | |
|---|---|
| Ryan James Larsen | 303.3 shares |
| Janet Sue Davis | 303.3 shares |
| Kevin John Dresser | 303.4 shares |
| Marsha Louise Madrid | 90.0 shares |

In exchange for the consideration contained in the Share Purchase Agreement, the Sellers, individually and collectively, agree to sell to Purchaser 800 shares of the 1000 issued and outstanding shares of the Company to Purchaser. Immediately after Closing, the following shall be the new distribution of shares, then representing 100% of the common stock of the Company:

| | |
|---|---|
| MV Transportation, Inc. | 800 shares |
| Ryan James Larsen | 75 shares |
| Janet Sue Davis | 75 shares |
| Kevin John Dresser | 0 shares |
| Marsha Louise Madrid | 50 shares |

**SELLERS**

_____
Witness

_____
Ryan James Larsen

_____
Witness

_____
Janet Sue Davis

_____
Witness

_____
Marsha Louise Madrid

_____
Witness

_____
Kevin John Dresser

**PURCHASER**

_____
Witness

_____
Jon Monson, Chief Executive Officer

**SELLERS**

Witness
_____

Ryan James Larsen
_____

Witness
_____

Janet Sue Davis
_____

Witness
_____

Marsha Louise Madrid
_____

Witness
_____

Kevin John Dresser
_____

**PURCHASER**

Witness
_____

Jon Monson, Chief Executive Officer
_____

**SELLERS**

Witness
_____

Witness
_____

Witness
_____

Witness
_____

**PURCHASER**

Witness
_____

Ryan James Larsen
_____

Janet Sue Davis
_____

Marsha Louise Madrid
_____

Kevin John Dresser
_____

Jon Monson, Chief Executive Officer
_____

**SELLERS**

_____
Witness

_____
Witness

_____
Witness

_____
Witness

**PURCHASER**

_____
Witness

_____
Ryan James Larsen

_____
Janet Sue Davis

_____
Marsha Louise Madrid

_____
Kevin John Dresser

_____
Jon Monson, Chief Executive Officer

**SELLERS**

_____
Witness

_____
Ryan James Larsen

_____
Witness

_____
Janet Sue Davis

_Marsha Louise Madrid_
Marsha Louise Madrid

_____
Witness

_____
Kevin John Dresser

_____
Witness

**PURCHASER**

_____
Witness

_____
Jon Monson, Chief Executive Officer

**SELLERS**

_____        _____
Witness                            Ryan James Larsen

_____        _____
Witness                            Janet Sue Davis

_____        _____
Witness                            Marsha Louise Madrid

_____        _____
Witness                            Kevin John Dresser

**PURCHASER**

_____        _____
Witness                            Jon Monson, Chief Executive Officer

# SCHEDULE 3.1(k)

## Schedule 3.1(k)

### Permits, Licenses, Registrations and Authorizations

Business Enterprise Certification" from the Virginia Dept of Business Assistance



## Schedule 3.1(k)

### Permits, Licenses, Registrations and Authorizations

Business Enterprise Certification" from the Virginia Dept of Business Assistance

**Schedule 3.1(k)**

**Permits, Licenses, Registrations and Authorizations**

Business Enterprise Certification" from the Virginia Dept of Business Assistance

Ow
12/5/03

**Schedule 3.1(k)**

**Permits, Licenses, Registrations and Authorizations**

Business Enterprise Certification" from the Virginia Dept of Business Assistance

# SCHEDULE 3.1(l)

**Projected**
**Local Motion Balance Sheet**
**as of 11/30/2003**



Assets

Current Assets
| | |
|---|---|
| Cash | $2,381.00 |
| Accounts Receivable (HRT) | $19,925.00 |
| Deposits | $3,550.00 |
| Refund of Rent in Virginia (for Dec) | $100.00 |
| Total Current Assets | $25,956.00 |

Property and Equipment

| | |
|---|---|
| Real Estate | $1.00 |
| Total Property and Equipment | $1.00 |
| Total Assets | $25,957.00 |

Liabilities and Stockholders Equity

Current Liabilities

| | |
|---|---|
| Accounts Payable | $47,682.31 |
| Accrued Employment Costs | $34,577.52 |
| Deposits from Tenants | $250.00 |
| Total Current Liabilities | $82,509.83 |

Long-term Liabilities

| | |
|---|---|
| Notes Payable - Officers | $166,500.00 |
| Total Long-term Liabilities | $166,500.00 |

Stockholder's Equity

| | |
|---|---|
| Paid in Capital | $400.00 |
| Retained Earnings | -$223,452.00 |
| Total Stockholder's Equity | -$223,052.00 |
| Total Liabilities and Stockholders Equity | $25,957.83 |

**Projected**
**Local Motion Balance Sheet**
**as of 11/30/2003**

Assets

Current Assets
| | |
|---|---|
| Cash | $2,381.00 |
| Accounts Receivable (HRT) | $19,925.00 |
| Deposits | $3,550.00 |
| Refund of Rent In Virginia (for Dec) | $100.00 |
| Total Current Assets | $25,956.00 |

Property and Equipment

| | |
|---|---|
| Real Estate | $1.00 |

| | |
|---|---|
| Total Property and Equipment | $1.00 |

| | |
|---|---|
| Total Assets | $25,957.00 |

Liabilities and Stockholders Equity

Current Liabilities

| | |
|---|---|
| Accounts Payable | $47,682.31 |
| Accrued Employment Costs | $34,577.52 |
| Deposits from Tenants | $250.00 |

| | |
|---|---|
| Total Current Liabilities | $82,509.83 |

Long-term Liabilities

| | |
|---|---|
| Notes Payable - Officers | $166,500.00 |

| | |
|---|---|
| Total Long-term Liabilities | $166,500.00 |

Stockholder's Equity

| | |
|---|---|
| Paid in Capital | $400.00 |
| Retained Earnings | -$223,452.00 |

| | |
|---|---|
| Total Stockholder's Equity | -$223,052.00 |

| | |
|---|---|
| Total Liabilities and Stockholders Equity | $25,957.83 |

*gw*
*12/5/03*

**Projected**
**Local Motion Balance Sheet**
**as of 11/30/2003**

Assets

Current Assets
    Cash                                        $2,381.00
    Accounts Receivable (HRT)       $19,925.00
    Deposits                            $3,550.00
    Refund of Rent in Virginia (for Dec)     $100.00
Total Current Assets                   $25,956.00

Property and Equipment

    Real Estate                      $1.00

Total Property and Equipment        $1.00

Total Assets                          $25,957.00

Liabilities and Stockholders Equity

Current Liabilities

    Accounts Payable             $47,682.31
    Accrued Employment Costs     $34,577.52
    Deposits from Tenants          $250.00

Total Current Liabilities           $82,509.83

Long-term Liabilities

    Notes Payable - Officers      $166,500.00

Total Long-term Liabilities        $166,500.00

Stockholder's Equity

    Paid in Capital              $400.00
    Retained Earnings       -$223,452.00

Total Stockholder's Equity       -$223,052.00

Total Liabilities and Stockholders Equity     $25,957.83

**Projected**
**Local Motion Balance Sheet**
**as of 11/30/2003**

Assets

| | |
|---|---|
| Current Assets | |
| Cash | $2,381.00 |
| Accounts Receivable (HRT) | $19,925.00 |
| Deposits | $3,550.00 |
| Refund of Rent in Virginia (for Dec) | $100.00 |
| Total Current Assets | $25,956.00 |

Property and Equipment

| | |
|---|---|
| Real Estate | $1.00 |
| Total Property and Equipment | $1.00 |

| | |
|---|---|
| Total Assets | $25,957.00 |

Liabilities and Stockholders Equity

Current Liabilities

| | |
|---|---|
| Accounts Payable | $47,682.31 |
| Accrued Employment Costs | $34,577.52 |
| Deposits from Tenants | $250.00 |
| Total Current Liabilities | $82,509.83 |

Long-term Liabilities

| | |
|---|---|
| Notes Payable - Officers | $166,500.00 |
| Total Long-term Liabilities | $166,500.00 |

Stockholder's Equity

| | |
|---|---|
| Paid in Capital | $400.00 |
| Retained Earnings | -$223,452.00 |
| Total Stockholder's Equity | -$223,052.00 |

| | |
|---|---|
| Total Liabilities and Stockholders Equity | $25,957.83 |



# SCHEDULE 3.1(m)

**Schedule 3.1(m)**

**Liabilities**

None.

# SCHEDULE 3.1(r)

## Schedule 3.1(r)

## Encumbrances

The following represents a full a complete list of all loans, notes and other financial liabilities of the Company at Closing, this the exception of normal trade payables and accrued payroll costs:

| | |
|---|---:|
| Note Payable to Marsha Louise Madrid | $24,000.00 |
| Note Payable to Janet Davis Note | $5,000.00 |
| Note Payable to Kevin Dresser Note | $110,600.00 |
| Note Payable to Ryan Larsen Note | $26,900.00 |

Company and Sellers certify and warrant that the above balances are true and collect and contain all interest charges, penalties and represents the pay-off balances of these Notes as of the Closing Date.

# SCHEDULE 3.1(s)

FROM : LOCAL MOTION            FAX NO. : 712-764-8401        Dec. 01 2003 08:41AM  P2

FROM : LOCAL MOTION            FAX NO. : 712 764-8401        Dec. 01 2003 08:00AM  P1

Fee $16.00 Paid
Transfer Fee $5.00     340J
Shelby County, Iowa
Filed for record September 10, 2003       ...t to County Auditor
                                   at 2:10 A.m.) September 11, 2003
at 2:10 P. m. Inst # 3460-03   Rec. ___ & Auditor's Fees Paid
Linda Jacobsen, Recorder/Registrar        Linda Studler.
                                      Deputy Recorder

_____ Linda Jacobsen _____
                Return to:
Document prepared by: Childs & Hall, P.C.; 1008 - 7th St., P.O. Box 726, Harlan, Iowa 51537

Smith Clinton, Shelby County ss.
Entered upon transfer books and for
taxation this 11th day of Sept.
2003 My fee collected by recorder.
MARSHA J. CARTER, County Auditor
_____ Kennedy Dunn _____
                              Deputy

Address of Tax Statement to: **BRYAN LARSEN 146 HWY 173**
                                        **ELK HORN, IA 51537**

Indexed ✓
Compared ✓
Paged ✓

## CORPORATE WARRANTY DEED

For the consideration of the sum of One Dollar and other valuable consideration City of Elk Horn, Iowa a municipal corporation organized and existing under the laws of Iowa does hereby convey to Local Motion IIS, Inc., the following described real estate in Shelby County, Iowa:

Out Lot D of College Heights Addition to the City of Elk Horn, Iowa, being a part of Lot 8 of the Original Town of Elk Horn, Iowa. except therefrom Lot 3 of Block 3 of College Heights Addition to the City of Elk Horn, Iowa.

Subject to the restrictions and uses retained by Salem Lutheran Homes.,

This transfer is exempt from transfer stamps as consideration is less than $500.00

The corporation hereby covenants with grantees, and successors in interest, that it holds the real estate by title in fee simple; that it has good and lawful authority to sell and convey the real estate; that the real estate is free and clear of all liens and encumbrances, except as may be above stated; and it covenants to Warrant and Defend the real estate against the lawful claims of all persons, except as may be above stated.

Words and phrases herein, including acknowledgment hereof, shall be construed as in the singular or plural number, according to the context.

_____ Dated this _____ day of September 2003.

City of Elk Horn, Iowa

By: _____ Howard R. Sorensen _____
     Howard Sorensen, Mayor

Attested:
_____ Jo Christoffersen _____
Jo Christoffersen, City Clerk

State of Shelby, County of Iowa, ss:

On this 4 day of Sept , 2003, before me, the undersigned, a Notary Public, personally appeared Howard Sorensen, Mayor and Jo Christoffersen, City Clerk, to me personally known, who being by me duly sworn, did say that they are the Mayor and City Clerk, respectively, of said municipal corporation; that the seal affixed to said instrument is the seal of said corporation and that said instrument was signed and sealed on behalf of said corporation by authority of its City Council; and that the said Mayor and City Clerk as such officers, acknowledged the execution of said instrument to be the voluntary act and deed of said corporation, by it and by them voluntarily executed.

_____ Lori Robertson _____
Notary Public


LORI ROBERTSON
Commission Number 197208
My Commission Expires
9-13-05

SCHEDULE A

The following restrictions and retained usages shall last into perpetuity unless otherwise stated hereafter:

1. The real estate described in the deed shall not be used in competition with the mission of Salem Lutheran Homes and such restriction on use includes use as a licensed nursing home, a licensed residential home, an assisted living facility, a general hospital and a home health care agency.

2. Salem Lutheran Homes shall receive the right of first refusal for the purchase of the property in the event it is to be sold, other than by the City of Elk Horn, Iowa, within twenty years of the date of this deed. In the event Salem Lutheran Homes refuses to purchase said property, the Elk Horn Lutheran Church shall have a second right of refusal to purchase said property.

3. Salem Lutheran Homes retains unencumbered access to the records, paint, supplies, and activities department storage located in the basement for a period of five years.

4. Salem Lutheran Homes retains the right to use the chapel located on the west end of the property for Salem Lutheran Homes meetings, community meeting purposes and for religious purposes for a period of five years.

5. Salem Lutheran Homes retains the right to remove such of its personal property from the building as approved by the owner for a period of up to one year.

FROM : LOCAL MOTION                     FAX NO. : 712-764-8401

Return to: Childs & Hall

Indexed ✓
Compared ✓
Paged ✓

Dec. 01 2003 08:42AM  P4
Fee $20.00 Paid        3459

Shelby County, Iowa
Filed for record September 10, 2003

at 2:05 P. m. Inst. # 3459-03
Linda Jacobsen, Recorder/Registrar

*Linda Jacobsen*

RESOLUTION NO. 2003-9-1

## A RESOLUTION TO TRANSFER PUBLIC PROPERTY
## TO LOCAL MOTION ITS, INC.

WHEREAS, after publication of notice of public hearing, a hearing was held and careful study was made as to the proposal to transfer to Local Motion ITS, Inc. the real estate received by the City of Elk Horn, Iowa from Salem Lutheran Homes, and

WHEREAS, the City of Elk Horn, Iowa previously received the real estate legally described as follows:

Out Lot D of College Heights Addition to the City of Elk Horn, Iowa, Being a part of Lot 8 of the Original Town of Elk Horn, Iowa, except therefrom Lot 3 of Block 3 of College Heights Addition to the City of Elk Horn, Iowa

from the Salem Lutheran Homes and said real estate has no benefit to the public, and

WHEREAS, pursuant to Iowa Code Chapter 15A economic development is a public purpose for which the city may provide assistance for the benefit of private persons, and

WHEREAS, an appraisal by an independent appraiser has determined that the real estate has no value, or a value of one dollar, and

WHEREAS Local Motion ITS, Inc. has proposed to the City of Elk Horn, Iowa that it intends to use said real estate for economic development to create job opportunities in the city of Elk Horn, Iowa and has offered the sum of one dollar for said property.

NOW THEREFORE BE IT RESOLVED by the City of Elk Horn, Iowa that the above-described real estate shall be conveyed to Local Motion ITS, Inc. for the sum of one dollar and for the proposed expressed purposes.

BE IT FURTHER RESOLVED that the Mayor and City Clerk be and they are hereby authorized, empowered and directed to execute a deed in conveyance of the above-described real estate to said Local Motion ITS, Inc.

Adopted and approved the _3rd_ day of _September_, 2003.

*Howard N. Sorensen*
Howard Sorensen, Mayor

Attest:

*Jo Christofferson*
Jo Christofferson, City Clerk

STATE OF IOWA         )
                      ) ss.
COUNTY OF SHELBY  )

On this __4__ day of ___Sept___, 2003 before me, the undersigned a notary public in and for said state, personally appeared Howard Sorensen and Jo Christofferson to me personally known, who being by me duly sworn, did say that they are mayor and city clerk respectively of the City of Elk Horn, Iowa, a municipal corporation, that said instrument was signed and sealed on behalf of the City of Elk Horn, Iowa by authority of its city counsel, and that Howard Sorensen and Jo Christofferson, as such officers, acknowledged the execution of said instrument to be the voluntary act and deed of said corporation by it voluntarily executed.



Notary Public

LORI ROBERTSON
Commission Number 157696
My Commission Expires
7-13-05



MICHAEL P. CHILDS
mpchilds@lchclaw.com

ROBERT W. HALL
rwhall@lchclaw.com

AMY L. ZACHARIAS
amyz@lchclaw.com

**Branch Offices:**

Elk Horn, Iowa
(712) 764-6062

Neola, Iowa
(712) 485-2245

# CHILDS & HALL, P.C.
## Attorneys At Law

1005 SEVENTH STREET
P.O. BOX 726
HARLAN, IA 51537
TEL: (712) 755-2111
FAX: (712) 755-2112

September 12, 2003

Local Motion, LLC
% Ryan Larsen
146 Highway 173
Elk Horn, IA 51531

Dear Ryan:

I am enclosing your deeds and the city resolution relative to the transfer of property. You may want to note that in the deed from Salem Homes to the City of Elk Horn the restrictions are listed in that form.

We have advanced $42.00 on your behalf in order to record those documents.

Very truly yours,

CHILDS & HALL, P.C.

By:

MPC:lb

enc.

FROM : LOCAL MOTION          FAX NO. : 712-764-8401          Dec. 01 2003 08:43AM  P7

---

| NEW | |
| --- | --- |
| Renewal of Number | |

## United States Liability Insurance Group
### 190 South Warner Road
### Wayne, PA  19087

COMMERCIAL
LIABILITY
POLICY

CUSTOMER COPY

**POLICY DECLARATIONS**

☐ United States Liability Insurance Company
☑ Mount Vernon Fire Insurance Company
☐ United States Underwriters Insurance Company

**CL2264526**

Named Insured  **LOCAL MOTION ITS, INC.**
Address  **2024 COLLEGE STREET**
 **ELK HORN, IA 51531**

Policy Period  09/22/2003 To 09/22/2004
Form Of Business  Corporation
Business Description  Vacant Building

12:01 AM STANDARD TIME AT YOUR
MAILING ADDRESS SHOWN ABOVE

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A LIMIT OF INSURANCE IS INDICATED.

| Coverage Part | Limits Of Insurance | Premium |
| --- | --- | --- |
| **Commercial General Liability** | | **$750.00** |
| Each Occurrence Limit | $300,000 | |
| Personal & Advertising Injury Limit (Any One Person/Organization) | $300,000 | |
| Medical Expense Limit (Any One Person) | $1,000 | |
| Damage To Premises Rented To You (Any One Premises) | $100,000 | |
| Products/Completed Operations Aggregate Limit | Excluded | |
| General Aggregate Limit (Other Than Products/Completed Operations) | $600,000 | |
| **Liquor Liability** | | |
| Each Common Cause Limit | Not Covered | |
| Aggregate Limit | Not Covered | |
| **Professional Liability** | | |
| Each Claim/Medical Incident Limit | Not Covered | |
| Aggregate Limit | Not Covered | |
| **Other** | | |

Total Advance Premium For This Policy (This Premium may be subject to adjustment.)    $750.00

Location Of All Premises You Own, Rent, Or Occupy: 1) 2024 College Street, Elk Horn IA

**PREMIUM COMPUTATION**

| Location Territory | Classification | Code No. | Premium Basis | Rate Pr/Co | All Other | Advance Premium Pr/Co | All Other |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 1 002 | Vacant Bldg-Not Factory-OTNFP | 68606 | A) 27000 | Excl | 27.780 | Excl | $750 |

Coverage Form(s)/Part(s) and Endorsement(s) made a part of this policy at time of issue: **See Endorsement EOD (01/95)**

| Policy Premium | $750.00 |
| --- | --- |
| Policy Fee | $100.00 |
| E&S Tax | $17.00 |
| Total | $867.00 |
| Agent | RDS GROUP |

Issued Date: 09/25/2003

By _____
Authorized Representative

This policy is issued, pursuant to Iowa
Code section 515-147, by an approved,
nonadmitted company in Iowa and as
such is not covered by the Iowa
Insurance Guaranty Association

BIG M AGENCY
POLICY PROCESSING FEE
$30

CLD (4/2000)

FROM : LOCAL MOTION                    FAX NO. : 712-764-8401          Dec. 01 2003 08:44AM  P8

FROM : LOCAL MOTION                    FAX NO. : 712 764-8401          Dec. 01 2003 08:09AM  P2

Fee $21.00 Paid
Transfer Fee $5.00    3458          Delivered to County Auditor        State of Iowa, Shelby County ss.
Shelby County, Iowa                                                    Entered upon transfer books and for
Filed for record __September 10___ 2003 at 8:00 AM on _September 11__ 2003   taxation this 11th day of Sept
at 2:00 P. __ ___ 3458-03         Recorder's & Auditor's Fees Paid     2003 My fee collected by recorder.
Linda Jacobson, Recorder/Registar     Linda STEPHEN                    MARSHA J. CARTER, County Auditor
                                         Deputy Recorder                Kamaja Osem
                     Return to:                                                        Deputy
Indexed
Compared          Document prepared by: Childs & Hall, P.C.; 1005 – 7th St., P.O. Box 726, Harlan, Iowa 51537
Paged                                 Address of Tax Statement: Exempt from taxes

## CORPORATE WARRANTY DEED

For the consideration of the sum of One Dollar and other valuable consideration Salem Lutheran Homes, a corporation organized and existing under the laws of Iowa does hereby convey to City of Elk Horn, Iowa, the following described real estate in Shelby County, Iowa:

Out Lot D of College Heights Addition to the City of Elk Horn, Iowa, being a part of Lot 8 of the Original Town of Elk Horn, Iowa, except therefrom Lot 3 of Block 3 of College Heights Addition to the City of Elk Horn, Iowa.

Subject to the restrictions and uses retained by Salem Lutheran Homes as described in the attached Schedule A.

This transfer is exempt from transfer stamps as consideration is less than $500.00

The corporation hereby covenants with grantees, and successors in interest, that it holds the real estate by title in fee simple; that it has good and lawful authority to sell and convey the real estate; that the real estate is free and clear of all liens and encumbrances, except as may be above stated; and it covenants to Warrant and Defend the real estate against the lawful claims of all persons, except as may be above stated.

Words and phrases herein, including acknowledgment hereof, shall be construed as in the singular or plural number, according to the context.

Dated this _25_ day of _August_, 2003.

                                        Salem Lutheran Homes

                                        By: _____
                                            Daniel E. Kem, President

                                        By: _____
                                            Herb Christensen, Secretary

State of Shelby, County of Iowa, ss:

On this _25_ day of _August_, 2003, before me, the undersigned, a Notary Public, personally appeared Daniel E. Kem, President and Herb Christensen, Secretary to me personally known, who being by me duly sworn, did say that they are the President and Secretary, respectively, of said corporation; that said instrument was signed on behalf of said corporation by authority of its Board of Directors; and that the said Daniel E. Kem and Herb Christensen as such officers, acknowledged the execution of said instrument to be the voluntary act and deed of said corporation, by it and by them voluntarily executed.

                                        _____
                                        Notary Public

MICHAEL P. CHILDS
COMMISSION # 9088
MY COMMISSION EXPIRES
11-04-04

# SCHEDULE 3.1(s1)

### LEASE AGREEMENT

Lori
Robertson

**This lease agreement,** made and entered into on this
__7__ day of __November__, 2003.

by and  between ____Local Motion ITS, Inc (Lessor),

and ____Lori Robertson____ (Lessee)

### WITNESSETH:

WHEREAS Lessor owns an office building located on
2024 College Street in Elk Horn, IA and Lessee
desires to lease a portion of the building, and Lessor is
willing to lease such building on certain terms.
**THEREFORE,** for and in consideration of the premises and
the mutual covenants herein, the Lessor and the Lessee agree
as follows:

1.   **Demise Premises.** The Lessor hereby leases to the
Lessee, and the Lessee hereby leases from the Lessor
approximately __1507__ square feet, containing __2__ rooms,
situated in the County of Shelby , in the building located
at __2024 College Street__ , in Elk Horn, IA (the "Property").
The Lessee has inspected the premises and has agreed to accept
them in "as is" condition..

2.   **Use of Premises.** The Premises shall be used for and
confined to the following operations and purposes: a
__Fitness__ and _____ facility. The Lessee must
obtain prior written approval of the Lessor for any alternate
use.  The Premises shall not be used, occupied or kept in
violation of any law, municipal ordinance or regulation or in
any manner that could create a hazard affecting the Lessor's
insurance of the property and or the premises.

3.   **Term.** The term of this lease shall be for a period of
five One (1) year leases, commencing on __December 1__, 2004
("Original Term"). Subject to the terms and conditions set
forth herein, this lease shall automatically renew for
additional four one (1) year periods ("Renewal Terms"), unless
terminated as provided herein. Should this lease be renewed
for a period extending over the Original Term, or any renewal
term, the Lessor reserves the right to adjust the rent, as set
forth herein. Not withstanding the foregoing, the Lessor or
Lessee may terminate this lease upon the expiration of the
Original Term, or any renewal term, by providing the other
party with written notice of the termination not less than
thirty (30) days prior to expiration of the current term.

Failure to notify the Lessor of an intent to cancel the lease less than one month prior to the renewal of the lease will automatically trigger the renewal for one more year.

4.    **Rent.**
A.    For the premises and the original term set forth above, the Lessee agrees to pay the Landlord the monthly amount of _____*$250.*_____ per month, payable on the first day of each calendar month. On the first (1) day of ___*December*___ for each consecutive year of the Original Term and the 1st renewal term as set forth herein above, the monthly rent amount shall remain constant.

B.    Any rental payment or other monies not paid by the due date, including any grace period hereunder, shall be considered late. If any payment is not made within five (5) days of its due date, a late charge of five percent (5%) of the total monthly installment due shall immediately be assessed upon the amount of the delinquent rent or monies and the failure of the Lessee to promptly pay the same will constitute default and shall entitle the Lessor the right to terminate this lease as provided in paragraph 15. In the event that it becomes necessary for the Lessor to initiate legal proceedings to collect any of the rents or monies payable under this lease, the Lessee will pay all reasonable and necessary expenses incurred by the Lessor in such legal proceedings, including fifteen (15%) percent interest plus attorney's fees.

5.    **Place of Payment.** Any payment due form the Lessee to the Lessor shall be made to: _146 Hwy 173 Atlantic, IA 50022_ or hand-delivered to same address.

6.    **Security Deposit.** The Lessor acknowledges the receipt of 1 month's rent____ *$250.00*____ Dollars as a Security Deposit for the faithful performance by the Lessee of its obligations under this lease. No interest shall be paid on the security deposit. The security deposit shall be used for damages to the premises, exclusive of normal wear and tear, which occur during the term of this lease. Lessor shall have sole discretion to determine any such use of the security deposit. The balance of the security deposit, if any, will be returned to the Lessee at the mailing address provided by the Lessee within thirty (30) days of the termination of this lease.

7.    **Alterations and Additions.** The Lessee shall make no alterations or improvements to the premises, including but not limited to, the construction of additional walls or the moving

of walls, during any term of the lease without, first
obtaining written consent of the Lessor. Consent will not be
unreasonably withheld by the lessor to allow for alterations
that are necessary for the continued operation of the
business. All such alterations or improvements are subject to
final approval of the Lessor, and shall be constructed in a
workman like manner. Unless the Lessor shall otherwise agree
in writing, the Lessee shall be solely responsible for all
costs and expenses for all such alterations and improvements.
Lessee shall indemnify and hold Lessor harmless for any claim
or damages arising in connection with or related to such
alterations and improvements as provided in paragraph 12.

8.    **Taxes and Utilities.**  The Lessor shall pay for all
charges assessed against the premises during the initial term
of this lease for real estate taxes. The Lessee shall be
responsible for its own water and/or electricity, including
any hookup charges, deposits or other costs.

9.    **Moveable Furniture and Equipment.**  All moveable furniture
and equipment installed by the Lessee shall be removed at the
expiration or earlier termination of this Lease; PROVIDES that
the Lessee shall repair any and all damage incurred to the
Premises and /or property caused by removal and promptly
restore the premises and/or property to its original order and
condition. Any such furniture or equipment not removed at or
prior to termination shall be and become the property of the
Lessor.

10.   **Maintenance and Repairs.** The Lessor shall keep in good
repair the common areas, roof, walls, all electrical, heating,
cooling and plumbing systems, gutters, downspouts, and
exterior painting. In addition, the Lessor shall maintain the
grounds of the property including snow removal. However the
Lessor shall not be liable (and shall assess the costs against
the Lessee) when any repair is made necessary by the negligent
or willful acts of omissions of the Lessee, its agents,
invitees or employees, reasonable wear and tear excepted. The
Lessee shall, at its own expense, keep the premises in good
repair for the term of this Lease and at the expiration of the
Lease, deliver the Premises to the Lessor in like conditions
when take, reasonable wear and tear excepted. Each day the
Lessee occupies the premises, it shall maintain the premises I
clean, sanitary, neat and attractive condition. The premises
may contain a thermostat that regulates the heating and
cooling systems in the property. The Lessor shall determine
the proper setting for the thermostats and the Lessee shall
not change the setting without the prior written approval of
the Lessor. The Lessor shall maintain the thermostat at a

reasonable temperature.  The Lessor shall have access to the
thermostats (if any) on a regular basis, daily if necessary,
to ensure that the thermostat is being maintained at the
designated settings.

11.  **Signs.**  The Lessee shall obtain the verbal or written
approval of the Lessor prior to displaying any sign on the
exterior or interior of the premises.  Any such sign must be
of the size, color and style as the Lessor shall approve and
is also subject to local city ordinances.  The lessor shall
not withhold reasonable approval of requests for signage.

12.  **Indemnification and Insurance.**  The Lessee shall indemnify
and hold harmless and assume the defense of the Lessor, its
agents, employees and officials, from any and all claims,
liabilities, judgments, costs, damages and expenses of any
nature whatsoever, including the cost of defending such
claims, which may accrue against, be charged to, be recovered
from or sought to be recovered from the Lessor, its agents,
employees or officials, by reason of or on account of any
personal injury, sickness, or death of any person or damage to
property arising from the Lessee's use and occupancy of the
premises and the operation of its business. Lessee shall
obtain and maintain insurance coverage for these casualties,
during the term of this lease, and provide proof thereof to
Lessor.

The Lessee shall be responsible for any damages it, its
employees, agents, representatives or invitees may cause to
the premises or to any personal or other property belonging to
the Lessor that may be on the premises. Any insurance
purchased by the Lessor covering the Premises or its contents
will not provide coverage for any property belonging to the
Lessee. The Lessee is required to purchase and maintain
insurance coverage for any such property, i.e. furniture,
equipment, etc., and provide proof thereof to Lessor.

13.  **Release.**  The Lessee hereby releases the Lessor, its
agents, employees and officials, from any liability or
responsibility to the Lessee or any other person, claiming
through it by way subrogation or otherwise, for loss or damage
to the Lessee's property or the property of any of its agents,
employees, representative or invitees which is brought onto
the premises, regardless of how much loss or damage may occur,
even if such damage or loss may have been caused by flood or
other casualty or by the negligence of the Lessor, its agents,
employees or officials. It is expressly agreed and understood
that the Lessee, its agents, employees, representatives or
invitees, in bringing property in and onto the premises do so

4                                                    10/31/03

at their own risk.  The lessor will not engage in any activities that are negligent in nature or are a detriment to the lessees business activities.

14.  **Assigning and subletting.** The Lessee agrees not to sublet, assign, transfer, or mortgage this lease or sublet the premises I whole or in part without the prior written consent of the Lessor.  The Lessor shall have the right to require credit references, credit reports, additional security deposits, or other information prior to approval of any such assignment or sublet, it its sole discretion.

15.  **Termination.**  The Lessor may terminate this lease agreement at its sole option in the event of default by the Lessee, as defined in paragraph 16 herein.  Either the Lessor or the Lessee may terminate this lease upon written notice to the other party at least thirty (30) days prior to the expiration of the original term or any renewal term of this agreement, or as otherwise set forth herein. In the event that the Lessee does not exercise its renewal right as set forth herein, the lease agreement shall terminate at the end of the current one-year term.

16.  **Default.** The occurrence of any of the following conditions shall constitute an "Event of Default" under this lease and shall entitle the Lessor at its option to terminate this lease in which even the Lessee shall vacate the premises within ten (10) days of the date of notice to vacate:

    A.   The Lessee fails to pay within ten (10) days of the date due, any rent, additional rent, required deposits, service fees, or other monies provided for in this lease.

    B.   The premises are vacated even though the Lessee continues to pay stipulated monthly rent.

    C.   Any petition or other action is filed by or against the Lessee under any section or chapter of the federal bankruptcy act.

    D.   The Lessee becomes insolvent or transfers property in fraud of creditors.

    E.   The Lessee fails to comply with any provision or covenant of this lease, any agreement attached hereto and/or any of the rules and regulation that may be established by the Lessor from time to time.

    F.   The Lessee is responsible for and fails to remove or satisfy any mechanic's lien or other claim or lien assessed or charged against or otherwise encumbering the premises or property within thirty (30) days alter such lien or claim arises.

Should the Lessee fail to vacate the premises upon notice of termination, the Lessor shall have the right to enter the Premises and remove the lessee and its effects without being liable for any damages thereto. The failure of the Lessor to call for a termination of the lease at any time shall not constitute a waiver of the Lessor's right to do so at a subsequent time. Upon an event of default, in addition to termination, and all other rights of the Lessor by law, the Lessor shall be entitled to recover from the Lessee as liquidated damages all unpaid rent through the end of the term as well as any other sums for which the Lessee is liable under the terms of this lease, including attorney fees.

17.  **Damage or Destruction of Premises.** If the premises shall be damaged or destroyed in whole or in part, by fire, acts of God, war or casualty or any other means so as to make the same untenatable, the Lessor shall have the option of repairing the premises within ninety days (90) or of canceling this lease in its entirety as of the date of the damage or destruction of the premises. If the Lessor elects to rebuild, during the period that the premises are untenantable in part, the rent shall be prorated until the premises can be restored to a good and tenantable condition, proved that no abatement shall occur if the Lessee causes any delay in repair or restoration, or if such damage is caused by the negligent or willful acts or omissions of the Lessee, its agents or employees. A failure by the lessor to repair the premises within 90 days will result in an automatic cancellation of this agreement.

18.  **Holding Over.** If the Lessee remains in possession of the premises after the expiration of the Original Term, or any renewal thereof, as the case may be, such occupancy shall not be deemed or construed to be a renewal or extension of this lease, but shall operate to create a month to month tenancy under the conditions of this lease, so far as applicable, and the rental due for each period shall be two hundred percent (200%) of the rent normally payable under the terms of this lease unless otherwise agreed in writing by the Lessor.

19.  **Rules and Regulations.** The Lessor shall have the right from time to time to promulgate and enforce rules and regulations with respect to use and operation of the premises, property and common areas and to amend such rules and regulation from time to time. The Lessee shall faithfully observe and comply with these rules and regulations. At no time shall the enforcement of these rules and regulations interfere with the lessee's ability to conduct normal reasonable business.

20.  **Binding Successors.** This Lease is binding on the
     respective heirs, successors, representatives and
     assigns of the parties hereto.

21.  **Construction of lease.**
     A.    Applicable Law.  The laws of the State of Iowa shall
govern the validity, interpretation, performance and
enforcement of this lease.

     B.    Entire Agreement.  This lease and its attachments,
shall be considered to contain the entire agreement between
the parties hereto pertaining to the premises. All amendments
hereof shall be in writing and signed by both parties

WITNESS the following signatures and seals:

BY: _____
Lessor Name

Date: _____

Tenants

_____
(Corporation)

BY: _____
Title: _____

Date: _____

State OF Iowa, COUNTY OF Shelby, to-wit:

     The foregoing addendum was acknowledged before me this
___day of ____Nov____, 2003 by ___Ryan Larsen___, on behalf
of _____Local Motion_____

                                    ROGER PARKER
                                    Commission Number 133839
                                    My Commission Expires
                                         3/27/05

     My commission expires: _____

                          _____
                          Notary Public

7                                                    10/31/03

# LEASE AGREEMENT

*Larsens* *cation*

**This lease agreement,** made and entered into on this
31st day of _October_ , **2003.**

by and between _____ Local Motion ITS, Inc (Lessor),

and _____ *Larsens Cation* _____ (Lessee)

## WITNESSETH:

WHEREAS Lessor owns an office building located on
2024 College Street in Elk Horn, IA and Lessee
desires to lease a portion of the building, and Lessor is
willing to lease such building on certain terms.
**THEREFORE,** for and in consideration of the premises and
the mutual covenants herein, the Lessor and the Lessee agree
as follows:

1.   **Demise Premises.** The Lessor hereby leases to the
Lessee, and the Lessee hereby leases from the Lessor
approximately _2190_ square feet, containing _3_ rooms,
situated in the County of Shelby , in the building located
at_ 2024 College Street. _, in Elk Horn, IA(the "Property").
The Lessee has inspected the premises and has agreed to accept
them in "as is" condition..

2.   **Use of Premises.** The Premises shall be used for and
confined to the following operations and purposes: a
_Catering_ and _banquet_ facility. The Lessee must
obtain prior written approval of the Lessor for any alternate
use.   The Premises shall not be used, occupied or kept in
violation of any law, municipal ordinance or regulation or in
any manner that could create a hazard affecting the Lessor's
insurance of the property and or the premises.

3.   **Term.** The term of this lease shall be for a period of
five One (1) year leases, commencing on _Nov 1_ , 2003
("Original Term"). Subject to the terms and conditions set
forth herein, this lease shall automatically renew for
additional four one (1) year periods ("Renewal Terms"), unless
terminated as provided herein. Should this lease be renewed
for a period extending over the Original Term, or any renewal
term, the Lessor reserves the right to adjust the rent, as set
forth herein. Not withstanding the foregoing, the Lessor or
Lessee may terminate this lease upon the expiration of the
Original Term, or any renewal term, by providing the other
party with written notice of the termination not less than
thirty (30) days prior to expiration of the current term.

1                                                    10/14/03

Failure to notify the Lessor of an intent to cancel the lease less than one month prior to the renewal of the lease will automatically trigger the renewal for one more year.

4. **Rent.**

A. For the premises and the original term set forth above, the Lessee agrees to pay the Landlord the monthly amount of _$250.⁰⁰_ per month, payable on the first day of each calendar month. On the first (1) day of _November_ for each consecutive year of the Original Term and the 1ˢᵗ renewal term as set forth herein above, the monthly rent amount shall remain constant.

B. Any rental payment or other monies not paid by the due date, including any grace period hereunder, shall be considered late. If any payment is not made within five (5) days of its due date, a late charge of five percent (5%) of the total monthly installment due shall immediately be assessed upon the amount of the delinquent rent or monies and the failure of the Lessee to promptly pay the same will constitute default and shall entitle the Lessor the right to terminate this lease as provided in paragraph 15. In the event that it becomes necessary for the Lessor to initiate legal proceedings to collect any of the rents or monies payable under this lease, the Lessee will pay all reasonable and necessary expenses incurred by the Lessor in such legal proceedings, including fifteen (15%) percent interest plus attorney's fees.

5. **Place of Payment.** Any payment due form the Lessee to the Lessor shall be made to: 146 Hwy 173 Atlantic, IA 50022 or hand-delivered to the same address.

6. **Security Deposit.** The Lessor acknowledges the receipt of 1 month's rent _$250.⁰⁰_ Dollars as a Security Deposit for the faithful performance by the Lessee of its obligations under this lease. No interest shall be paid on the security deposit. The security deposit shall be used for damages to the premises, exclusive of normal wear and tear, which occur during the term of this lease. Lessor shall have sole discretion to determine any such use of the security deposit. The balance of the security deposit, if any, will be returned to the Lessee at the mailing address provided by the Lessee within thirty (30) days of the termination of this lease.

7. **Alterations and Additions.** The Lessee shall make no alterations or improvements to the premises, including but not limited to, the construction of additional walls or the moving

of walls, during any term of the lease without, first obtaining written consent of the Lessor. Consent will not be unreasonably withheld by the lessor to allow for alterations that are necessary for the continued operation of the business. All such alterations or improvements are subject to final approval of the Lessor, and shall be constructed in a workman like manner. Unless the Lessor shall otherwise agree in writing, the Lessee shall be solely responsible for all costs and expenses for all such alterations and improvements. Lessee shall indemnify and hold Lessor harmless for any claim or damages arising in connection with or related to such alterations and improvements as provided in paragraph 12.

8.    **Taxes and Utilities.**  The Lessor shall pay for all charges assessed against the premises during the initial term of this lease for real estate taxes.  The Lessee shall be responsible for its own water and/or electricity, including any hookup charges, deposits or other costs.

9.    **Moveable Furniture and Equipment.**  All moveable furniture and equipment installed by the Lessee shall be removed at the expiration or earlier termination of this Lease; PROVIDES that the Lessee shall repair any and all damage incurred to the Premises and /or property caused by removal and promptly restore the premises and/or property to its original order and condition. Any such furniture or equipment not removed at or prior to termination shall be and become the property of the Lessor.

10. **Maintenance and Repairs.** The Lessor shall keep in good repair the common areas, roof, walls, all electrical, heating, cooling and plumbing systems, gutters, downspouts, and exterior painting. In addition, the Lessor shall maintain the grounds of the property including snow removal. However the Lessor shall not be liable (and shall assess the costs against the Lessee) when any repair is made necessary by the negligent or willful acts of omissions of the Lessee, its agents, invitees or employees, reasonable wear and tear excepted.  The Lessee shall, at its own expense, keep the premises in good repair for the term of this Lease and at the expiration of the Lease, deliver the Premises to the Lessor in like conditions when take, reasonable wear and tear excepted.  Each day the Lessee occupies the premises, it shall maintain the premises I clean, sanitary, neat and attractive condition.  The premises may contain a thermostat that regulates the heating and cooling systems in the property.  The Lessor shall determine the proper setting for the thermostats and the Lessee shall not change the setting without the prior written approval of the Lessor.  The Lessor shall maintain the thermostat at a

reasonable temperature. The Lessor shall have access to the thermostats (if any) on a regular basis, daily if necessary, to ensure that the thermostat is being maintained at the designated settings.

11. **Signs.** The Lessee shall obtain the verbal or written approval of the Lessor prior to displaying any sign on the exterior or interior of the premises. Any such sign must be of the size, color and style as the Lessor shall approve and is also subject to local city ordinances. The lessor shall not withhold reasonable approval of requests for signage.

12. **Indemnification and Insurance.** The Lessee shall indemnify and hold harmless and assume the defense of the Lessor, its agents, employees and officials, from any and all claims, liabilities, judgments, costs, damages and expenses of any nature whatsoever, including the cost of defending such claims, which may accrue against, be charged to, be recovered from or sought to be recovered from the Lessor, its agents, employees or officials, by reason of or on account of any personal injury, sickness, or death of any person or damage to property arising from the Lessee's use and occupancy of the premises and the operation of its business. Lessee shall obtain and maintain insurance coverage for these casualties, during the term of this lease, and provide proof thereof to Lessor.

The Lessee shall be responsible for any damages it, its employees, agents, representatives or invitees may cause to the premises or to any personal or other property belonging to the Lessor that may be on the premises. Any insurance purchased by the Lessor covering the Premises or its contents will not provide coverage for any property belonging to the Lessee. The Lessee is required to purchase and maintain insurance coverage for any such property, i.e. furniture, equipment, etc., and provide proof thereof to Lessor.

13. **Release.** The Lessee hereby releases the Lessor, its agents, employees and officials, from any liability or responsibility to the Lessee or any other person, claiming through it by way of subrogation or otherwise, for loss or damage to the Lessee's property or the property of any of its agents, employees, representative or invitees which is brought onto the premises, regardless of how much loss or damage may occur, even if such damage or loss may have been caused by flood or other casualty or by the negligence of the Lessor, its agents, employees or officials. It is expressly agreed and understood that the Lessee, its agents, employees, representatives or invitees, in bringing property in and onto the premises do so

at their own risk.  The lessor will not engage in any activities that are negligent in nature or are a detriment to the Iessees business activities.

14.  **Assigning and subletting.**  The Lessee agrees not to sublet, assign, transfer, or mortgage this lease or sublet the premises I whole or in part without the prior written consent of the Lessor.  The Lessor shall have the right to require credit references, credit reports, additional security deposits, or other information prior to approval of any such assignment or sublet, it its sole discretion.

15.  **Termination.**  The Lessor may terminate this lease agreement at its sole option in the event of default by the Lessee, as defined in paragraph 16 herein.  Either the Lessor or the Lessee may terminate this lease upon written notice to the other party at least thirty (30) days prior to the expiration of the original term or any renewal term of this agreement, or as otherwise set forth herein. In the event that the Lessee does not exercise its renewal right as set forth herein, the lease agreement shall terminate at the end of the current one-year term.

16.  **Default.** The occurrence of any of the following conditions shall constitute an "Event of Default" under this lease and shall entitle the Lessor at its option to terminate this lease in which even the Lessee shall vacate the premises within ten (10) days of the date of notice to vacate:

A.  The Lessee fails to pay within ten (10) days of the date due, any rent, additional rent, required deposits, service fees, or other monies provided for in this lease.

B.  The premises are vacated even though the Lessee continues to pay stipulated monthly rent.

C.  Any petition or other action is filed by or against the Lessee under any section or chapter of the federal bankruptcy act.

D.  The Lessee becomes insolvent or transfers property in fraud of creditors.

E.  The Lessee fails to comply with any provision or covenant of this lease, any agreement attached hereto and/pr any of the rules and regulation that may be established by the Lessor from time to time.

F.  The Lessee is responsible for and fails to remove or satisfy any mechanic's lien or other claim or lien assessed or charged against or otherwise encumbering the premises or property within thirty (30) days alter such lien or claim arises.

Should the Lessee fail to vacate the premises upon notice of termination, the Lessor shall have the right to enter the Premises and remove the Iessee and its effects without being liable for any damages thereto. The failure of the Lessor to call for a termination of the lease at any time shall not constitute a waiver of the Lessor's right to do so at a subsequent time. Upon an event of default, in addition to termination, and all other rights of the Lessor by law, the Lessor shall be entitled to recover from the Lessee as liquidated damages all unpaid rent through the end of the tern as well as any other sums for which the Lessee is liable under the terms of this lease, including attorney fees.

17. **Damage or Destruction of Premises.** If the premises shall be damaged or destroyed in whole or in part, by fire, acts of God, war or casualty or any other means so as to make the same untenatable, the Lessor shall have the option of repairing the premises within ninety days (90) or of canceling this lease in its entirety as of the date of the damage or destruction of the premises. If the Lessor elects to rebuild, during the period that the premises are untenantable in part, the rent shall be prorated until the premises can be restored to a good and tenantable condition, proved that no abatement shall occur if the Lessee causes any delay in repair or restoration, or if such damage is caused by the negligent or willful acts or omissions of the Lessee, its agents or employees. A failure by the lessor to repair the premises within 90 days will result in an automatic cancellation of this agreement.

18. **Holding Over.** If the Lessee remains in possession of the premises after the expiration of the Original Term, or any renewal thereof, as the case may be, such occupancy shall not be deemed or construed to be a renewal or extension of this lease, but shall operate to create a month to month tenancy under the conditions of this lease, so far as applicable, and the rental due for each period shall be two hundred percent (200%) of the rent normally payable under the terms of this lease unless otherwise agreed in writing by the Lessor.

19. **Rules and Regulations.** The Lessor shall have the right from time to time to promulgate and enforce rules and regulations with respect to use and operation of the premises, property and common areas and to amend such rules and regulation from time to time. The Lessee shall faithfully observe and comply with these rules and regulations. At no time shall the enforcement of these rules and regulations interfere with the lessee's ability to conduct normal reasonable business.

20. **Binding Successors.** This Lease is binding on the respective heirs, successors, representatives and assigns of the parties hereto.

21. **Construction of lease.**
A. Applicable Law. The laws of the State of Iowa shall govern the validity, interpretation, performance and enforcement of this lease.

B. Entire Agreement. This lease and its attachments, shall be considered to contain the entire agreement between the parties hereto pertaining to the premises. All amendments hereof shall be in writing and signed by both parties

WITNESS the following signatures and seals:

*Local Motion ITS, Inc*

BY: *Ryan J. Larsen*
Lessor Name

Date: *10/31/03*

Tenants

*Larsen's Catering*
(Corporation)
BY: *Neal Larsen*
Title: *Owner*

Date: *10-31-03*

State OF Iowa, COUNTY OF Shelby, to-wit:

The foregoing addendum was acknowledged before me this *31* day of *Oct*, 2003 by *Ryan Larsen*, on behalf of *Local Motion Inc*

My commission expires: *9-13-05*

*Lori Robertson*
Notary Public


LORI ROBERTSON
Commission Number 157696
My Commission Expires
9-13-05

10/14/03

ATTACHMENT A

Description of the Space to be rented

1 Dining Room approximately 33' x 30'
1 Kitchen approximately 24' x 30'
1 Storage Room approximately 16' x 13'
1 Walk-in Cooler
1 bathroom

Lessor Name  _Kyn Larse_

_10/31/03_
Date

Tenant Name  _Neal Larsen_

_10 - 31- 03_
Date

*Back*
*Alley Cat*

## LEASE AGREEMENT

**This lease agreement,** made and entered into on this
_____ day of _Novenber_ , 2003.

by and  between  _____  Local Motion ITS, Inc (Lessor),

and _Back Alley Cats_ _____ (Lessee)

### WITNESSETH:

WHEREAS Lessor owns an office building located on
2024 College Street in Elk Horn, IA and Lessee
desires to lease a portion of the building, and Lessor is
willing to lease such building on certain terms.
**THEREFORE,** for and in consideration of the premises and
the mutual covenants herein, the Lessor and the Lessee agree
as follows:

1.   **Demise Premises.** The Lessor hereby leases to the
Lessee, and the Lessee hereby leases from the Lessor
approximately _368_ square feet, containing _3_ rooms,
situated in the County of Shelby , in the building located
at   2024 College Street   , in Elk Horn, IA (the "Property").
The Lessee has inspected the premises and has agreed to accept
them in "as is" condition..

2.   **Use of Premises.** The Premises shall be used for and
confined to the following operations and purposes: a
_beauty salon_ and _tanning_ facility. The Lessee must
obtain prior written approval of the Lessor for any alternate
use.  The Premises shall not be used, occupied or kept in
violation of any law, municipal ordinance or regulation or in
any manner that could create a hazard affecting the Lessor's
insurance of the property and or the premises.

3.   **Term.** The term of this lease shall be for a period of
five One (1) year leases, commencing on _December 1_ , 2003
("Original Term"). Subject to the terms and conditions set
forth herein, this lease shall automatically renew for
additional four one (1) year periods ("Renewal Terms"), unless
terminated as provided herein. Should this lease be renewed
for a period extending over the Original Term, or any renewal
term, the Lessor reserves the right to adjust the rent, as set
forth herein. Not withstanding the foregoing, the Lessor or
Lessee may terminate this lease upon the expiration of the
Original Term, or any renewal term, by providing the other
party with written notice of the termination not less than
thirty (30) days prior to expiration of the current term.

1                                                    11/4/03

Failure to notify the Lessor of an intent to cancel the lease
less than one month prior to the renewal of the lease will
automatically trigger the renewal for one more year.

4.    **Rent.**
A.    For the premises and the original term set forth above,
the Lessee agrees to pay the Landlord the monthly amount of
_____ $200_____ per month,
payable on the first day of each calendar month.  On the first
(1) day of _December_____ for each consecutive year of the
Original Term and the 1st renewal term as set forth herein
above, the monthly rent amount shall remain constant.

B.    Any rental payment or other monies not paid by the due
date, including any grace period hereunder, shall be
considered late.  If any payment is not made within five (5)
days of its due date, a late charge of five percent (5%) of
the total monthly installment due shall immediately be
assessed upon the amount of the delinquent rent or monies and
the failure of the Lessee to promptly pay the same will
constitute default and shall entitle the Lessor the right to
terminate this lease as provided in paragraph 15.  In the
event that it becomes necessary for the Lessor to initiate
legal proceedings to collect any of the rents or monies
payable under this lease, the Lessee will pay all reasonable
and necessary expenses incurred by the Lessor in such legal
proceedings, including fifteen (15%) percent interest plus
attorney's fees.

5.    **Place of Payment.** Any payment due form the Lessee to the
Lessor shall be made to:  146 Hwy 173 Atlantic, IA 50022 or
hand-delivered to the same address.

6.    **Security Deposit.**  The Lessor acknowledges the receipt of
1 month's rent    $200.00    Dollars as a Security
Deposit for the faithful performance by the Lessee of its
obligations under this lease. No interest shall be paid on the
security deposit.  The security deposit shall be used for
damages to the premises, exclusive of normal wear and tear,
which occur during the term of this lease.  Lessor shall have
sole discretion to determine any such use of the security
deposit.  The balance of the security deposit, if any, will be
returned to the Lessee at the mailing address provided by the
Lessee within thirty (30) days of the termination of this
lease.

7.    **Alterations and Additions.** The Lessee shall make no
alterations or improvements to the premises, including but not
limited to, the construction of additional walls or the moving

of walls, during any term of the lease without, first
obtaining written consent of the Lessor.  Consent will not be
unreasonably withheld by the lessor to allow for alterations
that are necessary for the continued operation of the
business.  All such alterations or improvements are subject to
final approval of the Lessor, and shall be constructed in a
workman like manner.  Unless the Lessor shall otherwise agree
in writing, the Lessee shall be solely responsible for all
costs and expenses for all such alterations and improvements.
Lessee shall indemnify and hold Lessor harmless for any claim
or damages arising in connection with or related to such
alterations and improvements as provided in paragraph 12.

8.    **Taxes and Utilities.**  The Lessor shall pay for all
charges assessed against the premises during the initial term
of this lease for real estate taxes.  The Lessee shall be
responsible for its own water and/or electricity, including
any hookup charges, deposits or other costs.

9.    **Moveable Furniture and Equipment.**  All moveable furniture
and equipment installed by the Lessee shall be removed at the
expiration or earlier termination of this Lease; PROVIDES that
the Lessee shall repair any and all damage incurred to the
Premises and /or property caused by removal and promptly
restore the premises and/or property to its original order and
condition. Any such furniture or equipment not removed at or
prior to termination shall be and become the property of the
Lessor.

10. **Maintenance and Repairs.** The Lessor shall keep in good
repair the common areas, roof, walls, all electrical, heating,
cooling and plumbing systems, gutters, downspouts, and
exterior painting. In addition, the Lessor shall maintain the
grounds of the property including snow removal. However the
Lessor shall not be liable (and shall assess the costs against
the Lessee) when any repair is made necessary by the negligent
or willful acts of omissions of the Lessee, its agents,
invitees or employees, reasonable wear and tear excepted.  The
Lessee shall, at its own expense, keep the premises in good
repair for the term of this Lease and at the expiration of the
Lease, deliver the Premises to the Lessor in like conditions
when take, reasonable wear and tear excepted.  Each day the
Lessee occupies the premises, it shall maintain the premises I
clean, sanitary, neat and attractive condition.  The premises
may contain a thermostat that regulates the heating and
cooling systems in the property.  The Lessor shall determine
the proper setting for the thermostats and the Lessee shall
not change the setting without the prior written approval of
the Lessor.  The Lessor shall maintain the thermostat at a

reasonable temperature.  The Lessor shall have access to the
thermostats (if any) on a regular basis, daily if necessary,
to ensure that the thermostat is being maintained at the
designated settings.

11.  **Signs.**  The Lessee shall obtain the verbal or written
approval of the Lessor prior to displaying any sign on the
exterior or interior of the premises.  Any such sign must be
of the size, color and style as the Lessor shall approve and
is also subject to local city ordinances.  The lessor shall
not withhold reasonable approval of requests for signage.

12. **Indemnification and Insurance.**  The Lessee shall indemnify
and hold harmless and assume the defense of the Lessor, its
agents, employees and officials, from any and all claims,
liabilities, judgments, costs, damages and expenses of any
nature whatsoever, including the cost of defending such
claims, which may accrue against, be charged to, be recovered
from or sought to be recovered from the Lessor, its agents,
employees or officials, by reason of or on account of any
personal injury, sickness, or death of any person or damage to
property arising from the Lessee's use and occupancy of the
premises and the operation of its business. Lessee shall
obtain and maintain insurance coverage for these casualties,
during the term of this lease, and provide proof thereof to
Lessor.

The Lessee shall be responsible for any damages it, its
employees, agents, representatives or invitees may cause to
the premises or to any personal or other property belonging to
the Lessor that may be on the premises. Any insurance
purchased by the Lessor covering the Premises or its contents
will not provide coverage for any property belonging to the
Lessee. The Lessee is required to purchase and maintain
insurance coverage for any such property, i.e. furniture,
equipment, etc., and provide proof thereof to Lessor.

13.  **Release.**  The Lessee hereby releases the Lessor, its
agents, employees and officials, from any liability or
responsibility to the Lessee or any other person, claiming
through it by way subrogation or otherwise, for loss or damage
to the Lessee's property or the property of any of its agents,
employees, representative or invitees which is brought onto
the premises, regardless of how much loss or damage may occur,
even if such damage or loss may have been caused by flood or
other casualty or by the negligence of the Lessor, its agents,
employees or officials. It is expressly agreed and understood
that the Lessee, its agents, employees, representatives or
invitees, in bringing property in and onto the premises do so

at their own risk.  The lessor will not engage in any
activities that are negligent in nature or are a detriment to
the lessees business activities.

14.  **Assigning and subletting.** The Lessee agrees not to
sublet, assign, transfer, or mortgage this lease or sublet the
premises I whole or in part without the prior written consent
of the Lessor.  The Lessor shall have the right to require
credit references, credit reports, additional security
deposits, or other information prior to approval of any such
assignment or sublet, it its sole discretion.

15.  **Termination.**  The Lessor may terminate this lease
agreement at its sole option in the event of default by the
Lessee, as defined in paragraph 16 herein.  Either the Lessor
or the Lessee may terminate this lease upon written notice to
the other party at least thirty (30) days prior to the
expiration of the original term or any renewal term of this
agreement, or as otherwise set forth herein.  In the event that
the Lessee does not exercise its renewal right as set forth
herein, the lease agreement shall terminate at the end of the
current one-year term.

16.  **Default.** The occurrence of any of the following
conditions shall constitute an "Event of Default" under this
lease and shall entitle the Lessor at its option to terminate
this lease in which even the Lessee shall vacate the premises
within ten (10) days of the date of notice to vacate:

    A.   The Lessee fails to pay within ten (10) days of the
        date due, any rent, additional rent, required
        deposits, service fees, or other monies provided for
        in this lease.

    B.   The premises are vacated even though the Lessee
        continues to pay stipulated monthly rent.

    C.   Any petition or other action is filed by or against
        the Lessee under any section or chapter of the
        federal bankruptcy act.

    D.   The Lessee becomes insolvent or transfers property
        in fraud of creditors.

    E.   The Lessee fails to comply with any provision or
        covenant of this lease, any agreement attached
        hereto and/pr any of the rules and regulation that
        may be established by the Lessor from time to time.

    F.   The Lessee is responsible for and fails to remove or
        satisfy any mechanic's lien or other claim or lien
        assessed or charged against or otherwise encumbering
        the premises or property within thirty (30) days
        alter such lien or claim arises.

Should the Lessee fail to vacate the premises upon notice of termination, the Lessor shall have the right to enter the Premises and remove the lessee and its effects without being liable for any damages thereto.  The failure of the Lessor to call for a termination of the lease at any time shall not constitute a waiver of the Lessor's right to do so at a subsequent time.  Upon an event of default, in addition to termination, and all other rights of the Lessor by law, the Lessor shall be entitled to recover from the Lessee as liquidated damages all unpaid rent through the end of the term as well as any other sums for which the Lessee is liable under the terms of this lease, including attorney fees.

17.  **Damage or Destruction of Premises.**  If the premises shall be damaged or destroyed in whole or in part, by fire, acts of God, war or casualty or any other means so as to make the same untenatable, the Lessor shall have the option of repairing the premises within ninety days (90) or of canceling this lease in its entirety as of the date of the damage or destruction of the premises.  If the Lessor elects to rebuild, during the period that the premises are untenantable in part, the rent shall be prorated until the premises can be restored to a good and tenantable condition, proved that no abatement shall occur if the Lessee causes any delay in repair or restoration, or if such damage is caused by the negligent or willful acts or omissions of the Lessee, its agents or employees.  A failure by the lessor to repair the premises within 90 days will result in an automatic cancellation of this agreement.

18.  **Holding Over.**  If the Lessee remains in possession of the premises after the expiration of the Original Term, or any renewal thereof, as the case may be, such occupancy shall not be deemed or construed to be a renewal or extension of this lease, but shall operate to create a month to month tenancy under the conditions of this lease, so far as applicable, and the rental due for each period shall be two hundred percent (200%) of the rent normally payable under the terms of this lease unless otherwise agreed in writing by the Lessor.

19.  **Rules and Regulations.**  The Lessor shall have the right from time to time to promulgate and enforce rules and regulations with respect to use and operation of the premises, property and common areas and to amend such rules and regulation from time to time.  The Lessee shall faithfully observe and comply with these rules and regulations.  At no time shall the enforcement of these rules and regulations interfere with the lessee's ability to conduct normal reasonable business.

6                                                    11/4/03

20. **Binding Successors.** This Lease is binding on the respective heirs, successors, representatives and assigns of the parties hereto.

21. **Construction of lease.**

A.    Applicable Law.   The laws of the State of Iowa shall govern the validity, interpretation, performance and enforcement of this lease.

B.    Entire Agreement.   This lease and its attachments, shall be considered to contain the entire agreement between the parties hereto pertaining to the premises. All amendments hereof shall be in writing and signed by both parties

WITNESS the following signatures and seals:

_Local Motion ITS, Inc_

BY: _Kim J. Larsen_
Lessor Name

Date: _11/4/03_

Tenants

_Back Alley Cuts_
(Corporation)

BY: _Carol Hawkeraser_
Title:

Date: _11/4/03_

State OF Iowa, COUNTY OF Shelby, to-wit:

The foregoing addendum was acknowledged before me this _4_ day of _November,_ 2003 by _Ryan Larsen_, on behalf of _Local Motion LLC_

My commission expires: _9-13 05_

_Lori Robertson_
Notary Public



LORI ROBERTSON
Commission Number 157696
My Commission Expires
9-13-05

7                                                                 11/4/03

ATTACHMENT A

Description of the Space to be rented
1 room    16' 2" × 12' 5"        1 closet  4' × 4'
1 room    16' 2" × 10' 2"
1 bathroom

Lessor Name _____

_____
Date   11/4/03

Tenant Name _____

_____
Date

## LEASE AGREEMENT

This lease agreement, made and entered into on this _14th_ day of _November_, 2003.

by and between _____Local Motion ITS, Inc (Lessor),

and _Mindy Peterson_ (Lessee)

### WITNESSETH:

WHEREAS Lessor owns an office building located on 2024 College Street in Elk Horn, IA and Lessee desires to lease a portion of the building, and Lessor is willing to lease such building on certain terms. THEREFORE, for and in consideration of the premises and the mutual covenants herein, the Lessor and the Lessee agree as follows:

1. **Demise Premises.** The Lessor hereby leases to the Lessee, and the Lessee hereby leases from the Lessor approximately _600_ square feet, containing _1_ rooms, situated in the County of _Shelby_, in the building located at _2024 College Street_, in Elk Horn, IA(the "Property"). The Lessee has inspected the premises and has agreed to accept them in "as is" condition. Premises shall be used for and confined to the following operations and purposes: a _aerobics_ and _____ facility. The Lessee must obtain prior written approval of the Lessor for any alternate use. The Premises shall not be used, occupied or kept in violation of any law, municipal ordinance or regulation or in any manner that could create a hazard affecting the Lessor's insurance of the property and or the premises.

3. **Term.** The term of this lease shall be for a period of five One (1) year leases, commencing on _January 1_, _2004_ ("Original Term"). Subject to the terms and conditions set forth herein, this lease shall automatically renew for additional four one (1) year periods ("Renewal Terms"), unless terminated as provided herein. Should this lease be renewed for a period extending over the Original Term, or any renewal term, the Lessor reserves the right to adjust the rent, as set forth herein. Not withstanding the foregoing, the Lessor or Lessee may terminate this lease upon the expiration of the Original Term, or any renewal term, by providing the other party with written notice of the termination not less than thirty (30) days prior to expiration of the current term.

1

11/13/03

Failure to notify the Lessor of an intent to cancel the lease less than one month prior to the renewal of the lease will automatically trigger the renewal for one more year.

4.   **Rent.**

A.   For the premises and the original term set forth above, the Lessee agrees to pay the Landlord the monthly amount of _$150.00_ _____ per month, payable on the first day of each calendar month.  On the first (1) day of _January_ for each consecutive year of the Original Term and the 1st renewal term as set forth herein above, the monthly rent amount shall remain constant.

B.   Any rental payment or other monies not paid by the due date, including any grace period hereunder, shall be considered late.  If any payment is not made within five (5) days of its due date, a late charge of five percent (5%) of the total monthly installment due shall immediately be assessed upon the amount of the delinquent rent or monies and the failure of the Lessee to promptly pay the same will constitute default and shall entitle the Lessor the right to terminate this lease as provided in paragraph 15.  In the event that it becomes necessary for the Lessor to initiate legal proceedings to collect any of the rents or monies payable under this lease, the Lessee will pay all reasonable and necessary expenses incurred by the Lessor in such legal proceedings, including fifteen (15%) percent interest plus attorney's fees.

5.   **Place of Payment.**  Any payment due form the Lessee to the Lessor shall be made to:  _146 Hwy 173 Atlantic, IA 50022_ or hand-delivered to the same address.

6.   **Security Deposit.**  The Lessor acknowledges the receipt of _1 month's rent_   _$150.00_ _____ Dollars as a Security Deposit for the faithful performance by the Lessee of its obligations under this lease. No interest shall be paid on the security deposit.  The security deposit shall be used for damages to the premises, exclusive of normal wear and tear, which occur during the term of this lease.  Lessor shall have sole discretion to determine any such use of the security deposit.  The balance of the security deposit, if any, will be returned to the Lessee at the mailing address provided by the Lessee within thirty (30) days of the termination of this lease.

7.   **Alterations and Additions.**  The Lessee shall make no alterations or improvements to the premises, including but not limited to, the construction of additional walls or the moving

11/13/03

of walls, during any term of the lease without, first obtaining written consent of the Lessor. Consent will not be unreasonably withheld by the lessor to allow for alterations that are necessary for the continued operation of the business. All such alterations or improvements are subject to final approval of the Lessor, and shall be constructed in a workman like manner. Unless the Lessor shall otherwise agree in writing, the Lessee shall be solely responsible for all costs and expenses for all such alterations and improvements. Lessee shall indemnify and hold Lessor harmless for any claim or damages arising in connection with or related to such alterations and improvements as provided in paragraph 12.

8.   **Taxes and Utilities.** The Lessor shall pay for all charges assessed against the premises during the initial term of this lease for real estate taxes. The Lessee shall be responsible for its own water and/or electricity, including any hookup charges, deposits or other costs.

9.   **Moveable Furniture and Equipment.** All moveable furniture and equipment installed by the Lessee shall be removed at the expiration or earlier termination of this Lease; PROVIDES that the Lessee*shall repair any and all damage incurred to the Premises and /or property caused by removal and promptly restore the premises and/or property to its original order and condition. Any such furniture or equipment not removed at or prior to termination shall be and become the property of the Lessor.

10.  **Maintenance and Repairs.** The Lessor shall keep in good repair the common areas, roof, walls, all electrical, heating, cooling and plumbing systems, gutters, downspouts, and exterior painting. In addition, the Lessor shall maintain the grounds of the property including snow removal. However the Lessor shall not be liable (and shall assess the costs against the Lessee) when any repair is made necessary by the negligent or willful acts of omissions of the Lessee, its agents, invitees or employees, reasonable wear and tear excepted. The Lessee shall, at its own expense, keep the premises in good repair for the term of this Lease and at the expiration of the Lease, deliver the Premises to the Lessor in like conditions when take, reasonable wear and tear excepted. Each day the Lessee occupies the premises, it shall maintain the premises I clean, sanitary, neat and attractive condition. The premises may contain a thermostat that regulates the heating and cooling systems in the property. The Lessor shall determine the proper setting for the thermostats and the Lessee shall not change the setting without the prior written approval of the Lessor. The Lessor shall maintain the thermostat at a

3

reasonable temperature. The Lessor shall have access to the thermostats (if any) on a regular basis, daily if necessary, to ensure that the thermostat is being maintained at the designated settings.

11. **Signs.** The Lessee shall obtain the verbal or written approval of the Lessor prior to displaying any sign on the exterior or interior of the premises. Any such sign must be of the size, color and style as the Lessor shall approve and is also subject to local city ordinances. The lessor shall not withhold reasonable approval of requests for signage.

12. **Indemnification and Insurance.** The Lessee shall indemnify and hold harmless and assume the defense of the Lessor, its agents, employees and officials, from any and all claims, liabilities, judgments, costs, damages and expenses of any nature whatsoever, including the cost of defending such claims, which may accrue against, be charged to, be recovered from or sought to be recovered from the Lessor, its agents, employees or officials, by reason of or on account of any personal injury, sickness, or death of any person or damage to property arising from the Lessee's use and occupancy of the premises and the operation of its business. Lessee shall obtain and maintain insurance coverage for these casualties, during the term of this lease, and provide proof thereof to Lessor.

The Lessee shall be responsible for any damages it, its employees, agents, representatives or invitees may cause to the premises or to any personal or other property belonging to the Lessor that may be on the premises. Any insurance purchased by the Lessor covering the Premises or its contents will not provide coverage for any property belonging to the Lessee. The Lessee is required to purchase and maintain insurance coverage for any such property, i.e. furniture, equipment, etc., and provide proof thereof to Lessor.

13. **Release.** The Lessee hereby releases the Lessor, its agents, employees and officials, from any liability or responsibility to the Lessee or any other person, claiming through it by way subrogation or otherwise, for loss or damage to the Lessee's property or the property of any of its agents, employees, representative or invitees which is brought onto the premises, regardless of how much loss or damage may occur, even if such damage or loss may have been caused by flood or other casualty or by the negligence of the Lessor, its agents, employees or officials. It is expressly agreed and understood that the Lessee, its agents, employees, representatives or invitees, in bringing property in and onto the premises do so

4

at their own risk. The lessor will not engage in any
activities that are negligent in nature or are a detriment to
the lessees business activities.

14. **Assigning and subletting.** The Lessee agrees not to
sublet, assign, transfer, or mortgage this lease or sublet the
premises I whole or in part without the prior written consent
of the Lessor. The Lessor shall have the right to require
credit references, credit reports, additional security
deposits, or other information prior to approval of any such
assignment or sublet, it its sole discretion.

15. **Termination.** The Lessor may terminate this lease
agreement at its sole option in the event of default by the
Lessee, as defined in paragraph 16 herein. Either the Lessor
or the Lessee may terminate this lease upon written notice to
the other party at least thirty (30) days prior to the
expiration of the original term or any renewal term of this
agreement, or as otherwise set forth herein. In the event that
the Lessee does not exercise its renewal right as set forth
herein, the lease agreement shall terminate at the end of the
current one-year term.

16. **Default.** The occurrence of any of the following
conditions shall constitute an "Event of Default" under this
lease and shall entitle the Lessor at its option to terminate
this lease in which even the Lessee shall vacate the premises
within ten (10) days of the date of notice to vacate:

   A.  The Lessee fails to pay within ten (10) days of the
       date due, any rent, additional rent, required
       deposits, service fees, or other monies provided for
       in this lease.
   B.  The premises are vacated even though the Lessee
       continues to pay stipulated monthly rent.
   C.  Any petition or other action is filed by or against
       the Lessee under any section or chapter of the
       federal bankruptcy act.
   D.  The Lessee becomes insolvent or transfers property
       in fraud of creditors.
   E.  The Lessee fails to comply with any provision or
       covenant of this lease, any agreement attached
       hereto and/pr any of the rules and regulation that
       may be established by the Lessor from time to time.
   F.  The Lessee is responsible for and fails to remove or
       satisfy any mechanic's lien or other claim or lien
       assessed or charged against or otherwise encumbering
       the premises or property within thirty (30) days
       alter such lien or claim arises.

5

Should the Lessee fail to vacate the premises upon notice of termination, the Lessor shall have the right to enter the Premises and remove the lessee and its effects without being liable for any damages thereto. The failure of the Lessor to call for a termination of the lease at any time shall not constitute a waiver of the Lessor's right to do so at a subsequent time. Upon an event of default, in addition to termination, and all other rights of the Lessor by law, the Lessor shall be entitled to recover from the Lessee as liquidated damages all unpaid rent through the end of the term as well as any other sums for which the Lessee is liable under the terms of this lease, including attorney fees.

17.   **Damage or Destruction of Premises.** If the premises shall be damaged or destroyed in whole or in part, by fire, acts of God, war or casualty or any other means so as to make the same untenatable, the Lessor shall have the option of repairing the premises within ninety days (90) or of canceling this lease in its entirety as of the date of the damage or destruction of the premises. If the Lessor elects to rebuild, during the period that the premises are untenantable in part, the rent shall be prorated until the premises can be restored to a good and tenantable condition, proved that no abatement shall occur if the Lessee causes any delay in repair or restoration, or if such damage is caused by the negligent or willful acts or omissions of the Lessee, its agents or employees. A failure by the lessor to repair the premises within 90 days will result in an automatic cancellation of this agreement.

18.   **Holding Over.** If the Lessee remains in possession of the premises after the expiration of the Original Term, or any renewal thereof, as the case may be, such occupancy shall not be deemed or construed to be a renewal or extension of this lease, but shall operate to create a month to month tenancy under the conditions of this lease, so far as applicable, and the rental due for each period shall be two hundred percent (200%) of the rent normally payable under the terms of this lease unless otherwise agreed in writing by the Lessor.

19.   **Rules and Regulations.** The Lessor shall have the right from time to time to promulgate and enforce rules and regulations with respect to use and operation of the premises, property and common areas and to amend such rules and regulation from time to time. The Lessee shall faithfully observe and comply with these rules and regulations. At no time shall the enforcement of these rules and regulations interfere with the lessee's ability to conduct normal reasonable business.

---

6

20. **Binding Successors**. This Lease is binding on the respective heirs, successors, representatives and assigns of the parties hereto.

21. **Construction of lease.**

A.    Applicable Law.  The laws of the State of Iowa shall govern the validity, interpretation, performance and enforcement of this lease.

B.    Entire Agreement.  This lease and its attachments, shall be considered to contain the entire agreement between the parties hereto pertaining to the premises. All amendments hereof shall be in writing and signed by both parties

WITNESS the following signatures and seals:

BY: _____
      Lessor Name

Date: _____

Tenants

_____
(Corporation)

BY: _____
      Title:

Date: _____

State OF Iowa, COUNTY OF Shelby, to-wit:

The foregoing addendum was acknowledged before me this 19 day of _November_, 2003 by _Ryan Larsen_, on behalf of _Loral Motion Fts Inc._

~~My Commission expires:~~ _9-13-05_

_____
Notary Public

> LORI ROBERTSON
> Commission Number 157698
> My Commission Expires
> 9-13-05

7

11/13/03

**THIS LEASE AGREEMENT,** made and entered into on **LOCAL MOTION** by and between **HAWKEYE EAST ENTERPRISES,** a corporation organized and existing under the laws of the State of Virginia, with its principal office at 407 Roanoke St. City of Christiansburg, County of Montgomery , State of Virginia, referred to as Lessor, and Local Motion , a corporation organized and existing under the laws of the State of Virginia, with its principal office at 1 West Main Street, City of Pulaski, County of Pulaski , State of Virginia, referred to as Lessee. The parties agree as follows:

1.  **Demise, Description of Premises; Term, Use.**

Lessor leases to Lessee, and Lessee hires and takes as tenant from Lessor for a term of one ( 1) year, to commence on a date determined as set forth in Section 16 of this Lease Agreement.


2.  **Rent.** Lessee shall pay to Lessor as rent for the demised premises **One hundred** Dollars ($100.00) per month in advance, on the first day of every month during the term of this Lease Agreement.

3.  **Repairs and Maintenance.**

A.  Lessee shall make all necessary incidental repairs to the interior of the demised premises, and shall maintain the interior in good condition.

B.    Lessor shall make all exterior repairs, including repairs of the roof, sidewalks, skylights, as well as repairs as required because of water entering the demised premises from the roof or other parts of the building or from other causes not under the control of the Lessee. Lessor shall maintain the exterior of the building and adjacent areas in good condition.

4.    **Lessee to Comply with Laws, Rules and Regulations; Fire Prevention.**

A.    Lessee shall comply with all local, state and Federal laws, rules, regulations, and requirements applicable to the demised premises and, in particular, to the rules, regulations and requirements of the Virginia Charitable Gaming Commission, and in particular with the those for the correction, prevention, and abatement nuisances or other grievances in, on, or connected with the demised premises during the term of this Lease Agreement.

B.    Lessee shall promptly comply with and execute all rules, orders and regulations of the state and county for prevention of fires, at its own expense. Lessee shall not, however, be obligated to make structural changes or alterations or to install sprinkler or other systems for the detection or extinguishments of fire.

C.   Lessee shall not permit the demised premises to be occupied for any purpose deemed disreputable or extra hazardous on account of fire.

5.   **Assignment and Sublease.**

A.   Lessee shall not assign this Lease Agreement without first obtaining the written consent of Lessor to the assignment.   Lessor shall not withhold such consent unreasonably.

B.   Lessee shall have the right to sublet the demised premises for any lawful purpose provided the subletting shall be subject to the terms and conditions of this Lease Agreement, and further provided that Lessee shall notify Lessor in writing of any such subletting promptly.   A subletting shall not release Lessee from any of its obligations under this Lease Agreement.

6.   **Effect of Damage to or Destruction of Demised Premises.**

A.   If the demised premises are damaged or destroyed in whole or in part by fire or other casualty during the term of this Lease Agreement, Lessor shall, with due diligence, repair, restore, rebuild, or replace the demised premises or portions of the demised premises destroyed or damaged, so that the property shall be substantially the same as prior to the damage.   If the destruction or damage amounts to more than _____percent (_____) of the insurable

value of the premises, and the damage or destruction occurs within _____ (_____) years of the expiration date of this Lease Agreement, Lessor may, at its option, cancel and terminate this Lease Agreement by giving written notice thereof to Lessee within thirty (30) days after the date the damage or destruction occurred. In that event, this Lease Agreement shall terminate on the date specified in the notice, and Lessor shall not be obligated to repair or rebuild.

B.   In the event of any damage or destruction as described in the preceding paragraph, rent under this Lease Agreement shall be abated for the time during which, and to the extent to which, the demised premises are not used by Lessee for retail trade and before repair. Lessee shall be entitled to receive a pro rata refund out of any advance rent paid by it for the period during which the demised premises were unusable by reason of destruction or damage.

7.   **Lessor's Right to Inspect or Repair**

Lessor and its agents or other representatives shall have the right to enter the demised premises, or any part of the demised premises, at all reasonable hours for the purpose of examining them or making such repairs or alterations as may be necessary to make them safe and to preserve them.

8.    **Lessor's Right to Show and Advertise Premises.**

Lessee shall permit Lessor or its agents to show the demised premises to person wishing to lease or purchase them. During the ninety (90) days immediately preceding the expiration of the term of this Lease Agreement, Lessor or its agents shall have the right to place a sign on the exterior of the demised premises, such as "To Let" or "For Sale" signs, and shall allow the signs to remain on the building if they do not interfere with Lessee's use or occupany.

9.    **Lessee's Right to Place Signs; Removal for Repair of Building.**

A.    Lessee shall have the privilege of placing on the demised premises such signs as it deems necessary and proper in the conduct of its business.

B.    In the event Lessor or its representatives shall deem it necessary to remove any such signs in order to paint the demised premises or the building where they are situated

or make any other repairs, alterations, or improvements on the demised premises or building, Lessor shall have the right to do so, provided the signs are replaced whenever the repairs, alteration or improvements are completed, and provided such removal and replacement shall be at the expense of Lessor.

10.   **Utilities**

A.   Lessee shall pay for all electricity and gas used in the demised premises, or reimburse Lessor in case it has paid, all charges for water furnished the premises and all sewer rentals that may, during the term of this Lease Agreement, be assessed or imposed for water used or consumed on the demised premises, whether determined by meter or otherwise, as soon as they are assessed or imposed. If such charges or rentals are not paid by Lessee during the month in which they are due, they shall be added to the next month's rent thereafter to become due.

C.   Lessee shall maintain heating and hot water systems on the demised premises at its own expense.

11.   **Manner of Giving Notices.**

A. Any notice to be given by either party to the other, pursuant to the provisions of this Lease Agreement or of any law, shall be given by registered or certified mail, and sent or delivered to the party at the address stated above  or at  such other  address as  the party may have designated in writing.

B.   It is agreed that there is to be no enforceable default against Lessee, or the exercise of any option or right granted to Lessor under any provision of this Lease Agreement in the event of Lessee's default or omission, unless notice of the default or omission shall have first

been given as indicated in this Lease Agreement, specifying

the default or omission complained of, and Lessee shall have

had thirty (30) days after the actual receipt of such notice

to remedy the default or omission.    If the default or

omission complained of is of such nature that it cannot be

completely cured within such thirty (30) day period, the

default nevertheless shall not be enforceable against Lessee

if Lessee shall have begun curing it within the thirty (30)

day period, and shall, with reasonable diligence and in good

faith, proceed to remedy it.

   11.    **Lease Subordinate to Encumbrances.**

   This Lease Agreement is subject and subordinate to any

mortgages or trust deeds now on or that may be hereafter

placed against the demised premises, and to all advances

made or that may be made on account of the encumbrances, to

the full extent of the principal sums and interest secured

by any such mortgages or trust deeds.  Any mortgage and trust

deed hereafter so placed shall be made to or acquired by a

title company,   savings   bank,   trust   company, insurance

company,   educational   or philanthropic organization or

association, or state or municipal investment fund, and in

each case the mortgagee or trustee and beneficiary shall be

organized or authorized to do business in the State of

Virginia.

12. **Indemnification of Lessor.**

Lessee during the term of this Lease Agreement shall indemnify and hold Lessor harmless from any and all claims and demands, whether for injuries to persons, loss of life, or damage to property occurring on the demised premises and arising out of the use and occupancy of the demised premises by Lessee during the lease term, excepting, however, such claims and demands, whether for injuries to persons, loss of life, or damage to property, caused by the acts or omissions of Lessor. Nothing contained in this section shall, however, detract from Lessor's rights to protection under the public liability insurance policy to be paid for by Lessee as specified in Section Fourteen of this Lease Agreement.

13. **Insurance**

A. *Insurance Companies.*    It is agreed that all policies of insurance to be maintained in force by the respective parties to this Lease Agreement shall be obtained from good and solvent insurance companies.

B. *Lessee to obtain public liability insurance.* Lessee shall, at its own expense, at all times during the term of this Lease Agreement, maintain in force a policy or policies of insurance, written by one or more responsible insurance carriers designated by Lessor, which will insure Lessor against liability for injury to or death of persons

or loss or damage to property occurring in or about the demised premises. The Liability under such insurance shall not be less than One Million Dollars ($1,000,000.00) for any one person killed or injured, Two Million Dollars ($2,000,000.00) for any on accident, and Three Hundred Thousand Dollars ($300,000.00) for property damage.

C. *Lessee to obtain plate-glass insurance*. Lessee shall obtain and keep in force adequate plate-glass insurance on all plate glass on the demised premises.

D. *Lessee to obtain workers' compensation insurance*. Lessee shall maintain and keep in force all workers' compensation insurance required under the laws of the State Virginia, land such other insurance as may be necessary to protect Lessor against any other liability to person or

property arising under this Lease Agreement by operation of law, whether such law be now in force or adopted subsequent to the execution of this Lease Agreement.

E. *Lessor to obtain fire insurance on demised premises*. Lessor shall maintain in force at all times during the term of this Lease Agreement a policy or policies of fire insurance to the extent of at least One Hundred Percent (100%) of the insurable value of the demised premises. If permitted without additional charge, Lessor shall cause to be endorsed on its fire insurance and any extended coverage policy or policies, a waiver of the right

of subrogation.

F. *Lessee's waiver of casualty insurance proceeds.*
In the event the demised premises shall be damaged or
destroyed by fire or other casualty so insured against,
Lessee shall claim no interest I any insurance settlement
arising out of any such loss if the insurance premiums were
paid by Lessor or if the Lessor was named as the sole
beneficiary. Lessee shall execute all documents required by
Lessor or the insurance company or companies which may be
necessary for use in connection with the settlement of any
such loss.

G. *Lessee's failure to insure.* Should Lessee fail to
keep in effect and pay for such insurance as it is in this
section required to maintain, Lessor may do so, in which

event the insurance premiums paid by Lessor shall become due
and payable forthwith and failure of Lessee to pay such
amount on demand shall constitute a breach of this Lease
Agreement.

14. **Beginning Date of Lease Term; Rent Before Term
Begins.**

A. Beginning date of lease term. The term of this
Lease Agreement shall begin March 1, 2003 and the first
monthly installment of rent shall become due and payable
on March 1, 2003. If the day on which the term of this Lease
Agreement shall commence shall fall on a day other than the

first day of the month, the term of this Lease Agreement

shall run for the unexpired portion of such month

plus _one_ year, beginning with the first day of the

month next ensuing.

B. Rent before term begins.  Lessee will pay a pro

rated rent for the portion of the month from the date of

commencement of the term of this Lease Agreement to the

first of the month immediately succeeding.

15.  **Fixtures.**

A.  All fixtures installed by Lessee in the demised premises, including but not limited to, refrigeration machinery and controls, piping, coils and conduits appurtenant to such refrigeration machinery, air conditioning and air circulating machinery, light fixtures, food storage boxes, refrigerators, display cases, counters, shelves, racks and general store fixtures, shall be and remain the property of the Lessee and may be removed by it at any time during the term of or at the expiration of this Lease Agreement.

B.  Any such fixtures remaining in the demised premises after the expiration of the term of this Lease Agreement shall be deemed abandoned by Lessee and shall become the property of the Lessor.

C.  Any damage to the demised premises caused by the removal of such fixtures shall be repaired by Lessee.

16.  **Interior Alterations.**

Lessee shall have the right to install such interior partitions and to cut such holes I the flooring as may be desirable for the conduct of its business, but shall restore the demised premises to their former condition at or prior to the expiration of the term of this Lease Agreement, allowing for reasonable wear and rear. Lessee shall remove

all mechanic's liens arising out of such alterations within thirty (30) days after their completion.

17. **Lessee's Right to Make Payments on Encumbrances or Taxes on Lessor's Default.**

In the event the Lessor fails to make any payments on account of principal or interest on any mortgage or trust deed note affecting the demised premises, or to pay any tax or assessment assessed or levied against the demised premises during the period within which such payment may be made without penalty or interest, Lessee, on written notice to Lessor, shall have the right to pay such amount and to deduct the sum so paid from the next or any subsequent installment of rent due under this Lease Agreement.

18. **Painting Interior.**

Lessee shall paint the interior of the demised premises after the initial painting thereof at its own expense whenever such painting shall, in the opinion of Lessor, become necessary.

19. **Time of the Essence.**

Time is of the essence of each and every provision, covenant, and condition contained in this Lease Agreement and on the part of Lessee or Lessor to be done and performed.

20. **Lessor's Covenants and Warranties**

A. Lessor covenants and warrants that:

1.    Lessor is the owner of the demised premises and has the right to enter into this Lease Agreement.

2.    Lessee, on paying the rent herein reserved and on performance of all of the terms and conditions of this Lease Agreement on its part to be performed, shall at all times during the term of this Lease Agreement peacefully and quietly hold and enjoy the demised premises.

3.    The demised premises are now free from all encumbrances except mortgages and trust deeds of record.

B.    Lessor further covenants and warrants that at the time of the delivery of possession of the demised premises to Lessee:

1.    The demised premises hall be clear of all mechanics' liens.

2.    The demised premises shall be free from latent defects.

3.    A certificate of occupancy shall have been duly issued for the demised premises.

4.    The demised premises may be used as a supermarket for the sale of food, nonfood, and any other merchandise that usually offered for sale in a supermarket.

21.  **Use and Maintenance of Parking Area.**

Lessee, so long as it shall have the exclusive use of the parking are denoted as such in Exhibit B shall repair, maintain,  and illuminate the parking area at its own

expense.  Should the parking area be used in common with
other  Lessees  or  Tenants of  Lessor, the  repairs,
maintenance, and illumination shall be at Lessor's expense.

22.  **Lessor's Reentry on Default or Abandonment.**

If the demised premises, or any part of the demised
premises shall be deserted or become vacant during the term
of this Lease Agreement, or if any default is made in the
payment of rent or in the performance of any of the
covenants contained in this Lease Agreement, Lessor or its
representatives may reenter the demised premises by summary
ot other proceeding and remove all persons from the demised
premises, without being liable to prosecution for such
actions, and Lessee shall pay at the same time as the rent
becomes payable under the terms of this Lease Agreement a
sum equivalent to the rent reserved in this Lease Agreement.
Lessor may on reentry, rent the demised premises on behalf
of Lessee, reserving the right to rent them for a longer
period of time than that fixed in the original Lease
Agreement, without releasing the original tenant from
liability, applying any sums collected, first to the expense
of resuming or obtaining possession, second to restoring the
premises to a rentable condition, and finally to the payment
of the rent and al of the charges due and to become due to
Lessor, any surplus to be paid to Lessee, who shall remain
liable for any deficiency.

23.  **Lessor's Agreement to Construct Building on**

**Premises.**

A.    Lessor to obtain building permit. Lessor shall, within a reasonable time after execution of this Lease Agreement, secure a building permit and start erecting a building on the demised premises, in conformity with the plans and specifications that have been signed by the parties to this Lease Agreement as shown in Exhibit B, and referred to as the plans of the building. The building permit shall be secured from the appropriate authorities having jurisdiction of such matters.

B.    Lessor's covenant to construction building. Lessor shall proceed with the construction of the building with all due speed and shall complete it in a workman like manner and in conformity with the plans of the building, except as provided in this Lease Agreement, within _____ (____) months

after the date of the execution of this Lease Agreement. If, however, the construction of the building shall be delayed by any law, regulation, restriction, or directive of any governmental board, bureau, or agency having jurisdiction or by any strike or lockout, the time within which Lessor shall complete the building shall be extended during such stoppage for a further period, not exceeding _____ (__) months in duration.

C.    Substitution of building materials.  In the event
that Lessor shall be unable to obtain a sufficient amount of
any material for the type shown on the plans, it shall have
the right to   substitute   other material or methods of
construction,   which   shall as   nearly as possible be
equivalent to those specified on the plans, provided Lessee
shall consent to such substitution. The consent of Lessee
shall not be arbitrarily or unreasonably withheld.

D.    Failure to deliver possession.  Lessor shall not
be responsible in damages for failure to deliver possession
of the building within the time specified in this Lease
Agreement, provided such failure is occasioned by strikes,
lockouts, government  regulations  and restrictions   on
building, shortage of materials, or other causes beyond the
control of Lessor and not occasioned by any default or
negligence on its part.

E.    Lessee's option to extend time or terminate. In
the event that Lessor shall be unable to secure a building
permit, or if the building shall not be completed within the
time allowed in this Lease Agreement, Lessee may, at its
option, either extend to secure a building permit or to
complete the building, as the case may be, or terminate this
Lease Agreement by giving Lessor_____ (_____) days'
written notice of its election to do so. If this Lease
Agreement is so terminated, all rights of either party

against the other shall terminate.

F.   Construction Costs to be Borne by Lessor. Except as otherwise provided for in this Lease Agreement, all expenses incident to the construction of the building shall be borne by Lessor.

G.   Payment of Incidental Fees.   During the construction of the building and during the term of this Lease   Agreement,   Lessor shall pay all governmental inspection and license fees incident to the permanent structure of the building, including oil storage tank, sprinkler, and elevator inspection fees, should the same be required.

G.   Parking area.   The parking area denoted in Exhibit B shall be paved, fenced, marked, and equipped with adequate drainage facilities and lighting fixtures at Lessor's


expense prior to the commencement of the term of this Lease Agreement.

24.   **Lease Binding on Successors and Assigns.**

The covenants and agreements contained in this Lease Agreement shall be binding on the parties to this Lease Agreement   and   on their   respective   successors, heirs. executors, administrators and assigns.

25.   **Governing Law.**

It is agreed that this Lease Agreement shall be

governed by, construed, and enforced in accordance with the laws of the State of Virginia.

26.  **Attorney Fees.**

In the event that any action is filed in relation to this Lease Agreement, the unsuccessful party in the action shall pay to the successful party, in addition to all the sums that either party may be called on to pay, a reasonable sum for the successful party's attorney fees.

27.  **Entire Agreement.**

This Lease Agreement shall constitute the entire agreement between the parties.  Any prior understanding or representation of any kind preceding the date of this Lease Agreement shall not be binding upon either party except to the extent incorporated in this Lease Agreement.

28.  **Modification of Agreement.**

Any Modification of this Lease Agreement or additional obligation assumed by either party in connection with this agreement shall be binding only if evidenced in a writing signed by each party or an authorized representative of each party.

29.  **Binding Effect.**

This Lease Agreement shall bind and inure to the benefit of the respective heirs, personal representatives,

successors and assigns of the parties.

30.  **Counterparts.**

This Lease Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which together shall constitute but one and the same instrument.

31.  **Paragraph Headings.**

The titles to the paragraphs of this Lease Agreement are solely for the convenience of the parties and shall not be used to explain, modify, simplify, or aid in the interpretation of the provisions of this Lease Agreement

In witness whereof, each party to this Lease Agreement has caused it to be executed at _____on the date indicated below.

STATE OF _____

CITY/COUNTY OF_____,TO-WIT:

    The foregoing Lease Agreement was acknowledged before

me on this the _____ day of _____20____ , by

_____ ,    on    behalf      of

_____.

_____
       Notary Public

My Commission Expires:_____.

_____
(Corporation)

BY:_____
    Title:

Date:_____

_____
(Corporation)

BY:_____
    Title:

Date:_____

WITNESS the following signatures and seals:

BY: _KEVIN DRESSER_
Lessor Name

Date: _4-1-03_

Tenants

_Local Motion_
(Corporation)

BY: _Ryan Larsen_
Title: _President_

Date: _4/1/03_

COMMONWEALTH OF _____
COUNTY OF _____, to-wit:

The foregoing addendum was acknowledged before me this ____ day of _____, 2003 by _____, on behalf of
_____

My commission expires: _____

_____
Notary Public

**Hawkeye East Enterprises, Inc.**
407 Roanoke St. Suite 2, Christiansburg, VA 24073  (540) 381-0172  FAX (540) 381-1352

December 1, 2003

John Monson
MV Transit

Re: Lease for 1 West Main Street, Pulaski, VA

John,

This letter is to terminate the lease between Hawkeye East Enterprises and
Local Motion, dated April 1, 2003 to March 31, 2004.  For the use of office
space located at 1 West Main Street, Pulaski, VA, effective 11/30/2003.

Should you have any questions, please feel free to call me 540-381-0172.

Regards,

Kevin J. Dresser

# SCHEDULE 3.1(t)

## Schedule 3.1(t)

### Environmental Matters

Company and Sellers warrant that there have been no known environmental audits.

# SCHEDULE 3.1(u)

## Schedule 3.1(u)

## Fixed Assets

None

# SCHEDULE 3.1(w)

**Schedule 3.1(w)**

**Vehicles**

| **Make** | **Model** | **Serial No.** | **Ownership** |
| --- | --- | --- | --- |

None

# SCHEDULE 3.1(x)

**Schedule 3.1(x)**

**Personal Property Leases**

None.

# SCHEDULE 3.1(y)

**Schedule 3.1(y)**

**Accounts Receivable**

As of November 30, 2003 - None

# SCHEDULE 3.1(aa)

**Schedule 3.1(aa)**

**Revenue Contracts**

Contract between Local Motion ITS, Inc. and MV Transportation, Inc. dated 10-17-2003.

# TRANSPORTATION SERVICES AGREEMENT

This Agreement is made and entered into this 17th day of October, 2003 by and between, MV Transportation, Inc., a California corporation, hereinafter referred to "Contractor" and Local Motion ITS, Inc., a Virginia corporation, hereinafter referred to as "Subcontractor".

WHEREAS, Contractor has entered into an Agreement with the Transportation District Commission of Hampton Roads (hereinafter "HRT"), on October 7, 2003 for the management and operation of a paratransit system, hereinafter referred to as "Master Agreement", and;

WHEREAS, Subcontractor submitted to Contractor a proposal on September 12, 2003 to become a certified Disadvantaged Business Enterprise (hereinafter "DBE") subcontractor to Contractor for the performance of a portion of the services under the Master Agreement, and;

WHEREAS, Subcontractor represents that it is qualified to perform the services under the terms and conditions herein;

NOW THEREFORE, Contractor and Subcontractor do agree as follows:

1.  Master Agreement:  Contractor has entered into an Agreement with HRT on October 7, 2003.  The Agreement between Contractor and HRT is hereinafter referred to as "Master Agreement"

    The Master Agreement is attached hereto and by reference incorporated herein.

    HRT issued a Request For Proposal #32059 on July 23, 2003. The RFP is attached hereto and by reference incorporated herein.

    Contractor submitted a proposal to HRT on August 8, 2003 in response to the RFP.  The Contractor's Proposal is hereinafter referred to as "Proposal". The Proposal is attached hereto and by reference incorporated herein.

2.  Term of Agreement:  This Agreement shall be effective from November 15, 2003 through November 14, 2008 unless terminated earlier in accordance with Section 7 of this Agreement.

3.  Definition of Words and Terms:  The RFP shall be used to define words and terms in this Agreement unless otherwise defined in this Agreement.

4.  Reference to Master Agreement:  Portions of this Agreement refer to the Master Agreement.  Whenever the Master Agreement is used as a reference in this Agreement, then the term "Contractor" as used in the Master Agreement shall be construed to mean the Subcontractor under this Agreement and the terms "HRT" or "Commission" in the Master Agreement shall be construed to mean Contractor and HRT.

5.  **Performance of Work**:  To the extent that Subcontractor performs work under this Agreement, Subcontractor agrees to meet all of the terms, conditions and specifications required of Contractor in the Master Agreement, RFP and the Proposal, without limitation or exception, unless otherwise modified in this Agreement.

6.  **Administration**:  The Subcontractor represents that it has or will obtain all personnel required to perform hereunder.  Any current or former HRT employees who are involved, or become involved, in the performance of the Agreement must be disclosed to Contractor; provided, that if the Subcontractor employs current or former employees of the HRT, the Subcontractor shall notify Contractor in writing, and Contractor will determine, in conjunction with the HRT, whether conflicts of interest exist under the circumstances.  Subcontractor agrees to offer to any HRT employees displaced as result of the Master Agreement and this Agreement the first opportunity for employment for similar positions with Subcontractor as the HRT employee held with HRT at a rate of pay no less than the rate of pay listed for that employee in the RFP.

    6.1  **Performance Monitoring**:  The Subcontractor's performance under this Agreement will be monitored and reviewed by Contractor. Reports and data required to be provided by Subcontractor shall be delivered to the Contractor's General Manager.  Questions by the Subcontractor regarding interpretation of the terms, provisions and requirements of this Agreement shall be addressed to Contractor's General Manager in writing for response.

    6.2  **Compliance with Law**:  The Subcontractor shall comply with all local, state and federal laws and regulations applicable to this Agreement and applicable to the goods and services provided under this Agreement.

    6.3  **Inspection**.  Contractor and HRT shall have the right to inspect and monitor all activities of Subcontractor's performance under this Agreement.  Contractor will have the right to enter Subcontractor's facility at any time when Subcontractor staff is present Contractor will have the right to inspect and audit any records of Subcontractor at any time during normal business hours in order to ensure compliance with this Agreement.  Subcontractor shall not add any unauthorized security or in any manner prevent Contractor from full access to the Trapeze and Spiderinfo systems.  Subcontractor shall own no data nor have any copyrights to an material developed directly or indirectly as a result of the work contained or related to this Agreement.

7.  **Change Orders and Amendments**" All changes and amendments to this Agreement shall be made in writing and signed by Subcontractor and Contractor.  No verbal changes or amendments shall be considered valid or binding under any circumstances.

8.  <u>Termination:</u>

8.1  <u>Termination For Convenience</u>.  This Agreement may be terminated for convenience by Contractor upon thirty days written notice to Subcontractor, or in the event Subcontractor suffers a loss of its WBE/DBE status with HRT.  Any such termination shall be effected by delivery by Contractor to the Subcontractor a Notice of Termination specifying that work under the Agreement is terminated and the date upon which the termination becomes effective.  After Subcontractor's receipt of a Notice of Termination and, except as Contractor otherwise directs, Subcontractor shall incur no further obligations in connection with the terminated work and, on the date set in the Notice of Termination, the Subcontractor will stop work.

8.2  <u>Termination For Subcontractor's Default</u>.  In addition to the right of Contractor to terminate this Agreement for convenience as provided in Section 7.1 above, Contractor may, by written Notice of Default to the Subcontractor, terminate the whole or any part of this Agreement in the event of a "Default" of Subcontractor which is not cured under the provisions of this paragraph.  A "Default" shall mean any of the following:

7.2.1  the failure of Subcontractor to perform any of its obligations under this Agreement, including, without limitation, any obligation set forth in the RFP, the Master Agreement, or the Proposal;

7.2.2  the failure of Subcontractor to perform up to the standards that Contractor is required to meet under the Master Agreement, RFP, the Proposal or the policies and standards of Contractor or HRT that are consistent with or in accordance with, the RFP, or

7.2.3  the performance of Subcontractor under this Agreement in a manner that results in repeated instances of documented criticism of Subcontractor by HRT, or

7.2.4  The Subcontractor fails at any time to procure and maintain the required levels of insurance hereunder.

7.2.5  Notwithstanding anything to the contrary herein, it is understood and agreed that in the event of failure by Subcontractor to perform services required by this Agreement, in addition to all other remedies, penalties and damages provided herein or by law, the Contractor may provide such services, and deduct the cost of doing so from the amounts due or to become due to the Subcontractor.  The costs to be deducted shall be the actual costs to Contractor to provide such services, or the amounts specified under Section 10 - Price Formula, whichever is greater.

7.2.6   In the event of any of the foregoing Defaults, Contractor shall send written notice to Subcontractor setting forth the manner in which the Subcontractor is in default and stating that this Agreement will be terminated unless the Default is cured within ten (10) days (or such longer period as Contractor may authorize in writing) after receipt of notice from Contractor specifying such failure.  Notwithstanding the foregoing, it at any time Subcontractor fails to procure and maintain insurance as required, Contractor may terminate this Agreement immediately without a cure period.

1.2.1   Rights on Termination.  If this contract is terminated, the Subcontractor shall be paid for work successfully completed prior to termination but shall be entitled to no other costs, with the exception that if this Agreement is terminated for convenience by Contractor during the initial twelve months of this Agreement, Subcontract shall be entitled to recover any unamortized start-up costs based on the proposed start-up costs contained in Subcontractor's cost proposal to Contractor. The termination of this Contract shall in no way relieve the Subcontractor from any of its obligations under this contract nor limit the rights and remedies of Contractor hereunder in any manner.

8.3   Return of Property.   In the event this Agreement expires or is terminated for any reason, all pertinent data prepared for the project, and any property of Contractor or HRT, shall be made available by Subcontractor to Contractor and/or HRT without additional cost.

8.4   Payment on Default:   Notwithstanding any other provision of this Agreement, in the event Contractor declares a default against Subcontractor during the term of this Agreement, Contractor may withhold any and all payments due Subcontractor until such time as Contractor or a court of competent jurisdiction determines the amount of damages caused by the default of Subcontractor.

9.   Consideration:   During the term of this Agreement, Contractor shall pay Subcontractor for services performed in accordance with the Agreement shall pay subcontractor at the following fixed rate per month:  $34,538.00 during the first year; $32,967.00 during the second year; $33,736.00 during the third year; $34,524.00 during the fourth year and $35,333 during the fifth year.  The rate paid to Subcontractor shall compensate subcontractor for all costs associated with providing service to Contractor unless otherwise stated herein.  The rate paid to Subcontractor shall be reduced by any and all penalties, fines or liquidated damages or other costs assessed against Contractor by HRT related to the work, errors, omissions or lack of performance by Subcontractor.

9.1   Employee Benefits:  In the event Contractor and Subcontractor agree to provide additional fringe benefits over and above the benefits proposed by Subcontractor to employees transitioning from HRT, then

1  Subcontractor and Contractor will negotiate additional payments to
2  Subcontractor to reimburse Subcontractor for these mutually agreed
3  costs.

4  10. Payment: Subcontractor shall submit an invoice to Contractor on the first
5      day of each operating month for the upcoming service month (for example,
6      Subcontractor shall submit an invoice on November 15, 2003 for the period
7      November 15, 2003 through December 14, 2003). .

8  11. Payment: Contractor shall pay Subcontractor within thirty (30) days of
9      receipt of Subcontractor's invoice. Subcontractor acknowledges that if it is
10     late in submitting invoice to Contractor payment may be delayed.
11     Subcontractor shall be required to submit all reports required by HRT or
12     Contractor prior to receiving payment (for example, Contractor must
13     receive Subcontractor's reports due for November, 2003 prior to receiving
14     the payment due December 14, 2003 for the period November 15-
15     December 14, 2003). If Contractor disputes any item on an invoice,
16     Contractor may deduct that disputed item from the payment or subsequent
17     payment, but shall not delay payment for the undisputed portions.

18 12. Taxes: Subcontractor shall be responsible for the payment of all taxes, or
19     every kind, which result from Subcontractor's performance under this
20     Agreement.

21 13. Licenses: Subcontractor warrants that it has or shall obtain all licenses
22     required to provide the services herein. In the event that any required
23     license is not obtained, suspended, revoked or terminated during the term
24     of this Agreement, Subcontractor shall notify Contractor immediately in
25     writing of the situation and Contractor may then suspend Subcontractor's
26     services and payment under this Agreement or terminate this Agreement.

27 14. Waiver: Conducting of tests and inspections, review of specifications or
28     plans, payment for goods or services or acceptance by Contractor or HRT
29     shall not constitute a waiver, modification, or exclusion of any expressed
30     or implied warranty or any right under this Agreement or by law. If
31     Contractor waives any non-compliance or default of Subcontractor's of
32     performance of this Agreement, it shall not constitute a waiver of any other
33     non-performance or default.

34 15. Assignment and Subcontracting: The Subcontractor shall not subcontract
35     any portion of this Agreement without prior written consent of Contractor
36     may not assign this Agreement or any interest therein or transfer interest
37     in same without prior written consent of Contractor.

38 16. Indemnification: To the maximum extent permitted by law, Subcontractor
39     shall indemnify and hold harmless Contractor and HRT, their officers,
40     officials, agents and employees, from and against any and all suits,
41     claims, actions, losses, costs, penalties and damages of whatsoever kind
42     or nature arising out of, in connection with, or incident to the goods and/or
43     services provided by or on behalf of the Subcontractor, except for

damages resulting from Contractor's sole negligence or willful misconduct. In addition, the Subcontractor shall assume the defense of Contractor, HRT and their officers, officials and employees in all legal or claim proceedings arising, out of, in connection with or incident to such goods and/or services; shall pay all defense expenses, including reasonable attorney's fees, expert fees and costs incurred by Contractor or HRT on account of such litigation or claims, and; shall satisfy any judgment rendered in connection therewith or pay or reimburse Contractor or HRT on account of such litigation or claims, and; shall satisfy any judgment rendered in connection therewith or pay or reimburse Contractor or HRT's payment of any sums reasonable to settle such litigation or claims. In the event of litigation between the parties to enforce the rights under this paragraph, reasonable attorney fees shall be allowed to the prevailing party. This indemnification obligation shall include, but is not limited to, all claims against Contractor or HRT by an employee or former employee of the Subcontractor or its subcontractors, and the Subcontractor expressly waives all immunity and limitation on liability under any industrial insurance act, disability benefit act, or other employee benefit act of any jurisdiction which would otherwise be applicable in the case of such claim.

17. **Applicable Law and Forum:** Except as hereinafter specifically provided, this Agreement shall be governed by and construed according to the laws of the State of Virginia. The Subcontractor shall comply with all local, state and federal laws and regulations applicable to this Agreement and applicable in the goods and services provided under this Agreement. The Subcontractor shall insert the substance of the provisions of this clause in all subcontracts issued pursuant to this Agreement.

18. **Independent Contractor:** Subcontractor's relationship to Contractor in performance of this Agreement is that of an independent contractor. The personnel performing services under this Agreement shall at all times be under Subcontractor's exclusive direction and control and shall be employees of Subcontractor and not employees of Contractor or HRT. Subcontractor shall pay all wages, salaries and other amounts due its employees in connection with this Agreement and shall be responsible for all reports and obligations respecting them, such as social security, income tax withholding, unemployment compensation, workers compensation insurance, and similar matters. Subcontractor shall notify its employees by written notice that any and all obligations in connection with their employment are those of the Subcontractor and not of the Contractor or HRT.

19. **Audit and Records.** Subcontractor shall allow the authorized representatives of Contractor, the U.S. Department of Transportation, and the Comptroller General of the United States, the State of Virginia and the HRT to inspect and audit all data and records of the Subcontractor relating to performance under this Agreement. Such audit shall be allowed upon reasonable notice of any aforementioned agency. Further, Subcontractor

1        shall maintain all required records for three years after final payment
2        under this Agreement and until all other pending matters are closed.
3        Furthermore, Subcontractor shall maintain a separate set of books for all
4        costs and revenues attributable to this Agreement and shall not co-mingle
5        said books or records with any other operation of Subcontractor.

6    20.  Severability:   If any portion of this Agreement is ruled by a court of
7        competent jurisdiction to be invalid, illegal or unenforceable, such portion
8        shall be ineffective to the extent of the invalidity, illegally or
9        unenforceability without affecting in any way the remaining portions of the
10       Agreement.

11   21.  Insurance: The Subcontractor shall procure and maintain during the life of
12       this Agreement general liability insurance with minimum limits of
13       $1,000,000 and workers compensation and Employers Liability insurance
14       in an amount required by State Law. Prior to commencing any work under
15       this Agreement and no less than 30 days prior to the expiration of any of
16       these policies, certificates of Insurance approved by the Contractor
17       evidencing the maintenance of said insurance shall be furnished to the
18       HRT and Contractor.   The certificates shall provide that no material
19       alteration or cancellation, including expiration and non-renewal, shall be
20       effective until thirty (30) days after receipt of written notice by the
21       Contractor. The Subcontractor shall be responsible for maintaining any
22       other coverages required by law. The Subcontractor will furnish to the
23       Contractor within thirty (30) day of request certified copies of all policies
24       required under the Agreement

25       The insurance provided by the Subcontractor and its subcontractors shall
26       apply on a primary basis. Any insurance maintained by the Contractor or
27       HRT shall be excess of and shall not contribute with the insurance
28       provided by the Subcontactor and its subcontractors. Except as otherwise
29       specified, no deductible or self-insured retention is permitted.

30       Compliance with these insurance requirements shall not limit the liability of
31       the Subcontractor or its subcontractors.   Any remedy provided to the
32       Contractor by the insurance provided by the Subcontractor and its
33       subcontractors shall be in addition to and not in lieu of any other remedy
34       (including, but not limited to, as an indemnity of the Subcontractor)
35       available to the Contractor under the Agreement or otherwise.

36       Neither approval nor failure to disapprove insurance furnished by the
37       Subcontractor shall relieve the Subcontractor or its subcontractors from
38       responsibility to provide insurance as required by the Agreement.

39       The Subcontractor shall require each of its subcontractors, agents or
40       providers of service under the Agreement to provide the aforementioned
41       coverages.   The Contractor and HRT will be included as an additional
42       insured under these policies.

43       If liability insurance is provided on a claims made form it shall be

1  maintained so as to provide coverage not only for claims made during the
2  Subcontractor's performance of work hereunder, but also for claims made
3  during the four-year period following completion of such work, which arise
4  from occurrences during the Subcontractor's performance of such work.

5  Subcontractor shall also carry such other insurance that may be required
6  by law.    The foregoing requirements as to the types and minimum limits
7  of insurance to be maintained by Subcontractor and any approved of said
8  insurance by the Contractor shall not in any manner limit the liability or
9  obligations otherwise assumed by Subcontractor under this Agreement,
10 including but not limited to the indemnification provisions of this
11 Agreement.

12 Upon request of the Contractor, the Subcontractor shall furnish a properly
13 notarized affidavit signed by an authorized employee of the
14 Subcontractor's insurer(s) that states the Subcontractor's insurance
15 program meets all insurance requirements specified in this Agreement.

16 All subcontractors to Subcontractor shall be required to carry coverages
17 applicable thereto as set forth above, or to be covered by the
18 Subcontractor's insurance.    The Contractor and HRT shall be an
19 additional insured under any coverages carried by a subcontractor.

20 Anything to the contrary notwithstanding the liabilities of the Subcontractor
21 under the Agreement shall survive and not be terminated, reduced, or
22 otherwise limited by any expiration or termination of insurance coverages.

23 If Subcontractor, for any reason, fails to maintain insurance coverage,
24 which is required pursuant to this Agreement, the same shall be deemed a
25 material breach of contract.    Contractor, at its sole option, may
26 immediately terminate this Agreement and obtain damages from the
27 Subcontractor resulting from said breach.  Alternatively, Contractor may
28 purchase such required insurance coverage, and without further notice to
29 Subcontractor, Contractor may deduct from sums due to Subcontractor
30 any premium costs advanced by Contractor for such insurance.

31 22.  Scope of Service of Subcontractor:    Subcontractor shall provide and
32 operate a fully functional and complete paratransit reservations,
33 scheduling, dispatching and reporting system to Contractor to enable the
34 Contractor to meet the requirements of the Master Agreement.
35 Subcontractor shall provide all labor and materials required to provide
36 these services unless otherwise agreed to herein. Subcontractor's duties
37 shall include, but are not limited to, the following:  1)  The dispatching
38 duties listed in Section 2.03.02 of the RFP and ongoing monitoring to
39 ensure the achievement of HRT's on-time performance standards; 2)
40 Screening for eligible passengers as detailed in Section 2.03.03-1 of the
41 RFP; 3)  Monitoring passenger behavior as detailed in Section 2.03.03-2
42 of the RFP; Passenger scheduling as detailed in Section 2.03.03-3 of the
43 RFP; 4)  Reservation functions as detailed in Section 2.03.04 of the RFP;
44 5)  Scheduling of trips to ensure the following minimum number of revenue

1    trips are performed completed per driver payroll hour (gate to gate): Year
2    1 – 1.41; Year 2 – 1.44; Year 3 – 1.48; Year 4 – 1.52; Year 5 – 1.56; 6) All
3    reporting required by HRT and Contractor; 7) Dispatching of Contractor's
4    drivers. Subcontractor shall not deny any trips for any eligible passenger,
5    8) Preparing the schedule template for the specific time(s) when
6    Contractor needs to schedule vehicles and drivers; 9) Employ all
7    reservationists, schedulers, dispatchers and clerical personnel required to
8    perform the reservations, scheduling, dispatching and reporting functions
9    required by HRT or Contractor; 10) Manage complaints and customer
10   information process and calls; 11) Manage no show process and policies.
11   Subcontractor shall be able to establish routes and change driver
12   schedules on a daily basis.

13   23.  Items Provided by HRT or Contractor:   HRT and/or Contractor shall
14        provide the following to Subcontractor at no cost to Subcontractor:  1)
15        Use of HRT's Trapeze® Software license for reservations, scheduling,
16        dispatching and reporting; 2) Annual maintenance agreement required for
17        Trapeze ®Software; 3) All telephone systems (including automated call
18        distribution, call sequencing and TDD), including installation and
19        maintenance thereof; 4) All local telephone service with a sufficient
20        number of inbound telephone lines (Subcontractor shall pay its own long
21        distance service); 5) A facility (to be used jointly by Contractor and
22        Subcontractor) in or around Norfolk, Virginia, to house the employees of
23        Subcontractor, including maintenance and utilities thereto; 6) A functioning
24        radio communications system between the Subcontractor's dispatchers
25        and Contractor's drivers, including maintenance thereof; 7) Two file
26        servers, including maintenance thereof; 8) Computer work stations,
27        including maintenance thereof; 9) all office furniture; 10) Computer
28        networking.  Up on the expiration or termination of this Agreement, any
29        items provided to Contractor by HRT or Contractor shall be returned to
30        Contractor in the same condition, normal wear and tear excepted

31   24.  Incentive:  In addition to the monthly rate contained in Section 9 herein,
32        Contractor shall pay to Subcontractor an incentive based on productivity
33        (as measured in the number of revenue trips performed by and Contractor
34        for which Contractor is paid by HRT divided by the number of vehicle
35        hours).  Vehicle hours are defined as the amount of time from when a
36        Contractor vehicle leaves a facility each day until the time the Contractor
37        vehicle returns.  Subcontractor shall receive $3,000 per month for each
38        month when productivity exceeds the goals contained in this Section 24,
39        and an additional $3,000 for each additional 0.1 passengers per vehicle
40        hour by which the goal is exceeded.  For example, if the goal is 1.6
41        passengers per vehicle hour and the actual performance is 1.7,
42        Subcontractor shall receive an additional $6,000 for that month, $3,000 for
43        achieving 1.6 and an additional $3,000 for the added 0.1 increment).  All
44        fractions to be rounded down (example 1.59 will be treated as 1.5).  No
45        incentives will be paid for any month in which HRT's on-time performance

1  goals contained in the RFP are not met. The goals for the contract term
2  are: Year 1 – 1.5; Year 2 – 1.6; Year 3 – 1.6; Year 4 – 1.7; Year 5 – 1.7.

3  25.  Attorney Fees:  In the event either party is required to obtain the services
4       of an attorney to enforce any provision of this Agreement, the prevailing
5       party shall be entitled to recover its reasonable attorney fees and costs.

6  26.  Order of Precedence:  In the event of any conflict between the various
7       parts of this Agreement, the following order or precedence will be used to
8       resolve the conflict, with the document listed earlier having precedence
9       over a document listed later:  Amendment to this Agreement, this
10      Agreement, the Master Agreement, the RFP and the Proposal.

11  27. Cross Hiring:  Contractor and Subcontractor agree that during the term of
12      this Agreement, and for a period of one year following the termination
13      thereof, neither party shall hire an employee or former employee of the
14      other party without the written approval of the other party.  The term
15      "former employee" used in this provision shall mean employees who have
16      separated their employment within the prior twelve months.

17  28. FTA Requirements:  HRT is a recipient of transportation funding from the
18      United   States   Department   of   Transportation,   Federal   Transit
19      Administration (hereinafter "FTA").  Subcontractor shall comply with all
20      requirements imposed on the HRT by FTA to the extent that compliance is
21      within the scope of Subcontractor's duties under this Agreement.

22

23  IN WITNESS WHEREOF, the parties hereto, through their duly appointed
24  representatives, execute this Agreement on the date first written above.

25

MV TRANSPORTATION, INC.           LOCAL MOTION ITS, INC.

By: _____        By: _____

Title: _____ C&O _____      Title: _____ President _____

Date: _____ 10/20/03 _____      Date: ___ 10/16/03 _____

26