# SCHEDULE 3.1(ab)

## Schedule 3.1(ab)

## Insurance Policies

| Insurer | Type | Face Amount | Policy # |
|---|---|---|---|
| Primerica | Key Man Life – Ryan Larsen | $250,000 | 0423996394 |
| US Liability Insurance Group | General Liability | $300,000/$600,000 | CL2264526 |
| Burlington Insurance Co | General Liability Hampton | $1,000,000/$2,000,000 | H48484 |
| Farmers Insurance Exchange | Workers Compensation VA | Statutory | A16124894 |

# SCHEDULE 3.1(ac)

**Schedule 3.1(ac)**

**Intellectual Property**

All trade secrets, confidential or proprietary information with respect to the activities and businesses of the Company, including, without limitation, personnel information, secret processes, know-how, customer lists, employee lists, data bases, ideas, techniques, processes, inventions (whether patentable or not), and other technical plans, business plans, marketing plans, product plans, forecasts, contacts, strategies and information developed by the Directors and Officers of the Company since its inception with respect to the business plans and activities of the Company.

# SCHEDULE 3.1(ad)

**Schedule 3.1(ad)**

**Material Contracts**

None.

# SCHEDULE 3.1(ae)

## Schedule 3.1(ae)

## Purchasing Contracts

Software lease agreement between Company and Trapeze Software Group dated November 11, 2003.

# SCHEDULE 3.1(ai)

## Schedule 3.1(ai)

## Employment Matters

List of Directors

Ryan James Larsen

Janet Sue Davis

Kevin John Dresser

List of Officers

Ryan James Larsen, President

Janet Sue Davis, Senior Vice President

Marsha Louise Madrid, Senior Vice President

No director, officer or employee of the corporation has any written or implied agreement of employment and are considered At Will employees.

# SCHEDULE 3.1(ak)

## Schedule 3.1(ak)

## Pension and Benefit Matters

The Sellers certify and warrant that the Company has no pension plans nor has the Company entered into any agreement with any person to provide any pension or retirement plan.

# SCHEDULE 3.1(an)

**Schedule 3.1(an)**

**Bank Accounts**

Wachovoa Bank, Checking Account Number 20000255594

# SCHEDULE 3.1(ao)

**Schedule 3.1(ao)**

**Contracts with Non-Arms Length Persons**

The Company entered into a real estate lease agreement with Hawkeye East Enterprises, a Virginia Corporation controlled by Kevin John Dresser. This lease agreement to be terminated without penalty on or before closing.

# SCHEDULE 3.1(ap)

March 7th, 2003

Telephone: 1-540-250-0872
E-mail: rejanetd@yahoo.com

Janet Davis
5417 N. 183rd Avenue
Waddell, Arizona
85355

| Send by: | |
|---|---|
| Facsimile | ☐ |
| Regular Post | ☐ |
| Courier | ☐ |
| Email | ☑ |

Dear Janet:

Re:    Offer of Employment with Trapeze Software Group, Inc.

Trapeze Software Group Inc. (TSG) is pleased to offer you the position of Transit Consultant in our Operations Department managed through our Scottsdale, Arizona office. This position reports directly to Rob Dukes and includes an annual salary of $125,000. In addition, there will be a signing bonus of $20,000, which is contingent upon your guarantee to remain at TSG for a period of at least 2 years from your start date. If you choose to leave TSG before this two year period, you will be required to pay back a pro-rata portion (based on the length of time worked at TSG) of the signing bonus.

You will NOT be eligible to participate in the Employee Profit Share Plan at TSG for fiscal 2003 but as discussed, you will be provided a bonus factor of at least 0.25 for the Employee Profit Share Plan for fiscal 2004. You will also be eligible to participate in our standard benefits package immediately, and you will retain the same seniority level that you had when you left TSG in 2002, which entitles you to 5 weeks vacation.

We anticipate your start date to be March 24, 2003. If you agree to employment with TSG subject to the above terms, please indicate so by signing below and returning a copy to me before March 14, 2003.

If you have any questions, or if I've missed anything from our conversations yesterday regarding the above subject matter, please do not hesitate to contact me directly at (905) 629-3479.

Yours very truly,
TRAPEZE SOFTWARE GROUP, INC.


Rick Bacchus


I accept this offer of employment and agree to the above terms as they relate to my employment.


Name:    Janet Davis

Signature: _____    Date: _____

# TRAPEZE SOFTWARE GROUP, INC.
## STANDARD EMPLOYMENT CONTRACT

Employer:  **TRAPEZE SOFTWARE GROUP, INC.**     Date:  __March 13, 2003__

Employee:   Name:  Janet Davis

Address:        6417 N. 183rd Avenue
                Waddel, AZ 85355

        Telephone:  __540-230-0872__                    Start Date: March 24, 2003

        Cellular:  _____                    E-mail: tojanend@yahoo.com

1.   The Employer agrees to employ the Employee and the Employee agrees to work for the
     Employer as a **Transit Consultant** and to perform the duties associated therein. The duties may
     be altered or amended from time to time by Board of Directors, Chief Executive Officer, the
     President of the Employer, the Corporate Human Resources Manager or other authorized
     representative of the Employer. Employee will report to **Rob Dukes**, or to such other person as
     the Board of Directors, President, the Corporate Human Resources Manager or other authorized
     representative of the Employer may from time to time determine.

2.   As a condition of employment, the Employee agrees to be bound by, and to execute and deliver
     to Company, a Proprietary Rights Agreement in the form set out as Schedule A, attached hereto.
     Employee acknowledges and agrees that his or her obligations under the Proprietary Rights
     Agreement will not terminate with or be affected by the termination of Employee's Employment.

3.   The Employee acknowledges that Employee has been informed regarding the Employer's general
     policies and procedures applicable to employees of and employment by the Employer, and agrees
     to accept and observe all such policies and procedures and any additions, amendments or
     Employer-mandated departures from the policies and procedures made by the Employer from
     time to time during the Employee's employment. Employee acknowledges and agrees that
     Employer is free to add, amend, delete, modify or diverge in any manner from such policies and
     procedures at its sole discretion with or without prior notice.

4.   The Employer agrees to pay the Employee wages computed on the basis of an annual salary of
     $125,000 which shall be payable in approximately equal installments in accordance with the
     Employer's general salary payment policies in effect. The Employee agrees to use his or her best
     efforts to carry out his or her duties and responsibilities hereunder and to devote full time,
     attention and energy thereto. The Employee further agrees not to work either on a part-time, full-
     time, temporary, or independent contracting basis for any other business or enterprise during the

Trapeze Software Group, Inc. - "Standard Employee Contract"
With Attached Schedules A, B, X, Y

Employee's employment with Employer, without the Employer's prior written consent. Employee acknowledges and agrees that Employee's salary is subject to change in the sole discretion of the Employer.

4a.   **In addition, there will be a signing bonus of $20,000, which is contingent upon your guarantee to remain at TSG for a period of at least 2 years from your start date. If you choose to leave TSG before this two year period, you will be required to pay back a pro-rata portion (based on the length of time worked at TSG)of the signing bonus.**

5.   The Employee shall be eligible to participate in certain group benefit plans and incentive compensation as may be established from time to time by the Employer for which employees generally may be eligible to participate, provided that Employer meets the eligibility requirements of the plan or plans. Notwithstanding the foregoing, Employee shall not be entitled to participate in any discretionary plan unless participation is approved by Employer in accordance with the terms and conditions of such plan.

5a.   You will NOT be eligible to participate in the Employee Profit Share Plan at TSG for fiscal 2003 but as discussed you will be provided a bonus factor of at least 0.25 for the Employee Profit Share Plan for fiscal 2004.

6.   The Employee, while actively employed, may be eligible to participate in the following current benefits in accordance with the Employer's policies and eligibility requirements, and agrees that the Employer may make the appropriate deductions, where applicable, for:

   *   You will retain the seniority level that you had when you left TSG in 2002, which entitles you to 5 weeks vacation and 5 floater days.

   *   For anniversary awards your recognized date will be March 24, 2003.

   *   Reimbursement of reasonable business expenses as approved by the Employer.

   *   Other benefits as are implemented from time to time and for which Employee satisfies the eligibility criteria.

   *   Immediate participation in our standard benefits package (Medical, dental, life, STD & LTD)

   Employee acknowledges and agrees that all benefits in effect at the time Employee begins employment with the Employer, including salary and any and all benefits and other terms or conditions of employment referred to in this Agreement, may be changed, modified, withdrawn, deleted, superseded, substituted, or otherwise altered by Employer at any time without prior notice.

7.   Termination of employment for any reason whatsoever, by the Employer or the Employee, shall

---

Trapeze Software Group, Inc. - "Standard Employee Contract"
With Attached Schedules A, B, X, Y

not terminate or affect any of the Employee's duties and obligations under the Employer's Proprietary Rights Agreement.

8. Employee acknowledges that Employee is, and at all times during employment with the Employer, will be, employed at-will. The at-will employment relationship means that employment is terminable by Employer or Employee at any time, with or without cause, and with or without notice. Nothing contained in this Agreement is intended or should be construed to alter or affect the at-will status of Employee's employment. Employee's at-will status cannot be modified unless the President of the Employer and the employee sign a written contract setting forth an express intention to restrict the Employee's at-will status, and an express intention that it is a contract of employment intended to modify the employee's at-will employment with the Employer.

9. This Agreement, together with Schedules A, X, Y represents the entire agreement between the parties hereto, supersedes all previous agreements, representations, understandings, and promises, whether oral or written, to the extent that any such agreements, representations, understandings, or promises conflict with the terms of this Agreement. The Employee specifically acknowledges that he or she is not relying upon any representation, written or oral, concerning any term or condition of employment made by the Employer or any of its representatives prior to the date of execution hereof. Employee further represents that the execution and delivery of this Agreement, and the Employee' employment with the Employer, do not violate any previous or existing employment agreements or other contractual obligations of Employee.

10. If any provision of this Employment Contract is held invalid or unenforceable under applicable law, the validity and enforceability of the remaining provisions shall be unaffected, and the remaining provisions shall remain in effect.

11. This Agreement shall be freely assignable by the Employer and shall inure to the benefit of, and be binding upon any other entity which shall succeed to the Employer's business. Because this is an Agreement for personal services, neither this Agreement, nor any rights hereunder may be assigned by Employee. Any attempted assignment by Employee shall be void.

12. The parties acknowledge that the responsibilities and duties of the Employee may change at the direction and sole discretion of the Employer during the course of employment.

13. No modification, amendment, or waiver of any of the provisions of this Agreement shall be effective unless in writing specifically referring to this Agreement and signed by the parties hereto.

14. This Contract shall be governed by and construed in accordance with the laws of the State of Arizona, without giving effect to conflict of laws principles. Venue for any action arising out of, related to, or in any way connected with this Agreement and Employee's employment or termination shall lie exclusively in either Maricopa County Superior Court or the U.S. District Court for the District of Arizona.

Trapeze Software Group, Inc. - "Standard Employee Contract" With Attached Schedules A, B, X, Y

15. The Employee acknowledges that he or she was provided a reasonable and adequate period of time in which to consider this Agreement, was and hereby is advised to consult with counsel of his or her choosing before signing this Agreement, and that this Agreement is written in a manner that is understandable to Employee and Employee has read and understands all paragraphs of this Agreement.

IN WITNESS WHEREOF the parties hereto have executed and entered into this Employment Agreement on the date first above written.

Trapeze Software Group, Inc.                              Janet Davis
                                                          (Employee Name)

By: _____
    (Corporate Human Resources Manager)                   _____
                                                          (Employee Signature)

By: _____
(Chief Executive Officer) or (Chief Financial Officer)    _____
                                                          (Witness)

Trapeze Software Group, Inc. - "Standard Employee Contract"
With Attached Schedules A, B, X, Y

 **Trapeze Software Group**

March 25, 2003

Ms. Janet Davis

RE: Concerns in Section 6 (Non-Competition) of the Proprietary Rights Agreement

Janet:

Trapeze acknowledges that we are aware that you are currently completing a consulting contract with Laidlaw Transit Services, Inc. Pursuant to verbal agreements, Trapeze understands that you will complete this contract in such a way that such completion of services will not interfere in any way with the performance of your employment services with Trapeze. Trapeze acknowledges that completion of your employment contract with Laidlaw does not constitute a breach of Section 6 (Non-Competition) of the Proprietary Rights Agreement signed by you, and dated March 24, 2003. However, it is also Trapeze's understanding that you will not be entering any subsequent third party employment arrangements with Laidlaw Transit Services, Inc. or any other party that could violate Section 6 of the afore-mention Proprietary Rights Agreement. Trapeze also requires that you provide written notice upon the date of completion of the contract work with Laidlaw Transit Services, Inc. It is our understanding that you have signed a one year consultant contract with Laidlaw, ending _____3/14/04_____ and that this work will not interfere with Trapeze projects, as work will be done on your time, i.e. after hours and scheduled vacation time. This is a one time exception to Section 6 referencing consultant work.

In reference to Section 4 concerning salary, if there is a salary reduction within the next 24 months, it would void out Section 4a.

_____
Carrol Sipe
Corporate Human Resources Manager

_____
Janet Davis

Date: _3/25/03_

2800 Skymark Avenue, 2nd Floor, Building 1, Mississauga, Ontario, L4W 5A6, Canada
Tel: (905) 629-8727    Fax: (905) 238-8408    www.trapezesoftware.com

14400 North 87th Street, Suite 130, Scottsdale, Arizona, U.S.A. 85260
Tel: (480) 627-8400 : Fax: (480) 627-8411    www.trapezesoftware.com



Schedule A

# TRAPEZE SOFTWARE GROUP, INC.

## PROPRIETARY RIGHTS AGREEMENT

I, ____Janet Davis____ recognize that Trapeze Software Group, Inc. and Trapeze Software Inc. (collectively, the "Company") is engaged in a continuous program of software research and development and the marketing of software products, and that the Company also provides technical support, consultation and training services relating to those software products. I also recognize the importance of protecting the Company's trade secrets, confidential information and other proprietary information and related rights acquired through the Company's expenditure of time, effort, and money.

Therefore, because I wish to receive bonus payments and bonus shares from the Company, in a capacity in which I will receive and/or contribute to the Company's Confidential Information, and in consideration of the bonus payments and bonus shares I will receive from the Company, I agree to be bound by the following terms and conditions:

1. **Definitions**

   For the purposes of this Agreement:

   (a)   "Confidential Information," includes any of the following items:

      (i)    any and all versions of the software and related documentation owned or marketed by the Company, as well as the software and documentation owned by the Company's suppliers and used internally by the Company, including all related algorithms, concepts, data, designs, flowcharts, ideas, programming techniques, specifications and source code listings.

      (ii)   all Developments of the Company (as defined below).

      (iii)  information regarding the Company's business operations, methods and practices, including marketing strategies, product pricing, margins and hourly rates for staff, and information regarding the financial affairs of the Company.

      (iv)   the names of the Company's clients and prospects and the names of the suppliers of computer services and software to the Company, and the nature of the Company's relationships with these clients and suppliers.

Trapeze Software Group, Inc. - "Standard Employee Contract"
With Attached Schedules A, B, X, Y



    (v)    technical and business information of or regarding the clients of the Company obtained in order for the Company to provide such clients with software products and services, including information regarding the data processing requirements and the business operations, methods and practices and product plans of such clients; and

    vi)    any other trade secret or confidential or proprietary information in the possession or control of the Company,

but Confidential Information does not include information which is or becomes generally available to the public or which I can establish, through written records, was in my possession prior to its disclosure to me as a result of my work for the Company.

  (b)    "Developments" of the Company include all:

    (i)    software, documentation, data, designs, reprints, flowcharts, trade-marks, specifications and source code listings, and any related works, including any enhancements, modifications, or additions to the software products owned or marketed or used by the Company; and

    (ii)    the Company inventions, devices, discoveries, confidential ideas, algorithms, formulae, processes, techniques, systems and improvements, whether patentable or not, developed, created, generated or reduced to practice by me, alone or jointly with others, during my employment with the Company or which result from tasks assigned to me by the Company and related to the business of the Company or which result from the use of the premises or property (including equipment, supplies or Confidential Information) owned, leased or licensed by the Company.

## 2.   Non-Disclosure of Confidential Information

At all times during and subsequent to the termination of my employment with the Company, I shall keep in strictest confidence and trust the Confidential Information. I shall take all necessary precautions against unauthorized disclosure of the Confidential Information. I shall not directly or indirectly disclose, allow access to, transmit or transfer the Confidential Information to a third party, nor shall I copy or reproduce the Confidential Information except as may be reasonably required for me to perform my duties for the Company.

## 3.   Restricted Use of Confidential Information

  (a)    At all times during and subsequent to the termination of my employment with the Company, I shall not use the Confidential Information in any manner except as reasonably required for me to perform my duties for the Company.



(b)     Without limiting my obligations under subsection 3(a), I agree that at all times during and subsequent to the termination of my employment with the Company, I shall not use or take advantage of the Confidential Information for creating, maintaining, marketing, or aiding in the creation, maintenance or marketing of any software which is competitive with any software owned or marketed by the Company.

(c)     Upon the request of the Company, and in any event upon the termination of my employment with the Company, I shall immediately return to the Company all materials, including all copies in whatever form, containing the Confidential Information which are in my possession or under my control.

## 4.   Ownership of Confidential Information

(a)     I acknowledge and agree that I shall not acquire any right, title, or interest in or to the Confidential Information.

(b)     I agree to make full disclosure to the Company of each Development promptly after its creation. I hereby assign and transfer to the Company, and agree that the Company shall be the exclusive owner of, all of my right, title and interest to each Development throughout the world, including all trade secrets, patent rights, copyrights and all other intellectual property rights therein. I further agree to co-operate fully at all times during and subsequent to my employment with respect to signing further documents and doing such acts and other things reasonably requested by the Company to confirm such transfer of ownership of rights, including intellectual property rights, effective at or after the time the Development is created and to obtain patents or copyrights or the like covering the Developments. I agree that the obligations in this clause (b) shall continue beyond the termination of my employment with the Company with respect to Developments created during my employment with the Company.

(c)     I agree that the Company, its assignees, and their licensees are not required to designate me as the author of any Developments. I hereby waive in whole all moral rights which I may have in the Developments, including the right to the integrity of the Developments, the right to be associated with the Developments, the right to restrain or claim damages for any distortion, mutilation or other modification of the Developments, and the right to restrain use or reproduction of the Developments in any context and in connection with any product, service, cause or institution.

(d)     Listed in Schedule X to this Agreement are those works and inventions created by me, alone or jointly with others, prior to my employment by the Company, which are exempt from the operation of this Agreement. If nothing is listed in Schedule X, I represent that I have made no such works or inventions as of the date of this Agreement.



**5.    Protection of Computer Systems and Software**

I agree to take all necessary precautions to protect the computer systems and software of the Company and of the suppliers and clients of the Company, including without limitation complying with the obligations set out in the Company's Computer and Network Protection Rules (collectively, the "Rules"). A copy of the Rules, as currently in effect, is attached as Schedule Y to this Agreement. I agree that the Company may unilaterally amend the Rules, and upon their delivery to me such new rules shall, form part of this Agreement and will be binding on me. I agree that violation of any of such Rules may be grounds for discipline, up to and including immediate dismissal for cause.

**6.    Non-Competition**

I agree that while I am employed by the Company and for 3 months immediately following the termination of my employment with the Company, regardless of who terminates the employment or whether the termination is voluntary or involuntary, I will not become engaged, directly or indirectly, as an employee, consultant, partner, principal, agent, proprietor, shareholder (other than a holding of shares listed on a stock exchange that does not exceed 2% of the outstanding shares so listed) or advisor, in a business or organization that: (a) develops or markets software competitive with the software owned or marketed by the Company; or (b) provides consulting, maintenance, support or training services that are competitive with the consulting, maintenance, support or training services provided by the Company; or (c) solicits or sells such competitive software or provides such competitive consulting, maintenance, support or training services.

The Company agrees that this Non-Competition section (Section 6) shall not apply if the work I do following the termination of my employment with the Company does not in any way, shape or form include or involve either: the development or marketing of software competitive with the software owned or marketed by the Company; or consulting, maintenance, support, or training services related to such software.

**7.    Non-Solicitation of Clients**

I agree that while I am employed by the Company and for 12 months immediately following the termination of my employment with the Company, regardless of who terminates the employment or whether the termination is voluntary or involuntary, I will not, directly or indirectly, contact or solicit any Clients of the Company, with whom/which I had Company business related contact at any time during the 12 month period before the termination of my employment, for the purpose of selling or supplying to these Clients of the Company any products or software services which are competitive with the products or software services sold, owned or supplied by the Company at the time of my termination.

The term "Clients of the Company" in this Non-Solicitation section (Section 7) is limited to any person, business or organization that:

(a)    was a client of the Company at the time of termination of my employment with the company; or

Trapeze Software Group, Inc. - "Standard Employee Contract"
With Attached Schedules A, B, X, Y



    (b)    became a client of the Company within six months after the termination of my employment with the Company and I was involved with the marketing effort in respect of such client prior to the termination of my employment with the Company; or

    (c)    was a client of the Company during the 12 month period before the termination of my employment.

**8.**    <u>Non-Solicitation of Employees</u>

I agree that while I am employed by the Company, and for six months after the termination of my employment with the Company, I shall not directly or indirectly hire any employees of or consultants to the Company nor shall I solicit or induce or attempt to induce any persons who were employees of or consultants to the Company at the time of such termination or during the 90 days immediately preceding such termination, to terminate their employment or consulting agreement with the Company, without the prior consent of the Company.

**9.**    <u>Reasonableness of Non-Competition and Non-Solicitation Obligations</u>

I confirm that the obligations in Sections 6, 7 and 8 are fair and reasonable given that, among other reasons,

    (a)    the sustained contact I will have with the clients of the Company will expose me to Confidential Information regarding the particular requirements of these clients and the Company's unique methods of satisfying the needs of these clients, all of which I agree not to act upon to the detriment of the Company; and/or

    (b)    I will be performing important development work on the software owned or marketed by the Company.



and I agree that the obligations in Sections 6, 7 and 8, together with my other obligations under this Agreement, are reasonably necessary for the protection of the Company's proprietary interests. I further confirm that the geographic scope of the obligation in Section 6 is reasonable given the international nature of the market for the products and services of the Company. I also agree that the obligations in Sections 6, 7 and 8 are in addition to the non-disclosure and other obligations provided elsewhere in this Agreement. I also acknowledge that my obligations contained in this Agreement will not preclude me from becoming gainfully directly employed in the computer software industry following a termination of my employment with the Company given my general knowledge and experience in the computer industry.

## 10.    No Conflicting Obligations

(a)    I acknowledge and represent to the Company that my performance as an employee of the Company shall not breach any agreement or other obligation to keep confidential the proprietary information of any prior employer of mine and any other third party. I further acknowledge and represent that I am not bound by any agreement or obligation with any other third party that conflicts with any of my obligations under this Agreement.

(b)    I represent and agree that I will not bring to the Company, and shall not use in the performance of my work with the Company, any trade secrets, confidential information and other proprietary information of any prior employer of mine or any other third party. I represent and agree that in my work creating Developments I will not knowingly infringe the intellectual property rights, including copyright, of any third party.

## 11.    Enforcement

I acknowledge and agree that damages may not be an adequate remedy to compensate the Company for any breach of my obligations contained in this Agreement. And accordingly I agree that in addition to any and all other remedies available, the Company may be entitled to seek relief by way of a temporary or permanent injunction to enforce the obligations contained in this Agreement.

## 12.    General

(a)    This Agreement shall be governed by the laws in force in the State of Arizona. If any provision of this Agreement is wholly or partially unenforceable for any reason, such unenforceable provision or part thereof shall be deemed to be omitted from this Agreement without in any way invalidating or impairing the other provisions of this Agreement. In this Agreement any reference to a termination of employment shall include termination for any reason whatsoever and with or without cause.

(b)    The rights and obligations under this Agreement shall survive the termination of my service to the Company and shall inure to the benefit of and shall be binding upon (i) my heirs and personal representatives and (ii) the successors and assigns of the Company.

Trapeze Software Group, Inc. - "Standard Employee Contract"
With Attached Schedules A, B, X, Y



(c)   Any terms and conditions of employment expressly negotiated between the Company, and myself as established in prior agreements between the Company and myself are expressly preserved and shall be continued. But this Agreement shall prevail over the terms and conditions of prior agreements where there is any conflict or inconsistency between them.

I HAVE READ THIS AGREEMENT, UNDERSTAND IT, HAVE HAD THE OPPORTUNITY TO OBTAIN INDEPENDENT LEGAL ADVICE IN RESPECT OF IT, AND I AGREE TO ITS TERMS. I ACKNOWLEDGE HAVING RECEIVED A FULLY EXECUTED COPY OF THIS AGREEMENT.

Signed, sealed and delivered
in the presence of:

_____
Witness

_____
(Name of witness - printed)

_____
Employee (signature)

**Janet Davis**
(Name of employee - printed)

3/23/03
(Date)

**Trapeze Software Group, Inc.**

By: _____
     President or
     Chief Financial Officer

**Trapeze Software Group, Inc.**

By: _____
Corporate Human Resources Manager

---

**Trapeze Software Group, Inc. - "Standard Employee Contract"**
**With Attached Schedules A, B, X, Y**

# SCHEDULE 3.1(ar)

**Schedule 3.1(ar)**

**Schedule of Outstanding Proposals**

The following proposals to potential customers are outstanding as of Closing:

Health Care USA

# SCHEDULE 3.8

**LOCAL MOTION ITS, INC.**
**SHAREHOLDERS AGREEMENT**

THIS SHAREHOLDERS AGREEMENT (this "Agreement") is made and entered into as of December 1, 2003, by and among Local Motion ITS, Inc., a Virginia corporation (the "**Company**"), MV Transportation, Inc., a California corporation ("**MVT**") and Janet Sue Davis, or her successor or assigns ("**Shareholder**").

A.    MVT and Shareholder own 800 shares and 75 shares, respectively, of the capital stock (the "Stock") of the Company,

B.    Shareholder may receive additional shares of the Company pursuant a stock option agreement between the Company and the Shareholder.

C.    MVT, Shareholder and the Company desire to provide for the rights related to Shareholder's Stock specified in this Agreement and other agreements between Shareholder, Company and MVT.

NOW, THEREFORE, in consideration of the promises herein made and on the terms and subject to the conditions herein contained, the Company, MVT and Shareholder hereby agree as follows:

1.    *Rights to Purchase Stock.*

1.1    *Termination.*    If Shareholder has entered into a written Employment Agreement with the Company and shall later cease to be an employee of the Company due to the resignation, death or permanent disability of employee or the occurrence of one or more of the following:  (i) the commission by Employee of any fraudulent, criminal or illegal act, or any act of fraud, embezzlement, theft, bad faith, gross negligence, recklessness or willful misconduct; (ii) gross incompetence or repeated material failure or refusal to perform the duties required by this Agreement and as may be reasonably assigned to Employee by the Chief Executive Officer or Board of Directors from time to time; (iii) conviction of a felony or of any crime of moral turpitude; (iv) any material misrepresentation by Employee to the Company regarding the operation of the business; or (v) breach of any covenant of the Employment Agreement (a " **For Cause"** event), the Company and MVT shall have the right to repurchase some or all of Shareholder's Stock at a purchase price equal to the fair market value of the stock (hereinafter "FMV"), which shall be discounted for minority interest in a closely held private company but shall be no less than book value.  The parties may agree upon FMV.  If the parties cannot agree on the FMV, the FMV shall be determined by an independent consultant, selected jointly by Shareholder and MVT, who has expertise in determining the fair market value of stock in privately held companies.    If, within ten days of MVT's decision to purchase Shareholder's stock, Shareholder and MVT cannot agree on the

consultant, then the consultant shall be selected by an arbitrator selected from a list of seven arbitrators from the American Arbitration Association in San Francisco. Each party shall have the right to provide the arbitrator a list of two consultants acceptable to that party. The arbitrator shall select from the list of four consultants the consultant deemed most qualified to provide a fair market value for Shareholder's stock. The parties equally shall share in the cost of the arbitration and the cost of the consultant.

1.2 **_Exercise of Repurchase Right_**. Either the Company or MVT may exercise its right of repurchase set forth in this Section 1 by written notice to Shareholder within 365 days after the date on which Shareholder ceases to be retained as an employee of the Company due to a For Cause event. If the Company or MVT (or their assignees), exercises its right of repurchase, Shareholder shall, if necessary, endorse and deliver to the Company or MVT (or their assignees), as the case may be, the certificates representing the Stock, and the Company or MVT (or their assignees), as the case may be, shall pay Shareholder the total repurchase price in cash upon such delivery. Shareholder shall cease to have any rights with respect to such repurchased shares immediately upon receipt of the repurchase price.

1.3 **_Right of First Refusal and Restrictions on Transfer_**. The Stock shall be subject to a right of first refusal by the Company and/or MVT in the event that Shareholder or any transferee of the Stock proposes to sell, pledge or otherwise transfer the Stock or any interest in the Stock to any person or entity except pursuant to an "Exempt Transfer" (as hereinafter defined). An "Exempt Transfer" shall mean a transfer by any holder of the Stock who is a natural person to his or her spouse or to any of his or her lineal descendants, or to a trust, corporation or partnership the sole beneficiaries, stockholders or partners of which are and, during the period of ownership by such trust, corporation or partnership, remain such stockholder and his or her spouse or lineal descendants; provided that the transferee (including any trust, corporation or partnership) agrees in writing to be bound by this Agreement. Any subsequent proposed transfer by any person who received any Stock pursuant to an Exempt Transfer or a sale to any person whereby the Company and/or MVT does not exercise its right of first refusal shall again be subject to the right of first refusal described above.

Any holder of the Stock desiring to transfer the Stock or any interest in the Stock (except pursuant to an Exempt Transfer) shall give a written notice to the Company and MVT describing the proposed transfer, including the number of shares of the Stock proposed to be transferred, the price and terms at which the shares are proposed to be transferred and the name and address of the proposed transferee. Unless otherwise agreed by the Company or MVT, as the case may be, and the holder of such shares, purchases by the Company or MVT under this Section shall be at the proposed price and terms specified in the notice to the Company and MVT. If neither the Company nor

MVT exercises its right of first refusal within 30 days from the date on which the Company and MVT receive the holder's notice, the holder may, within the next 90 days, conclude a transfer to the proposed transferee of the exact number of shares of Stock covered by that notice on terms not more favorable (taken as a whole) to the transferee than those described in the notice. The Company's and MVT's right of first refusal shall attach to the Stock, and all transferees shall be subject thereto, and any holder's right to transfer Stock under this Section 1.3 to any transferee other than the Company or MVT, and any such transferee's right to become a holder of stock shall be subject to and conditioned upon such transferee's execution and delivery to the Company of, and agreement to be bound by, this Agreement. Any subsequent proposed transfer shall again be subject to the Company's and MVT's right of first refusal. If the Company or MVT exercises its right of first refusal, the shareholder shall endorse and deliver to the Company or MVT, as the case may be, the Stock certificates representing the shares being purchased and the Company or MVT, as the case may be, shall upon such delivery pay the shareholder the total repurchase price. The holder of the shares being purchased shall cease to have any rights with respect to the shares immediately upon receipt of the repurchase price.

2. **Additional Rights**.

2.1 **Drag-Along Rights.**

(a) If MVT proposes to sell all of its Stock in Company to a person or persons, other than an affiliate of MVT, in a single transaction or two or more related transactions, MVT shall have the right but not the obligation, upon giving 30-days written notice thereof to Shareholder (including any successor or assign) to require Shareholder to participate in and sell all of their Stock to such person or persons in such transaction or transactions.

(b) Any such participation by Shareholder shall be at the same price per share (in form and amount) applicable to the sale of the MVT's Stock and otherwise shall be on the same terms and conditions (including any option as to the form and amount of consideration to be received) as are applicable to MVT).

2.2 **Right to Purchase in the Event of an Acquisition of MVT.**

(a) In the event of (i) a sale by MVT security holders of MVT securities representing more than 50% of the combined voting power of the MVT's then outstanding securities to a person or persons, other than an affiliate of MVT, in a single transaction or two or more related transactions, (ii) a sale of assets involving 75% or more of the fair market value of the MVT as determined in good faith by the Board of Directors of MVT to a person or persons, other than an affiliate of MVT, in a single transaction or two or more related transactions which also involves the sale of MVT's shares in the Company or substantially all of the assets of the Company (iii) any

3

0

merger or reorganization of MVT whether or not another entity is the surviving entity, pursuant to which holders of all the shares of capital stock outstanding before the transaction hold, as a group, less than 50% of the shares of capital stock of the Company or the surviving entity (or parent) immediately after such merger or reorganization or (iv) in the event MVT commences the first sale of its Common Stock pursuant to a registration statement under the Securities Act of 1933, as amended, for an underwritten public offering, MVT or Company shall have the right to purchase Shareholder's Stock simultaneously with the consummation of a transaction referred to in clauses (i), (ii) or (iii) or after the filing of a registration statement in the event of a public offering referred to in clause (iv) at a purchase price equal to FMV as described in Section 1.1 herein.

(b) MVT may exercise its right of purchase set forth in this Section 2.2 by written notice to Shareholder not less than 30 days before the date on which the transaction giving rise to the right to purchase is consummated or any time after 30 days prior to the filing of a registration statement with the Securities and Exchange Commission. If MVT (or its assignees) exercises its right of purchase under this Section 2.2, Shareholder shall, if necessary, endorse and deliver to MVT (or its assignees) the certificates representing the Stock, and MVT (or its assignees) shall pay Shareholder the total purchase price in cash upon such delivery. Shareholder shall cease to have any rights with respect to the Stock immediately upon receipt of the purchase price.

2.3    **No Encumbrances.**  Shareholder hereby agrees to deliver his or her Stock free and clear of all liens or encumbrances in connection with disposition pursuant to this Section 2.

2.4 **Other Rights.**  In the event that MVT exercises its rights to purchase the Stock of Shareholder pursuant to Sections 2.1 or 2.2 herein prior to December 31, 2006, any "unvested option shares" contained in the "Local Motion ITS, Inc. 2003 Stock Option Plan" and the "Stock Option Agreement under the Local Motion ITS, Inc. 2003 Stock Option Plan", Schedules 2.8(a) and 2.8(b), respectively, to the "Share Purchase Agreement" of even date herewith shall immediately vest and shall be considered vested immediately prior to the purchase by MVT, provided that Shareholder shall have not suffered a Termination of Eligibility event pursuant to the Stock Option Plan prior to the date of purchase of Stock by MV Transportation, Inc. or Company.

Additionally, in the event of a purchase of Stock by Company or MVT pursuant to Section 2.1 or 2.2 herein prior to December 31, 2006, the Shareholder will be entitled to receive a cash payment from Company in lieu of a cash dividend pursuant to Section 2.9 of the Share Purchase Agreement. The amount of the cash payment made in lieu of the dividend will be the same amount that Shareholder would have received as a dividend pursuant to Section 2.9 of the Share Purchase Agreement in the event the purchase of Shareholder's Stock pursuant to this Shareholder Agreement had not occurred.

0

3.    ***Other Restrictions on Resale of Stock***.

         3.1    ***Legends***.    Shareholder understands and acknowledges that the Stock is not registered under the Securities Act of 1933, as amended (the "Act"), and that under the Act and other applicable laws Shareholder may be required to hold the shares for an indefinite period of time.  Each stock certificate representing shares shall bear the following legends:

"THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT").    ANY TRANSFER OF SUCH SECURITIES SHALL BE INVALID UNLESS A REGISTRATION STATEMENT UNDER THE ACT IS IN EFFECT AS TO SUCH TRANSFER OR, IN THE OPINION OF COUNSEL REASONABLY ACCEPTABLE TO THE COMPANY, SUCH REGISTRATION IS UNNECESSARY FOR SUCH TRANSFER TO COMPLY WITH THE ACT.

THE SECURITIES REPRESENTED HEREBY ARE SUBJECT TO THE TERMS OF AN AGREEMENT AMONG THE ISSUER AND SHAREHOLDERS OF THE ISSUER.    PURSUANT TO THE TERMS OF SUCH AGREEMENT, ISSUER AND A SHAREHOLDER OF THE ISSUE HAVE RIGHTS OF FIRST REFUSAL WITH RESPECT TO TRANSFER OF SUCH SECURITIES AND HAVE RIGHTS TO PURCHASE SUCH SECURITIES UNDER CERTAIN CIRCUMSTANCES. A COPY OF THE AGREEMENT CAN BE OBTAINED FROM THE SECRETARY OF THE COMPANY."

         3.2    ***Market Standoff***.    Shareholder agrees that if so requested by the Company or any representative of the underwriters in connection with the registration of a public offering of any securities of the Company under the Securities Act of 1933 (the "Act"), Shareholder shall not sell or otherwise transfer any shares of Stock or other securities of the Company or MVT during the 180 day period following the effective date of such registration statement.  The Company may impose stop transfer instructions with respect to securities subject to the foregoing restrictions until the end of such 180 day period.

         3.3    ***Refusal to Transfer.***    The Company shall not be required (i) to transfer on its books any Stock that have been sold or otherwise transferred in violation of any of the provisions of this Agreement or (ii) to treat as owner of such Stock or to accord the right to vote or pay dividends to any purchaser or other transferee to whom such Stock shall have been so transferred.

0

4.      **Tax Advice.**  Shareholder acknowledges that Shareholder has not relied and will not rely upon the Company or the Company's counsel with respect to any tax consequences related to the ownership, purchase, or disposition of the Stock.   Shareholder assumes full responsibility for all such consequences and for the preparation and filing of all tax returns and elections which may or must be filed in connection with the Stock.

5.      **No Commitment.**  Nothing in this Agreement constitutes an agreement that Shareholder will be employed or retained by the Company for any term.    Does this differ or conflict with our employment agreements?

6.      **Notices.**   Any notice or other communication required or permitted hereunder shall be in writing and shall be deemed to have been duly given on the date of service if served personally or five days after mailing if mailed by first class United States mail, certified or registered with return receipt requested, postage prepaid, and addressed as follows:

To the Company or MVT at:      360 Campus Lane Suite 201
                               Fairfield, CA  94534
To Shareholder at:             The address listed after Shareholder's
                               signature

7.      **Binding Effect.**  This Agreement shall be binding upon the heirs, legal representatives and successors of the Company, MVT and Shareholder; provided, however, that Shareholder may not assign any rights or obligations under this Agreement.  The Company's and MVT's rights under this Agreement shall be freely assignable.

8.      **Governing Law.**  This Agreement shall be governed by and construed in accordance with the laws of the State of California applicable to contracts entered into and to be performed entirely within the State of California by residents of the State of California.

9.      **Entire Agreement.**   Except as to the Share Purchase Agreement (and its applicable exhibits, attachments and schedules) of this same date, this Agreement constitutes the entire agreement of the parties pertaining to the Stock and supersedes all prior and contemporaneous agreements, representations, and understandings of the parties.

10.     **Optional Purchase.**   In the event Shareholder (a) is adjudicated as bankrupt (voluntary or involuntary), or makes an assignment for the benefit for his creditors, (b) is physically or mentally incapacitated for more than six (6) months as shown by inability to participate in the business of Company, (c) is terminated as an employee of Company for Cause (as defined in the separate Employment

6

0

Agreement between Shareholder and Company), (d) dies or (e) has his or her shares of stock awarded to such Shareholder's spouse under a decree of divorce or judgment of dissolution or separate maintenance, Company and the remaining Shareholders shall have the option for a period of ninety (90) days following notice of any such event(s) to purchase all or any part of the shares owned by the Shareholder. Notice shall be given to the Shareholder or his representative in accordance with Paragraph 6 of this Agreement. The option shall be exercisable first by Company and thereafter by the remaining Shareholders, and the price, terms of purchase, and method of exercise of the option shall be the same as are provided in Paragraph 1.1 of this Agreement. In the event this option is not exercised as to all the shares owned by the Shareholder, he or his successor in interest shall hold the shares subject to the provisions of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

LOCAL MOTION ITS, INS.

By: _____

Name: _____ Jon Monson

Title: _____ Chief Executive Officer

MV TRANSPORTATION, INC.

By: _____

Name: _____ Jon monson

Title: Chief Executive Officer / President

SHAREHOLDER

By: _____

Name: _____ Janet Sue Davis

Address: 6417 N 183 Ave
WADDELL, AZ 85355

## CONSENT OF SPOUSE

By execution of this Agreement, the undersigned spouse of Shareholder agrees to be bound by the terms of this Agreement as to such spouse's interest, whether as community property or otherwise, if any, in the Stock purchased hereby, including, without limitation, the terms of Sections 1, 2 and 10 of this Agreement.

8                                                    0

## LOCAL MOTION ITS, INC.
## SHAREHOLDERS AGREEMENT

THIS SHAREHOLDERS AGREEMENT (this "Agreement") is made and entered into as of December 1, 2003, by and among Local Motion ITS, Inc., a Virginia corporation (the "**Company**"), MV Transportation, Inc., a California corporation ("**MVT**") and Ryan James Larsen, or his successor or assigns ("**Shareholder**").

A.    MVT and Shareholder own 800 shares and 75 shares, respectively, of the capital stock (the "Stock") of the Company,

B.    Shareholder may receive additional shares of the Company pursuant a stock option agreement between the Company and the Shareholder.

C.    MVT, Shareholder and the Company desire to provide for the rights related to Shareholder's Stock specified in this Agreement and other agreements between Shareholder, Company and MVT.

NOW, THEREFORE, in consideration of the promises herein made and on the terms and subject to the conditions herein contained, the Company, MVT and Shareholder hereby agree as follows:

1.    ***Rights to Purchase Stock.***

1.1    ***Termination.***    If Shareholder has entered into a written Employment Agreement with the Company and shall later cease to be an employee of the Company due to the resignation, death or permanent disability of Employee or the occurrence of one or more of the following: (i) the commission by Employee of any fraudulent, criminal or illegal act, or any act of fraud, embezzlement, theft, bad faith, gross negligence, recklessness or willful misconduct; (ii) gross incompetence or repeated material failure or refusal to perform the duties required by this Agreement and as may be reasonably assigned to Employee by the Chief Executive Officer or Board of Directors from time to time; (iii) conviction of a felony or of any crime of moral turpitude; (iv) any material misrepresentation by Employee to the Company regarding the operation of the business; or (v) breach of any covenant of the Employment Agreement (a "**For Cause**" event), the Company and MVT shall have the right to repurchase some or all of Shareholder's Stock at a purchase price equal to the fair market value of the stock (hereinafter "FMV"), which shall be discounted for minority interest in a closely held private company but shall be no less than book value. The parties may agree upon FMV. If the parties cannot agree on the FMV, the FMV shall be determined by an independent consultant, selected jointly by Shareholder and MVT, who has expertise in determining the fair market value of stock in privately held companies. If, within ten days of MVT's decision to purchase Shareholder's stock, Shareholder and MVT cannot agree on the

consultant, then the consultant shall be selected by an arbitrator selected from a list of seven arbitrators from the American Arbitration Association in San Francisco. Each party shall have the right to provide the arbitrator a list of two consultants acceptable to that party. The arbitrator shall select from the list of four consultants the consultant deemed most qualified to provide a fair market value for Shareholder's stock. The parties equally shall share in the cost of the arbitration and the cost of the consultant.

1.2     ***Exercise of Repurchase Right***.    Either the Company or MVT may exercise its right of repurchase set forth in this Section 1 by written notice to Shareholder within 365 days after the date on which Shareholder ceases to be retained as an employee of the Company due to a For Cause event. If the Company or MVT (or their assignees), exercises its right of repurchase, Shareholder shall, if necessary, endorse and deliver to the Company or MVT (or their assignees), as the case may be, the certificates representing the Stock, and the Company or MVT (or their assignees), as the case may be, shall pay Shareholder the total repurchase price in cash upon such delivery. Shareholder shall cease to have any rights with respect to such repurchased shares immediately upon receipt of the repurchase price.

1.3     ***Right of First Refusal and Restrictions on Transfer***.    The Stock shall be subject to a right of first refusal by the Company and/or MVT in the event that Shareholder or any transferee of the Stock proposes to sell, pledge or otherwise transfer the Stock or any interest in the Stock to any person or entity except pursuant to an "Exempt Transfer" (as hereinafter defined). An "Exempt Transfer" shall mean a transfer by any holder of the Stock who is a natural person to his or her spouse or to any of his or her lineal descendants, or to a trust, corporation or partnership the sole beneficiaries, stockholders or partners of which are and, during the period of ownership by such trust, corporation or partnership, remain such stockholder and his or her spouse or lineal descendants; provided that the transferee (including any trust, corporation or partnership) agrees in writing to be bound by this Agreement. Any subsequent proposed transfer by any person who received any Stock pursuant to an Exempt Transfer or a sale to any person whereby the Company and/or MVT does not exercise its right of first refusal shall again be subject to the right of first refusal described above.

Any holder of the Stock desiring to transfer the Stock or any interest in the Stock (except pursuant to an Exempt Transfer) shall give a written notice to the Company and MVT describing the proposed transfer, including the number of shares of the Stock proposed to be transferred, the price and terms at which the shares are proposed to be transferred and the name and address of the proposed transferee. Unless otherwise agreed by the Company or MVT, as the case may be, and the holder of such shares, purchases by the Company or MVT under this Section shall be at the proposed price and terms specified in the notice to the Company and MVT. If neither the Company nor

0

MVT exercises its right of first refusal within 30 days from the date on which the Company and MVT receive the holder's notice, the holder may, within the next 90 days, conclude a transfer to the proposed transferee of the exact number of shares of Stock covered by that notice on terms not more favorable (taken as a whole) to the transferee than those described in the notice. The Company's and MVT's right of first refusal shall attach to the Stock, and all transferees shall be subject thereto, and any holder's right to transfer Stock under this Section 1.3 to any transferee other than the Company or MVT, and any such transferee's right to become a holder of stock shall be subject to and conditioned upon such transferee's execution and delivery to the Company of, and agreement to be bound by, this Agreement. Any subsequent proposed transfer shall again be subject to the Company's and MVT's right of first refusal. If the Company or MVT exercises its right of first refusal, the shareholder shall endorse and deliver to the Company or MVT, as the case may be, the Stock certificates representing the shares being purchased and the Company or MVT, as the case may be, shall upon such delivery pay the shareholder the total repurchase price. The holder of the shares being purchased shall cease to have any rights with respect to the shares immediately upon receipt of the repurchase price.

2.    **Additional Rights.**

2.1    **Drag-Along Rights.**

(a) If MVT proposes to sell all of its Stock in Company to a person or persons, other than an affiliate of MVT, in a single transaction or two or more related transactions, MVT shall have the right but not the obligation, upon giving 30-days written notice thereof to Shareholder (including any successor or assign) to require Shareholder to participate in and sell all of their Stock to such person or persons in such transaction or transactions.

(b) Any such participation by Shareholder shall be at the same price per share (in form and amount) applicable to the sale of the MVT's Stock and otherwise shall be on the same terms and conditions (including any option as to the form and amount of consideration to be received) as are applicable to MVT).

2.2    **Right to Purchase in the Event of an Acquisition of MVT.**

(a) In the event of (i) a sale by MVT security holders of MVT securities representing more than 50% of the combined voting power of the MVT's then outstanding securities to a person or persons, other than an affiliate of MVT, in a single transaction or two or more related transactions, (ii) a sale of assets involving 75% or more of the fair market value of the MVT as determined in good faith by the Board of Directors of MVT to a person or persons, other than an affiliate of MVT, in a single transaction or two or more related transactions which also involves the sale of MVT's shares in the Company or substantially all of the assets of the Company (iii) any

3                                                                                    0

merger or reorganization of MVT whether or not another entity is the surviving entity, pursuant to which holders of all the shares of capital stock outstanding before the transaction hold, as a group, less than 50% of the shares of capital stock of the Company or the surviving entity (or parent) immediately after such merger or reorganization or (iv) in the event MVT commences the first sale of its Common Stock pursuant to a registration statement under the Securities Act of 1933, as amended, for an underwritten public offering, MVT or Company shall have the right to purchase Shareholder's Stock simultaneously with the consummation of a transaction referred to in clauses (i), (ii) or (iii) or after the filing of a registration statement in the event of a public offering referred to in clause (iv) at a purchase price equal to FMV as described in Section 1.1 herein.

(b) MVT may exercise its right of purchase set forth in this Section 2.2 by written notice to Shareholder not less than 30 days before the date on which the transaction giving rise to the right to purchase is consummated or any time after 30 days prior to the filing of a registration statement with the Securities and Exchange Commission. If MVT (or its assignees), exercises its right of purchase under this Section 2.2, Shareholder shall, if necessary, endorse and deliver to MVT (or its assignees) the certificates representing the Stock, and MVT (or its assignees) shall pay Shareholder the total purchase price in cash upon such delivery. Shareholder shall cease to have any rights with respect to the Stock immediately upon receipt of the purchase price.

2.3    **No Encumbrances.**  Shareholder hereby agrees to deliver his or her Stock free and clear of all liens or encumbrances in connection with disposition pursuant to this Section 2.

2.4 **Other Rights.**  In the event that MVT exercises its rights to purchase the Stock of Shareholder pursuant to Sections 2.1 or 2.2 herein prior to December 31, 2006, any "unvested option shares" contained in the "Local Motion ITS, Inc. 2003 Stock Option Plan" and the "Stock Option Agreement under the Local Motion ITS, Inc. 2003 Stock Option Plan", Schedules 2.8(a) and 2.8(b), respectively, to the "Share Purchase Agreement" of even date herewith shall immediately vest and shall be considered vested immediately prior to the purchase by MVT, provided that Shareholder shall have not suffered a Termination of Eligibility event pursuant to the Stock Option Plan prior to the date of purchase of Stock by MV Transportation, Inc. or Company.

Additionally, in the event of a purchase of Stock by Company or MVT pursuant to Section 2.1 or 2.2 herein prior to December 31, 2006, the Shareholder will be entitled to receive a cash payment from Company in lieu of a cash dividend pursuant to Section 2.9 of the Share Purchase Agreement. The amount of the cash payment made in lieu of the dividend will be the same amount that Shareholder would have received as a dividend pursuant to Section 2.9 of the Share Purchase Agreement in the event the purchase of Shareholder's Stock pursuant to this Shareholder Agreement had not occurred.

4

0

3.    ***Other Restrictions on Resale of Stock***.

      3.1    ***Legends***.    Shareholder understands and acknowledges that the Stock is not registered under the Securities Act of 1933, as amended (the "Act"), and that under the Act and other applicable laws Shareholder may be required to hold the shares for an indefinite period of time.  Each stock certificate representing shares shall bear the following legends:

"THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT").    ANY TRANSFER OF SUCH SECURITIES SHALL BE INVALID UNLESS A REGISTRATION STATEMENT UNDER THE ACT IS IN EFFECT AS TO SUCH TRANSFER OR, IN THE OPINION OF COUNSEL REASONABLY ACCEPTABLE TO THE COMPANY, SUCH REGISTRATION IS UNNECESSARY FOR SUCH TRANSFER TO COMPLY WITH THE ACT.

THE SECURITIES REPRESENTED HEREBY ARE SUBJECT TO THE TERMS OF AN AGREEMENT AMONG THE ISSUER AND SHAREHOLDERS OF THE ISSUER.    PURSUANT TO THE TERMS OF SUCH AGREEMENT, ISSUER AND A SHAREHOLDER OF THE ISSUE HAVE RIGHTS OF FIRST REFUSAL WITH RESPECT TO TRANSFER OF SUCH SECURITIES AND HAVE RIGHTS TO PURCHASE SUCH SECURITIES UNDER CERTAIN CIRCUMSTANCES. A COPY OF THE AGREEMENT CAN BE OBTAINED FROM THE SECRETARY OF THE COMPANY."

      3.2    ***Market Standoff***.    Shareholder agrees that if so requested by the Company or any representative of the underwriters in connection with the registration of a public offering of any securities of the Company under the Securities Act of 1933 (the "Act"), Shareholder shall not sell or otherwise transfer any shares of Stock or other securities of the Company or MVT during the 180 day period following the effective date of such registration statement.   The Company may impose stop transfer instructions with respect to securities subject to the foregoing restrictions until the end of such 180 day period.

      3.3    ***Refusal to Transfer.***    The Company shall not be required (i) to transfer on its books any Stock that have been sold or otherwise transferred in violation of any of the provisions of this Agreement or (ii) to treat as owner of such Stock or to accord the right to vote or pay dividends to any purchaser or other transferee to whom such Stock shall have been so transferred.

0

4.    **Tax Advice.**  Shareholder acknowledges that Shareholder has not relied and will not rely upon the Company or the Company's counsel with respect to any tax consequences related to the ownership, purchase, or disposition of the Stock.   Shareholder assumes full responsibility for all such consequences and for the preparation and filing of all tax returns and elections which may or must be filed in connection with the Stock.

5.    **No Commitment.**  Nothing in this Agreement constitutes an agreement that Shareholder will be employed or retained by the Company for any term.   Does this differ or conflict with our employment agreements?

6.    **Notices.**  Any notice or other communication required or permitted hereunder shall be in writing and shall be deemed to have been duly given on the date of service if served personally or five days after mailing if mailed by first class United States mail, certified or registered with return receipt requested, postage prepaid, and addressed as follows:

To the Company or MVT at:      360 Campus Lane Suite 201
                               Fairfield, CA 94534
To Shareholder at:             The address listed after Shareholder's
                               signature

7.    **Binding Effect.**  This Agreement shall be binding upon the heirs, legal representatives and successors of the Company, MVT and Shareholder; provided, however, that Shareholder may not assign any rights or obligations under this Agreement.  The Company's and MVT's rights under this Agreement shall be freely assignable.

8.    **Governing Law.**  This Agreement shall be governed by and construed in accordance with the laws of the State of California applicable to contracts entered into and to be performed entirely within the State of California by residents of the State of California.

9.    **Entire Agreement.**  Except as to the Share Purchase Agreement (and its applicable exhibits, attachments and schedules) of this same date, this Agreement constitutes the entire agreement of the parties pertaining to the Stock and supersedes all prior and contemporaneous agreements, representations, and understandings of the parties.

10.    **Optional Purchase.**  In the event Shareholder (a) is adjudicated as bankrupt (voluntary or involuntary), or makes an assignment for the benefit for his creditors, (b) is physically or mentally incapacitated for more than six (6) months as shown by inability to participate in the business of Company, (c) is terminated as an employee of Company for Cause (as defined in the separate Employment

6

0

Agreement between Shareholder and Company), (d) dies or (e) has his or her shares of stock awarded to such Shareholder's spouse under a decree of divorce or judgment of dissolution or separate maintenance, Company and the remaining Shareholders shall have the option for a period of ninety (90) days following notice of any such event(s) to purchase all or any part of the shares owned by the Shareholder. Notice shall be given to the Shareholder or his representative in accordance with Paragraph 6 of this Agreement. The option shall be exercisable first by Company and thereafter by the remaining Shareholders, and the price, terms of purchase, and method of exercise of the option shall be the same as are provided in Paragraph 1.1 of this Agreement. In the event this option is not exercised as to all the shares owned by the Shareholder, he or his successor in interest shall hold the shares subject to the provisions of this Agreement.

0

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**LOCAL MOTION ITS, INC.**

By: _____

Name: _____

Title: _____

**MV TRANSPORTATION, INC.**

By: _____

Name: _____

Title: _____

**SHAREHOLDER**

By: _____

Name: _____

Address: _____

_____

## CONSENT OF SPOUSE

By execution of this Agreement, the undersigned spouse of Shareholder agrees to be bound by the terms of this Agreement as to such spouse's interest, whether as community property or otherwise, if any, in the Stock purchased hereby, including, without limitation, the terms of Sections 1, 2 and 10 of this Agreement.

_____

8                                                    0

**LOCAL MOTION ITS, INC.**
**SHAREHOLDERS AGREEMENT**

THIS SHAREHOLDERS AGREEMENT (this "Agreement") is made and entered into as of December 1, 2003, by and among Local Motion ITS, Inc., a Virginia corporation (the "***Company***"), MV Transportation, Inc., a California corporation ("**MVT**") and Marsha Louise Madrid, or her successor or assigns ("***Shareholder***").

A.    MVT and Shareholder own 800 shares and 50 shares, respectively, of the capital stock (the "Stock") of the Company,

B.    Shareholder may receive additional shares of the Company pursuant a stock option agreement between the Company and the Shareholder.

C.    MVT, Shareholder and the Company desire to provide for the rights related to Shareholder's Stock specified in this Agreement and other agreements between Shareholder, Company and MVT.

NOW, THEREFORE, in consideration of the promises herein made and on the terms and subject to the conditions herein contained, the Company, MVT and Shareholder hereby agree as follows:

1.    ***Rights to Purchase Stock***.

1.1    ***Termination***.    If Shareholder has entered into a written Employment Agreement with the Company and shall later cease to be an employee of the Company due to the resignation, death or permanent disability of employee or the occurrence of one or more of the following:  (i) the commission by Employee of any fraudulent, criminal or illegal act, or any act of fraud, embezzlement, theft, bad faith, gross negligence, recklessness or willful misconduct; (ii) gross incompetence or repeated material failure or refusal to perform the duties required by this Agreement and as may be reasonably assigned to Employee by the Chief Executive Officer or Board of Directors from time to time; (iii) conviction of a felony or of any crime of moral turpitude; (iv) any material misrepresentation by Employee to the Company regarding the operation of the business; or (v) breach of any covenant of the Employment Agreement (a " **For Cause"** event), the Company and MVT shall have the right to repurchase some or all of Shareholder's Stock at a purchase price equal to the fair market value of the stock (hereinafter "FMV"), which shall be discounted for minority interest in a closely held private company but shall be no less than book value.  The parties may agree upon FMV.  If the parties cannot agree on the FMV, the FMV shall be determined by an independent consultant, selected jointly by Shareholder and MVT, who has expertise in determining the fair market value of stock in privately held companies.    If, within ten days of MVT's decision to purchase Shareholder's stock, Shareholder and MVT cannot agree on the

consultant, then the consultant shall be selected by an arbitrator selected from a list of seven arbitrators from the American Arbitration Association in San Francisco. Each party shall have the right to provide the arbitrator a list of two consultants acceptable to that party. The arbitrator shall select from the list of four consultants the consultant deemed most qualified to provide a fair market value for Shareholder's stock. The parties equally shall share in the cost of the arbitration and the cost of the consultant.

        1.2    **_Exercise of Repurchase Right_**. Either the Company or MVT may exercise its right of repurchase set forth in this Section 1 by written notice to Shareholder within 365 days after the date on which Shareholder ceases to be retained as an employee of the Company due to a For Cause event. If the Company or MVT (or their assignees), exercises its right of repurchase, Shareholder shall, if necessary, endorse and deliver to the Company or MVT (or their assignees), as the case may be, the certificates representing the Stock, and the Company or MVT (or their assignees), as the case may be, shall pay Shareholder the total repurchase price in cash upon such delivery. Shareholder shall cease to have any rights with respect to such repurchased shares immediately upon receipt of the repurchase price.

        1.3    **_Right of First Refusal and Restrictions on Transfer_**. The Stock shall be subject to a right of first refusal by the Company and/or MVT in the event that Shareholder or any transferee of the Stock proposes to sell, pledge or otherwise transfer the Stock or any interest in the Stock to any person or entity except pursuant to an "Exempt Transfer" (as hereinafter defined). An "Exempt Transfer" shall mean a transfer by any holder of the Stock who is a natural person to his or her spouse or to any of his or her lineal descendants, or to a trust, corporation or partnership the sole beneficiaries, stockholders or partners of which are and, during the period of ownership by such trust, corporation or partnership, remain such stockholder and his or her spouse or lineal descendants; provided that the transferee (including any trust, corporation or partnership) agrees in writing to be bound by this Agreement. Any subsequent proposed transfer by any person who received any Stock pursuant to an Exempt Transfer or a sale to any person whereby the Company and/or MVT does not exercise its right of first refusal shall again be subject to the right of first refusal described above.

Any holder of the Stock desiring to transfer the Stock or any interest in the Stock (except pursuant to an Exempt Transfer) shall give a written notice to the Company and MVT describing the proposed transfer, including the number of shares of the Stock proposed to be transferred, the price and terms at which the shares are proposed to be transferred and the name and address of the proposed transferee. Unless otherwise agreed by the Company or MVT, as the case may be, and the holder of such shares, purchases by the Company or MVT under this Section shall be at the proposed price and terms specified in the notice to the Company and MVT. If neither the Company nor

0

MVT exercises its right of first refusal within 30 days from the date on which the Company and MVT receive the holder's notice, the holder may, within the next 90 days, conclude a transfer to the proposed transferee of the exact number of shares of Stock covered by that notice on terms not more favorable (taken as a whole) to the transferee than those described in the notice. The Company's and MVT's right of first refusal shall attach to the Stock, and all transferees shall be subject thereto, and any holder's right to transfer Stock under this Section 1.3 to any transferee other than the Company or MVT, and any such transferee's right to become a holder of stock shall be subject to and conditioned upon such transferee's execution and delivery to the Company of, and agreement to be bound by, this Agreement. Any subsequent proposed transfer shall again be subject to the Company's and MVT's right of first refusal. If the Company or MVT exercises its right of first refusal, the shareholder shall endorse and deliver to the Company or MVT, as the case may be, the Stock certificates representing the shares being purchased and the Company or MVT, as the case may be, shall upon such delivery pay the shareholder the total repurchase price. The holder of the shares being purchased shall cease to have any rights with respect to the shares immediately upon receipt of the repurchase price.

2.    **Additional Rights**.

2.1    **Drag-Along Rights.**

(a) If MVT proposes to sell all of its Stock in Company to a person or persons, other than an affiliate of MVT, in a single transaction or two or more related transactions, MVT shall have the right but not the obligation, upon giving 30-days written notice thereof to Shareholder (including any successor or assign) to require Shareholder to participate in and sell all of their Stock to such person or persons in such transaction or transactions.

(b) Any such participation by Shareholder shall be at the same price per share (in form and amount) applicable to the sale of the MVT's Stock and otherwise shall be on the same terms and conditions (including any option as to the form and amount of consideration to be received) as are applicable to MVT).

2.2    **Right to Purchase in the Event of an Acquisition of MVT.**

(a) In the event of (i) a sale by MVT security holders of MVT securities representing more than 50% of the combined voting power of the MVT's then outstanding securities to a person or persons, other than an affiliate of MVT, in a single transaction or two or more related transactions, (ii) a sale of assets involving 75% or more of the fair market value of the MVT as determined in good faith by the Board of Directors of MVT to a person or persons, other than an affiliate of MVT, in a single transaction or two or more related transactions which also involves the sale of MVT's shares in the Company or substantially all of the assets of the Company (iii) any

0

merger or reorganization of MVT whether or not another entity is the surviving entity, pursuant to which holders of all the shares of capital stock outstanding before the transaction hold, as a group, less than 50% of the shares of capital stock of the Company or the surviving entity (or parent) immediately after such merger or reorganization or (iv) in the event MVT commences the first sale of its Common Stock pursuant to a registration statement under the Securities Act of 1933, as amended, for an underwritten public offering, MVT or Company shall have the right to purchase Shareholder's Stock simultaneously with the consummation of a transaction referred to in clauses (i), (ii) or (iii) or after the filing of a registration statement in the event of a public offering referred to in clause (iv) at a purchase price equal to FMV as described in Section 1.1 herein.

(b) MVT may exercise its right of purchase set forth in this Section 2.2 by written notice to Shareholder not less than 30 days before the date on which the transaction giving rise to the right to purchase is consummated or any time after 30 days prior to the filing of a registration statement with the Securities and Exchange Commission. If MVT (or its assignees), exercises its right of purchase under this Section 2.2, Shareholder shall, if necessary, endorse and deliver to MVT (or its assignees) the certificates representing the Stock, and MVT (or its assignees) shall pay Shareholder the total purchase price in cash upon such delivery. Shareholder shall cease to have any rights with respect to the Stock immediately upon receipt of the purchase price.

2.3    **No Encumbrances.**    Shareholder hereby agrees to deliver his or her Stock free and clear of all liens or encumbrances in connection with disposition pursuant to this Section 2.

2.4 **Other Rights.** In the event that MVT exercises its rights to purchase the Stock of Shareholder pursuant to Sections 2.1 or 2.2 herein prior to December 31, 2006, any "unvested option shares" contained in the "Local Motion ITS, Inc. 2003 Stock Option Plan" and the "Stock Option Agreement under the Local Motion ITS, Inc. 2003 Stock Option Plan", Schedules 2.8(a) and 2.8(b), respectively, to the "Share Purchase Agreement" of even date herewith shall immediately vest and shall be considered vested immediately prior to the purchase by MVT, provided that Shareholder shall have not suffered a Termination of Eligibility event pursuant to the Stock Option Plan prior to the date of purchase of Stock by MV Transportation, Inc. or Company.

Additionally, in the event of a purchase of Stock by Company or MVT pursuant to Section 2.1 or 2.2 herein prior to December 31, 2006, the Shareholder will be entitled to receive a cash payment from Company in lieu of a cash dividend pursuant to Section 2.9 of the Share Purchase Agreement. The amount of the cash payment made in lieu of the dividend will be the same amount that Shareholder would have received as a dividend pursuant to Section 2.9 of the Share Purchase Agreement in the event the purchase of Shareholder's Stock pursuant to this Shareholder Agreement had not occurred.

0

3.    *Other Restrictions on Resale of Stock*.

3.1    **Legends**.    Shareholder understands and acknowledges that the Stock is not registered under the Securities Act of 1933, as amended (the "Act"), and that under the Act and other applicable laws Shareholder may be required to hold the shares for an indefinite period of time. Each stock certificate representing shares shall bear the following legends:

"THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"). ANY TRANSFER OF SUCH SECURITIES SHALL BE INVALID UNLESS A REGISTRATION STATEMENT UNDER THE ACT IS IN EFFECT AS TO SUCH TRANSFER OR, IN THE OPINION OF COUNSEL REASONABLY ACCEPTABLE TO THE COMPANY, SUCH REGISTRATION IS UNNECESSARY FOR SUCH TRANSFER TO COMPLY WITH THE ACT.

THE SECURITIES REPRESENTED HEREBY ARE SUBJECT TO THE TERMS OF AN AGREEMENT AMONG THE ISSUER AND SHAREHOLDERS OF THE ISSUER. PURSUANT TO THE TERMS OF SUCH AGREEMENT, ISSUER AND A SHAREHOLDER OF THE ISSUE HAVE RIGHTS OF FIRST REFUSAL WITH RESPECT TO TRANSFER OF SUCH SECURITIES AND HAVE RIGHTS TO PURCHASE SUCH SECURITIES UNDER CERTAIN CIRCUMSTANCES. A COPY OF THE AGREEMENT CAN BE OBTAINED FROM THE SECRETARY OF THE COMPANY."

3.2    **Market Standoff**.    Shareholder agrees that if so requested by the Company or any representative of the underwriters in connection with the registration of a public offering of any securities of the Company under the Securities Act of 1933 (the "Act"), Shareholder shall not sell or otherwise transfer any shares of Stock or other securities of the Company or MVT during the 180 day period following the effective date of such registration statement. The Company may impose stop transfer instructions with respect to securities subject to the foregoing restrictions until the end of such 180 day period.

3.3    **Refusal to Transfer.**    The Company shall not be required (i) to transfer on its books any Stock that have been sold or otherwise transferred in violation of any of the provisions of this Agreement or (ii) to treat as owner of such Stock or to accord the right to vote or pay dividends to any purchaser or other transferee to whom such Stock shall have been so transferred.

0

4.    **Tax Advice.**  Shareholder acknowledges that Shareholder has not relied and will not rely upon the Company or the Company's counsel with respect to any tax consequences related to the ownership, purchase, or disposition of the Stock.    Shareholder assumes full responsibility for all such consequences and for the preparation and filing of all tax returns and elections which may or must be filed in connection with the Stock.

5.    **No Commitment**.  Nothing in this Agreement constitutes an agreement that Shareholder will be employed or retained by the Company for any term.    Does this differ or conflict with our employment agreements?

6.    **Notices**.    Any notice or other communication required or permitted hereunder shall be in writing and shall be deemed to have been duly given on the date of service if served personally or five days after mailing if mailed by first class United States mail, certified or registered with return receipt requested, postage prepaid, and addressed as follows:

To the Company or MVT at:        360 Campus Lane Suite 201
                                 Fairfield, CA  94534
To Shareholder at:               The address listed after Shareholder's
                                 signature

7.    **Binding Effect**.  This Agreement shall be binding upon the heirs, legal representatives and successors of the Company, MVT and Shareholder; provided, however, that Shareholder may not assign any rights or obligations under this Agreement.   The Company's and MVT's rights under this Agreement shall be freely assignable.

8.    **Governing Law**.  This Agreement shall be governed by and construed in accordance with the laws of the State of California applicable to contracts entered into and to be performed entirely within the State of California by residents of the State of California.

9.    **Entire Agreement**.    Except as to the Share Purchase Agreement (and its applicable exhibits, attachments and schedules) of this same date, this Agreement constitutes the entire agreement of the parties pertaining to the Stock and supersedes all prior and contemporaneous agreements, representations, and understandings of the parties.

10.    **Optional Purchase.**    In the event Shareholder (a) is adjudicated as bankrupt (voluntary or involuntary), or makes an assignment for the benefit for his creditors, (b) is physically or mentally incapacitated for more than six (6) months as shown by inability to participate in the business of Company, (c) is terminated as an employee of Company for Cause (as defined in the separate Employment

0

Agreement between Shareholder and Company), (d) dies or (e) has his or her shares of stock awarded to such Shareholder's spouse under a decree of divorce or judgment of dissolution or separate maintenance, Company and the remaining Shareholders shall have the option for a period of ninety (90) days following notice of any such event(s) to purchase all or any part of the shares owned by the Shareholder. Notice shall be given to the Shareholder or his representative in accordance with Paragraph 6 of this Agreement. The option shall be exercisable first by Company and thereafter by the remaining Shareholders, and the price, terms of purchase, and method of exercise of the option shall be the same as are provided in Paragraph 1.1 of this Agreement. In the event this option is not exercised as to all the shares owned by the Shareholder, he or his successor in interest shall hold the shares subject to the provisions of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**LOCAL MOTION ITS, INC.**

By: _____

Name: _Jon Monson_____

Title: _Chief Executive Officer__

**MV TRANSPORTATION, INC.**

By: _____

Name: _Jon Monson_____

Title: _President / CEO_____

**SHAREHOLDER**

By: _Marsha L Madrid  11/30/03_

Name: _Marsha L. Madrid_____

Address: _3744 Kinsale Ln SE____
_Olympia, WA 98501_____

## CONSENT OF SPOUSE

By execution of this Agreement, the undersigned spouse of Shareholder agrees to be bound by the terms of this Agreement as to such spouse's interest, whether as community property or otherwise, if any, in the Stock purchased hereby, including, without limitation, the terms of Sections 1, 2 and 10 of this Agreement.

_____

8

0

## LOCAL MOTION ITS, INC.
## SHAREHOLDERS AGREEMENT

THIS SHAREHOLDERS AGREEMENT (this "Agreement") is made and entered into as of December 1, 2003, by and among Local Motion ITS, Inc., a Virginia corporation (the "**Company**"), MV Transportation, Inc., a California corporation ("**MVT**") and Kevin John Dresser, or his successor or assigns ("**Shareholder**").

A.    MVT and Shareholder own 800 shares and 0 shares, respectively, of the capital stock (the "Stock") of the Company,

B.    Shareholder may receive shares of the Company pursuant a stock option agreement between the Company and the Shareholder.

C.    MVT, Shareholder and the Company desire to provide for the rights related to Shareholder's Stock specified in this Agreement and other agreements between Shareholder, Company and MVT.

NOW, THEREFORE, in consideration of the promises herein made and on the terms and subject to the conditions herein contained, the Company, MVT and Shareholder hereby agree as follows:

1.    ***Rights to Purchase Stock.***

1.1    ***Price.***    In the event the Company and MVT has the right to repurchase some or all of Shareholder's Stock pursuant to Section 2.2 or Section 10 of this Shareholder's Agreement, it shall be at a purchase price equal to the fair market value of the stock (hereinafter "FMV"), which shall be discounted for minority interest in a closely held private company but shall be no less than book value. The parties may agree upon FMV. If the parties cannot agree on the FMV, the FMV shall be determined by an independent consultant, selected jointly by Shareholder and MVT, who has expertise in determining the fair market value of stock in privately held companies. If, within ten days of MVT's decision to purchase Shareholder's stock, Shareholder and MVT cannot agree on the consultant, then the consultant shall be selected by an arbitrator selected from a list of seven arbitrators from the American Arbitration Association in San Francisco. Each party shall have the right to provide the arbitrator a list of two consultants acceptable to that party. The arbitrator shall select from the list of four consultants the consultant deemed most qualified to provide a fair market value for Shareholder's stock. The parties equally shall share in the cost of the arbitration and the cost of the consultant.

1.2    ***Right of First Refusal and Restrictions on Transfer.***    The Stock shall be subject to a right of first refusal by the Company and/or MVT in the event that Shareholder or any transferee of the Stock proposes to sell, pledge or otherwise transfer the Stock or any interest in the Stock to any person or entity except pursuant to an "Exempt Transfer" (as hereinafter defined). An "Exempt Transfer" shall mean a transfer by any holder of the Stock who is a natural person to his or her spouse or to

any of his or her lineal descendants, or to a trust, corporation or partnership the sole beneficiaries, stockholders or partners of which are and, during the period of ownership by such trust, corporation or partnership, remain such stockholder and his or her spouse or lineal descendants; provided that the transferee (including any trust, corporation or partnership) agrees in writing to be bound by this Agreement. Any subsequent proposed transfer by any person who received any Stock pursuant to an Exempt Transfer or a sale to any person whereby the Company and/or MVT does not exercise its right of first refusal shall again be subject to the right of first refusal described above.

Any holder of the Stock desiring to transfer the Stock or any interest in the Stock (except pursuant to an Exempt Transfer) shall give a written notice to the Company and MVT describing the proposed transfer, including the number of shares of the Stock proposed to be transferred, the price and terms at which the shares are proposed to be transferred and the name and address of the proposed transferee. Unless otherwise agreed by the Company or MVT, as the case may be, and the holder of such shares, purchases by the Company or MVT under this Section shall be at the proposed price and terms specified in the notice to the Company and MVT. If neither the Company nor MVT exercises its right of first refusal within 30 days from the date on which the Company and MVT receive the holder's notice, the holder may, within the next 90 days, conclude a transfer to the proposed transferee of the exact number of shares of Stock covered by that notice on terms not more favorable (taken as a whole) to the transferee than those described in the notice. The Company's and MVT's right of first refusal shall attach to the Stock, and all transferees shall be subject thereto, and any holder's right to transfer Stock under this Section 1.2 to any transferee other than the Company or MVT, and any such transferee's right to become a holder of stock shall be subject to and conditioned upon such transferee's execution and delivery to the Company of, and agreement to be bound by, this Agreement. Any subsequent proposed transfer shall again be subject to the Company's and MVT's right of first refusal. If the Company or MVT exercises its right of first refusal, the shareholder shall endorse and deliver to the Company or MVT, as the case may be, the Stock certificates representing the shares being purchased and the Company or MVT, as the case may be, shall upon such delivery pay the shareholder the total repurchase price. The holder of the shares being purchased shall cease to have any rights with respect to the shares immediately upon receipt of the repurchase price.

2.    **Additional Rights**.

2.1    **Drag-Along Rights.**

(a)    If MVT proposes to sell all of its Stock in Company to a person or persons, other than an affiliate of MVT, in a single transaction or two or more related transactions, MVT shall have the right but not the obligation, upon giving 30-days written notice thereof to Shareholder (including any successor or assign) to require Shareholder to participate in and sell all of their Stock to such person or persons in such transaction or transactions.

0

(b)    Any such participation by Shareholder shall be at the same price per share (in form and amount) applicable to the sale of the MVT's Stock and otherwise shall be on the same terms and conditions (including any option as to the form and amount of consideration to be received) as are applicable to MVT).

2.2    **Right to Purchase.**

(a)    In the event of (i) a sale by MVT security holders of MVT securities representing more than 50% of the combined voting power of the MVT's then outstanding securities to a person or persons, other than an affiliate of MVT, in a single transaction or two or more related transactions, (ii) a sale of assets involving 75% or more of the fair market value of the MVT as determined in good faith by the Board of Directors of MVT to a person or persons, other than an affiliate of MVT, in a single transaction or two or more related transactions which also involves the sale of MVT's shares in the Company or substantially all of the assets of the Company (iii) any merger or reorganization of MVT whether or not another entity is the surviving entity, pursuant to which holders of all the shares of capital stock outstanding before the transaction hold, as a group, less than 50% of the shares of capital stock of the Company or the surviving entity (or parent) immediately after such merger or reorganization or (iv) in the event MVT commences the first sale of its Common Stock pursuant to a registration statement under the Securities Act of 1933, as amended, for an underwritten public offering, MVT or Company shall have the right to purchase Shareholder's Stock simultaneously with the consummation of a transaction referred to in clauses (i), (ii) or (iii) or after the filing of a registration statement in the event of a public offering referred to in clause (iv) at a purchase price equal to FMV as described in Section 1.1 herein.

(b)    MVT may exercise its right of purchase set forth in this Section 2.2 by written notice to Shareholder not less than 30 days before the date on which the transaction giving rise to the right to purchase is consummated or any time after 30 days prior to the filing of a registration statement with the Securities and Exchange Commission.  If MVT (or its assignees), exercises its right of purchase under this Section 2.2, Shareholder shall, if necessary, endorse and deliver to MVT (or its assignees) the certificates representing the Stock, and MVT (or its assignees) shall pay Shareholder the total purchase price in cash upon such delivery.  Shareholder shall cease to have any rights with respect to the Stock immediately upon receipt of the purchase price.

( c)    On February 2, 2007 MVT shall purchase any and all stock owned by Shareholder at a purchase price equal to FMV as described in Section 1.1 herein.

2.3    **No Encumbrances.**  Shareholder hereby agrees to deliver his or her Stock free and clear of all liens or encumbrances in connection with disposition pursuant to this Section 2.

2.4 **Other Rights.**  In the event that MVT exercises its rights to purchase the Stock of Shareholder pursuant to Sections 2.1 or 2.2 herein prior to December 31,

3

0

2006, any "unvested option shares" contained in the "Local Motion ITS, Inc. 2003 Stock Option Plan" and the "Stock Option Agreement under the Local Motion ITS, Inc. 2003 Stock Option Plan", Schedules 2.8(a) and 2.8(b), respectively, to the "Share Purchase Agreement" of even date herewith shall immediately vest and shall be considered vested immediately prior to the purchase by MVT, provided that Shareholder shall have not suffered a Termination of Eligibility event pursuant to the Stock Option Plan and Agreement prior to the date of purchase of Stock by MVT or Company.

Additionally, in the event of a purchase of Stock by Company or MVT pursuant to Section 2.1 or 2.2 herein prior to December 31, 2006, the Shareholder will be entitled to receive a cash payment from Company in lieu of a cash dividend pursuant to Section 2.9 of the Share Purchase Agreement. The amount of the cash payment made in lieu of the dividend will be the same amount that Shareholder would have received as a dividend pursuant to Section 2.9 of the Share Purchase Agreement in the event the purchase of Shareholder's Stock pursuant to this Shareholder Agreement had not occurred.

3. **Other Restrictions on Resale of Stock.**

3.1    **Legends.**  Shareholder understands and acknowledges that the Stock is not registered under the Securities Act of 1933, as amended (the "Act"), and that under the Act and other applicable laws Shareholder may be required to hold the shares for an indefinite period of time. Each stock certificate representing shares shall bear the following legends:

> "THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT").  ANY TRANSFER OF SUCH SECURITIES SHALL BE INVALID UNLESS A REGISTRATION STATEMENT UNDER THE ACT IS IN EFFECT AS TO SUCH TRANSFER OR, IN THE OPINION OF COUNSEL REASONABLY ACCEPTABLE TO THE COMPANY, SUCH REGISTRATION IS UNNECESSARY FOR SUCH TRANSFER TO COMPLY WITH THE ACT.

> THE SECURITIES REPRESENTED HEREBY ARE SUBJECT TO THE TERMS OF AN AGREEMENT AMONG THE ISSUER AND SHAREHOLDERS OF THE ISSUER.  PURSUANT TO THE TERMS OF SUCH AGREEMENT, ISSUER AND A SHAREHOLDER OF THE ISSUE HAVE RIGHTS OF FIRST REFUSAL WITH RESPECT TO TRANSFER OF SUCH SECURITIES AND HAVE RIGHTS TO PURCHASE SUCH SECURITIES UNDER CERTAIN CIRCUMSTANCES. A COPY OF THE AGREEMENT CAN BE OBTAINED FROM THE SECRETARY OF THE COMPANY."

0

3.2    **Market Standoff**.  Shareholder agrees that if so requested by the Company or any representative of the underwriters in connection with the registration of a public offering of any securities of the Company under the Securities Act of 1933 (the "Act"), Shareholder shall not sell or otherwise transfer any shares of Stock or other securities of the Company or MVT during the 180 day period following the effective date of such registration statement.  The Company may impose stop transfer instructions with respect to securities subject to the foregoing restrictions until the end of such 180 day period.

3.3    **Refusal to Transfer.**  The Company shall not be required (i) to transfer on its books any Stock that have been sold or otherwise transferred in violation of any of the provisions of this Agreement or (ii) to treat as owner of such Stock or to accord the right to vote or pay dividends to any purchaser or other transferee to whom such Stock shall have been so transferred.

4. **Tax Advice.**  Shareholder acknowledges that Shareholder has not relied and will not rely upon the Company or the Company's counsel with respect to any tax consequences related to the ownership, purchase, or disposition of the Stock. Shareholder assumes full responsibility for all such consequences and for the preparation and filing of all tax returns and elections which may or must be filed in connection with the Stock.

5. **No Commitment**.  Nothing in this Agreement constitutes an agreement that Shareholder will be employed or retained by the Company for any term.  Does this differ or conflict with our employment agreements?

6. **Notices**.  Any notice or other communication required or permitted hereunder shall be in writing and shall be deemed to have been duly given on the date of service if served personally or five days after mailing if mailed by first class United States mail, certified or registered with return receipt requested, postage prepaid, and addressed as follows:

|  |  |
|---|---|
| To the Company or MVT at: | 360 Campus Lane Suite 201 |
|  | Fairfield, CA  94534 |
| To Shareholder at: | The address listed after Shareholder's |
|  | signature |

7. **Binding Effect**.  This Agreement shall be binding upon the heirs, legal representatives and successors of the Company, MVT and Shareholder; provided, however, that Shareholder may not assign any rights or obligations under this Agreement.  The Company's and MVT's rights under this Agreement shall be freely assignable.

8. **Governing Law**.  This Agreement shall be governed by and construed in accordance with the laws of the State of California applicable to contracts entered into and to be performed entirely within the State of California by residents of the State of California.

0

9. ***Entire Agreement***.  Except as to the Share Purchase Agreement (and its applicable exhibits, attachments and schedules) of this same date, this Agreement constitutes the entire agreement of the parties pertaining to the Stock and supersedes all prior and contemporaneous agreements, representations, and understandings of the parties.

10. ***Optional Purchase.***  In the event Shareholder (a) is adjudicated as bankrupt (voluntary or involuntary), or makes an assignment for the benefit for his creditors, (b) is physically or mentally incapacitated for more than six (6) months as shown by inability to participate in the business of Company, (c) dies or (d) has his or her shares of stock awarded to such Shareholder's spouse under a decree of divorce or judgment of dissolution or separate maintenance,  Company and the remaining Shareholders shall have the option for a period of ninety (90) days following notice of any such event(s) to purchase all or any part of the shares owned by the Shareholder.  Notice shall be given to the Shareholder or his representative in accordance with Paragraph 6 of this Agreement.  The option shall be exercisable first by Company and thereafter by the remaining Shareholders, and the price, terms of purchase, and method of exercise of the option shall be the same as are provided in Paragraph 1.1 of this Agreement.  In the event this option is not exercised as to all the shares owned by the Shareholder, he or his successor in interest shall hold the shares subject to the provisions of this Agreement.

0

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

LOCAL MOTION ITS, INC.

By: _____

Name: _Jon Monson_____

Title: _Chief Executive Officer_____

MV TRANSPORTATION, INC.

By: _____

Name: _Jon Monson_____

Title: _President / CEO_____

SHAREHOLDER

By: _Kevin J. Dresser_____

Name: _KEVIN J. DRESSER_____

Address: _1695 Turnberry Lane_____
_Riner, VA 24149_____

## CONSENT OF SPOUSE

By execution of this Agreement, the undersigned spouse of Shareholder agrees to be bound by the terms of this Agreement as to such spouse's interest, whether as community property or otherwise, if any, in the Stock purchased hereby, including, without limitation, the terms of Sections 1, 2 and 10 of this Agreement.

_Penny M. Dresser_____

7                                              0

# SCHEDULE 4.1(g)

*The Law Offices of*
## Carm R. Moehle, P.C.
*a professional corporation*

Carm R. Moehle
Admitted to practice in
Arizona
Colorado
Missouri

November 30, 2003

519 E. Thomas Road
Phoenix, Arizona 85012
(602) 264-5840
FAX (602) 230-7579
E-Mail: carm.moehle@azbar.org

VIA TELEFACSIMILE ONLY (707-581-1733)
Mr. Jon Monson
MV Transportation, Inc.

Re:   Sale of Local Motion ITS, Inc. shares
      Sellers: Janet Davis, Kevin Dresser, Ryan Larsen and
      Marsha Madrid
      Purchaser: MV Transportation, Inc.

Dear Mr. Monson:

This is to verify that I have consulted with, and given limited advice to, the above-referenced Sellers regarding the subject transaction, specifically regarding that certain "Share Purchase Agreement" of December 1, 2003 and related schedules thereto. No advice or opinion was rendered to the Sellers regarding tax or securities matters. No advice or opinion was given regarding the advisability or suitability of the substantive matters involved in the transaction. No negotiations were undertaken on the Sellers' behalf. Nothing herein should be construed as a disclosure, intended or otherwise, of any attorney-client privileged communications or work product created by undersigned counsel, said matters being expressly reserved from disclosure.

Within these parameters, it is my general impression that the Sellers are aware of and understand the material provisions of the "Share Purchase Agreement" document, and, correspondingly, that said written memorandum (the "Share Purchase Agreement") accurately reflects their understanding of the substantive elements of the transaction.

DATED:    November 30, 2003.

Carm R. Moehle
Attorney at law

Printed on Recycled Paper.

# SCHEDULE 4.1(h)

RESIGNATION

I, Janet Sue Davis, being Senior Vice President and Director of Local Motion ITS, Inc., a Virginia Corporation, do hereby resign and relinquish all positions and offices of Local Motion ITS, Inc. effective the 30th day of November, 2003.

By: _____

Date: _____

RESIGNATION

I, Kevin John Dresser, being Secretary/Treasurer and Director of Local Motion ITS, Inc., a Virginia Corporation, do hereby resign and relinquish all positions and offices of Local Motion ITS, Inc. effective the 30th day of November, 2003.

By: _____

Date: _____

RESIGNATION

I, Ryan James Larsen, being President and Director of Local Motion ITS, Inc., a Virginia Corporation, do hereby resign and relinquish all positions and offices of Local Motion ITS, Inc. effective the 30th day of November, 2003.

By: _____

Date: _____

RESIGNATION

I, Marsha Louise Madrid, being Vice President of Local Motion ITS, Inc., a Virginia Corporation, do hereby resign and relinquish all positions and offices of Local Motion ITS, Inc. effective the 30th day of November, 2003.

By: _Marsha R Madrid_

Date: _11/30/03_

# SCHEDULE 4.1(j)

## NON-COMPETITION AGREEMENT

This Non-Competition Agreement ("Covenant") is given in connection with the Share Purchase Agreement entered into between the parties this same date by RYAN J. LARSEN, a resident of Iowa, MARSHA L. MADRID, a resident of Washington, KEVIN J. DRESSER, a resident of Virginia, and JANET S. DAVIS, a resident of Arizona (jointly and severally referred to as Shareholders) in favor of MV TRANSPORTATION, INC., a California corporation ("Purchaser"), and LOCAL MOTION ITS, INC., a Virginia corporation ("Company") to be effective on and as of December 1-, 2003 ("Effective Date").

## RECITALS

**WHEREAS,** the Company and Purchaser engage in the business of of paratransit services, consulting services, medical transportation, paratransit brokerage and paratransit software Application Service Provider (ASP).

**WHEREAS,** there are issued and outstanding One Thousand (1,000) shares of the Company's authorized shares of common stock, no par value (the "Capital Stock"). Shareholders jointly own One Thousand (1,000) shares of the Capital Stock, equaling One Hundred percent (100%) of the issued Capital Stock of the Company (the "Stock").

**WHEREAS,** The parties have entered into a Share Purchase Agreement, dated the Effective Date (the "Agreement"). Pursuant to the Agreement, Purchaser shall purchase the 80% of Stock from the Shareholders.

**WHEREAS,** in accordance with the terms of the Agreement, Purchaser and Company desire to obtain from Shareholders, and Shareholders are willing to grant to Purchaser and Company a covenant not to compete.

All capitalized terms in this Covenant shall have the same meanings ascribed to them in the Agreement unless otherwise specifically defined herein.

## ARTICLE I. COVENANT AGREEMENT

For and in consideration of the above recitals, for consideration provided to Shareholders under the Agreement, and for other good and valuable consideration this Covenant is given by Shareholders and is accepted by Purchaser and the Company on the terms and conditions stated herein.

Section 1.01. Term of Covenant. This Covenant shall be in force for a period of Sixty (60) calendar months from the Closing Date.

Section 1.02. The Covenant. The Shareholders hereby agree that neither they nor their Affiliates anywhere in all the cities, counties and states within the United States in which Purchaser, Company or any of their subsidiaries, successor or affiliates do or market business (collectively the "Covenant Area") shall, in any manner, directly or indirectly:

   1.02.1   Engage in, or become interested in (whether as an owner, stockholder, lender or other investor, director, officer, employee, consultant, broker, agent, trustee, landlord or otherwise) any business which offers to provide services or products substantially similar to or in competition with the Company or Purchaser (including Purchaser's subsidiaries, successor or affiliates) within the Covenant Area; or

   1.02.2   Solicit, service, divert or appropriate to any competing business customer or client or other business opportunities of the Company or Purchaser (including Purchaser's subsidiaries, successor or affiliates); or

   1.02.3   Attempt to induce any employee of the Company or Purchaser (or Purchaser's subsidiaries, successor or affiliates) to leave such employment.

   1.02.4   This Agreement shall not be construed to prohibit Shareholders from engaging as a private consultant on an individual basis to government agencies in the United States, so long as Shareholder is not acting on behalf of any other person on entity, or in partnership or as an employee of any other person or entity and so long as the government agency is not then a customer of the Purchaser (or Purchaser's subsidiaries, successor or affiliates) or Company (except that consulting for a government agency that is a customer of Purchase or Company shall be permitted if such consulting does not involve or is not associated with the service being performed by the Purchaser or Company) . In the event a Shareholder does engage in consulting permitted by this Section, such Shareholder shall provide prior written notice to Purchaser and Company of the name of the entity and the terms of the engagement.

   1.02.5   This Agreement shall not be construed to prohibit Shareholders from working as an employee of a federal, state or local government agency.

   1.02.6   At the time of the execution of this Agreement, the Company or Purchaser is not engaged in the business of the development of or sale of computer software for the scheduling, routing, reservation or dispatching of passenger transportation, transit or paratransit vehicles (hereinafter referred to as "Transit Software Business"). In the event a Shareholder leaves the employ of the Company or Purchaser prior to Company or Purchaser beginning the development of the Transit Software Business or prior to the Company or Purchaser acquiring a Transit Software Business, this Agreement shall not be construed to prohibit a Shareholder from

engaging in the Transit Software Business after leaving the employ of the Company or Purchaser. In the event the Company or Purchaser begins the development of or completes an acquisition of a company in the Transit Software Business at any time in the future, this Agreement shall extend to the Transit Software Business for the remaining term hereof.

For purposes of this Section 1.02, the term "Affiliate" shall include any individual, trust, corporation, partnership or other business entity that directly or indirectly through one or more intermediaries, has an equity interest which is owned by Shareholders. For purposes of determining the foregoing, equity interests representing less than five (5%) percent of total outstanding equity shall be ignored and the constructive ownership provisions of Section 318 of the Code shall apply for purposes of determining ownership.

Section 1.03    Divisible by Time and Geographical Area.    The parties hereby agree that, if the restrictive covenants, or any of them, are held to be unreasonable, arbitrary or against public policy, such covenant or covenants shall be considered divisible both as to time and geographical area. Each month of the specified period shall be deemed a separate period of time, and each quarter mile of the Covenant Area shall be deemed a separate geographical area, so that the lesser period of time or geographical area shall remain effective so long as the time or geographical area are not unreasonable, arbitrary, or against public policy. The parties further agree that, in the event any court determines the specified time period or the specified geographical area to be unreasonable, arbitrary, or against public policy, a lesser time period or geographical area which is determined to be reasonable, nonarbitrary and not against public policy may be enforced against the Shareholders.

## ARTICLE 2. REMEDIES

In the event of breach of this Covenant set forth in this instrument, Shareholders hereby acknowledge and stipulate that Purchaser and Company will suffer irreparable damage for any such breach, that any remedy at law for any such breach of this Covenant would be inadequate and that the Purchaser and the Company will be entitled to both (a) a preliminary or permanent injunction to prevent the continuation of such breach, and (b) monetary damages insofar as they can be determined. Nothing contained herein shall be construed to prohibit either the Purchaser or the Company from also pursuing any other remedy, the parties having agreed that all remedies shall be cumulative.

## ARTICLE 3. MISCELLANEOUS

Section 3.01 Attorneys' Fees and Costs.    In the event that any party to this Covenant shall initiate or bring an action or other proceeding against any other party to this Covenant to enforce or declare any rights herein created, or to bring about or declare the termination, cancellation, or rescission of this Covenant, the prevailing party

or parties in such action or proceeding shall be entitled to receive from the other party or parties all reasonable attorneys' fees and costs incurred in connection therewith.

Section 3.02. Successors.  This Covenant shall be binding upon and shall inure to the benefit of Purchaser and Company and their respective  heirs, executors, successors and assigns and to the benefit of the Shareholders and their respective heirs, executors, successors and assigns.

Section 3.03. Headings.  Section titles or captions contained in this Covenant are included only as a matter of convenience and reference, and in no way define, limit, extend, or describe the scope of this Covenant or the intent of any provision thereof.

Section 3.04. Assignment.  No party hereto may assign this Covenant or any rights or remedies hereunder without the prior written consent of all of the parties hereto.

Section 3.05. Entire ·Covenant.  This Covenant, together with all Exhibits incorporated herein or attached hereto, constitutes the entire agreement between the parties dealing with the specific subject matter treated herein and superseding all negotiations, prior discussions, and written agreements.  This Covenant may not be changed, modified, or amended, except by a writing executed by all of the parties.

Section 3.06. Governing Law.  This covenant shall be governed by the laws of the State of California.·

Section 3.07. Severability.  If any provisions of this Covenant shall be held to be invalid or unenforceable for any reason, then, so far as is reasonable possible, the remainder of the Covenant shall be considered valid and operative.

Section 3.08. Waiver.  No Waiver of any term, provision or condition of this Covenant in any one or more instances, shall be construed or be deemed to be a further or continuing waiver of any such term, provision, or condition of this Covenant, nor shall it be construed nor shall it constitute a waiver of any other term or provision of this Covenant.  No waiver shall be effective unless written and signed by the party or parties making such waiver.

Section 3.09. Interpretation.  Should any provision of this Covenant require interpretation by a court of law, it is agreed by the parties that the Court interpreting or construing this Covenant shall not apply a presumption that the terms of this Covenant shall be more strictly construed against one party by reason of the rule of construction that a document is to be construed more strictly against the party who by himself or through his agent prepared such document, it being agreed that the agents of all parties have participated in the preparation of this Agreement.

Section 310.  Representation of Counsel.  The parties acknowledge that they have each been advised to be represented by independent counsel of their choice in

the negotiation of this Covenant, that they have read this Covenant, and that its meaning and legal consequences have been explained to them.

[SIGNATURES TO FOLLOW]

The parties have signed this Covenant to be effective on and as of the Effective Date stated hereinabove.

"SHAREHOLDERS"

_____
RYAN J. LARSEN

_____
MARSHA L. MADRID

_____
KEVIN J. DRESSER

_____
JANET S. DAVIS

This Covenant is accepted and its terms and conditions are agreed.

MV TRANSPORTATION, INC.,
a California corporation

By: _____
    JON MONSON, President/CEO

ATTEST:

    JOHN A. BIARD, Secretary

the negotiation of this Covenant, that they have read this Covenant, and that its meaning and legal consequences have been explained to them.

[SIGNATURES TO FOLLOW]

The parties have signed this Covenant to be effective on and as of the Effective Date stated hereinabove.

"SHAREHOLDERS"

_____
RYAN J. LARSEN

_____
MARSHA L. MADRID

_____
KEVIN J. DRESSER

_____
JANET S. DAVIS

This Covenant is accepted and its terms and conditions are agreed.

MV TRANSPORTATION, INC.,
a California corporation

By _____

JON MONSON, President/CEO

ATTEST:

JOHN A. BIARD, Secretary

the negotiation of this Covenant, that they have read this Covenant, and that its meaning and legal consequences have been explained to them.

[SIGNATURES TO FOLLOW]

The parties have signed this Covenant to be effective on and as of the Effective Date stated hereinabove.

"SHAREHOLDERS"

_____

RYAN J. LARSEN

_____

MARSHA L. MADRID

_____

KEVIN J. DRESSER

_____

JANET S. DAVIS

This Covenant is accepted and its terms and conditions are agreed.

MV TRANSPORTATION, INC.,
a California corporation

By: _____

    JON MONSON, President/CEO

ATTEST:

    JOHN A. BIARD, Secretary

the negotiation of this Covenant, that they have read this Covenant, and that its meaning and legal consequences have been explained to them.

[SIGNATURES TO FOLLOW]

The parties have signed this Covenant to be effective on and as of the Effective Date stated hereinabove.

"SHAREHOLDERS"


RYAN J. LARSEN


MARSHA L. MADRID


KEVIN J. DRESSER


JANET S. DAVIS

This Covenant is accepted and its terms and conditions are agreed.

MV TRANSPORTATION, INC.,
a California corporation

By:

JON MONSON, President/CEO

ATTEST:

JOHN A. BIARD, Secretary

LOCAL MOTION ITS, INC.,
a Virginia corporation

By:

Jon Monson, CEO

ATTEST:

John A. Biard , Secretary

# SCHEDULE 4.1(k)

<u>EMPLOYMENT AGREEMENT</u>

THIS EMPLOYMENT AGREEMENT ("**Agreement**") is made and entered into effective as of December 1, 2003 (the "**Effective Date**"), by and between LOCAL MOTION ITS, INC., a Virginia corporation (the "**Company**") and JANET SUE DAVIS ("**Employee**"), with reference to the following:

### BACKGROUND

The Company is in the public and paratransit contracting services, consulting, transportation brokerage and application service provider business, (the "**Business**").

Employee has extensive public transportation operation and technical experience.

The Company now desires to retain the full-time services of Employee as Senior Vice President of the Company and Employee is willing to be employed by the Company in that capacity on the terms and conditions set forth in this Agreement.

NOW THEREFORE, in consideration of the promises herein made and on the terms and subject to the conditions herein contained, the Company and Employee hereby agree as follows:

1.    EMPLOYMENT.  The Company hereby employs Employee on the terms set forth herein and Employee hereby accepts such employment, for a term beginning on the Effective Date and ending on November 30, 2005 (the "**Initial Term**"), unless sooner terminated pursuant to Section 5 below.  This Agreement will automatically renew for additional annual terms ("**Renewal Terms**") upon the expiration of the Initial Term, unless either party delivers a notice to the other party, on or before August 1, stating the party's election not to renew this Agreement for the Renewal Term commencing on the following December 1, provided that the foregoing will not affect the Company's rights to terminate this Agreement pursuant to Sections 5.3 or 5.4 below.

2.    DUTIES.  During the period of her employment with the Company hereunder, Employee will be employed as Senior Vice President of the Company and Employee will:

(a)  devote her full business time and attention, and give her best effort and skill solely to the Company's business affairs and interests;

(b)    perform such services and assume such duties and responsibilities appropriate to the positions of Senior Vice President and those

which may from time to time be reasonably assigned to him by the President of the Company, to whom Employee will directly report; and

(c)        in all respects use her best efforts to further, enhance and develop the Company's business affairs, interests and welfare.

3.    COMPENSATION.   In consideration of Employee's services to the Company during the term of this Agreement, Employee will receive the following compensation:

(a)  The Company shall pay Employee a base salary of $145,000 per annum during the period from the Effective Date through November 30, 2004.  Employee's base salary will be paid in equal installments (pro rated for portions of a pay period) on the Company's regular pay days and the Company will withhold from such compensation all applicable federal and state income, social security, disability and other taxes as required by applicable laws.   On December 1, 2004 and annually thereafter, provided this Agreement is extended by both parties, Employee's base salary shall be increased by the Company at its sole discretion after the Company assesses the performance of Employee.

(b)  The Employee and Company agree to negotiate in good faith a written bonus plan for Employee, payable annually, based on the performance of the Employee.

(c)  The Company shall grant Employee an option to acquire shares of Common Stock in the Company pursuant to the Restricted Stock Purchase Agreement, a copy of which is attached to this Agreement as **Exhibit A**.

(d)  The Company shall reimburse Employee for any signing bonus that Employee is legally obligated to repay her prior employer, up to a maximum of $15,000, subject to provision of reasonable documentation of these expenses.

4.  BENEFITS AND REIMBURSEMENTS.

4.1  Employee will, during the term hereof, have the right to receive such benefits as are generally made available to full-time executive officers of the Company.   In addition, or inclusive of such benefits, the Company will provide Employee with the following:

(a)    either (i) the Company's standard medical and dental plan insurance covering Employee and her immediate family, or (ii) upon Employee's election, a maximum of $400 per month allowance for private medical and dental insurance coverage for Employee and her immediate family, *provided that* Employee's election to receive such monthly insurance allowance will not preclude Employee from choosing to receive the coverage provided for in subsection (i), in lieu of such allowance, at a later date;

(b)    in addition to normal holidays recognized by the Company, Employee will be entitled to three weeks paid vacation annually, the earning of which is pro-rated monthly, subject to the consent of the Company as to the timing of such vacation time;

(c)    the Employee may choose to obtain a term life insurance policy on Employee's life at a face amount determined by Employee. The Company shall reimburse employee for that portion of the premium that is attributable to 2 times the employee's base annual salary as listed in 3(a) and amended from time to time. For example, if employee selects a life insurance policy in the amount of 4 times her annual salary, then Company shall reimburse Employee for 50% of the annual premium. It shall be Employee's sole responsibility to and option to place said life insurance policy, and Company shall have no responsibility for Employee's failure or choice to do so, or for any lapse in coverage due to any event. Company's sole obligation under this section shall be to reimburse Employee for premiums paid, if any.

4.2    The Company will reimburse Employee for travel and other out-of-pocket expenses reasonably incurred by Employee in the performance of her duties hereunder, provided that all such expenses will be reimbursed only (i) upon the presentation by Employee to the Company of such documentation as may be reasonably necessary to substantiate that all such expenses were incurred in the performance of her duties, and (ii) if such expenses are consistent with all policies of the Company in effect from time to time as to the kind and amount of such expenses and (iii) the cost of all other reasonable expenses, including without limitation, telephone and cellular phone expenses, DSL Internet Access costs related to the preparation and dissemination of proposals, and costs incurred to entertain clients or prospective clients.

5. TERMINATION OF EMPLOYMENT.

5.1    Death of Employee.  This Agreement will terminate upon the death of Employee.

5.2    Permanent Disability of Employee.  This Agreement will terminate if Employee becomes permanently disabled. Employee will be deemed permanently disabled for the purpose of this Agreement if Employee becomes physically or mentally incapable of performing her duties hereunder for a continuous period of one hundred eighty (180) days, in which event Employee will be deemed permanently disabled upon the expiration of such one hundred eighty (180) day period.

5.3    Employee's Discharge for Cause.  The Company will have the right to terminate Employee's employment hereunder for "Cause" at any time effective upon its giving of written notice setting forth with particularity the facts and circumstances constituting such Cause. For such purposes, "**Cause**" means

the occurrence of one or more of the following: (i) the commission by Employee of any fraudulent, criminal or illegal act, or any act of fraud, embezzlement, theft, bad faith, gross negligence, recklessness or willful misconduct; (ii) gross incompetence or repeated material failure or refusal to perform the duties required by this Agreement and as may be reasonably assigned to Employee by the Chief Executive Officer or Board of Directors from time to time; (iii) conviction of a felony or of any crime of moral turpitude; (iv) any material misrepresentation by Employee to the Company regarding the operation of the business; or (v) breach of any covenant of this Agreement.

5.4    The Company's Right to Terminate At Will.    Subject to the payment to Employee of the severance payments as provided in Section 5.5(b) below, the Company will have the right, exercisable at any time, to terminate Employee's employment with the Company without "Cause" (as defined in Section 5.3 above), immediately upon written notice to Employee.

5.5    Compensation Upon Termination.

(a)    Upon termination of Employee's employment pursuant to this Article 5.1-5.3, Employee will be entitled to only: (i) the compensation provided for in Section 3(a) hereof for the period of time ending with the date of termination; (ii) "COBRA" benefits to the extent required by applicable law; and (iii) reimbursement for such expenses as Employee may have properly incurred on behalf of the Company as provided in Article 4 above prior to the date of termination.

(b)    If the Company terminates Employee's employment pursuant to Section 5.4 above only, in addition to the amounts payable in Section 5.5 (a) above, Employee will be entitled to receive a severance payment in an amount equal to the remaining salary that would have been paid to Employee during the remainder of her term of employment in the absence of such termination, as provided in Section 3(a) above, regardless of whether provided that such termination occurs during the Initial Term or during a Renewal term. In the event such termination occurs in during a Renewal term, Employee will be entitled to receive a severance payment in an amount equal to four months salary at the rate as provided in Section 3(a) above or the rate then in effect at the time of termination, whichever is greater.

(c)    The termination of Employee pursuant to Section 5.4 shall not affect Employee's rights as set forth in either 1) the "Local Motion ITS, Inc. 2003 Stock Option Plan" or 2) the "Stock Option Agreement under the Local Motion ITS, Inc. 2003 Stock Option Plan", which are Schedules 2.8(a) and 2.8(b), respectively, of that certain "Share Purchase Agreement of even date herewith, to which Local Motion ITS, Inc. is also designated as the "Company".

(d)    The payments set forth in this Section 5.5 will fully discharge all responsibilities of the Company to Employee under this Agreement or relating to

or arising out of the termination of Employee's employment and shall be conditioned upon Employee's execution of a Release Agreement with the Company in substantially the form attached hereto as **Exhibit B**.

6.    UNFAIR COMPETITION BY EMPLOYEE.

6.1    Employee agrees that all trade secrets, confidential or proprietary information with respect to the activities and businesses of the Company, including, without limitation, personnel information, secret processes, know-how, customer lists, employee lists, data bases, ideas, techniques, processes, inventions (whether patentable or not), and other technical plans, business plans, marketing plans, product plans, forecasts, contacts, strategies and information (collectively "**Proprietary Information**") which were learned by Employee in the course of her employment by the Company, and any other Proprietary Information received, developed or learned by Employee hereafter in the course of her future employment by or in association with the Company, are confidential and will be kept and held in confidence and trust as a fiduciary by Employee.    Employee will not use or disclose Proprietary Information of the Company except as necessary in the normal course of the business of the Company for its sole and exclusive benefit, unless Employee is compelled so to disclose under process of law, in which case Employee will first notify the Company promptly after receipt of a demand to so disclose, and will afford the Company the opportunity to contest, prevent or limit such disclosure.

6.2    Employee and the Company acknowledge that:    (i) each covenant and restriction contained in Section 6.1 and Article 7 of this Agreement is necessary, fundamental, and required for the protection of the Company's business; (ii) such relate to matters which are of a special, unique, and extraordinary character that gives each of them a special, unique, and extraordinary value; and (iii) a breach of any such covenant or restriction will result in irreparable harm and damage to the Company which cannot be compensated adequately by a monetary award.    Accordingly, it is expressly agreed that, in addition to all other remedies available at law or in equity, and notwithstanding anything to the contrary in Section 9 below, the Company will be entitled to the immediate remedy of a temporary restraining order, preliminary injunction, or such other form of injunctive or equitable relief as may be used by any court of competent jurisdiction to restrain or enjoin any of the parties to this Agreement from breaching any such covenant or restriction, or otherwise specifically to enforce the provisions contained in Section 6.1 and Article 7 of this Agreement.

7.    PROPRIETARY MATTERS.    Employee expressly understands and agrees that any and all improvements, inventions, discoveries, processes, or know-how related to the business of the Company that are generated or conceived by Employee during the term of this Agreement, whether so generated or conceived during Employee's regular working hours or otherwise, will be the sole and exclusive property of the

Company, and Employee will, whenever requested to do so by the Company (either during the term of this Agreement or thereafter), execute and assign any and all applications, assignments and/or other instruments and do all things which the Company may deem necessary or appropriate in order to apply for, obtain, maintain, enforce and defend patents, copyrights, trade names or trademarks of the United States or of foreign countries for said improvements, inventions, discoveries, processes, or know-how, or in order to assign and convey or otherwise make available to the Company the sole and exclusive right, title, and interest in and to said improvements, inventions, discoveries, processes, know-how, applications, patents, copyrights, trade names or trademarks.

8.    KEY-MAN INSURANCE.    Employee agrees to make herself available and to undergo, at the Company's request and expense, any physical examination or other procedure necessary to allow the Company to obtain a key-man insurance policy on Employee.    If the Company obtains such policy, it will maintain the policy at its expense and all proceeds will be the sole property of the Company.

9.    ARBITRATION.    The parties will attempt in good faith promptly by negotiations to resolve any dispute or controversy arising out of or relating to this Agreement or to the employment or termination of Employee by the Company.    If a party intends to be accompanied at a negotiation meeting by an attorney, the other party will be given at least three working days' notice of such intention and may also be accompanied by an attorney.    All negotiations pursuant to this clause are confidential and will be treated as compromise and settlement negotiations for purposes of the Federal Rules of Evidence and state rules of evidence.

In the event the parties are unable to settle such controversy amicably through negotiations, the dispute will be submitted to binding arbitration before a single arbitrator in accordance with the Employment Dispute Resolution Rules of the American Arbitration Association provided that:  (i) the arbitrator will be instructed and empowered to take whatever steps to expedite the arbitration as he or she deems reasonable; (ii) each party will bear its own costs in connection with the arbitration; provided that the costs of the arbitrator will be borne by the party who the arbitrator determines not to have prevailed in the matter; (iii) the arbitrator's judgment will be final and binding upon the parties, except that it may be challenged on the grounds of fraud or gross misconduct; (iv) except for damages arising out of a breach of Section 6.1 or of Article 7 above, the arbitrator is not empowered to award damages in excess of compensatory damages and each party hereby irrevocably waives any damages in excess of compensatory damages; and (v) the arbitration will be held in San Francisco, California.  Judgment upon any verdict in arbitration may be entered in any court of competent jurisdiction.  The parties hereby consent to the jurisdiction of, and proper venue in, the federal and state courts located in Tucson, Arizona.

Unless otherwise expressly set forth in this Agreement, the procedures specified in this Section 9 will be the sole and exclusive procedures for the resolution of disputes and controversies between the parties arising out of or relating to this Agreement; provided, however, that a party may seek a preliminary injunction or other provisional judicial relief if in its judgment such action is necessary to avoid irreparable damage or to preserve the status quo. Despite such action the parties will continue to participate in good faith in the procedures specified in this Section 9.

**The parties hereby waive any and all rights they may have to trial by jury as to any disputes arising out of this Agreement.**

10. MISCELLANEOUS.

10.1    Governing Law; Interpretation.    This Agreement will be governed by the substantive laws of the State of Virginia applicable to contracts entered into and fully performed in such jurisdiction.  The headings and captions of the Articles and Sections of this Agreement are for convenience only and in no way define, limit or extend the scope or intent of this Agreement or any provision hereof.  This Agreement will be construed as a whole, according to its fair meaning, and not in favor of or against any party, regardless of which party may have initially drafted certain provisions set forth herein.

10.2    Assignment.  This Agreement is personal to Employee and he may not assign any of her rights or delegate any of her obligations hereunder without first obtaining the prior written consent of the Chief Executive Officer of the Company.

10.3    Notices.  Any notice, request, claim or other communication required or permitted hereunder will be in writing and will be deemed to have been duly given if delivered by hand or if sent by certified mail, postage and certification prepaid, to Employee at her residence (as noted in the Company's records), or to the Company at its address as set forth below its signature on the signature page of this Agreement, or to such other address or addresses as either party may have furnished to the other in writing in accordance herewith.

10.4    Severability.  In the event any provision of this Agreement or the application of any such provision to either of the parties is held by a court of competent jurisdiction to be contrary to law, such provision will be deemed amended to the extent necessary to comply with such law, and the remaining provisions of this Agreement will remain in full force and effect.

10.5    Entire Agreement; Amendments.  This Agreement (together with the Stock Option Agreement and any other exhibits and attachments hereto) constitutes the final and complete expression of all of the terms of the understanding and agreement between the parties to this Agreement with respect to the subject matter hereof, and this Agreement replaces and

supersedes any and all prior or contemporaneous negotiations, communications, understandings, obligations, commitments, agreements or contracts, whether written or oral, between the parties respecting the subject matter hereof.  Except as provided in Section 10.4 above, this Agreement may not be modified, amended, altered or supplemented except by means of the execution and delivery of a written instrument mutually executed by both parties.

10.6  <u>Attorneys' Fees</u>.  In the event it becomes necessary for any party to initiate legal action or any other proceeding to enforce, defend or construe such party's rights or obligations under this Agreement, the prevailing party will be entitled to its reasonable costs and expenses, including attorneys' fees, incurred in connection with such action or proceeding.

[TEXT CONTINUED NEXT PAGE]

11. <u>Employee Acknowledgment</u>. Employee acknowledges that he has been given the opportunity to consult with legal counsel concerning the rights and obligations arising under this Agreement (including for purposes of this Section 11, the Stock Option Agreement), that he has read and understands each and every provision of this Agreement, and that he is fully aware of the legal effect and implications of this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

LOCAL MOTION ITS, INC.                          Janet Sue Davis:

By:_____                     _____

JON MONSON, CHIEF EXECUTIVE
OFFICER

<u>EMPLOYMENT AGREEMENT</u>

THIS EMPLOYMENT AGREEMENT ("**Agreement**") is made and entered into effective as of December 1, 2003 (the "**Effective Date**"), by and between LOCAL MOTION ITS, INC., a Virginia corporation (the "**Company**") and RYAN JAMES LARSEN ("**Employee**"), with reference to the following:

### BACKGROUND

The Company is in the public and paratransit contracting services, consulting, transportation brokerage and application service provider business, (the "**Business**").

Employee has extensive public transportation operation and technical experience.

The Company now desires to retain the full-time services of Employee as President of the Company and Employee is willing to be employed by the Company in that capacity on the terms and conditions set forth in this Agreement.

NOW THEREFORE, in consideration of the promises herein made and on the terms and subject to the conditions herein contained, the Company and Employee hereby agree as follows:

1.      EMPLOYMENT.  The Company hereby employs Employee on the terms set forth herein and Employee hereby accepts such employment, for a term beginning on the Effective Date and ending on November 30, 2005 (the "**Initial Term**"), unless sooner terminated pursuant to Section 5 below.  This Agreement will automatically renew for additional annual terms ("**Renewal Terms**") upon the expiration of the Initial Term, unless either party delivers a notice to the other party, on or before August 1, stating the party's election not to renew this Agreement for the Renewal Term commencing on the following December 1, provided that the foregoing will not affect the Company's rights to terminate this Agreement pursuant to Sections 5.3 or 5.4 below.

2.      DUTIES.  During the period of his employment with the Company hereunder, Employee will be employed as President of the Company and Employee will:

(a)  devote his full business time and attention, and give his best effort and skill solely to the Company's business affairs and interests;

(b)      perform such services and assume such duties and responsibilities appropriate to the positions of President and those which may

from time to time be reasonably assigned to him by the Chief Executive Officer of the Company, to whom Employee will directly report; and

(c)        in all respects use his best efforts to further, enhance and develop the Company's business affairs, interests and welfare.

3.    COMPENSATION.  In consideration of Employee's services to the Company during the term of this Agreement, Employee will receive the following compensation:

(a)  The Company shall pay Employee a base salary of $125,000 per annum during the period from the Effective Date through November 30, 2004.  Employee's base salary will be paid in equal installments (pro rated for portions of a pay period) on the Company's regular pay days and the Company will withhold from such compensation all applicable federal and state income, social security, disability and other taxes as required by applicable laws.  On December 1, 2004 and annually thereafter, provided this Agreement is extended by both parties, Employee's base salary shall be increased by the Company at its sole discretion after the Company assesses the performance of Employee.

(b)  The Employee and Company agree to negotiate in good faith a written bonus plan for Employee, payable annually, based on the performance of the Employee.

(c)  The Company shall grant Employee an option to acquire shares of Common Stock in the Company pursuant to the Restricted Stock Purchase Agreement, a copy of which is attached to this Agreement as **Exhibit A**.

4.  BENEFITS AND REIMBURSEMENTS.

4.1  Employee will, during the term hereof, have the right to receive such benefits as are generally made available to full-time executive officers of the Company.  In addition, or inclusive of such benefits, the Company will provide Employee with the following:

(a)    either (i) the Company's standard medical and dental plan insurance covering Employee and his immediate family, or (ii) upon Employee's election, a maximum of $400 per month allowance for private medical and dental insurance coverage for Employee and his immediate family, *provided that* Employee's election to receive such monthly insurance allowance will not preclude Employee from choosing to receive the coverage provided for in subsection (i), in lieu of such allowance, at a later date;

(b)    in addition to normal holidays recognized by the Company, Employee will be entitled to three weeks paid vacation annually, the earning of which is pro-rated monthly, subject to the consent of the Company as to the timing of such vacation time;

(c)    the Employee may choose to obtain a term life insurance policy on Employee's life at a face amount determined by Employee. The Company shall reimburse employee for that portion of the premium that is attributable to 2 times the employee's base annual salary as listed in 3(a) and amended from time to time.  For example, if employee selects a life insurance policy in the amount of 4 times his annual salary, then Company shall reimburse Employee for 50% of the annual premium.  It shall be Employee's sole responsibility to and option to place said life insurance policy, and Company shall have no responsibility for Employee's failure or choice to do so, or for any lapse in coverage due to any event.  Company's sole obligation under this section shall be to reimburse Employee for premiums paid, if any.

4.2    The Company will reimburse Employee for travel and other out-of-pocket expenses reasonably incurred by Employee in the performance of his duties hereunder, provided that all such expenses will be reimbursed only (i) upon the presentation by Employee to the Company of such documentation as may be reasonably necessary to substantiate that all such expenses were incurred in the performance of his duties, and (ii) if such expenses are consistent with all policies of the Company in effect from time to time as to the kind and amount of such expenses and (iii) the cost of all other reasonable expenses, including without limitation, telephone and cellular phone expenses, DSL Internet Access costs related to the preparation and dissemination of proposals, and costs incurred to entertain clients or prospective clients.

5. TERMINATION OF EMPLOYMENT.

5.1   Death of Employee.  This Agreement will terminate upon the death of Employee.

5.2   Permanent Disability of Employee.   This Agreement will terminate if Employee becomes permanently disabled.  Employee will be deemed permanently disabled for the purpose of this Agreement if Employee becomes physically or mentally incapable of performing his duties hereunder for a continuous period of one hundred eighty (180) days, in which event Employee will be deemed permanently disabled upon the expiration of such one hundred eighty (180) day period.

5.3   Employee's Discharge for Cause.  The Company will have the right to terminate Employee's employment hereunder for "Cause" at any time effective upon its giving of written notice setting forth with particularity the facts and circumstances constituting such Cause. For such purposes, "**Cause**" means the occurrence of one or more of the following:  (i) the commission by Employee of any fraudulent, criminal or illegal act, or any act of fraud, embezzlement, theft, bad faith, gross negligence, recklessness or willful misconduct; (ii) gross incompetence or repeated material failure or refusal to perform the duties required by this Agreement and as may be reasonably assigned to Employee by

the Chief Executive Officer or Board of Directors from time to time; (iii) conviction of a felony or of any crime of moral turpitude; (iv) any material misrepresentation by Employee to the Company regarding the operation of the business; or (v) breach of any covenant of this Agreement.

   5.4 <u>The Company's Right to Terminate At Will</u>. Subject to the payment to Employee of the severance payments as provided in Section 5.5(b) below, the Company will have the right, exercisable at any time, to terminate Employee's employment with the Company without "Cause" (as defined in Section 5.3 above), immediately upon written notice to Employee.

  5.5 <u>Compensation Upon Termination</u>.

   (a) Upon termination of Employee's employment pursuant to this Article 5.1-5.3, Employee will be entitled to only:  (i) the compensation provided for in Section 3(a) hereof for the period of time ending with the date of termination; (ii) "COBRA" benefits to the extent required by applicable law; and (iii) reimbursement for such expenses as Employee may have properly incurred on behalf of the Company as provided in Article 4 above prior to the date of termination.

   (b) If the Company terminates Employee's employment pursuant to Section 5.4 above only, in addition to the amounts payable in Section 5.5 (a) above, Employee will be entitled to receive a severance payment in an amount equal to the remaining salary that would have been paid to Employee during the remainder of his term of employment in the absence of such termination, as provided in Section 3(a) above, regardless of whether provided that such termination occurs during the Initial Term or during a Renewal term.  In the event such termination occurs in during a Renewal term, Employee will be entitled to receive a severance payment in an amount equal to four months salary at the rate as provided in Section 3(a) above or the rate then in effect at the time of termination, whichever is greater.

   (c) The termination of Employee pursuant to Section 5.4 shall not affect Employee's rights as set forth in either 1)  the "Local Motion ITS, Inc. 2003 Stock Option Plan" or 2)  the "Stock Option Agreement under the Local Motion ITS, Inc. 2003 Stock Option Plan", which are Schedules 2.8(a) and 2.8(b), respectively, of that certain "Share Purchase Agreement of even date herewith, to which Local Motion ITS, Inc. is also designated as the "Company".

   (d) The payments set forth in this Section 5.5 will fully discharge all responsibilities of the Company to Employee under this Agreement or relating to or arising out of the termination of Employee's employment and shall be conditioned upon Employee's execution of a Release Agreement with the Company in substantially the form attached hereto as **Exhibit B**.

6. UNFAIR COMPETITION BY EMPLOYEE.

6.1    Employee agrees that all trade secrets, confidential or proprietary information with respect to the activities and businesses of the Company, including, without limitation, personnel information, secret processes, know-how, customer lists, employee lists, data bases, ideas, techniques, processes, inventions (whether patentable or not), and other technical plans, business plans, marketing plans, product plans, forecasts, contacts, strategies and information (collectively "**Proprietary Information**") which were learned by Employee in the course of his employment by the Company, and any other Proprietary Information received, developed or learned by Employee hereafter in the course of his future employment by or in association with the Company, are confidential and will be kept and held in confidence and trust as a fiduciary by Employee.    Employee will not use or disclose Proprietary Information of the Company except as necessary in the normal course of the business of the Company for its sole and exclusive benefit, unless Employee is compelled so to disclose under process of law, in which case Employee will first notify the Company promptly after receipt of a demand to so disclose, and will afford the Company the opportunity to contest, prevent or limit such disclosure.

6.2    Employee and the Company acknowledge that:    (i) each covenant and restriction contained in Section 6.1 and Article 7 of this Agreement is necessary, fundamental, and required for the protection of the Company's business; (ii) such relate to matters which are of a special, unique, and extraordinary character that gives each of them a special, unique, and extraordinary value; and (iii) a breach of any such covenant or restriction will result in irreparable harm and damage to the Company which cannot be compensated adequately by a monetary award.    Accordingly, it is expressly agreed that, in addition to all other remedies available at law or in equity, and notwithstanding anything to the contrary in Section 9 below, the Company will be entitled to the immediate remedy of a temporary restraining order, preliminary injunction, or such other form of injunctive or equitable relief as may be used by any court of competent jurisdiction to restrain or enjoin any of the parties to this Agreement from breaching any such covenant or restriction, or otherwise specifically to enforce the provisions contained in Section 6.1 and Article 7 of this Agreement.

7.    PROPRIETARY MATTERS.    Employee expressly understands and agrees that any and all improvements, inventions, discoveries, processes, or know-how related to the business of the Company that are generated or conceived by Employee during the term of this Agreement, whether so generated or conceived during Employee's regular working hours or otherwise, will be the sole and exclusive property of the Company, and Employee will, whenever requested to do so by the Company (either during the term of this Agreement or thereafter), execute and assign any and all applications, assignments and/or other instruments and do all things which the Company may deem necessary

or appropriate in order to apply for, obtain, maintain, enforce and defend patents, copyrights, trade names or trademarks of the United States or of foreign countries for said improvements, inventions, discoveries, processes, or know-how, or in order to assign and convey or otherwise make available to the Company the sole and exclusive right, title, and interest in and to said improvements, inventions, discoveries, processes, know-how, applications, patents, copyrights, trade names or trademarks.

8.      KEY-MAN INSURANCE.  Employee agrees to make himself available and to undergo, at the Company's request and expense, any physical examination or other procedure necessary to allow the Company to obtain a key-man insurance policy on Employee.  If the Company obtains such policy, it will maintain the policy at its expense and all proceeds will be the sole property of the Company.

9.      ARBITRATION.    The parties will attempt in good faith promptly by negotiations to resolve any dispute or controversy arising out of or relating to this Agreement or to the employment or termination of Employee by the Company.  If a party intends to be accompanied at a negotiation meeting by an attorney, the other party will be given at least three working days' notice of such intention and may also be accompanied by an attorney.   All negotiations pursuant to this clause are confidential and will be treated as compromise and settlement negotiations for purposes of the Federal Rules of Evidence and state rules of evidence.

In the event the parties are unable to settle such controversy amicably through negotiations, the dispute will be submitted to binding arbitration before a single arbitrator in accordance with the Employment Dispute Resolution Rules of the American Arbitration Association provided that:  (i) the arbitrator will be instructed and empowered to take whatever steps to expedite the arbitration as he or she deems reasonable;  (ii) each party will bear its own costs in connection with the arbitration; provided that the costs of the arbitrator will be borne by the party who the arbitrator determines not to have prevailed in the matter; (iii) the arbitrator's judgment will be final and binding upon the parties, except that it may be challenged on the grounds of fraud or gross misconduct; (iv) except for damages arising out of a breach of Section 6.1 or of Article 7 above, the arbitrator is not empowered to award damages in excess of compensatory damages and each party hereby irrevocably waives any damages in excess of compensatory damages; and (v) the arbitration will be held in San Francisco, California.  Judgment upon any verdict in arbitration may be entered in any court of competent jurisdiction.    The parties hereby consent to the jurisdiction of, and proper venue in, the federal and state courts located in Tucson, Arizona.

Unless otherwise expressly set forth in this Agreement, the procedures specified in this Section 9 will be the sole and exclusive procedures for the resolution of disputes and controversies between the parties arising out of or

relating to this Agreement; provided, however, that a party may seek a preliminary injunction or other provisional judicial relief if in its judgment such action is necessary to avoid irreparable damage or to preserve the status quo. Despite such action the parties will continue to participate in good faith in the procedures specified in this Section 9.

**The parties hereby waive any and all rights they may have to trial by jury as to any disputes arising out of this Agreement.**

10. M<small>ISCELLANEOUS</small>.

10.1   <u>Governing Law; Interpretation</u>.   This Agreement will be governed by the substantive laws of the State of Virginia applicable to contracts entered into and fully performed in such jurisdiction. The headings and captions of the Articles and Sections of this Agreement are for convenience only and in no way define, limit or extend the scope or intent of this Agreement or any provision hereof.   This Agreement will be construed as a whole, according to its fair meaning, and not in favor of or against any party, regardless of which party may have initially drafted certain provisions set forth herein.

10.2   <u>Assignment</u>.   This Agreement is personal to Employee and he may not assign any of his rights or delegate any of his obligations hereunder without first obtaining the prior written consent of the Chief Executive Officer of the Company.

10.3   <u>Notices</u>.   Any notice, request, claim or other communication required or permitted hereunder will be in writing and will be deemed to have been duly given if delivered by hand or if sent by certified mail, postage and certification prepaid, to Employee at his residence (as noted in the Company's records), or to the Company at its address as set forth below its signature on the signature page of this Agreement, or to such other address or addresses as either party may have furnished to the other in writing in accordance herewith.

10.4   <u>Severability</u>.   In the event any provision of this Agreement or the application of any such provision to either of the parties is held by a court of competent jurisdiction to be contrary to law, such provision will be deemed amended to the extent necessary to comply with such law, and the remaining provisions of this Agreement will remain in full force and effect.

10.5   <u>Entire Agreement; Amendments</u>.   This Agreement (together with the Stock Option Agreement and any other exhibits and attachments hereto) constitutes the final and complete expression of all of the terms of the understanding and agreement between the parties to this Agreement with respect to the subject matter hereof, and this Agreement replaces and supersedes any and all prior or contemporaneous negotiations, communications, understandings, obligations, commitments, agreements or contracts, whether written or oral, between the parties respecting the subject matter hereof. Except

as provided in Section 10.4 above, this Agreement may not be modified, amended, altered or supplemented except by means of the execution and delivery of a written instrument mutually executed by both parties.

10.6 <u>Attorneys' Fees</u>.  In the event it becomes necessary for any party to initiate legal action or any other proceeding to enforce, defend or construe such party's rights or obligations under this Agreement, the prevailing party will be entitled to its reasonable costs and expenses, including attorneys' fees, incurred in connection with such action or proceeding.

[TEXT CONTINUED NEXT PAGE]

11. <u>Employee Acknowledgment</u>.  Employee acknowledges that he has been given the opportunity to consult with legal counsel concerning the rights and obligations arising under this Agreement (including for purposes of this Section 11, the Stock Option Agreement), that he has read and understands each and every provision of this Agreement, and that he is fully aware of the legal effect and implications of this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

LOCAL MOTION ITS, INC.

By: _____
JON MONSON, CHIEF EXECUTIVE OFFICER

Ryan James Larsen:

_____

<u>EMPLOYMENT AGREEMENT</u>

THIS EMPLOYMENT AGREEMENT ("**Agreement**") is made and entered into effective as of December 1, 2003 (the "**Effective Date**"), by and between LOCAL MOTION ITS, INC., a Virginia corporation (the "**Company**") and MARSHA LOUISE MADRID ("**Employee**"), with reference to the following:

**B A C K G R O U N D**

The Company is in the public and paratransit contracting services, consulting, transportation brokerage and application service provider business, (the "**Business**").

Employee has extensive public transportation operation and technical experience.

The Company now desires to retain the full-time services of Employee as Vice President of the Company and Employee is willing to be employed by the Company in that capacity on the terms and conditions set forth in this Agreement.

NOW THEREFORE, in consideration of the promises herein made and on the terms and subject to the conditions herein contained, the Company and Employee hereby agree as follows:

1.    <u>EMPLOYMENT</u>.   The Company hereby employs Employee on the terms set forth herein and Employee hereby accepts such employment, for a term beginning on the Effective Date and ending on November 30, 2005 (the "**Initial Term**"), unless sooner terminated pursuant to Section 5 below.   This Agreement will automatically renew for additional annual terms ("**Renewal Terms**") upon the expiration of the Initial Term, unless either party delivers a notice to the other party, on or before August 1, stating the party's election not to renew this Agreement for the Renewal Term commencing on the following December 1, provided that the foregoing will not affect the Company's rights to terminate this Agreement pursuant to Sections 5.3 or 5.4 below.

2.    <u>DUTIES</u>.   During the period of her employment with the Company hereunder, Employee will be employed as Vice President of the Company and Employee will:

(a)   devote her business time and attention for a minimum of eight days per month, and give her best effort and skill to the Company's business affairs and interests during these work days;

(b)   perform such services and assume such duties and responsibilities appropriate to the positions of Vice President and those which

may from time to time be reasonably assigned to him by the President of the Company, to whom Employee will directly report; and

(c)        in all respects use her best efforts to further, enhance and develop the Company's business affairs, interests and welfare.

3.    COMPENSATION.    In consideration of Employee's services to the Company during the term of this Agreement, Employee will receive the following compensation:

(a)  The Company shall pay Employee a base salary of $80,000 per annum during the period from the Effective Date through November 30, 2004. Employee's base salary will be paid in equal installments (pro rated for portions of a pay period) on the Company's regular pay days and the Company will withhold from such compensation all applicable federal and state income, social security, disability and other taxes as required by applicable laws.  On December 1, 2004 and annually thereafter, provided this Agreement is extended by both parties, Employee's base salary shall be increased by the Company at its sole discretion after the Company assesses the performance of Employee.

(b)  The Employee and Company agree to negotiate in good faith a written bonus plan for Employee, payable annually, based on the performance of the Employee.

(c)  The Company shall grant Employee an option to acquire shares of Common Stock in the Company pursuant to the Restricted Stock Purchase Agreement, a copy of which is attached to this Agreement as **Exhibit A**.

4.  BENEFITS AND REIMBURSEMENTS.

4.1  Employee will, during the term hereof, have the right to receive such benefits as are generally made available to full-time executive officers of the Company.  In addition, or inclusive of such benefits, the Company will provide Employee with the following:

(a)    either (i) the Company's standard medical and dental plan insurance covering Employee and her immediate family, or (ii) upon Employee's election, a maximum of $400 per month allowance for private medical and dental insurance coverage for Employee and her immediate family, *provided that* Employee's election to receive such monthly insurance allowance will not preclude Employee from choosing to receive the coverage provided for in subsection (i), in lieu of such allowance, at a later date;

(b)        the Employee may choose to obtain a term life insurance policy on Employee's life at a face amount determined by Employee.  The Company shall reimburse employee for that portion of the premium that is attributable to 2 times the employee's base annual salary as listed in 3(a) and amended from time to time.  For example, if employee selects a life

insurance policy in the amount of 4 times her annual salary, then Company shall reimburse Employee for 50% of the annual premium.  It shall be Employee's sole responsibility to and option to place said life insurance policy, and Company shall have no responsibility for Employee's failure or choice to do so, or for any lapse in coverage due to any event.  Company's sole obligation under this section shall be to reimburse Employee for premiums paid, if any.

        4.2  The Company will reimburse Employee for travel and other out-of-pocket expenses reasonably incurred by Employee in the performance of her duties hereunder, provided that all such expenses will be reimbursed only (i) upon the presentation by Employee to the Company of such documentation as may be reasonably necessary to substantiate that all such expenses were incurred in the performance of her duties, and (ii) if such expenses are consistent with all policies of the Company in effect from time to time as to the kind and amount of such expenses and (iii) the cost of all other reasonable expenses, including without limitation, telephone and cellular phone expenses, DSL Internet Access costs related to the preparation and dissemination of proposals, and costs incurred to entertain clients or prospective clients.

5. TERMINATION OF EMPLOYMENT.

        5.1  Death of Employee.  This Agreement will terminate upon the death of Employee.

        5.2  Permanent Disability of Employee.  This Agreement will terminate if Employee becomes permanently disabled.  Employee will be deemed permanently disabled for the purpose of this Agreement if Employee becomes physically or mentally incapable of performing her duties hereunder for a continuous period of one hundred eighty (180) days, in which event Employee will be deemed permanently disabled upon the expiration of such one hundred eighty (180) day period.

        5.3  Employee's Discharge for Cause.  The Company will have the right to terminate Employee's employment hereunder for "Cause" at any time effective upon its giving of written notice setting forth with particularity the facts and circumstances constituting such Cause.  For such purposes, "**Cause**" means the occurrence of one or more of the following:  (i) the commission by Employee of any fraudulent, criminal or illegal act, or any act of fraud, embezzlement, theft, bad faith, gross negligence, recklessness or willful misconduct; (ii) gross incompetence or repeated material failure or refusal to perform the duties required by this Agreement and as may be reasonably assigned to Employee by the Chief Executive Officer or Board of Directors from time to time; (iii) conviction of a felony or of any crime of moral turpitude; (iv) any material misrepresentation by Employee to the Company regarding the operation of the business; or (v) breach of any covenant of this Agreement.

5.4  <u>The Company's Right to Terminate At Will</u>.  Subject to the payment to Employee of the severance payments as provided in Section 5.5(b) below, the Company will have the right, exercisable at any time, to terminate Employee's employment with the Company without "Cause" (as defined in Section 5.3 above), immediately upon written notice to Employee.

5.5  <u>Compensation Upon Termination</u>.

(a)  Upon termination of Employee's employment pursuant to this Article 5.1-5.3, Employee will be entitled to only:  (i) the compensation provided for in Section 3(a) hereof for the period of time ending with the date of termination; (ii) "COBRA" benefits to the extent required by applicable law; and (iii) reimbursement for such expenses as Employee may have properly incurred on behalf of the Company as provided in Article 4 above prior to the date of termination.

(b)  If the Company terminates Employee's employment pursuant to Section 5.4 above only, in addition to the amounts payable in Section 5.5 (a) above, Employee will be entitled to receive a severance payment in an amount equal to the remaining salary that would have been paid to Employee during the remainder of her term of employment in the absence of such termination, as provided in Section 3(a) above, regardless of whether provided that such termination occurs during the Initial Term or during a Renewal term.  In the event such termination occurs in during a Renewal term, Employee will be entitled to receive a severance payment in an amount equal to four months salary at the rate as provided in Section 3(a) above or the rate then in effect at the time of termination, whichever is greater.

(c)  The termination of Employee pursuant to Section 5.4 shall not affect Employee's rights as set forth in either 1)  the "Local Motion ITS, Inc. 2003 Stock Option Plan" or 2)  the "Stock Option Agreement under the Local Motion ITS, Inc. 2003 Stock Option Plan", which are Schedules 2.8(a) and 2.8(b), respectively, of that certain "Share Purchase Agreement of even date herewith, to which Local Motion ITS, Inc. is also designated as the "Company".

(d)  The payments set forth in this Section 5.5 will fully discharge all responsibilities of the Company to Employee under this Agreement or relating to or arising out of the termination of Employee's employment and shall be conditioned upon Employee's execution of a Release Agreement with the Company in substantially the form attached hereto as **Exhibit B**.

6. UNFAIR COMPETITION BY EMPLOYEE.

6.1    Employee agrees that all trade secrets, confidential or proprietary information with respect to the activities and businesses of the Company, including, without limitation, personnel information, secret processes, know-how, customer lists, employee lists, data bases, ideas, techniques, processes, inventions (whether patentable or not), and other technical plans, business plans, marketing plans, product plans, forecasts, contacts, strategies and information (collectively "**Proprietary Information**") which were learned by Employee in the course of her employment by the Company, and any other Proprietary Information received, developed or learned by Employee hereafter in the course of her future employment by or in association with the Company, are confidential and will be kept and held in confidence and trust as a fiduciary by Employee.   Employee will not use or disclose Proprietary Information of the Company except as necessary in the normal course of the business of the Company for its sole and exclusive benefit, unless Employee is compelled so to disclose under process of law, in which case Employee will first notify the Company promptly after receipt of a demand to so disclose, and will afford the Company the opportunity to contest, prevent or limit such disclosure.

6.2    Employee and the Company acknowledge that:   (i) each covenant and restriction contained in Section 6.1 and Article 7 of this Agreement is necessary, fundamental, and required for the protection of the Company's business; (ii) such relate to matters which are of a special, unique, and extraordinary character that gives each of them a special, unique, and extraordinary value; and (iii) a breach of any such covenant or restriction will result in irreparable harm and damage to the Company which cannot be compensated adequately by a monetary award.   Accordingly, it is expressly agreed that, in addition to all other remedies available at law or in equity, and notwithstanding anything to the contrary in Section 9 below, the Company will be entitled to the immediate remedy of a temporary restraining order, preliminary injunction, or such other form of injunctive or equitable relief as may be used by any court of competent jurisdiction to restrain or enjoin any of the parties to this Agreement from breaching any such covenant or restriction, or otherwise specifically to enforce the provisions contained in Section 6.1 and Article 7 of this Agreement.

7.    PROPRIETARY MATTERS.  Employee expressly understands and agrees that any and all improvements, inventions, discoveries, processes, or know-how related to the business of the Company that are generated or conceived by Employee during the term of this Agreement, in the normal course of doing business for the Company,, whether so generated or conceived during Employee's regular working hours or otherwise, will be the sole and exclusive property of the Company, and Employee will, whenever requested to do so by the Company (either during the term of this Agreement or thereafter), execute and assign any and all applications, assignments and/or other instruments and do all things which the Company may deem necessary or appropriate in order to

apply for, obtain, maintain, enforce and defend patents, copyrights, trade names or trademarks of the United States or of foreign countries for said improvements, inventions, discoveries, processes, or know-how, or in order to assign and convey or otherwise make available to the Company the sole and exclusive right, title, and interest in and to said improvements, inventions, discoveries, processes, know-how, applications, patents, copyrights, trade names or trademarks.

This Section 7 shall not be construed to prohibit Employee from engaging in business unrelated to Company or its affiliates not in the public transportation field.  The Company shall have no proprietary interest in any improvements, inventions, discoveries, processes, or know-how developed by Employee not related to passenger transportation services business.

    8.    KEY-MAN INSURANCE.  Employee agrees to make herself available and to undergo, at the Company's request and expense, any physical examination or other procedure necessary to allow the Company to obtain a key-man insurance policy on Employee.  If the Company obtains such policy, it will maintain the policy at its expense and all proceeds will be the sole property of the Company.

    9.    ARBITRATION.  The parties will attempt in good faith promptly by negotiations to resolve any dispute or controversy arising out of or relating to this Agreement or to the employment or termination of Employee by the Company.  If a party intends to be accompanied at a negotiation meeting by an attorney, the other party will be given at least three working days' notice of such intention and may also be accompanied by an attorney.  All negotiations pursuant to this clause are confidential and will be treated as compromise and settlement negotiations for purposes of the Federal Rules of Evidence and state rules of evidence.

    In the event the parties are unable to settle such controversy amicably through negotiations, the dispute will be submitted to binding arbitration before a single arbitrator in accordance with the Employment Dispute Resolution Rules of the American Arbitration Association provided that:  (i) the arbitrator will be instructed and empowered to take whatever steps to expedite the arbitration as he or she deems reasonable; (ii) each party will bear its own costs in connection with the arbitration; provided that the costs of the arbitrator will be borne by the party who the arbitrator determines not to have prevailed in the matter; (iii) the arbitrator's judgment will be final and binding upon the parties, except that it may be challenged on the grounds of fraud or gross misconduct; (iv) except for damages arising out of a breach of Section 6.1 or of Article 7 above, the arbitrator is not empowered to award damages in excess of compensatory damages and each party hereby irrevocably waives any damages in excess of compensatory damages; and (v) the arbitration will be held in San Francisco, California.  Judgment upon any verdict in arbitration may be entered in any court of competent jurisdiction.  The parties hereby consent to the

jurisdiction of, and proper venue in, the federal and state courts located in Tucson, Arizona.

Unless otherwise expressly set forth in this Agreement, the procedures specified in this Section 9 will be the sole and exclusive procedures for the resolution of disputes and controversies between the parties arising out of or relating to this Agreement; provided, however, that a party may seek a preliminary injunction or other provisional judicial relief if in its judgment such action is necessary to avoid irreparable damage or to preserve the status quo. Despite such action the parties will continue to participate in good faith in the procedures specified in this Section 9.

**The parties hereby waive any and all rights they may have to trial by jury as to any disputes arising out of this Agreement.**

10. MISCELLANEOUS.

10.1    Governing Law; Interpretation.    This Agreement will be governed by the substantive laws of the State of Virginia applicable to contracts entered into and fully performed in such jurisdiction.  The headings and captions of the Articles and Sections of this Agreement are for convenience only and in no way define, limit or extend the scope or intent of this Agreement or any provision hereof.  This Agreement will be construed as a whole, according to its fair meaning, and not in favor of or against any party, regardless of which party may have initially drafted certain provisions set forth herein.

10.2    Assignment.    This Agreement is personal to Employee and he may not assign any of her rights or delegate any of her obligations hereunder without first obtaining the prior written consent of the Chief Executive Officer of the Company.

10.3    Notices.    Any notice, request, claim or other communication required or permitted hereunder will be in writing and will be deemed to have been duly given if delivered by hand or if sent by certified mail, postage and certification prepaid, to Employee at her residence (as noted in the Company's records), or to the Company at its address as set forth below its signature on the signature page of this Agreement, or to such other address or addresses as either party may have furnished to the other in writing in accordance herewith.

10.4    Severability.    In the event any provision of this Agreement or the application of any such provision to either of the parties is held by a court of competent jurisdiction to be contrary to law, such provision will be deemed amended to the extent necessary to comply with such law, and the remaining provisions of this Agreement will remain in full force and effect.

10.5    Entire Agreement; Amendments.    This Agreement (together with the Stock Option Agreement and any other exhibits and attachments hereto) constitutes the final and complete expression of all of the terms of the

understanding and agreement between the parties to this Agreement with respect to the subject matter hereof, and this Agreement replaces and supersedes any and all prior or contemporaneous negotiations, communications, understandings, obligations, commitments, agreements or contracts, whether written or oral, between the parties respecting the subject matter hereof. Except as provided in Section 10.4 above, this Agreement may not be modified, amended, altered or supplemented except by means of the execution and delivery of a written instrument mutually executed by both parties.

       10.6  <u>Attorneys' Fees</u>. In the event it becomes necessary for any party to initiate legal action or any other proceeding to enforce, defend or construe such party's rights or obligations under this Agreement, the prevailing party will be entitled to its reasonable costs and expenses, including attorneys' fees, incurred in connection with such action or proceeding.

[TEXT CONTINUED NEXT PAGE]

11. <u>Employee Acknowledgment</u>.  Employee acknowledges that he has been given the opportunity to consult with legal counsel concerning the rights and obligations arising under this Agreement (including for purposes of this Section 11, the Stock Option Agreement), that he has read and understands each and every provision of this Agreement, and that he is fully aware of the legal effect and implications of this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

LOCAL MOTION ITS, INC.

By: _____
JON MONSON, CHIEF EXECUTIVE
OFFICER

Marsha Louise Madrid:

_Marsla Louise Madrid_ 11/30/03

# SCHEDULE 4.1(I)

**Schedule 4.1(l)**

**Encumbrances to be Discharged**

The following Encumbrances shall be discharged by Sellers and Company concurrent with Closing and shall be funded from the proceeds paid by Purchaser to the Sellers:

| | |
|---|---:|
| Note Payable to Marsha Louise Madrid | $24,000.00 |
| Note Payable to Janet Davis Note | $5,000.00 |
| Note Payable to Kevin Dresser Note | $110,600.00 |
| Note Payable to Ryan Larsen Note | $26,900.00 |

The above Notes shall be paid in full at closing by Purchaser.

The Noteholders certify that upon receipt of payment of the above amounts, the Company will have discharged any and all obligations under the Notes, including principal, interest, fees and all other expenses and that all obligations of the Company with respect to the Notes have been fulfilled.

"NOTEHOLDERS"

RYAN J. LARSEN

MARSHA L. MADRID

KEVIN J. DRESSER

JANET S. DAVIS

## Schedule 4.1(l)

## Encumbrances to be Discharged

The following Encumbrances shall be discharged by Sellers and Company concurrent with Closing and shall be funded from the proceeds paid by Purchaser to the Sellers:

| | |
|---|---|
| Note Payable to Marsha Louise Madrid | $24,000.00 |
| Note Payable to Janet Davis Note | $5,000.00 |
| Note Payable to Kevin Dresser Note | $110,600.00 |
| Note Payable to Ryan Larsen Note | $26,900.00 |

The above Notes shall be paid in full at closing by Purchaser.

The Noteholders certify that upon receipt of payment of the above amounts, the Company will have discharged any and all obligations under the Notes, including principal, interest, fees and all other expenses and that all obligations of the Company with respect to the Notes have been fulfilled.

"NOTEHOLDERS"

_____
RYAN J. LARSEN

*Marsha L Madrid* 11/30/03
MARSHA L. MADRID

_____
KEVIN J. DRESSER

_____
JANET S. DAVIS

**Schedule 4.1(l)**

**Encumbrances to be Discharged**

The following Encumbrances shall be discharged by Sellers and Company concurrent with Closing and shall be funded from the proceeds paid by Purchaser to the Sellers:

| | |
|---|---|
| Note Payable to Marsha Louise Madrid | $24,000.00 |
| Note Payable to Janet Davis Note | $5,000.00 |
| Note Payable to Kevin Dresser Note | $110,600.00 |
| Note Payable to Ryan Larsen Note | $26,900.00 |

The above Notes shall be paid in full at closing by Purchaser.

The Noteholders certify that upon receipt of payment of the above amounts, the Company will have discharged any and all obligations under the Notes, including principal, interest, fees and all other expenses and that all obligations of the Company with respect to the Notes have been fulfilled.

"NOTEHOLDERS"

_____
RYAN J. LARSEN

_____
MARSHA L. MADRID

_____
KEVIN J. DRESSER

_____
JANET S. DAVIS

## Schedule 4.1(l)

### Encumbrances to be Discharged

The following Encumbrances shall be discharged by Sellers and Company concurrent with Closing and shall be funded from the proceeds paid by Purchaser to the Sellers:

| | |
|---|---|
| Note Payable to Marsha Louise Madrid | $24,000.00 |
| Note Payable to Janet Davis Note | $5,000.00 |
| Note Payable to Kevin Dresser Note | $110,600.00 |
| Note Payable to Ryan Larsen Note | $26,900.00 |

The above Notes shall be paid in full at closing by Purchaser.

The Noteholders certify that upon receipt of payment of the above amounts, the Company will have discharged any and all obligations under the Notes, including principal, interest, fees and all other expenses and that all obligations of the Company with respect to the Notes have been fulfilled.

"NOTEHOLDERS"


RYAN J. LARSEN


MARSHA L. MADRID


KEVIN J. DRESSER


JANET S. DAVIS